UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| ROBERT JURADO, | Case No.: 08cv1400 JLS (JMA) |
|---|---|

ROBERT JURADO,

Petitioner,

v.

RON DAVIS, Warden of San Quentin State Prison,

Respondent.

Case No.: 08cv1400 JLS (JMA)

**DEATH PENALTY CASE**

**ORDER:**

**(1) DENYING PETITIONER'S REQUEST FOR EVIDENTIARY DEVELOPMENT, DISCOVERY AND/OR EVIDENTIARY HEARING AND**

**(2) DENYING HABEAS RELIEF ON CLAIMS 2-4, 7-13, 15-32, 35-42, 44, AND 46-48 IN THE SECOND AMENDED PETITION**

Presently before the Court are the remaining claims in the Second Amended Petition ["SAP"], namely Claims 2-4, 7-13, 15-32, 35-42, 44, and 46-48; Claims 1, 5-6, 14, 33-34, 43 and 45 were previously adjudicated in the Group One Order. (See ECF No. 171.) Petitioner has filed a Group Two Merits Brief ["Pet. Br."], providing additional briefing on Claims 2-4, 7-8, 10-12, 19, 29-30, 38 and 47-48 in the SAP and requesting evidentiary

1

development and/or an evidentiary hearing. (ECF No. 182.) Respondent filed a Response ["Resp."] to Petitioner's Group Two Merits Brief, and Petitioner has filed a Reply ["Reply"]. (ECF Nos. 187, 194.) The Court held oral arguments on May 22, 2018. Subsequent to oral arguments and pursuant to the Court's request, Petitioner filed a Supplemental Brief on June 5, 2018, outlining the claims on which Petitioner requests a COA. (ECF No. 205.) On June 19, 2018, Respondent filed a Response to Petitioner's Supplemental Brief. (ECF No. 206.)

For the following reasons, based on the arguments presented in the pleadings, including relevant portions of the SAP, Answer ["Ans."], and Memorandum of Points and Authorities in Support of the Answer ["Ans. Mem."], as well as at oral argument and in the supplemental briefs, the Court **DENIES** Petitioner's request for evidentiary development, discovery, and/or an evidentiary hearing on Claims 2-4, 7-8, 10-12, 19, 29-30, 38, and 47-48 and **DENIES** habeas relief on Claims 2-4, 7-13, 15-32, 35-42, 44, and 46-48 in the SAP.

## I. PROCEDURAL HISTORY

By an Amended Information filed on October 11, 1991, Petitioner Robert Jurado and co-defendants Denise Shigemura and Anna Humiston were charged with first-degree murder and conspiracy to commit murder in the death of Teresa Holloway. (CT 49-51.) Petitioner was tried separately from his co-defendants.

Petitioner was convicted on May 23, 1994, of one count of first-degree murder pursuant to California Penal Code § 187 and one count of conspiracy to commit murder pursuant to California Penal Code §§ 182 and 187. (CT 1656-58.) The jury found that Petitioner used a deadly and dangerous weapon to commit the murder. (CT 1658.) The jury also found true the special circumstance allegation that the murder was committed while lying in wait under California Penal Code § 190.2(a)(15). (CT 1659.) On June 14, 1994, the jury returned a sentence of death. (CT 1676.) On October 7, 1994, the trial court denied Petitioner's motions for a new trial, to set aside the special circumstance finding, and for modification of the verdicts, and sentenced him to death. (CT 1682-83.)

08cv1400

On automatic appeal (hereinafter "direct appeal") of this conviction and judgment to the California Supreme Court, Petitioner filed an opening brief on July 9, 2003, raising twenty-six (26) claims for relief. (Lodgment No. 72.) Petitioner also filed a reply brief on February 15, 2005. (Lodgment No. 74.) The California Supreme Court affirmed Petitioner's conviction and sentence in a decision issued on April 6, 2006. People v. Jurado, 38 Cal. 4th 72 (2006). On October 10, 2006, the Supreme Court of the United States denied his petition for a writ of certiorari. Jurado v. California, 549 U.S. 956 (2006). On August 11, 2005, while his direct appeal was pending, Petitioner filed a habeas petition with the California Supreme Court, raising thirty-two (32) claims for relief. (Lodgment No. 76.) Petitioner also filed a reply brief on July 9, 2007. (Lodgment No. 78.) The petition was denied on July 23, 2008, without an evidentiary hearing. (Lodgment No. 79.)

On July 31, 2008, Petitioner filed motions for the appointment of counsel and for a stay of execution with this Court. (ECF No. 1.) On August 6, 2008, the Court granted Petitioner's motions and referred the matter to the Selection Board for the suggestion of one or more attorneys to represent Petitioner on federal habeas review, and appointed counsel on June 23, 2009. (ECF Nos. 2, 23.) On July 18, 2009, Petitioner filed a Protective Petition for a Writ of Habeas Corpus. (ECF No. 42.) After hearing and adjudicating Petitioner's request for equitable tolling, Petitioner filed an Amended Petition and accompanying exhibits on February 22, 2010. (ECF Nos. 73, 74.) On March 9, 2010, the parties submitted a joint statement regarding exhausted claims and a joint stipulation to stay the federal proceedings and hold the case in abeyance pending the exhaustion of those claims. (ECF No. 78.) On March 10, 2010, the Court granted a stay of the federal proceedings. (ECF No. 79.)

On January 16, 2013, the California Supreme Court denied Petitioner's state exhaustion petition. (Lodgment No. 91.) On February 14, 2013, Petitioner filed the Second Amended Petition, the operative pleading in this action, and accompanying exhibits. (ECF Nos. 94-95.) On August 14, 2013, Respondent filed an Answer and accompanying Memorandum of Points and Authorities. (ECF Nos. 104, 104-1.)

On November 19, 2015, after briefing and oral argument, the Court issued an Order denying Respondent's request to dismiss Claims 1.J, 1.K, 1.T through 1.AA, 5-6, 14, 33-34, 43 and 45 on the basis of state procedural bars, denying Petitioner's motion for investigation, discovery and an evidentiary hearing on procedural default, denying Petitioner's motion for evidentiary development and/or an evidentiary hearing on Claims 1.A through 1.K, 1.M through 1.W, 1.Y through 1.AA, 5 and 6, denying Petitioner's request for stay and abeyance, and denying habeas relief on the Group One Claims, Claims 1, 5-6, 14, 33-34, 43 and 45. (ECF No. 171.)

Pursuant to the Court's request, the parties submitted a joint statement with respect to setting a briefing schedule for the claims remaining in the SAP. (ECF No. 172.) Based on the parties' respective proposals and the claims remaining in the SAP, the Court ordered one additional round of briefing, limited to Claims 2-4, 7-8, 10-12, 19, 29-32, 38 and 47-48. (ECF No. 173.) As noted above, on June 12, 2016, Petitioner filed the Group Two Merits Brief, addressing Claims 2-4, 7-8, 10-12, 19, 29-30 and 47-48,[1] along with an attached exhibit. (ECF Nos. 182, 182-1.) On December 1, 2016, Respondent filed a response, and on March 9, 2017, Petitioner filed a Reply with attached exhibits. (ECF Nos. 187, 194.) On June 5, 2018, Petitioner filed a Supplemental Brief, and on June 19, 2018, Respondent filed a Response to Petitioner's Supplemental Brief. (ECF Nos. 205, 206.)

## II. TRIAL PROCEEDINGS

The Court refers the parties to the statement of evidence issued by the California Supreme Court in Jurado, 38 Cal. 4th at 82-93. The California Supreme Court's factual findings are presumptively reasonable and entitled to deference in these proceedings. See Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

///

---

[1] In the Group Two Merits Brief, Petitioner notes that he did not submit additional briefing on Claims 31-32, "as those claims are fully briefed in the Second Amended Petition." (Pet. Br. at 16 n.1.)

In order to provide a context for the Court's discussion of the claims addressed in the instant order, restated below is the California Supreme Court's summary of evidence presented during the guilt and penalty phases.

On May 17, 1991, a stranded motorist saw the body of Teresa (Terry) Holloway in a culvert beneath Highway 163 in San Diego County. She had been strangled and beaten to death two days earlier. As the prosecution's evidence at trial established, defendant killed Holloway, with the help of Denise Shigemura and Anna Humiston, to prevent her from disclosing their plan to kill a drug dealer named Doug Mynatt.[FN2]

> FN2. Shigemura pled guilty to first degree murder and was sentenced to 25 years to life in state prison. Humiston, who was 17 years old at the time of the killing, was tried as an adult, convicted of first degree murder and conspiracy to commit murder, and sentenced to 25 years to life in state prison. (See *People v. Humiston* (1993) 20 Cal.App.4th 460, 465, 24 Cal.Rptr.2d 515.)

A. *Prosecution's Guilt Phase Case-in-Chief*

In October 1989, Brian Johnsen met Teresa Holloway; a month later, they began living together and continued living together until late April 1991. Throughout this time, Holloway was using methamphetamine on a regular basis. In December 1989, Holloway met Doug Mynatt at a bar and introduced him to Johnsen.

In July or August of 1990, Brian Johnsen met defendant and bought crystal methamphetamine from him at Mark Schmidt's house. Defendant was sharing an apartment with Denise Shigemura, but his girlfriend was Anna Humiston, a high school student who lived with her parents. Johnsen and Teresa Holloway socialized and shared drugs with defendant, Shigemura, and Humiston. Johnsen later introduced defendant to Mynatt.

In October 1990, Denise Shigemura was arrested and remained in federal custody until April 1991, when she was released to a halfway house. During her time in custody, Shigemura exchanged letters and telephone calls with Teresa Holloway. When Shigemura obtained overnight passes from the halfway house, she stayed at the house where Teresa Holloway lived with Brian Johnsen.

///

5

In February 1991, Teresa Holloway argued with defendant, and their relationship became strained. Holloway's relationships with Anna Humiston also became strained, and on one occasion they had a quarrel that almost turned violent. Around the same time, Doug Mynatt moved on a temporary basis into the house that Brian Johnsen and Holloway shared. Johnsen had been buying methamphetamine from Mynatt.

In late March 1991, defendant gave Doug Mynatt a .38-caliber handgun in exchange for drugs. When Mynatt learned that defendant had stolen the gun, he insisted that defendant take it back and instead pay money for the drugs. A few weeks later, Mynatt and Johnsen took defendant from his apartment to Johnsen's house. Mynatt made him stay there overnight until defendant agreed to pay Mynatt and to sell methamphetamine for him. Mynatt threatened to kill defendant if he did not agree.

On April 11, 1991, Brian Johnsen was arrested during a drug raid and spent five days in custody. He was arrested because drugs were found under a couch at his house. Some of the drugs belonged to defendant, but defendant did not admit they were his. Johnsen felt that defendant owed him something because of this incident, and defendant agreed to compensate Johnsen with marijuana.

In late April 1991, Brian Johnsen made Teresa Holloway move out of the house they had shared because of her continuing drug use, and he offered to let Doug Mynatt remain in the house on a more permanent basis as his roommate. Holloway approached Thomas Carnahan, who agreed to let her live in his apartment temporarily. He did not give her a key, and he insisted that she either be in the apartment by 11:00 p.m. or telephone him before that time to let him know when she would be arriving.

On May 6, 1991, Brian Johnsen began serving a 14-day jail sentence for driving with a suspended license. Doug Mynatt continued to live in Johnsen's house. Defendant still owed Mynatt money.

On May 13, 1991, during a telephone conversation, Denise Shigemura told Brian Johnsen (who was still in custody) that Doug Mynatt had stolen her purse, which contained $80, a key to the business where she was then working, and the combination to the business's safe. According to Shigemura, Mynatt admitted taking the purse and said he did it because he suspected Shigemura of stealing $450 from him. Shigemura seemed very upset about the incident and was worried about what Mynatt might do with the business key and the safe combination. During this conversation, defendant phoned Shigemura,

6

and a three-way conversation ensued between defendant, Shigemura, and Johnsen, during which they discussed possibly killing Mynatt. They were worried about potential retaliation, however, because Mynatt had claimed to have a friend who was affiliated with the Hell's Angels. They agreed to discuss the matter further the next day. They decided not to tell Teresa Holloway about the plan to kill Mynatt because of concern that she would reveal it to the police.

On the same day, Monday May 13th, defendant telephoned David Colson, with whom he had used methamphetamine, and he asked to borrow a shotgun. Defendant said he "needed to do somebody up," which Colson understood to mean that defendant intended to kill someone. Colson told defendant that he did not own a shotgun, although his brother did, and he gave defendant his brother's telephone number. Defendant called Colson's brother and asked to borrow his shotgun, saying he "had a job to do," but the brother refused to lend the shotgun to defendant.

Around the same time, Denise Shigemura asked Steven Baldwin if he could get her a "gat" (a slang term for a gun). Shigemura explained that she had a problem she needed to take care of. Baldwin told her he could not help her with her problem.

On Tuesday, May 14th, Brian Johnsen telephoned his house from the county jail and spoke to Denise Shigemura. They decided to contact defendant so the three of them could discuss what to do about Doug Mynatt. Johnsen telephoned Anna Humiston's house and spoke briefly to defendant about the plan to kill Mynatt. Defendant said he was still deciding whether to go through with it.

Later on the same day, Tuesday May 14th, Holloway was at the apartment complex where defendant lived. Larissa Slusher and Ted Meier managed the complex, and they occupied an apartment next to defendant's. Slusher had known Teresa Holloway as a casual acquaintance for seven or eight months. Holloway asked Meier if she could spend the night in their apartment, because it was after 11:00 p.m., and she had been locked out of the apartment where she had been staying. Meier agreed. The next morning, Holloway left the apartment around 8:00 or 9:00 a.m., taking with her a dress that Slusher had loaned her. Before she left, Holloway said she would return later that day, May 15th, but she never did.

On Wednesday evening, May 15th, Brian Johnsen telephoned Mark Schmidt and asked him to bring defendant and Denise Shigemura to

08cv1400

Schmidt's house so he could talk to them. Schmidt ran about two and a half blocks to defendant's apartment, where he found Teresa Holloway and Shigemura with defendant. Anna Humiston arrived in a blue Geo Metro while Schmidt was speaking to defendant. Defendant agreed to take Johnsen's call, and he came to Schmidt's apartment in Humiston's car with Humiston, Shigemura, and Holloway.

At 8:17 p.m. that evening, Brian Johnsen telephoned Schmidt's apartment. Schmidt answered and passed the phone to Shigemura, who said she was still unsure about the plan to kill Mynatt. Defendant then got on the phone and told Johnsen that he could not wait and that it (meaning the killing of Mynatt) would probably happen before Johnsen was released from jail. Johnsen said that was fine with him. Teresa Holloway then got on the phone and asked whether there was a plan to kill Mynatt. Johnsen told her not to get involved.

While Teresa Holloway was speaking on the telephone to Brian Johnsen, defendant had a "forceful talk" with Anna Humiston; he seemed angry about something; she seemed both angry and scared. Defendant then asked Schmidt for a chain that defendant could use to tie up Johnsen's motorcycle so Doug Mynatt could not steal it. Schmidt offered defendant an 18-inch length of plastic weed-eater cord. Defendant wrapped the cord around his own neck, with one end in each fist clenched at shoulder height. He said: "It will do." Denise Shigemura needed to return to her halfway house by 9:00 p.m. At defendant's request, Schmidt told Holloway to get off the phone because he needed to leave the apartment. They all left Schmidt's apartment around 8:45 p.m.

At 9:31 p.m., defendant telephoned Christie Medlin at her apartment. He told her that he was stranded and needed a ride, and that he was calling from a 7-Eleven store. Medlin asked David Silva, her boyfriend, to pick up defendant and his friends. Silva found defendant with Denise Shigemura and Anna Humiston at the 7-Eleven store at Spruce and Fifth Streets. He drove them to Medlin's apartment; when they arrived, Humiston was holding her stomach and appeared to be ill; she told Medlin she had an upset stomach. Defendant seemed bothered by something, and Shigemura seemed agitated. Noticing what appeared to be blood on defendant's socks, Medlin asked him what had happened. Defendant said he "got into a fight." Humiston used Medlin's telephone to call her father to tell him that the blue Geo Metro had broken down. Silva drove Humiston home. Medlin then drove defendant and Shigemura to defendant's apartment.

On Thursday morning, May 16th, around 9:30, a tow truck driver met defendant, Anna Humiston, and Denise Shigemura on Highway 163 near the Quince Street Bridge, where the blue Geo Metro was parked. The driver towed the car to the apartment complex where defendant lived. He observed nothing unusual about their demeanor. Humiston signed the towing receipt.

On the afternoon of the same day, Thursday May 16th, defendant and Denise Shigemura went to David Silva's apartment, and the three shared pizza and beer. Shigemura asked defendant and Silva to "bruise her up" so she could say she had been beaten and would have an excuse for not returning to her halfway house the previous night. Defendant and Silva then hit Shigemura with their fists. When defendant and Shigemura later went to Mark Schmidt's apartment, Shigemura removed her shirt to show Schmidt the bruises on her chest and arms. She told Schmidt that she had been "jumped" the previous night.

During the same day, defendant and Denise Shigemura went to Steven Baldwin's house with Mark Schmidt. They sat in the living room, with Baldwin and Schmidt on one couch, defendant and Shigemura on another. Shigemura said to Baldwin: "I no longer need what it was I asked you for. We took care of the problem and we dumped the body at Balboa Park." Defendant said nothing; his face had what Baldwin described as an "empty look."

On Friday morning, May 17th, Joseph Hedley experienced engine trouble as he was driving a van on Highway 163 through Balboa Park. He parked the van beside the freeway and began walking to a telephone call box about 100 yards away. As he neared the call box, he noticed a human foot protruding from a culvert that ran beneath the freeway. Approaching closer, he saw a woman's body inside the culvert, where it was not visible to persons traveling on the freeway. He called to her but received no response. Using the call box, Hedley reported what he had seen. Police officers arrived 15 minutes later and found that the body was Teresa Holloway's.

During the autopsy of Teresa Holloway's body, Mark A. Super, a deputy medical examiner employed by the San Diego County Medical Examiner's Office, saw many injuries on the face, torso, and extremities. Contusions and abrasions were on the chest and on both legs and both arms, with the right hand being particularly bruised and swollen. Some of the abrasions showed clusters of short parallel linear marks suggesting they were made by an object with threads. There were many bruises and abrasions on the neck, including some marks that could have been made by ligature or manual strangulation. The hyoid bone was fractured and there were

08cv1400

hemorrhages in the eyeballs; both of these findings were consistent with strangulation. There was a bite mark in the center of the back. The most extensive injuries were to the face and head. The jaw and all the facial bones were fractured and some had caved in. There were many deep lacerations on the scalp, and the skull was fractured. In Super's expert opinion, a scissor jack had "all the characteristics that one would expect" in the weapon that inflicted the injuries he observed. The cause of death was "blunt force head injuries and strangulation."

On Friday evening, May 17th, James R. Manis, a sergeant with the San Diego Police, found defendant with Anna Humiston outside defendant's apartment complex. He told defendant he was investigating the death of Teresa Holloway. Defendant said that he knew Holloway, that he had last seen her about three days before at a party at the house of a man named Mark, that she was a drug user who owed money to drug dealers, and that he did not trust her because she had stolen from him. Defendant led Sergeant Manis to Holloway's car, which was parked about three or four blocks from defendant's apartment.

On Saturday morning, May 18th, defendant and Anna Humiston arrived at David Silva's apartment in a new car that Humiston's parents had just given her. They then drove to defendant's apartment, where Sergeant Manis arrested them. Later that day, Sergeant Manis found a scissor jack in a tree midway between the place where Teresa Holloway's body was found and the 7-Eleven store at the corner of Spruce and Fifth Streets where David Silva had found defendant, Shigemura, and Humiston on the night of the murder. The jack was covered with red stains and had hair attached to it. Denise Shigemura was arrested on the same day.

After his arrest, defendant made telephone calls from the jail to Brian Johnsen, Christie Medlin, and David Silva. When Johnsen asked defendant why he had killed Teresa Holloway, defendant said it had to be done. To Medlin, defendant sang "On, on, that bitch is gone." According to Medlin's trial testimony, defendant said "something like he doesn't really care if he has to spend the rest of his life paying for this, the bitch is gone." When Silva asked defendant about Holloway's death, defendant told him that Holloway was killed in a car, that he had been sitting in the back seat with Humiston while Shigemura was driving and Holloway was sitting in the front passenger seat, and that an argument "got out of hand."

Around May 19th, Larissa Slusher saw the dress she had loaned Teresa Holloway in a dumpster about 100 feet from defendant's apartment. With the

dress were Holloway's purse, her wallet, her identification papers, photographs of her daughter, a sandal that matched one found at the murder scene, and a pair of shoes belonging to defendant.

Gary Mark Dorsett, an evidence technician for the San Diego Police Department Crime Lab, examined the blue Geo Metro. He collected samples of red stains from the front passenger seat cover and seatbelt harness and from the rear floorboard carpet on the passenger side. There was no jack in the car.

Norman Donald Sperber, a forensic dentist, compared the bite mark on Holloway's back with dental impressions from defendant, Denise Shigemura, and Anna Humiston. In Sperber's opinion, defendant's teeth were "highly consistent" with the bite mark, but neither Shigemura nor Humiston could have made it.

At trial, as part of the prosecution's case, the parties stipulated to the results of blood analysis. The blood on the scissor jack and on the rear floorboard of the blue Geo Metro was consistent with Teresa Holloway's blood, but inconsistent with the blood of defendant, Denise Shigemura, and Anna Humiston. Blood on the sandal and purse found in the dumpster, and on the front passenger seat cover of the blue Geo Metro, was consistent with the blood of all four of these individuals.

The parties also stipulated to the results of hair comparison analysis. Ten of the hairs found in Teresa Holloway's hand were consistent with the hair of Anna Humiston but not with the hair of defendant, Denise Shigemura, or Teresa Holloway. Four of the hairs were consistent with the hair of both Humiston and Holloway, but not with the hair of defendant or Shigemura, and three of the hairs were inconsistent with Humiston's hair and were not compared to the hair of defendant, Shigemura, or Holloway.

B. *Defense Case at the Guilt Phase*

After defendant's arrest, Brian Johnsen went to the house of Josephine Jurado, defendant's mother, and knocked on the door of her house one night around 9:30. Without opening the door, she asked Johnsen who he was and what he wanted. Johnsen said he wanted a helmet he had lent to defendant. She told him she did not have the helmet and did not know where it was, but Johnsen would not leave. She was frightened because she knew that Teresa Holloway had been Johnsen's girlfriend and that defendant had been charged with her murder. Johnsen eventually left after defendant's mother telephoned the police.

On May 19, 1991, during a 10-minute interview, San Diego Police Officer David Swiskowski asked Mark Schmidt to describe what happened at Schmidt's apartment on the evening of May 15, 1991, before Teresa Holloway's murder, but Schmidt's replies were vague and evasive. Schmidt said that defendant, Holloway, Anna Humiston, and Denise Shigemura came to his apartment that evening around 8 o'clock, and that he received a phone call from Brian Johnsen. Schmidt told Swiskowski that he gave the phone to defendant, and that defendant and Holloway were alone in his bedroom with the phone for about 10 minutes. Schmidt did not say anything to Swiskowski about having to leave the apartment, or making up a story about having to leave the apartment, or that defendant put a cord around his neck.

On the same day, May 19th, during an interview that lasted 10 to 15 minutes, David Silva told Officer Swiskowski that defendant had called him from jail after being arrested for Teresa Holloway's murder. Silva told Swiskowski that during that conversation defendant did not talk about the murder except to say that he had been charged with it. Silva did not tell Swiskowski that defendant said Holloway was killed because she was a snitch, nor did Silva say that defendant had described where persons were seated in Humiston's car before or during the murder.

On September 10, 1991, Tony Bento, an investigator for the San Diego District Attorney, interviewed David Silva for around 25 minutes. During the interview, Silva said he had talked to defendant on several occasions after defendant's arrest, and that defendant had always denied killing Teresa Holloway and never said that she had been killed because she had overheard a conversation, or that she was killed because an argument got out of hand. At the end of the interview, however, Silva mentioned a conversation with defendant before Holloway's death during which defendant had said that Holloway had overheard something and she "was going to snitch him off about something."

On September 16, 1991, Tony Bento interviewed Brian Johnsen for at least an hour, during which Johnsen said that after defendant's arrest, defendant called and told him to stay away from defendant's family or "the same thing would happen to them." Bento understood "them" as a reference to Johnsen and his friends. In this interview, Johnsen never said that defendant told him that Terry Holloway was killed because it had to be done. Johnsen also told Bento that he had discussed with Jeffrey Latimer the plan to kill Doug Mynatt.

///

Jeffrey Latimer was a childhood friend of Brian Johnsen and through him met defendant and Doug Mynatt. Latimer testified that he never discussed with Johnsen a plan to kill Mynatt, and that to his knowledge Johnsen had "never really been honest" and "was always the crook and the thief."

In 1991, Richard Whalley, a forensic scientist and toxicologist, arranged to have a private laboratory retest the urine sample taken from defendant after his arrest. The urine was found to contain methamphetamine at a very low level (130 nanograms) that would not have caused any effect but which suggested that defendant had probably used methamphetamine during the previous two to four days.

In January 1992, Marion Louise Pasas, a licensed private investigator whom Anna Humiston's attorney had retained, interviewed Christie Medlin at her apartment. Medlin told Pasas that after Teresa Holloway's murder defendant had called Medlin from jail on one occasion, but during that conversation defendant did not talk about the murder. Medlin did not tell Pasas that defendant said he was glad Holloway was dead or that he said he did not care whether he spent the rest of his life in jail or in prison.

C. *Prosecution's Penalty Phase Case in Aggravation*

Before August 1988, while defendant was living with his mother and his sister in an apartment in San Marcos, he once became highly agitated and upset, pushed his mother slightly against a bed, and spit in her face. Another incident occurred later while defendant was living with his mother and sister in a house in San Diego. On this occasion, defendant came home very upset after having broken up with his girlfriend, threatened to obtain weapons and shoot up the house, threatened to kill his mother, and advanced toward her with a raised hand as if to strike her. Defendant's friends restrained him and took him outside. When defendant's sister tried to telephone the police, defendant grabbed the phone from her hand. After this incident, in December 1989, defendant's mother applied for a restraining order to have him removed from her house.

In October 1990, defendant was convicted of felony possession of marijuana for sale.

In May 1991, during the autopsy of Teresa Holloway's body, she was found to have been pregnant. The fetus, which was around 17 weeks old, was too young and too small to have survived outside the womb, but it showed no evidence of traumatic injury or other condition that would have precluded its

survival to full term and birth had Holloway not died. Some weeks before her death, Holloway had told defendant that she was pregnant, but defendant did not believe her. Holloway said she was planning to get a pregnancy test and that when she got the test result she would show it to defendant to prove she was pregnant.

On July 21, 1991, Steven Baldwin was booked into the county jail for a probation violation. As a deputy was escorting him to a holding tank, defendant, who was inside the tank, saw him and said to another inmate: "I know that dude. He's the reason I'm in here. He told the cops I killed that bitch." After the deputy had placed Baldwin in the tank, an inmate named Richard Janssen, whom Baldwin did not know, approached him and struck him. Baldwin was then hit several times, from different directions, on the back of the head and the side of the face. Defendant did not strike him, but when the beating stopped, defendant came out of a side cell and told Baldwin: "You can't be in this cell. You got to roll up out of this cell." Baldwin lost consciousness, and the next thing he remembered was being outside the tank on a gurney. As a result of the beating, Baldwin suffered injuries to the left side of his face, including bruising and swelling both above and below the eye, a laceration below the eye, and a nondisplaced fracture of the malar bone.

On September 5, 1993, a fight broke out among inmates in module 5-B of the county jail in San Diego. Deputies arriving at the module observed 15 to 20 Hispanic inmates on one side of the module faced off against eight to 10 Black inmates on the other side of the module. The inmates were yelling and throwing things back and forth, and some inmates had bloodstained towels wrapped on their arms. Defendant was in the group of Hispanic inmates and was one of at least four inmates holding metal bars, 12 to 18 inches in length and one-quarter inch in diameter, that had been removed from inmate bunks. The inmates were slamming these bars against bunks and making stabbing motions with them toward Black inmates, although defendant was not seen to strike anyone. After the inmates were removed, the deputies found many items that could be used as weapons scattered throughout the module, including 13 metal bars, seven wooden mop handle pieces, two razors, one razor blade attached to a comb, three wooden window grate pieces, and two socks containing soap bars.

Teresa Holloway's murder deeply affected her parents, James and Joan Cucinotta, and her daughter, who at the time of Teresa Holloway's death was four years old and lived with her father. After the daughter learned of her mother's death, she became sad and withdrawn and cried a lot. She often said: "I want my Mommy, I want my Mommy."

A police detective came to the home of James and Joan Cucinotta to tell them of Teresa Holloway's death. At first Joan could not accept it; she was very upset and angry, and she tried to hit the detective. When he said they had identified Teresa Holloway's body through fingerprints, Joan fell apart and became hysterical. Some friends and family came over to be with her. That night and for days afterwards, she was unable to eat or sleep. She just cried and smoked cigarettes. She was unable to deal with making the funeral arrangements or telephoning relatives, so James Cucinotta did those things.

James Cucinotta, Terry Holloway's father, was also seriously affected by her murder. At the time of her death, he worked in law enforcement as an investigator, but within two weeks after learning of the murder, he lost his job because he was no longer able to function. He began drinking heavily until eventually he went into a treatment center. He and his wife Joan both received treatment from psychiatrists for their grief. The murder also deeply affected their two other children, Teresa Holloway's brother and sister, and family holidays became very painful. At the time of his testimony, more than four years after Teresa Holloway's death, James Cucinotta and his wife continued to visit Teresa's grave every week. Joan Cucinotta sometimes took Teresa's daughter to the grave.

D. *Defense Penalty Phase Case in Mitigation*

Calvin Bruce was one of the inmates in module 5-B of the county jail in San Diego on September 5, 1993. He was talking on the phone to his wife when he saw two inmates, one Black and the other Hispanic, have a confrontation that became physical and resulted in a face-off between groups of Black and Hispanic inmates during which inmates in both groups wielded and threw metal pipes. According to Bruce, defendant was not one of the original combatants, he did not have any weapon in his hand during the incident, and he tried unsuccessfully to persuade other inmates to stop the fighting.

Defendant's parents-Robert Jurado, Sr., and Josephine Jurado-married in 1968. Defendant was born in June 1970, and his sister Oralia in November 1973. At that time, the family lived in Los Banos. Once, when he was around four years old, defendant saw his father hit his mother. Defendant ran up to his mother and hugged her.

In 1973, defendant's parents separated, and defendant began to experience "tremendous headaches that would make him cry a lot." He also developed a fear of sleeping in the dark, and he became more rebellious with

his mother. After the separation, defendant's father saw his children no more than once or twice a year.

In 1977, defendant's parents finalized their divorce. In 1984, defendant's mother moved to San Diego. His father never went there to visit, and he telephoned very seldom. Around 1985, defendant's father remarried. In 1986, defendant's grades began to fail and he began to use drugs. In 1987 or 1988, defendant's mother placed him in a drug treatment program. When he learned that defendant was using illegal drugs, defendant's father cut all ties with defendant. Around this time, a psychiatrist told defendant's mother that defendant was suicidal and needed to be hospitalized right away. When defendant's mother telephoned his father to get some insurance papers to cover defendant's hospitalization, defendant's father said something to the effect that it might be better if defendant did commit suicide.

Defendant's father testified that he had seen defendant once since his arrest and could now form a relationship with him because defendant was no longer using drugs.

Before moving to San Diego with his mother in 1984, defendant had close relationships with his aunt, Patricia Camacho, and his two grandmothers, Josefina Martinez and Paz Jurado. They each testified that they love defendant very much and intended to visit him in prison. Defendant's mother and his sister Oralia both testified that they love defendant very much, that they had visited defendant weekly since his arrest, and that they intended to continue visiting him in prison.

Jurado, 38 Cal. 4th at 82-93.

# III. PROCEDURAL BARS

A.  **Teague v. Lane**

"Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  Teague v. Lane, 489 U.S. 288, 310 (1989) (plurality opinion); see also Stringer v. Black, 503 U.S. 222, 227 (1992) ("Subject to two exceptions, a case decided after a petitioner's conviction and sentence became final may not be the predicate for federal habeas corpus relief unless the decision was dictated by precedent existing when the judgment in question became final.")  A new rule "breaks new ground

08cv1400

or imposes a new obligation on the States or the Federal Government" or one whose "result was not *dictated* by precedent existing at the time defendant's conviction became final." Teague, 489 U.S. at 301. The two exceptions to Teague are if the new rule: (1) "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" or (2) "requires the observance of 'those procedures that . . . are implicit in the concept of ordered liberty.'" Id. at 307, quoting Mackey v. United States, 401 U.S. 667, 692, 693 (1971). "That a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate conviction is *seriously* diminished." Schriro v. Summerlin, 542 U.S. 348, 352 (2004), quoting Teague, 489 U.S. at 313. "[I]f the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply Teague v. Lane before considering the merits of the claim." Caspari v. Bohlen, 510 U.S. 383, 389 (1994).

For the reasons discussed below in section III.A.3., and previously discussed in the Court's Group One Order, while Respondent offers a general Teague assertion with respect to the bulk of the claims in the SAP, that does not properly raise the issue before this Court. (See e.g. ECF No. 171 at 18-19.) However, upon review of the Answer, the accompanying Memorandum of Points and Authorities, and the Response to Petitioner's Group Two Merits Brief, Respondent offers specific arguments that Claims 3, 19, 47 and 48 are Teague-barred. (See Ans. Mem. at 180-81; Resp. at 50-51, 59, 61.)

### 1. Claim 3

In Claim 3, Petitioner asserts that "[t]he prosecution's use of mutually exclusive and inconsistent theories violated Petitioner's right to fundamental fairness under the Due Process clause of the Fourteenth Amendment" and "resulted in a fundamentally unreliable determination of Petitioner's guilt." (SAP at 284.) Respondent argues that "there is no clearly established precedent from the United States Supreme Court to support a conclusion that due process prohibits a prosecutor from arguing inconsistent theories." (Ans. Mem. at 181.) Respondent references Justice Thomas' concurrence from Bradshaw v. Stumph, 545 U.S. 175 (2005), which states: "This Court has never hinted, much less held, that the Due

Process Clause prevents a State from prosecuting defendants based on inconsistent theories." Bradshaw, 545 U.S. at 190.

Petitioner cites to both California state law and Ninth Circuit cases to support his argument, but he fails to point to any such support in clearly established federal law. Thus, it appears that this rule falls under Teague, in that it would "break[] new ground or impose[] a new obligation on the States or the Federal Government," and it does not seem to satisfy either exception. See Teague, 489 U.S. at 301, 307. As an alternate ground for the disposition, the Court finds that Claim 3 fails on the merits for the reasons discussed below.

## 2. **Claims 19, 47 and 48**

In Claim 19, Petitioner contends that the cumulative effect of the guilt phase errors requires reversal of his convictions. (SAP at 468.) Meanwhile, in Claim 47, Petitioner argues that the cumulative effect of the errors raised on direct appeal require reversal of his death sentence, and in Claim 48, asserts that the combination of errors in his capital proceedings deprived him of his constitutional rights. (Id. at 676-80.) In the Answer, Respondent addresses Claims 19, 47 and 48 on the merits but has not raised any specific Teague argument with respect to these three claims. (See Ans. Mem. at 320-21, 425-27.) In the Response to Petitioner's Group Two Merits Brief, Respondent offers a specific Teague argument with respect to all three claims which had not been previously presented.

With respect to Claim 19, Respondent now argues that there is a lack of any United States Supreme Court precedent with respect to a claim of cumulative error. (Resp. at 50-51.) Respondent acknowledges that the Ninth Circuit has recognized this type of claim, for instance in Parle v. Runnels, 505 F.3d 922 (9th Cir. 2007), but argues that this does not suffice as clearly established federal law. (Id. at 51) ("[T]here is no clearly established Supreme Court precedent for the cumulative error claim asserted by Jurado.") Respondent asserts that: "Likewise, Jurado's assertion of a due process right through cumulative error would constitute a new rule of criminal procedure barred under *Teague v. Lane*, 489 U.S. 288, 310 (1989)." (Id.) With respect to Claims 47 and 48, Respondent, employing identical language in each section, refers the Court to the argument presented in connection with

Claim 19. (See id. at 59, 61) ("As previously discussed in Argument IX [which addresses Claim 19], Jurado is not entitled to relief because there is no clearly established United States Supreme Court law as to cumulative error. [¶] In any event, even if cumulative error were cognizable in federal habeas proceedings, Jurado would not be entitled to relief.")

The Ninth Circuit has explicitly rejected arguments that a claim of cumulative error is not clearly established or that it is Teague-barred. See Parle, 505 F.3d at 928, n.8 ("The State's argument that Parle's cumulative error claim is not cognizable on habeas review because it asks the court to recognize a new constitutional rule, see Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), lacks merit. As noted above, Chambers [v. Mississippi, 410 U.S. 284 (1973)] and its progeny clearly established the cumulative error doctrine decades ago.") In view of clear Ninth Circuit authority specifically refuting Respondent's contention, the Court is compelled to conclude that Petitioner's claims of cumulative error are not barred from habeas review under Teague.

### 3. Remainder of Claims in SAP

With respect to the remaining claims in the SAP, Respondent generally asserts that: "To the extent any of Petitioner's claims rely upon a new rule of constitutional law, including so-called 'actual innocence,' the non-retroactivity doctrine forecloses federal habeas corpus relief because, at the time his conviction and sentence were final, existing precedent did not 'compel' the result he now seeks." (Ans. Mem. at 64.) The Ninth Circuit has previously declined to conduct a Teague analysis when the state mentions it "only in passing." Arredondo v. Ortiz, 365 F.3d 778, 781 (9th Cir. 2004) ("Normally we decline to address an issue that is simply mentioned but not argued . . . and we see no reason to depart from that practice in a habeas appeal.") (internal citation omitted). Respondent does not offer a specific Teague argument with respect to the remaining claims sufficient to raise the issue. See id. at 782 ("No true Teague argument having been made by the state in this case, we decline to conduct a Teague analysis on our own."), citing Caspari, 510 U.S. at

08cv1400

389.  Thus, in accord with the reasoning of the Ninth Circuit, the Court will not engage in a Teague analysis with respect to the remainder of the claims in the SAP.

**B.    State Procedural Bars**

In the Answer, Respondent contends that Claims 1 (subparts J, K, and T through AA), 5-6, 14, 33-34, 43 and 45 are procedurally barred.  (Ans. at 2.)  Each of these claims were denied in the Group One Order.  (See ECF No. 171.)  Respondent notes that the California Supreme Court also denied a number of Petitioner's claims on procedural grounds when they were raised again in the second state petition, after previously denying those same claims on the merits either on direct appeal or when raised in the prior habeas petition, namely Claims 2-4, 7-13, 15-19, 24, 28-32, 35-42, 44, and 46-48.[2]  (See Ans.

---

[2] The Court's review of the procedural bars imposed by the state court has revealed several errors in Respondent's recitation, the first two of which are of some consequence. Respondent claims the California Supreme Court imposed several procedural bars on Claims 38 and 44, specifically asserting that the state court denied both claims as untimely, successive and as previously raised and rejected on appeal.  (See Ans. Mem. at 404 n. 91, 416 n. 99.)  Yet, an examination of the state record reveals that the California Supreme Court specifically declined to impose procedural bars on either of these two claims in adjudicating the second state petition.  The California Supreme Court denied all claims in that petition as untimely, "except claims 20 to 23, 25 to 27, *38 and 44*," and did not list Claim 38 or 44 among those barred either as successive or because they had been previously raised.  (See Lodgment No. 91) (emphasis added.)  Accordingly, Respondent's contention that Claims 38 and 44 were subject to procedural bars is without record support.

As for the remaining errors, Respondent asserts that Claims 2-4, 24 and 42 were barred as successive, but an examination of the California Supreme Court's decision does not support that contention.  (Compare Ans. Mem. at 175, n. 36, 180, n. 39, 187 n. 42, 325 n. 69, 413 n. 97 with Lodgment No. 91.)  Respondent asserts that the state court barred Claim 28 as previously raised on appeal, but an examination of the state court adjudication reflects Claim 28 was also barred as untimely.  (Compare Ans. Mem. at 329, n. 71 with Lodgment No. 91.)  Respondent asserts that Claims 7-9 were barred as untimely and successive, while the state court adjudication reflects Claims 7-9 were also barred as repetitive of claims rejected on appeal.  (Compare Ans. Mem. 193, n. 43, 201 n. 45, 205 n. 46 with Lodgment No. 91.)  Respondent asserts that Claim 48 was barred as untimely, successive and because it was previously raised on appeal, but a review of the state court adjudication reflects that Claim 48 was only barred as untimely by the California Supreme

Mem. at 175 n. 36, 180 n. 39, 187 n. 42, 193 n. 43, 201 n. 45, 205 n. 46, 227 n. 47, 243-44 n. 50, 262-63 n. 53, 269 n. 56, 290 n. 60, 298 n. 63, 301 n. 65, 310 n. 66, 321 n. 68, 325 n. 69, 329 n. 71, 330 n. 72, 338 n. 76, 342 n. 78, 351 n. 80, 379 n. 85, 385 n. 86, 395-96 n. 90, 404 n. 91, 405-06 n. 92, 408 n. 94, 410 n. 96, 413 n. 97, 416 n. 99, 422 n. 101, 425 n. 102, 426 n. 104.)

Respondent states that: "Once state remedies are exhausted, subsequent imposition of a procedural bar by the state court in a subsequent state court proceeding does not bar federal merits review of the claim. When a claim is presented and denied on the merits (whether on direct appeal or in a prior post-conviction review proceeding) the claim is not barred in federal court. *See, Ylst v. Nunnemaker*, 501 U.S. 797, n.3, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991)." (Id. at 58 n. 14.)

With respect to Claim 2, Respondent states that "subsequent imposition of procedural bars by the state court does not bar federal habeas merits review where, as here, the same claim was denied on the merits in previous state proceedings," and that "the State does not rely on the procedural bars applied to this claim as to the instant Petition except to the extent that Jurado alleged any facts for the first time in his second state petition."[3] (Id. at 175, n. 36, citing Ylst v. Nunnemaker, 501 U.S. 797, n.3.)  Respondent repeats the substance of this assertion in the subsequent footnotes addressing the remainder of the claims noted above.  (See id. at 180 n. 39, 187 n. 42, 193 n. 43, 201 n. 45, 205 n. 46, 227 n. 47, 243-44 n. 50, 262-63 n. 53, 269 n. 56, 290 n. 60, 298 n. 63, 301 n. 63, 310 n. 66, 321 n. 68, 325 n. 69, 329 n. 71, 330 n. 72, 338 n. 76, 342 n. 78, 351 n. 80, 379 n. 85, 395-96 n.

_____

Court.  (Compare Ans. Mem. at 426, n. 104 with Lodgment No. 91.)  These remaining errors are of minimal consequence to this Court's review because, as discussed in this section, Respondent has indicated the State will decline to assert the imposition of procedural bars as to these claims.

[3] In response to the Court's inquiry on this point at oral arguments, Respondent indicated that the State had not identified any new facts that were not previously presented.

90, 404 n. 91, 405-06 n. 92, 408 n. 94, 410 n. 96, 413 n. 97, 416 n. 99, 422 n. 101, 425 n. 102, 426 n. 104.)

In light of <u>Ylst</u> and Respondent's assurance that the State will generally decline to assert the imposition of a procedural bar on the claims listed above, the Court will not address the procedural bars noted above in this section. To the extent Respondent asserts that certain facts may have been alleged for the first time in the second habeas petition and a procedural bar may therefore apply, the Court will address any such argument along with the merits discussion of that claim.

## IV. STANDARD OF REVIEW

### A. Standard of Merits Review under AEDPA

The provisions of the Anti-Terrorism and Effective Death Penalty Act ["AEDPA"] apply to federal habeas petitions filed after its effective date of April 24, 1996. <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Woodford v. Garceau</u>, 538 U.S. 202, 207 (2003). Because Petitioner filed his federal petition in this Court after that date, AEDPA applies to this case.

Pursuant to AEDPA, a state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless that ruling: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Harrington v. Richter</u>, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle

to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

"Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions at the time of the relevant state-court decision.'" Lockyer v. Andrade, 538 U.S. 63, 71 (2003), quoting Williams, 529 U.S. at 412. The Supreme Court has stated that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." Parker v. Matthews, 567 U.S. 37, 48-49 (2012).[4] However, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011), quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010); see also Rodgers, 569 U.S. at 64 (While a reviewing court may "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent, . . . it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.") (internal citations and quotations omitted).

Pursuant to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007), citing Williams, 529 U.S. at 410. "State-court factual findings,

---

[4] In the Memorandum of Points and Authorities in Support of the Answer, Respondent contended that "it is 'err[or]' to even 'consult[]' lower court decisions." (Ans. Mem. at 68, see also Group One Merits Resp. [ECF No. 145] at 17), quoting Parker, 567 U.S. at 48. For the reasons noted in the Group One Order, the Court rejected this contention and noted that the Supreme Court has clearly indicated that circuit law continues to play a role in habeas corpus review. (See ECF No. 171 at 20 n. 2, citing Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam).)

moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" Rice v. Collins, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101, quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Richter, 562 U.S. at 102.

Of the claims adjudicated in this Order, the claims which were not denied with a reasoned state court opinion include Claims 2-4, 21-25, 27-28, 44, 46 and 48, which were denied on the merits by the California Supreme Court in a July 23, 2008, Order stating in relevant part: "The petition for writ of habeas corpus filed on August 11, 2005, is denied. All claims are denied on the merits, except for Claim XXVII, which is denied as premature, without prejudice to renewal after an execution date is set." (Lodgment No. 79.) Meanwhile, Claims 21-23, 25-27 and 48[5] were denied on the merits by the California

_____

[5] While both Petitioner and Respondent note that Claim 48 was raised in the first state petition (see SAP at 678, Ans. Mem. at 426), the California Supreme Court characterized Claim 48 as one of the "only new claims" when it was raised in the second state petition. (See Lodgment No. 91.) It appears that both Petitioner and Respondent acknowledge that Claim 48 as raised in the second state petition incorporated all of the claims raised in the second state petition, including several newly raised claims. (See Lodgment No. 89 at 118; Lodgment No. 90 at 85.) In any event, the state supreme court's characterization of Claim 48 as "new" does not impact the standard of review under AEDPA because the California Supreme Court clearly denied both iterations of Claim 48 on the merits, and as discussed above in section III.B., Respondent is not asserting the untimeliness procedural bar the state court imposed on Claim 48 in its adjudication of the second state petition.

Supreme Court in a January 16, 2013, Order which stated in relevant part: "The petition for writ of habeas corpus filed on March 18, 2010, is denied. [¶] Claims 1.J, 1.K, 1.T to 1.AA, 5, 6, 26, 33, 34 and 48, which Petitioner concedes are the only new claims, and Claims 21 to 23, 25, and 27, which are not subject to procedural bars, are each denied on the merits for failure to state a prima facie case for relief." (Lodgment No. 91.)

With respect to the claims which were denied on the merits without a statement of reasoning, the Court will conduct an independent review of the record with respect to each of these claims in order "to determine whether the state court clearly erred in its application of Supreme Court Law." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); see also Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (in the absence of a reasoned decision by the state court, "[o]nly by [an independent review of the record] may we determine whether the state court's decision was objectively unreasonable.") "Under § 2254(d), a habeas court must determine what arguments or theories supported, or as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter, 562 U.S. at 102; see also Cullen v. Pinholster, 563 U.S. 170, 187 (2011) ("Section 2254(d) applies even where there has been a summary denial."), citing Richter, 562 U.S. at 101-03.

## V. DISCUSSION

### A. Applicability of AEDPA and Request for Evidentiary Development

As an initial matter, the Court rejects Petitioner's contention that § 2254(d) does not apply. In the Group Two Merits Brief, Petitioner asserts that "the California Supreme Court was unreasonable in denying each of Jurado's claims, and § 2254 does not bar relief." (Pet. Br. at 16.) With respect to several claims contained in Group Two, Petitioner argues that "'there was no reasonable basis' for the state court to summarily deny the constitutional claims presented in the state habeas petitions, and thus § 2254(d) does not apply to bar merits review of those claims (i.e., Claims 2-4 and 48)." (Id. at 19.) Petitioner asserts that he established a prima facie case for each claim, warranting additional

evidentiary development, and contends that "[t]he state court decisions summarily denying the claims satisfies § 2254(d) because they (1) are contrary to federal law that requires state courts to hold a hearing to resolve federal claims; (2) imposed an unconstitutionally higher burden on Mr. Jurado than the elements of federal constitutional law governing each of his claims as established by Supreme Court precedent; and/or (3) constitute an 'objectively unreasonable' application of federal constitutional law because the state court failed to initiate adversarial proceedings to reliably resolve the claims." (Id. at 27.)  Petitioner also contends that he has satisfied section 2254(d)(2) because the California Supreme Court "necessarily" made factual determinations in denying Petitioner's claims without an evidentiary hearing, which constituted an unreasonable determination of the facts.  (Id. at 27-28.)

As the Court previously held with respect to Petitioner's similar argument concerning the Group One Claims (see ECF No. 171 at 24-26), "the Ninth Circuit has explicitly rejected the contention that evidentiary development is a prerequisite to deference under section 2254(d)."  (Id. at 24, citing Lambert v. Blodgett, 393 F.3d 943, 965-66 (9th Cir. 2004) ("We decline to hold that AEDPA's reference to 'adjudicated on the merits' authorizes us to review the form or the sufficiency of the proceedings conducted by the state court.  Thus, we will not read into 'adjudicated on the merits' a requirement that the state have conducted an evidentiary hearing, or indeed, any particular kind of hearing.").)

Moreover, "[s]ection 2254(d) applies even where there has been a summary denial." See Pinholster, 563 U.S. at 187, citing Richter, 562 U.S. 101-03; see also Lambert, 393 F.3d at 969 ("[W]e hold that a state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits.")  In this case, the claims newly raised in the second state habeas petition were denied on the merits "for failure to state a prima facie case for relief."  (See

Lodgment No. 91.) Meanwhile, the claims raised in the first state habeas petition were denied in relevant part as follows: "All claims are denied on the merits, except for Claim XXVII,[6] which is denied as premature, without prejudice to renewal after an execution date is set." (Lodgment No. 79.) Because these claims were adjudicated on the merits, section 2254(d) applies. See Pinholster, 563 U.S. at 187-88, citing Richter, 562 U.S. at 101-03.

The Court's previous discussion with respect to the Group One Claims (see ECF No. 171 at 24), remains relevant to Petitioner's contention that the California Supreme Court likely made credibility determinations adverse to Petitioner in summarily denying his Group Two Claims[7] on state habeas review. (See Pet. Br. at 27-29.) Again, as discussed previously, both of Petitioner's 2008 and 2013 state habeas denials were on the merits without an accompanying statement of reasoning, and there is no substantive evidence in the record to support Petitioner's implication that the state court based its denials on credibility determinations.

As with the prior set of claims, in the course of reviewing the claims at issue in the instant Order, the Court also examined whether the California Supreme Court's summary rejection of the claims involved an objectively unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts.

Petitioner also advances a general request for evidentiary development, but does not specifically articulate which claims warrant further development nor what type of evidence he intends to gather. Instead, Petitioner asserts that: "§ 2254(d) does not bar relief, and thus this Court should review the claims de novo and grant habeas relief. To the extent this

---

[6] Claim XXVII in the state petition is Claim 20 in the instant federal Petition, in which Petitioner alleges that California's lethal injection protocol constitutes cruel and unusual punishment. (SAP at 470.) As discussed below, (see infra), the parties agree that this claim remains unripe for review.

[7] As noted in the prior section, this contention appears to include Group Two Claims denied without a statement of reasoning in the first or second state habeas petitions, namely Claims 2-4, 21-28, 44, 46 and 48. (See Lodgment Nos. 79, 91.)

Court believes that Mr. Jurado has not successfully demonstrated relief under *de novo* review, he requests a meaningful opportunity for evidentiary development, including funding and discovery, and an evidentiary hearing, pursuant to the rules governing § 2254 cases." (Pet. Br. at 139; <u>see</u> <u>also</u> Reply at 76.)

"If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." <u>Pinholster</u>, 563 U.S. at 185. Section 2254(d)(2), meanwhile, explicitly directs that a habeas court's review is of the "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." <u>Pinholster</u>, 563 U.S. at 186.

"Section 2254(e)(2) imposes a limitation on the discretion of federal habeas courts to take new evidence in an evidentiary hearing." <u>Id.</u> at 185. Under that section: "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing" unless the petitioner's claim meets several exceptions. 28 U.S.C. § 2254(e)(2). The statute also directs that the claim must either rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence" and the prisoner must also show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." <u>Id.</u> The Supreme Court has stated that: "Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar habeas relief," such as, "when deciding claims that were not adjudicated on the merits in state court." <u>Pinholster</u>, 563 U.S. at 185-86.

"Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." <u>Landrigan</u>, 550 U.S. at 474. "It follows that if the

08cv1400

record refutes the applicant's factual allegations or otherwise precludes relief, a district court is not required to hold an evidentiary hearing." Id.; see also Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")  As discussed below, because Petitioner's claims do not warrant habeas relief under section 2254, an evidentiary hearing or other evidentiary development is unnecessary.  See id.

**B.  Claims Alleging Destruction of Evidence and Prosecutorial Misconduct**

    **1.  Claim 2**

Petitioner alleges a denial of due process "as material and exculpatory evidence has been destroyed by the San Diego Police Department," namely, blood and urine samples that were taken upon Petitioner's May 18, 1991 arrest, and which were later destroyed in 1996 pursuant to police department policy at the time.  (SAP at 280-82.)

Petitioner raised this claim as Claim VII in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.)  While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be

of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta, 467 U.S. 479, 488-89 (1984) (footnote and internal citation omitted). In Arizona v. Youngblood, 488 U.S. 51 (1988), the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58.

Petitioner asserts, citing Trombetta and Brady, that "[t]he blood and urine samples would have played a significant role in Petitioner's defense as they possessed an exculpatory value that was apparent before the evidence was destroyed, and were of such a nature that Petitioner is now unable to obtain comparable evidence by other reasonable available means." (SAP at 282.) He contends that "[t]esting would have demonstrated Petitioner was under the influence of LSD at the time of the offense," which would have undermined the prosecution's theory of first-degree murder, the lying in wait special circumstance, and would have provided evidence in mitigation. (Id.)

However, the record clearly shows that the blood and urine evidence already had played a role in Petitioner's trial proceedings, and in particular, his defense. As both parties acknowledge, the blood and urine samples taken on May 18, 1991[8] were tested not once, but twice; both times were prior to Petitioner's 1994 trial proceedings, albeit not in either instance for the presence of LSD. (See id. at 280; see also Ans. Mem. at 175-76.) The San Diego Police Department laboratory had Petitioner's urine sample tested for a number of substances, including amphetamines, benzodiazepines, antidepressants, sedatives, barbiturates, opiates, PCP, cocaine and THC/cannabinoids, and the blood sample was tested for amphetamines, several opiates, PCP and cocaine. (Ex. 1 to SAP, ECF No. 95-1 at 1-2.) The blood sample tested negative for every substance, while THC/cannabinoid was identified in the urine sample. (Id.) The defense, meanwhile, retained its own

_____

[8] The murder of Teresa Holloway occurred on the evening of May 15, 1991, three days prior to Petitioner's arrest. (See CT 129.)

08cv1400

toxicologist and found that methamphetamine was present in Petitioner's urine, but "it was lower than 500 ng/ml." (Ex. 2 to SAP, ECF No. 95-1 at 3.) After conducting re-testing on Petitioner's urine sample, the defense's retained expert reported that "methamphetamine was detected at a concentration of 130 ng/ml," which according to the expert was "consistent with Jurado using methamphetamine in the last three days." (Id.)

As discussed previously in the Group One Order (see ECF No. 171 at 56-57), both the prosecution and defense at trial presented expert testimony concerning the drugs in Petitioner's samples. Criminalist Jennifer Wheeler, who testified for the prosecution, stated that the presence of 34 nanograms per milliliter of marijuana in Petitioner's urine sample "doesn't say much" due to the fact that "marijuana is kind of a difficult drug because the drug tends to get struck [sic] in the fat in the body and is released slowly," and that the drug could show up in tests well after a person stopped using it. (RT 2545.) Wheeler noted that because the marijuana was found in Petitioner's urine rather than his blood, the results only reflected "what was at one time in your bloodstream; whereas, your bloodstream, that is actually showing what's going on in your system at that moment." (RT 2547.) Forensic scientist and toxicologist Richard Whalley testified for the defense that after resubmitting the tests on Petitioner's urine sample using a lower threshold than in prior testing, Petitioner's sample showed a positive result of 130 nanograms, which indicated that "[t]he person has been exposed or used methampetamine" but at "a low level." (RT 2616-17.) Whalley stated that unlike with alcohol, it was not possible to go backwards and determine Petitioner's methamphetamine level in days prior, but that "[t]he person has used in the last several days, probably in the last two to four days, or the person has used a very small amount, you know, a couple of hours ago, which typically isn't the situation." (RT 2618.) Whalley explained that because Petitioner's blood sample had tested negative for methamphetamine, the latter situation was unlikely. (RT 2621.)

Petitioner's argument that the samples "would have" played a role in his defense and "possessed an exculpatory value that was apparent before the evidence was destroyed" is unpersuasive on this record. The blood and urine evidence had already played a role in

Petitioner's defense and had been evaluated and tested by both the prosecution and defense experts for its evidentiary, including any exculpatory, value. Moreover, the evidence was not destroyed until 1996, well after its use at Petitioner's 1994 trial proceedings. Petitioner's assertion that the blood and urine evidence would have not only shown the presence of LSD, but would have somehow shown him to be under the influence of LSD at the time of the crime, is entirely speculative. The assertion is particularly untenable in light of the trial testimony from the defense's expert witness acknowledging that it was not possible, using the samples in question, to extrapolate the levels of methamphetamine in Petitioner's system at the time of the crime or to pinpoint when that drug was taken. (See RT 2618.) As discussed in the Group One Order concerning Petitioner's claims of ineffective assistance of counsel for failing to investigate and present evidence of Petitioner's purported LSD use and intoxication at the time of the crime:

> [T]here is no evidence that, had counsel tested his blood and urine for LSD, it could have shown that he was actually intoxicated at the time of the murder. Based on academic sources, Petitioner claims that "LSD can be detected in urine up to four days after it is ingested." (Merits Br. at 52 (citation omitted).) In this case, Petitioner's blood and urine samples were taken three days after the crime. Similar tests were conducted to determine the presence of other drugs in Petitioner's system, and even positive results showing the presence of marijuana and methamphetamine did not conclusively support a claim of intoxication on the day of the murder. Petitioner fails to explain how testing his samples for LSD would have compellingly shown he was under the influence at the time of the crime, when drug testing failed to do so for the other substances.

(ECF No. 171 at 61.) Petitioner fails to offer any persuasive argument or factual support for the proposition that testing for LSD would have provided specific proof of that drug's use on the day of the murder when testing for other drugs, such as marijuana or methamphetamine, could not.

Because the blood and urine evidence had already been subjected to multiple rounds of scientific testing and analysis, and because Petitioner offers only the speculative assertion that additional testing would have shown him to be under the influence of LSD

at the time of the murder (which the original rounds of testing could not show for other substances), it is clear that Petitioner fails to state a reason the police should have been aware of any remaining evidentiary value, much less exculpatory value, of this evidence. See Youngblood, 488 U.S. at 57 ("The Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.")

"[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58. Because this evidence had twice been subjected to testing for a myriad of chemical substances by both the prosecution and defense and both sets of results had been discussed at trial, Petitioner fails to convincingly show that the samples were anything more than "potentially useful" after the conclusion of the trial proceedings. As to whether the destruction was done in "bad faith," a 2005 San Diego Police Department report indicates the samples were destroyed pursuant to a May 1996 forensic science departmental policy which stated that "[e]vidence samples (blood and urine) will be kept for three (3) years." (Ex. 4, ECF No. 95-1 at 16-17.) The same report indicates that "this policy changed in 1997 and all blood and urine are retained related to homicide and sex crimes cases." (Id. at 16.)

Petitioner argues that "[a] policy mandating destruction of biological evidence in murder and especially capital murder cases, as late as 1994 demonstrates bad faith in [sic] its face." (SAP at 282-83.) Clearly established law does not support this position, as courts have rejected claims of constitutional violations in instances where police actions were done "in good faith and in accord with their normal practice." See Trombetta, 467 U.S. at 488, quoting Killian v. United States, 386 U.S. 231, 242 (1961) (internal quotations omitted). Petitioner asserts that the samples were destroyed "based on an earlier purported

departmental policy" which was later changed to preserve samples in cases such as Petitioner's (see SAP at 282), but there is no evidence that the policy in question was "purported" nor that the destruction in this case was anything but routine. Simply put, Petitioner fails to show any bad faith or a violation constitutional guarantees, as he offers no evidence supporting a conclusion that the blood and urine samples were destroyed in any "calculated effort to circumvent the disclosure requirements" under Brady. See Trombetta, 467 U.S. at 488. Again, it is clear from the state record that the samples were made available to the defense for testing and evaluation prior to Petitioner's trial proceedings (and the defense could have tested them for LSD at that time), the results were introduced into evidence at trial, the samples were retained for several years after they were taken, and that they were destroyed according to procedures in place at the time, well after the conclusion of the trial proceedings.

Because Petitioner fails to demonstrate that the police had reason to believe the evidence in this case had any apparent remaining exculpatory value at the time of destruction, and because the evidence was destroyed, pursuant to existing policy, years after it had been subject to testing by both the defense and prosecution and played a part at trial, the Court cannot conclude that the destruction was done in bad faith or amounted to a violation of Petitioner's constitutional rights. The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established law, nor has Petitioner shown that it was based on an unreasonable determination of the facts. Brady, 373 U.S. at 87; Bagley, 473 U.S. at 682; Trombetta, 467 U.S. at 488-89; Youngblood, 488 U.S. at 57-58. Habeas relief is not warranted on Claim 2. Petitioner has not demonstrated entitlement to an evidentiary hearing. See Sully, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

///

///

///

## 2. **Claim 3**

Petitioner asserts that "[t]he prosecution's use of mutually exclusive and inconsistent theories violated Petitioner's right to fundamental fairness under the Due Process clause of the Fourteenth Amendment" and "resulted in a fundamentally unreliable determination of Petitioner's guilt." (SAP at 284.) Specifically, Petitioner contends that "[i]n order to convict and secure the death penalty for Petitioner, the state relied on a theory of facts that was factually irreconcilable with theories the state had earlier used to secure the conviction of Anna Humiston and the death penalty for Brian Johnsen. This misconduct lacked a good faith justification and entitles Petitioner to relief." (Id. at 285.)

Petitioner raised this claim as Claim XIX in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.) While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits. Also, as discussed above in section III.A.1., while it appears this claim is barred under Teague, the Court addresses this claim on the merits as an alternate ground for the disposition.

Relying on clearly established law prohibiting a prosecutor from knowingly presenting false evidence, the Ninth Circuit has reasoned that "[i]t follows that a prosecutor's pursuit of fundamentally inconsistent theories in separate trials against separate defendants charged with the same murder can violate due process if the prosecutor knowingly uses false evidence or acts in bad faith." Nguyen v. Lindsey, 232 F.3d 1236, 1240 (9th Cir. 2000). While Petitioner cites circuit authority and California state decisional law in support of this claim, it appears, as noted above in the Court's discussion of Teague, Respondent is correct in his observation that the Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a state from prosecuting defendants based on inconsistent theories." Stumpf, 545 U.S. at 190 (Thomas, J., concurring). In the absence of any Supreme Court authority supporting Petitioner's claim of constitutional error, the state supreme court's rejection of this claim cannot be contrary to, or an unreasonable

application of, clearly established federal law.  See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [Petitioner's] favor, 'it cannot be said that the state court unreasonabl(y) appli(ed) clearly established law.'"), quoting Carey v. Musladin, 549 U.S. 70, 77 (2006) (additional internal quotation omitted).

Even to the extent Petitioner could overcome AEDPA's restriction to clearly established Supreme Court case law, he fails to demonstrate that his claim is meritorious. With respect to Brian Johnsen,[9] Petitioner contends that "[d]uring the penalty phase of the state's case against Brian Johnsen, the prosecution presented and argued aggravating evidence that Johnsen was a liar who was directly involved in Terry Holloway's murder in letters to Eric Holland and Assistant District Attorney Pettine," while "[s]everal weeks later, at Petitioner's trial, the prosecution entirely changed its position," and "not only presented Johnsen as a credible witness, it advanced the theory that Johnsen was in no way involved in Holloway's death."  (SAP at 287-88.)

Yet, as Respondent aptly and accurately points out, the two cases were not tried by the same prosecutor.  (See Ans. Mem. at 186.)  Johnsen was tried, convicted of capital murder, and sentenced to death in Stanislaus County for crimes committed in that jurisdiction.  See Jurado, 38 Cal. 4th at 116 fn. 9; see also State v. Johnsen, California Supreme Court Case No. S040704, http://www.courts.ca.gov/supremecourt.htm. Petitioner, meanwhile, was tried, convicted, and sentenced in San Diego County.  Petitioner fails to offer any authority supporting a proposition that two different prosecutorial agencies are required to advance the same theory in entirely separate prosecutions.  As an

---

[9] Petitioner's arguments in Claim 3 overlap in parts with Claim 4, in which Petitioner asserts the state committed misconduct by presenting the false testimony of Brian Johnsen at Petitioner's trial.  (Compare SAP at 284-90 with SAP at 290-98.)  In the adjudication of Claim 3, the Court limits its analysis to the claim of error arising from the prosecution's alleged use of inconsistent facts and theories at separate judicial proceedings, and addresses the state's alleged use of false evidence in Claim 4, below.

additional matter, Johnsen was not prosecuted for the Holloway murder. The Holloway murder was introduced into evidence at Johnsen's Stanislaus County penalty phase proceedings; Johnsen was actually prosecuted for a separate murder and other crimes committed in Modesto, California in early 1992. (See SAP at 288; see also Ex. 5 to SAP, ECF No. 95-1 at 17-31.) The Court remains unpersuaded that Petitioner's due process rights were in any way implicated when a prosecutor in a wholly unrelated capital trial advocated for a death sentence in that case by arguing that Johnsen actually had more knowledge of, or involvement in, Holloway's murder.[10]

With respect to Mark Schmidt, Petitioner points out that at Humiston's trial, the prosecutor urged the jury to reject Schmidt's trial testimony and rely on his earlier statements to police, but later turned around and relied on Schmidt's testimony at Petitioner's trial, particularly his testimony about Petitioner's request for a cord or cable on the evening of Holloway's murder, an incident Schmidt did not tell the police about in his earlier statements. Specifically, Petitioner contends: "It was factually inconsistent to argue that (1) Schmidt was a liar and the only testimony of his that was credible is what he told to police investigators in the days immediately following Holloway's death, and (2) one of the statements that Schmidt did not tell police investigators in the days immediately following Holloway's death is not only credible, but the most crucial evidence that the prosecution has of the Petitioner's premeditation." (SAP at 287.)

Respondent maintains that "[t]he prosecutor did not argue irreconcilable and inconsistent theories, because the prosecutor did not argue, in Humiston's and Jurado's separate trials, that Humiston and Jurado both committed a criminal act that only one of

_____

[10] In any event, as discussed in greater detail below with respect to Claim 4, the prosecutor in Petitioner's case attempted to introduce Johnsen's letters to Eric Holland, which appear to indicate Johnsen had more intimate knowledge of and involvement in the Holloway murder, but defense counsel prevented the admission of that evidence by successfully arguing that the letters should be excluded from Petitioner's trial. (See CT 907-09; RT 1883-84.)

08cv1400

them could have committed. The prosecutor's consistent theory in both trials was that Jurado, Humiston and Shigemura all plotted and participated in the murder of Holloway." (Ans. Mem. at 185.) The record supports Respondent's position. At Humiston's trial, the prosecutor argued that Schmidt was biased in favor of Humiston and minimized her involvement in the Holloway murder to help her defense. (See CT 659-61.) Indeed, at that trial, Schmidt testified that it was "Robert [Jurado] and Denise [Shigemura]," not Humiston, who urged the victim to leave with them that evening, and denied his earlier police statements that Humiston was angered when Petitioner and the victim were alone in a bedroom together. (Ex. 25 to SAP, ECF No. 95-2 at 273-77.) On later examination, Schmidt admitted he was friends with Humiston and did not like to see her in trouble. (Id. at 278.) While the prosecutor clearly challenged Schmidt's testimony at Humiston's trial as conflicting with his earlier statements about Humiston, Schmidt's statements and testimony about Petitioner's involvement do not present a similar conflict. Most pertinent to the ultimate disposition of this claim, the record shows that the prosecutor advanced the same theory at both trials, that Petitioner, Humiston and Shigemura were all involved in planning and carrying out the murder of Teresa Holloway.

In sum, Petitioner fails to show that the differing arguments made by two separate prosecutorial agencies in two unrelated cases about the extent of Brian Johnsen's involvement in the Holloway murder, only one of which was actually a prosecution for that murder, amounted to a violation Petitioner's constitutional rights. Neither does Petitioner demonstrate that the prosecutor's decision to challenge Schmidt's testimony at Humiston's trial but rely upon it at Petitioner's trial resulted in a constitutional violation, particularly given that the record reflects the theory advanced at both trials was that all three defendants were actively involved in Holloway's murder. Petitioner has not demonstrated that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Even if he could make that showing, the claim still fails for the reasons discussed above. Thus, Petitioner does not merit habeas relief or

an evidentiary hearing on Claim 3.  See Sully, 725 F.3d at 1075; see also Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state record.").

### 3.    Claim 4

Petitioner asserts that the "state knowingly presented Brian Johnsen's perjured testimony, which was material to Petitioner's conviction.  The prosecution presented a videotaped recording of Brian Johnsen's conditional examination at Petitioner's trial even though it knew or should have known that crucial portions of Johnsen's testimony were perjured and false."  (SAP at 291.)  Specifically, Petitioner argues that "[d]uring his conditional examination, Johnsen committed perjury and testified falsely with regards to his role in Holloway's death, the content of his May 15, 1991 conversations during his phone call to Schmidt's apartment, and the nature of his relationship with Holloway."  (Id.)

Petitioner also asserts that "[t]he State knowingly presented the perjured testimony of Mark Schmidt" and "relied on Schmidt's testimony even though it knew or should have known this testimony to be perjured and false."  (Id. at 295.)  Specifically, Petitioner asserts that despite the fact that the prosecutor challenged the veracity of Schmidt's testimony at Humiston's earlier trial, "at Petitioner's trial it called Schmidt to testify to some of the exact same trumped up stories that the state had rejected at Humiston's proceeding."  (Id. at 296.)

Petitioner raised this claim as Claim XX in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.)  While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  Napue v. Illinois, 360 U.S. 264, 269 (1959), citing Mooney v. Holohan, 294 U.S. 103 (1935) and Pyle v. Kansas, 317 U.S. 213 (1942).  "The principle that a State may not knowingly use false

39

evidence, including false testimony, to obtain a tainted conviction, . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness," and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. "[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (internal footnotes and citations omitted). "A Napue claim requires the petitioner to show that '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material.'" Gentry v. Sinclair, 705 F.3d 884, 903 (9th Cir. 2013), quoting United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).

Petitioner's primary contention is that Johnsen testified falsely about his knowledge of and involvement in Holloway's murder. In his conditional examination testimony, which was introduced at Petitioner's trial, Johnsen denied knowledge of any plans to kill Holloway, while in later letters to the prosecutor and another inmate written prior to Petitioner's trial, Johnsen indicated that he had a discussion with Petitioner about killing Holloway which he failed to disclose at the conditional examination. (SAP at 291-92.) Petitioner asserts that "[t]he very existence of these letters showed that Johnsen was a liar, a co-conspirator, or both," and that "[w]hether they were true or not, the letters demonstrated that Johnsen was a liar and that his testimony was fundamentally unreliable." (Id. at 292.) However, whether Johnsen was a reliable witness is not the question- the claim raised here is that the prosecution *knowingly* presented false testimony at Petitioner's trial. While Petitioner now asserts that the letters demonstrate Johnsen lied at the conditional examination (and thus at trial), the defense was successful in excluding those very same letters from the trial proceedings, in part by arguing that it was the *letters*, rather than the conditional exam testimony, that were inherently untrustworthy and unreliable. (See e.g. CT 907-09.)

At the hearing on the defense motion to preclude introduction of the Johnsen letters and statements to Holland, defense counsel argued that the statements were not reliable, and pointed out with respect to Johnsen's reason for mentioning his conversation with Petitioner about Holloway, "all we can really do is speculate, because without asking him about it and without subjecting him to cross-examination it's very difficult to get at the truth of that statement." (RT 1883.) Defense counsel speculated that Johnsen made the statements to Holland as "collateral" in order to get Holland to kill witnesses for him, and Johnsen's motives rendered those statements "particularly dubious." (RT 1883-84.)

At that same hearing, the prosecution acknowledged that with respect to the conditional examination testimony: "I think everyone had at least a suspicion Brian Johnsen knew more and was involved more than he was letting on. I believe that was based on the totality of the circumstances," and surmised that "I think there was a feeling and from the totality of the evidence that this really is true, that he probably did participate in this conversation with the defendant." (RT 1885.) The prosecutor argued that the evidence should be admitted, stating that "in this particular instance we're simply offering the letter itself as being trustworthy. And again I think our main point is that these things are not inherently unreliable." (RT 1887.) The trial court reasoned that there was "a real problem under [Cal. Ev. Code section] 1230 establishing the basic trustworthiness of the declaration." (RT 1889.) The trial court characterized the statements as "basically one crook trying to out macho another crook. One crook trying to out con another crook," which "doesn't pass muster." (Id.) The trial court granted the defense motion to preclude the prosecution from introducing the letters and statements into evidence. (RT 1890.)

Based on a review of the record, it is evident that while the prosecution acknowledged their own suspicions that Johnsen knew more than he testified to at the conditional examination, that does not amount to a deliberate presentation of evidence known to be false. As it stood, the prosecutor presented Johnsen's conditional examination testimony, which was inconsistent with other statements that the prosecution unsuccessfully sought to introduce into evidence. The prosecution's attempts to ameliorate

any possibility that Johnsen was not being truthful by impeaching their own witness were thwarted by the defense's successful efforts to keep the letters out of evidence. The defense had evidence of Johnsen's inconsistent statements, which they not only declined to use but vociferously and successfully argued against admitting into evidence. The present record reflects only that Johnsen's trial testimony denying prior knowledge of plans to kill Terry Holloway was inconsistent with later statements, which does not establish that Johnsen's testimony about this matter was actually false, that the prosecution knew the testimony to be false, or that the prosecutor knowingly presented false testimony.

With respect to the other two alleged instances of Johnsen's false testimony, the record again fails to support Petitioner's contention that the prosecution presented or failed to correct testimony they knew or should have known to be false. First, Petitioner points out that Johnsen testified that the May 15, 1991 phone call to Mark Schmidt's apartment was only about 7-9 minutes long, which "supported Johnsen's testimony that little was discussed" during the call. (SAP at 293, citing CT 1065-66.) Petitioner argues that the prosecutor possessed phone records that the call was actually 27 minutes long and therefore should have known Johnsen's testimony was false in this respect, yet persisted in presenting his testimony and "misrepresented information that was material to the jury's assessment of Johnsen's credibility and the truthfulness of his entire testimony." (Id. at 293-94, citing Exs. 27, 28 to SAP.)

It is apparent from a review of the record that the prosecution made efforts to introduce the corrected information about the phone call through the testimony of Mark Schmidt, reference to the phone records themselves, and in arguments to the jury. During Schmidt's trial testimony, the prosecutor referenced Schmidt's phone bill, which had been introduced as an exhibit at trial and asked about the "27-minute phone call," which Schmidt confirmed was a collect call from Brian Johnsen and that, after Schmidt answered the phone: "He [Johnsen] wanted to talk to Robert, and I handed the phone to Robert." (RT 2284.) In closing arguments, the prosecutor noted that the jurors would have the phone records in the room during their deliberations, again specifically referred to the 27 minute

phone call, and stated that the advantage of phone records over witness recollection is that the record "gives you precise information, not subject to human error in making time estimates" about what took place that evening. (RT 2824-25.)

The Court also remains unpersuaded that the prosecution presented false testimony because they knew or should have known Johnsen lied about the nature of his relationship with the victim. Petitioner contends that despite evidence of violent incidents that occurred between Holloway and Schmidt, "Johnsen testified that he was a concerned and loving boyfriend to Holloway," and the prosecution therefore knew that Johnsen painted a false picture of the relationship but failed to correct such testimony. (Pet. Br. at 51; see also SAP at 294, citing CT 954, 980-81, 1022-24, 1119.) A review of the record, in particular the citations offered by Petitioner, does not support this contention. Johnsen testified that he and Holloway were boyfriend-girlfriend, that at one point he asked her to leave the apartment they shared when she came home on drugs, that he spoke to her on the phone the evening of the murder and wanted to continue that discussion despite the other individuals urging her to leave Schmidt's apartment with them, and that after her murder, he told Mynatt about the earlier plot because "[h]aving Terry no longer in my life made me realize the value of life." (CT 954, 980-81, 1022-24, 1119.) The Court remains unpersuaded that these incidents portray Johnsen as "concerned and loving." In any event, Johnsen also testified that as a result of one argument between him and Holloway, she went to a bar and came home with Doug Mynatt, who thereafter sold drugs to both of them on occasion. (CT 975.) After examining the actual substance of his testimony, the Court is not persuaded that Johnsen testified falsely in this respect. For the reasons discussed above, Petitioner fails to demonstrate that the prosecution knowingly presented false testimony from Brian Johnsen.[11]

---

[11] Because Petitioner fails to demonstrate that the prosecution knowingly presented false testimony from Johnsen, it is unnecessary to undertake a detailed examination of the materiality prong or prejudice. However, as discussed in the Group One Order (see ECF

With respect to Mark Schmidt, Petitioner contends that despite contesting the veracity of Schmidt's testimony at Humiston's trial, the prosecutor relied on that very same testimony at Petitioner's trial. In particular, Petitioner notes that at Humiston's trial, Schmidt testified that Humiston did not tell Holloway to leave Schmidt's apartment that evening, stated that Humiston was not upset when Holloway and Petitioner were alone in a bedroom in Schmidt's apartment, denied overhearing a statement about not trusting Doug Mynatt, and testified that Petitioner asked for a cord and wrapped it around his neck prior to leaving the apartment with the victim; he repeated these same statements at Petitioner's trial. (SAP at 295-96.) First, as discussed above with respect to Claim 3, the record clearly shows that the prosecutor challenged Schmidt's testimony at Humiston's trial by arguing that Schmidt was biased in favor of Humiston and minimized her involvement in the Holloway murder to help her defense. (See CT 659-61.) There is nothing in the record to reflect Schmidt had a similar inclination to help Petitioner.

A review of the trial record in Petitioner's case demonstrates Schmidt's testimony at Petitioner's trial was, unlike his testimony at Humiston's trial, largely consistent with his earlier police statements. For instance, at Petitioner's trial, Schmidt admitted he told police that Humiston was upset the victim and Petitioner were alone in a bedroom together. (See RT 2337-38, 2347-49, 2349-52.) Schmidt also testified that he recalled telling a police detective about overhearing a statement about not trusting Doug Mynatt. (RT 2723-27.)

---

No. 171 at 70-71) with respect to trial counsel's decision to stipulate to Johnsen's unavailability, which avoided the possibility Johnsen would be cross-examined on the letters, "the letters between Johnsen and Holland presented significant drawbacks for the defense." (Id. at 70.) While the letters could have impeached Johnsen's credibility, they also revealed details concerning Petitioner's primary role in planning and carrying out Holloway's murder, which defense counsel indicated would be "devastating on issues of premeditation and lying-in-wait." (CT 911-12; see also RT 1889-90.) As such, even were Petitioner able to demonstrate that the prosecution knowingly presented false testimony, in light of the content of the letters, it is dubious at best that Petitioner would be able to show both materiality and prejudice.

08cv1400

Moreover, at both Humiston's and Petitioner's trials, Schmidt testified that prior to leaving his apartment that evening, Petitioner asked him for a cord, wrapped it around his neck and stated it "will do." While Petitioner is correct that the statement about the cord was not in Schmidt's original police statement, that fact alone does not demonstrate it was fabricated. Detective Swisikowski noted that Schmidt was "vague" and "evasive" in his initial interview with police; Swisikowski testified that Schmidt mentioned the Johnsen phone call, but did not mention either the statement about the cord nor Schmidt's own lie to get Holloway to leave the apartment. (RT 2637-40, 2642-44.) Schmidt, meanwhile, testified at Petitioner's trial that when he was initially interviewed by the police, he did not realize the full meaning of the statement about the cord. (RT 2347-49.) Petitioner fails to demonstrate that the prosecution knowingly presented false testimony in this matter, as he fails to show either that Schmidt testified falsely about Petitioner's involvement in the murder, much less that the prosecutor knew Schmidt's testimony was false but presented it anyway. At any rate, the inconsistencies Petitioner cites between Schmidt's police statements and trial testimony were addressed at Petitioner's trial proceedings during both Schmidt's testimony and in closing arguments by both the defense and prosecution. (See e.g. RT 2890-92, 2921, 2927-28.)

Petitioner fails to show that the inconsistencies highlighted here demonstrate that either Johnsen's or Schmidt's trial testimony was actually false, or that the prosecutor knew the testimony to be false, yet presented it anyways. Again, several portions of testimony Petitioner points to as false were addressed during trial, either during the witnesses' examination or during arguments to the jury, and the record clearly reflects the prosecutor's efforts to present accurate testimony to the jury. In any event, because Petitioner fails to persuasively demonstrate that the prosecutor presented or failed to correct testimony they "knew or should have known" to be "actually false," this claim is without merit. Gentry, 705 F.3d at 903, quoting Zuno-Arce, 339 F.3d at 889. The Court cannot conclude that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an

unreasonable determination of the facts.  Neither habeas relief nor an evidentiary hearing is warranted on Claim 4.  <u>Sully</u>, 725 F.3d at 1075; <u>Totten</u>, 137 F.3d at 1176.

## C.  **Claims Alleging Errors During Pretrial Proceedings or Jury Selection**

### 1.  **Claim 7**

Petitioner argues that his guilty plea after the dismissal of the lying in wait special circumstance raised a double jeopardy bar to his subsequent prosecution for capital murder once the special circumstance was reinstated by the state appellate court.  (SAP at 303.)

On direct appeal, the California Supreme Court held that the California Court of Appeal's decision denying this claim was the law of the case and rejected Petitioner's contention that either exception to the law of the case doctrine was present, as follows:

> The District Attorney of San Diego County filed an amended information charging defendant with murder (§ 187) and conspiracy to commit murder (§§ 182, 187), and alleging a lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) making defendant eligible for the death penalty. Defendant filed a motion under section 995 to set aside the conspiracy count and the lying-in-wait special circumstance allegation on the ground that they were not adequately supported by the evidence presented at the preliminary hearing. The prosecution filed written opposition to the motion, and the trial court, after a hearing, denied the motion to dismiss as to the conspiracy count, but the court granted the motion as to the special circumstance allegation.

> Immediately after the court made its ruling dismissing the special circumstance allegation, defendant announced his intention to plead guilty to the remaining charges. The prosecutor stated that his office might seek appellate review of the ruling setting aside the special circumstance by petitioning the Court of Appeal for a writ of mandate, and that for this reason he would not sign the change of plea form if defendant pled guilty to the remaining charges. Defendant then withdrew his previous not-guilty pleas and pled guilty to the remaining charges.

> To challenge the ruling setting aside the special circumstance allegation, the prosecution petitioned the Court of Appeal for a writ of mandate. (See *People v. Superior Court* (*Jurado*) (1992) 4 Cal.App.4th 1217, 6 Cal.Rptr.2d 242.) The Court of Appeal stayed defendant's sentencing hearing, which had been scheduled for December 23, 1991. In his opposition to the writ petition, defendant argued that because he had already pled guilty

46

to the remaining charges, any further prosecution of the special circumstance allegation would violate the double jeopardy clauses of the federal and state Constitutions (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15), and for this reason the special circumstance allegation could not be reinstated even if the trial court had erred in dismissing it. (See *People v. Superior Court* (*Jurado*), *supra*, at p. 1229, 6 Cal.Rptr.2d 242.)

The Court of Appeal held that the trial court had erred in dismissing the special circumstance allegation under section 995 (*People v. Superior Court* (*Jurado*), *supra*, 4 Cal.App.4th at p. 1229, 6 Cal.Rptr.2d 242) and also that there was no double jeopardy bar to reinstatement and prosecution of the special circumstance allegation (*id.* at pp. 1235-1236, 6 Cal.Rptr.2d 242). In granting the petition for writ of mandate, the Court of Appeal directed the trial court to enter a new order denying defendant's section 995 motion in its entirety, thereby reinstating the special circumstance allegation. (*People v. Superior Court* (*Jurado*), *supra*, at p. 1236, 6 Cal.Rptr.2d 242.) This court denied defendant's petition for review. (*Ibid.*) Defendant then withdrew his guilty pleas, pled not guilty to the charges, and denied the special circumstance allegation.

Defendant here raises the same double jeopardy issue he raised unsuccessfully in opposing the prosecutor's pretrial writ petition in the Court of Appeal. The Attorney General argues that defendant's claim is barred by the law of the case doctrine.

Under the doctrine of the law of the case, a principle or rule that a reviewing court states in an opinion and that is necessary to the reviewing court's decision must be applied throughout all later proceedings in the same case, both in the trial court and on a later appeal. (*People v. Turner* (2004) 34 Cal.4th 406, 417, 20 Cal.Rptr.3d 182, 99 P.3d 505; *People v. Barragan* (2004) 32 Cal.4th 236, 246, 9 Cal.Rptr.3d 76, 83 P.3d 480; *People v. Stanley* (1995) 10 Cal.4th 764, 786, 42 Cal.Rptr.2d 543, 897 P.2d 481.) We apply the doctrine even in death penalty cases, and even when the previous decision was rendered by a Court of Appeal, but we do not apply it when an intervening decision has altered or clarified the controlling rules of law, or when the rule stated in the prior decision was a "'manifest misapplication' of the law resulting in 'substantial injustice.'" (*People v. Stanley*, *supra*, at p. 787, 42 Cal.Rptr.2d 543, 897 P.2d 481; accord, *People v. Gray* (2005) 37 Cal.4th 168, 197, 33 Cal.Rptr.3d 451, 118 P.3d 496.)

Defendant argues that both of the recognized exceptions to the doctrine of the law of the case-intervening change in the law and manifest

misapplication of existing legal principles resulting in substantial injustice-are present here. To evaluate his arguments, we begin by reviewing the Court of Appeal's decision.

The Court of Appeal framed the issue this way: "Jurado's response to the People's petition presents the question of whether the prejeopardy dismissal of the special circumstance allegation pursuant to Jurado's motion under section 995 and his immediate guilty plea without the concurrence of the prosecutor and before the prosecutor could seek pretrial review of that dismissal would result in a 'second prosecution' for the same offense after 'acquittal' or 'conviction.'" (*People v. Superior Court* (*Jurado*), *supra*, 4 Cal.App.4th at pp. 1229-1230, 6 Cal.Rptr.2d 242.) The court concluded, first, that dismissal of the special circumstance allegation under section 995 was a prejeopardy rather than a postjeopardy determination. (*People v. Superior Court* (*Jurado*), *supra*, at pp. 1230-1231, 6 Cal.Rptr.2d 242.) The court concluded, second, that the lying-in-wait special circumstance was not "an added element which would create a greater offense out of the charged murder," but instead was a "penalty enhancement." (*Id.* at p. 1231, 6 Cal.Rptr.2d 242.) Third, the court concluded, after distinguishing certain decisions that defendant cited, that this case "most closely resembles" *Ohio v. Johnson* (1984) 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (*Johnson*). (*People v. Superior Court* (*Jurado*), *supra*, at p. 1233, 6 Cal.Rptr.2d 242.)

In *Johnson*, a defendant charged with four offenses arising from the same incident pled guilty to two of the offenses-involuntary manslaughter and grand theft-after which, on the defendant's motion, the trial court dismissed the other two charges-murder and aggravated robbery-"on the ground that because of his guilty pleas, further prosecution on the more serious offenses was barred by the double jeopardy prohibitions of the Fifth and Fourteenth Amendments." (*Johnson*, *supra*, 467 U.S. at p. 494, 104 S.Ct. 2536.) The United States Supreme Court concluded, to the contrary, that "prosecuting [the defendant] on the two more serious charges would not constitute the type of 'multiple prosecution' prohibited by the Double Jeopardy Clause." (*Ibid.*)

The high court explained that the federal Constitution's double jeopardy clause protects against (1) a second prosecution for the same offense after acquittal or conviction and (2) multiple punishment for the same offense. (*Johnson*, *supra*, 467 U.S. at p. 498, 104 S.Ct. 2536.) The bar against a subsequent prosecution after acquittal or conviction "ensures that the State does not make repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence,"

08cv1400

while the bar against multiple punishment for a single offense "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." (*Id.* at pp. 498-499, 104 S.Ct. 2536.) The court concluded that the issue of multiple punishment was not yet presented because the defendant had never been tried for, convicted of, or sentenced for the more serious offenses of murder and aggravated robbery. (*Id.* at pp. 499-500, 104 S.Ct. 2536.) "While the Double Jeopardy Clause may protect a defendant against cumulative punishments for convictions on the same offense, the Clause does not prohibit the State from prosecuting respondent for such multiple offenses in a single prosecution." (*Id.* at p. 500, 104 S.Ct. 2536.)

The court also rejected the argument that further prosecution of the murder and aggravated robbery charges would violate the double jeopardy prohibition against successive prosecutions: "No interest of respondent protected by the Double Jeopardy Clause is implicated by continuing prosecution on the remaining charges brought in the indictment. Here respondent offered only to resolve part of the charges against him, while the State objected to disposing of any of the counts against respondent without a trial.... There simply has been none of the governmental overreaching that double jeopardy is supposed to prevent. On the other hand, ending prosecution now would deny the State its right to one full and fair opportunity to convict those who have violated its laws." (*Johnson*, *supra*, 467 U.S. at pp. 501-502, 104 S.Ct. 2536.)

Here, the Court of Appeal rejected defendant's attempts to distinguish *Johnson*, *supra*, 467 U.S. 493, 104 S.Ct. 2536. Defendant argued that the prosecutor here did not sufficiently object to defendant's guilty pleas. As the Court of Appeal pointed out, however, the prosecutor advised the trial court that his office might seek appellate review of the dismissal of the special circumstance allegation, and the trial court advised defendant of the possibility that the special circumstance would be reinstated. (*People v. Superior Court* (*Jurado*), *supra*, 4 Cal.App.4th at pp. 1234-1235, 6 Cal.Rptr.2d 242.) The Court of Appeal concluded: "Jurado was never in jeopardy for the special circumstance, nor was he ever convicted or acquitted of that charge. Since the special circumstance is not in a lesser- or greater-offense relationship to the murder, there is no reason to allow Jurado's tactical maneuver to deny the People the right to a trial on the merits of that allegation." (*Id.* at pp. 1235-1236, 6 Cal.Rptr.2d 242.)

Defendant argues, first, that the United States Supreme Court's decision in *Ring v. Arizona* (2002) 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, constitutes an intervening change in the law establishing that a special

circumstance making a defendant eligible for the death penalty is the functional equivalent of an element of a greater offense of capital murder. We need not decide whether defendant is correct that a special circumstance is, for double jeopardy purposes, the functional equivalent of an element of a greater offense. Even if that is true, and the Court of Appeal erred in stating otherwise, it does not assist defendant because it is not a basis for distinguishing *Johnson*, *supra*, 467 U.S. 493, 104 S.Ct. 2536. There, the high court accepted the Ohio Supreme Court's determination that the defendant could not be convicted of both murder and involuntary manslaughter for the same killing, but it nonetheless concluded that a guilty plea to involuntary manslaughter did not bar prosecution for murder under the facts of that case. (*Johnson*, *supra*, 467 U.S. at pp. 496-497 & fn. 6, 104 S.Ct. 2536.) So also here, for purposes of double jeopardy analysis under the facts shown, it makes no difference whether a special circumstance is or is not an element, or the functional equivalent of an element, of a greater offense.

Defendant's second argument is that *Johnson*, *supra*, 467 U.S. 493, 104 S.Ct. 2536, is distinguishable, and that the Court of Appeal's reliance on that decision was a manifest misapplication of the law, because unlike the defendant in *Johnson*, he pled guilty to all charges then pending against him and the prosecutor openly and actively participated in the taking of these pleas. We are unpersuaded that these slight differences are significant. The prosecution charged defendant with murder with a special circumstance allegation, it timely sought review of the trial court's erroneous dismissal of the allegation, and it did not acquiesce in defendant's guilty plea to the murder charge. The prosecutor's participation in the taking of the guilty plea, primarily in the form of insisting that an adequate factual basis be demonstrated, was not an "effort to prosecute the charges seriatim" (*Johnson*, *supra*, 467 U.S. at p. 500, fn. 9, 104 S.Ct. 2536) and did not pose the risks that the successive prosecution aspect of the double jeopardy bar was intended to guard against-"repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence" (*id.* at pp. 498-499, 104 S.Ct. 2536). As in *Johnson*, there was "none of the governmental overreaching that double jeopardy is supposed to prevent," and imposing a double jeopardy bar "would deny the State its right to one full and fair opportunity to convict those who have violated its laws." (*Id.* at pp. 501-502, 104 S.Ct. 2536.)

Because defendant has not shown that the Court of Appeal's decision rejecting his double jeopardy claim was a manifest misapplication of the law, that it resulted in substantial injustice, or that there has been an intervening

change in the controlling law, the Court of Appeal's decision is the law of the case on that issue.

Jurado, 38 Cal. 4th at 93-97 (alteration in original). This claim was later re-raised in the second state habeas petition and denied on procedural grounds, but for the reasons discussed above in section III.B., the Court will address this claim on the merits.

As an initial matter, Petitioner asserts that "[t]he California Court of Appeal's opinion is the 'last reasoned opinion' in this matter for purposes of the AEDPA. (Pet. Br. at 54; Reply at 37, citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).) In Ylst, the Supreme Court stated that: "Where there has been one reasoned state judgment rejecting a federal claim, later *unexplained orders* upholding that judgment or rejecting the same claim rest upon the same ground." 501 U.S. at 803 (emphasis added). The Supreme Court reasoned that: "The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no* effect- which simply 'looks through' them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play." Id. at 804 (emphasis in original). Respondent appears to concur with Petitioner's contention, and similarly relies on Ylst, stating that: "The 'look through' doctrine does not readily apply here because the California Supreme Court's decision on this issue was not unexplained. However, the lower court's decision is still the last reasoned judgment based on the California Supreme Court holding that the lower court's decision was the law of the case." (Resp. at 41 n. 14.)

By the plain language of Ylst, the Supreme Court indicated that the "look through" doctrine applies when one court rejects a claim in an "unexplained order" that another court addressed in a reasoned decision. See Ylst, 501 U.S. at 803-04. Here, the California Supreme Court clearly issued a reasoned and lengthy decision, as detailed above. Neither Petitioner nor Respondent[12] provide a persuasive reason for this Court to eschew the state

_____

[12] In response to inquiry on this matter at oral arguments, Respondent indicated that that the Court could look to both decisions, noting that the two decisions were in agreement

supreme court's decision in favor of reviewing only the California Court of Appeal's decision, much less compelling authority supporting that course of action. It is also unclear how the Court could "look through" the California Supreme Court's reasoned decision denying Petitioner's claim on direct appeal. The <u>Ylst</u> Court indicated that such an approach was appropriate when facing an "unexplained" order, which is clearly not the situation presented here.

Although not the sole focus of the Court's review, it is evident that the California appellate court decision remains highly pertinent to this Court's consideration of this matter, as the California Supreme Court not only explicitly referenced that decision to determine whether an exception to the law of the case doctrine applied, but also clearly incorporated the state appellate court's reasoning in its own analysis of the claim. <u>See</u> <u>e.g.</u> <u>Jurado</u>, 38 Cal. 4th at 96 ("Defendant argued that the prosecutor here did not sufficiently object to defendant's guilty pleas. As the Court of Appeal pointed out, however, the prosecutor advised the trial court that his office might seek appellate review of the dismissal of the special circumstance allegation, and the trial court advised defendant of the possibility that the special circumstance would be reinstated.") "Although 'AEDPA generally requires federal courts to review one state decision,' if the last reasoned decision adopts or substantially incorporates the reasoning from a previous state court decision, we may consider both decisions to 'fully ascertain the reasoning of the last decision.'" <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc), quoting <u>Barker v. Fleming</u>, 423 F.3d 1085, 1093 (9th Cir. 2005); <u>see</u> <u>also</u> <u>Hedlund v. Ryan</u>, 854 F.3d 557, 565 (9th Cir. 2017) (same). Thus, the Court will consider the reasoning of both decisions in evaluating the California Supreme Court's rejection of this claim under AEDPA.

---

and the California Supreme Court decision relied on the reasoning of the appellate court. Petitioner disagreed and asserted that because the decision of the Court of Appeal was the last and only reasoned decision on the merits, the state appellate court decision was the appropriate focus of the Court's review.

08cv1400

The Double Jeopardy clause of the Fifth Amendment states that "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Am. V. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989); see also Brown v. Ohio, 432 U.S. 161, 165 (1977).

Petitioner contends that his claim of double jeopardy is meritorious and that the state court rejection of his claim involved both an unreasonable application of clearly established federal law as well as an unreasonable determination of the facts. (SAP at 303; Pet. Br. at 54-55, 58; Reply at 40.) Petitioner argues that "the state appellate court was incorrect in ruling that the special circumstance was not an element of capital murder" and erred in its application of Ohio v. Johnson, 467 U.S. 493 (1984), to his case. (Reply at 40; Pet. Br. at 59-60, 65-66; SAP at 305.) Petitioner also asserts that the appellate court made unreasonable factual findings in: (1) holding the special circumstance was not a lesser included offense or added element of the charged murder, (2) finding Petitioner's decision to plead guilty was an attempt to "cut off" the prosecutor's ability to get the lying in wait special circumstance reinstated, and (3) failing to recognize the prosecutor's "active" participation in the plea proceedings. (Pet. Br. at 66-70; Reply at 40.)

Petitioner first asserts that the state appellate court erred in ruling that the special circumstance was not a lesser included offense or added element of first-degree murder, and that this holding was both an unreasonable application of law as well as an unreasonable factual determination. Upon review, the California Supreme Court explicitly found that the appellate court's holding on this matter was not determinative of the outcome, stating: "We need not decide whether defendant is correct that a special circumstance is, for double jeopardy purposes, the functional equivalent of an element of a greater offense. Even if that is true, and the Court of Appeal erred in stating otherwise, it does not assist defendant because it is not a basis for distinguishing *Johnson*, *supra*, 467

U.S. 493, 104 S.Ct. 2536." <u>Jurado</u>, 38 Cal. 4th at 96. The state court reasoned that "for purposes of double jeopardy analysis under the facts shown, it make[s] no difference whether a special circumstance is or is not an element, or the functional equivalent of an element, of a greater offense." <u>Id.</u> at 97. Thus, because the California Supreme Court's adjudication of this issue did not rest on the state appellate court's finding concerning the special circumstance, Petitioner fails to show that the asserted error by the state appellate court implicates either section 2254(d)(1) or (d)(2).

Because the California Supreme Court did not rest its decision on whether the special circumstance was an element of a greater offense, Petitioner's reliance on <u>Sattazahn v. Pennsylvania</u>, 537 U.S. 101 (2003), is misplaced. Petitioner notes that the <u>Sattazahn</u> Court stated that "for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of 'murder' is a distinct, lesser included offense of 'murder plus one or more aggravating circumstances'," and that the same understanding extended for purposes of a double jeopardy analysis. (Pet. Br. at 59-60, quoting <u>Sattazahn</u>, 537 U.S. at 111.) Petitioner asserts that "*Sattazahn* demonstrates that the appellate court's double jeopardy analysis is erroneous." (<u>Id.</u> at 60.) Yet again, the California Supreme Court clearly resolved Petitioner's double jeopardy claim on other grounds, finding that even if the appellate court erred in this respect, it was not a basis for distinguishing <u>Johnson</u>.[13] Again, the Court is reviewing the reasonableness of the California Supreme Court's decision that regardless of the appellate court's finding on the special circumstance, <u>Johnson</u> was not

---

[13] Moreover, while <u>Sattazahn</u> was a majority decision in Parts I-II and IV-V, Petitioner's citation above is to Part III, which was not joined by a majority. <u>See</u> <u>Sattazahn</u>, 537 U.S. at 103. As the parties acknowledged at oral arguments, that portion of <u>Sattazahn</u> is not controlling. Thus, it is of limited utility in reviewing the state court resolution of this issue. <u>See</u> <u>Smith v. Hedgpeth</u>, 706 F.3d 1099, 1104-06 (9th Cir. 2013) ("Justice Scalia's statements in Part III are part of a plurality opinion and are not a binding declaration of the Court."); <u>see</u> <u>also</u> <u>Andrade</u>, 538 U.S. at 71 ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions at the time of the relevant state-court decision.'"), quoting <u>Williams</u>, 529 U.S. at 412.

08cv1400

distinguishable from Petitioner's case and the appellate court's application of Johnson was appropriate and constituted the law of the case.

Petitioner contends that Johnson is distinguishable and asserts that the California Court of Appeal erred in its application of Johnson to his case, offering a variation on the same argument rejected both by that court as well as by the California Supreme Court. Petitioner argues that "unlike the defendant in *Johnson*, Petitioner pleaded guilty to *all* of the charges pending against him at the time of his plea," and that "the prosecutor in *Johnson* affirmatively objected to entry of the respondent's guilty plea to the lesser charges," but in Petitioner's case, "while the prosecutor did not sign the change of plea form and said there was a 'possibility' his office would consider filing a writ petition challenging the court's ruling striking the special circumstance allegation (PRT 290), the record clearly demonstrates the prosecutor's open and active participation in the taking of Petitioner's plea." (SAP at 309-10) (footnote omitted.) The California Supreme Court addressed this matter, namely Petitioner's argument that "unlike the defendant in *Johnson*, he pled guilty to all charges then pending against him and the prosecutor openly and actively participated in the taking of these pleas." Jurado, 38 Cal. 4th at 97. The California Supreme Court recognized that the two situations differed but nonetheless held that: "We are unpersuaded that these slight differences are significant." Id. The state court reasonably noted that the prosecution was "timely" in seeking review of the trial court's dismissal of the special circumstance, "did not acquiesce" in Petitioner's plea, and noted that the prosecutor's participation in the plea proceedings, rather than attempting to prosecute the pending charges, was "primarily in the form of insisting that a factual basis be demonstrated." Id.

While Petitioner continues to insist that Johnson is distinguishable from his situation, he fails to persuasively explain how the California Supreme Court's rejection of that argument was unreasonable. Because this claim is presented on federal habeas review, the question before the Court is not simply the applicability of Johnson, but is instead the reasonableness of the California Supreme Court's determination that Johnson is not distinguishable and that the state appellate court's decision was the law of the case.

The California Supreme Court found that the prosecutor's actions at the plea proceedings "did not pose the risks that the successive prosecution aspect of the double jeopardy bar was intended to guard against-'repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence.'" Jurado, 38 Cal. 4th at 97, quoting Johnson, 467 U.S. at 498-99.  The state court also reasoned that: "As in Johnson, there was 'none of the governmental overreaching that double jeopardy is supposed to prevent,' and imposing a double jeopardy bar 'would deny the State its right to one full and fair opportunity to convict those who have violated its laws.'" Id., citing Johnson, 467 U.S. at 501-02.

The Court similarly finds that the situation in Johnson bears favorable comparison to the instant case and does not implicate double jeopardy concerns- i.e., prosecution after acquittal, multiple prosecutions for the same offense, or multiple punishments.[14]  In both cases, the trial court dismissed the charges at issue prior to their prosecution, as opposed to disposition by acquittal or other verdict after prosecution.  See Sattazahn, 537 U.S. at 109 ("[T]he touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'")  Moreover, in both cases, the actions were prompted by the defense.  In Johnson, the defendant offered to plead guilty to the lesser charges and moved to dismiss the greater charges, which the trial court granted.  In

---

[14] At oral arguments, Petitioner argued that Grady v. Corbin, 495 U.S. 508 (1990), supported their argument as in order to prove the special circumstance, the prosecutor would have to prove conduct for which Petitioner had already pled guilty.  In Grady, the Supreme Court held that "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." Grady, 495 U.S. at 510, overruled by United States v. Dixon, 509 U.S. 688 (1993).  However, as Respondent accurately noted at oral arguments, the Supreme Court overruled the "same conduct" test established in Grady.  Dixon, 509 U.S. at 704. Accordingly, Grady does not assist Petitioner in this regard.

Petitioner's case, the defense moved to dismiss the special circumstance, which when granted by the trial court was promptly followed by the defendant's guilty plea to the remaining charges. As discussed in greater detail below, in neither case did the prosecutor assent to the guilty plea and in both situations, the prosecution sought review of the trial court's decision. Nor was Petitioner subject to multiple punishments, as sentencing was stayed due to the prosecution's appeal of the special circumstance dismissal and Petitioner later withdrew his guilty plea when it was reinstated. Instead, as in Johnson, "[t]he trial court's dismissal of these more serious charges did more than simply prevent the imposition of cumulative punishments; it halted completely the proceedings that ultimately would have led to a verdict of guilt or innocence on these more serious charges." Johnson, 467 U.S. at 499-500. Petitioner has not demonstrated that the state supreme court erred in its application of Johnson, much less that the decision was an unreasonable application of clearly established law. See Williams, 529 U.S. at 413 ("[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.")

In addition to arguing that the state appellate court erred in applying Johnson, Petitioner also asserts that the appellate court made unreasonable factual findings in (1) holding the special circumstance was not a lesser included offense or added element of the charged murder, (2) finding Petitioner's decision to plead guilty was an attempt to "cut off" the prosecutor's ability to get the lying in wait special circumstance reinstated, and (3) failing to recognize the prosecutor's "active" participation in the plea proceedings. (Pet. Br. at 66-70; Reply at 40.) As noted above, given that the California Supreme Court's rejection of this claim did not rest on the whether the special circumstance was or was not a lesser included offense or added element, the reasonableness of the appellate court's factual finding on this matter is not pertinent to this Court's analysis under AEDPA. With respect to the remaining assertions, Petitioner specifically argues that: "Jeopardy attached by virtue of Jurado's plea to all remaining charges combined with the state's action in (1) failing to unequivocally state an objection thereto and (2) actively participating in the plea to first-degree murder." (Reply at 40.)

Petitioner contends that rather than immediately appealing the trial court's ruling, requesting a continuance, or voicing a clear objection to the plea, the prosecutor only "stated an intent to *possibly* seek review of the superior court's ruling, and then actively participated in the plea hearing." (Pet. Br. at 68.) Petitioner details the prosecutor's participation in the plea proceedings, including that he asked to see change of plea form, offered input and concerns, requested a factual basis for the plea, and questioned Petitioner during the plea proceedings concerning the factual basis. (Id. at 68-70.)

Petitioner fails to explain how, given the timing of events and Petitioner's right to enter a plea regardless of the prosecutor's agreement or lack thereof, the prosecutor's decision to voice his disagreement, refuse to sign the plea form, and raise the possibility of appeal was somehow tantamount to acquiescence in those proceedings sufficient to raise a double jeopardy bar. A review of the trial record reflects that the court's decision to dismiss the special circumstance was immediately followed by Petitioner stating an intention to plead guilty to first degree murder. (See PRT 287) (trial court's decision granting motion to dismiss the special circumstance); (PRT 288) (defense states Petitioner's intention to plead guilty to first degree murder). After this sequence of events, the prosecutor promptly indicated that "just for the record, I've advised counsel that the People would not be signing the change of plea form. I know he can plead to the face at any time, but consulting with Mr. Fisher [another member of the prosecution], there's a possibility that the People may take a writ on the ruling by the Court, so I just wanted counsel to be aware that the plea could conceivably be set aside at a later time depending on how that procedure goes." (PRT 290.) Even Petitioner acknowledges that the prosecutor's agreement was not needed for the plea, stating that: "As the appellate court noted, Petitioner was entitled to plead guilty to the 'face' of the remaining pleading, and there was no requirement that the prosecution consent to that plea." (SAP at 310, n. 20, citing Jurado, 4 Cal. App. 4th at 1234.)

///

///

///

The record also reflects that while the prosecutor participated in the plea proceedings, he clearly did not concur in the plea and indicated several times a possible intent to appeal. The prosecutor remained present for the plea proceedings, but described himself as simply "interested" and again indicated he would not sign the plea form; the trial court similarly described him as an "interested party." (PRT 296.) The record also reflects that the exchanges during the first portion of the proceeding took place almost entirely between Petitioner and the trial court, including Petitioner's admission to the crimes, the consequences of the plea, his satisfaction with defense counsel's advice, and his rights, including his right to a jury trial, to confront witnesses against him, to remain silent, to testify, present evidence and witnesses, and the maximum possible penalty. (PRT 298-312.) It was only after the trial court and defense counsel were discussing completion of the change of plea form, and defense counsel submitted the preliminary hearing transcript to provide a factual basis for the plea, that the prosecutor stated: "We would ask the court to get a factual basis from Mr. Jurado. We would not be inclined to stipulate to a factual basis." (PRT 312-13.) The trial court agreed that it would require Petitioner to state a factual basis, but then first inquired of the prosecution whether they agreed that Petitioner could withdraw his plea in the event they pursued a writ and the court of appeal reversed the dismissal of the special circumstance, and whether statements he made could or could not be used against him. (PRT 314-16.) In response to the trial court's inquiry, the prosecution responded that "any statement he makes here cannot be used against him later if the plea is withdrawn." (PRT 316.) The trial court then inquired as to the factual basis for the plea and Petitioner responded- the prosecutor interjected during this portion of the proceedings to ask Petitioner to "elaborate" on his conversations with co-defendant Shigemura, asked a few questions on that point, asked for comment on the overt acts alleged, and specifically inquired as to whether Petitioner's statement that "it was me" who killed the victim was a sufficient factual basis for the conspiracy charge, to which Petitioner stated that he and Shigemura conspired, but that he killed the victim. (PRT 317-26.) The trial court then resumed his direct exchange with Petitioner, asking for his plea to each

charge, and accepting the plea.  (PRT 327-33.)  Finally, within a few weeks of the plea proceedings and prior to sentencing, the prosecution petitioned the state appellate court for review and that court stayed sentencing and ordered additional filings on the matter.  (See PRT 337; CT 141-42.)

On this record, it was not unreasonable for the state court to intimate that the timing of Petitioner's guilty plea was an attempt to head off a potential appeal.  See Jurado, 38 Cal. 4th at 95.  Almost immediately after the trial court's dismissal of the lying in wait special circumstance, which was the sole special circumstance alleged, the defense stated that Petitioner wished to plead guilty to the remaining charges, and entered the plea even in the wake of the prosecutor's indication that the ruling might be challenged.  While it is quite possible that Petitioner's actions were not aimed at curtailing a potential appeal, it was not unreasonable for the state court to surmise otherwise in light of the record.  California law provides for an appeal by the prosecution under the circumstances presented here.  See Cal. Penal Code § 1238 (stating in relevant part that: "(a) An appeal may be taken by the people from any of the following: (1) An order setting aside all or any portion of the indictment, information, or complaint.  (2) An order sustaining a demurrer to all or any portion of the indictment, accusation, or information. . . .")  Also, as noted above and contrary to Petitioner's assertion, the California Supreme Court acknowledged Petitioner's attempt to distinguish Johnson in part on the grounds that "the prosecutor openly and actively participated in the taking of these pleas."  Jurado, 38 Cal. 4th at 97.  However, the state court found that "[t]he prosecutor's participation in the taking of the guilty plea, primarily in the form of insisting that an adequate factual basis be demonstrated, was not an 'effort to prosecute the charges seriatim'" and did not fall under the double jeopardy prohibition against successive prosecution.  Id.  In view of the record, this finding was not unreasonable.  It is evident from this Court's review of the trial proceedings that the vast majority of the exchanges during the plea colloquy took place between Petitioner and the trial court, the prosecutor's participation was limited, either taking place in response to the trial court's inquiry, or clearly directed at ensuring adherence to the law and procedure,

including noting that a factual basis was required for the plea and inquiring as to the factual basis on certain counts.[15]  The California Supreme Court reasonably concluded that these actions did not amount to an effort to prosecute the charges so as to violate double jeopardy, and that decision was not based on an unreasonable determination of the facts.

For the reasons discussed throughout this claim, the state court correctly and reasonably found that Petitioner's situation was akin to, and governed by, the Supreme

---

[15] Petitioner has also attached as Exhibit A to his merits brief transcripts from co-defendant Humiston's trial proceedings.  (See ECF No. 182-1.)  He notes that during Humiston's trial, the parties stipulated that Petitioner had pled guilty and contends that "[t]he state's use of Mr. Jurado's plea of guilty-during the pendency of the appellate court writ proceedings and *by the same prosecutor*-supports the double jeopardy claim because it shows that the state was using the plea of guilty to its own advantage.  Indeed, in this instance, the state was using Mr. Jurado's plea as a sword."  (Pet. Br. at 64) (emphasis in original.)  Respondent, in turn, argues first that the exhibit cannot be considered unless it was in the state court record at the time the state court adjudicated this claim, and second that the record does not reflect why the parties entered into that stipulation and therefore does not support a contention that the prosecutor was using the stipulation to his advantage.  (Resp. at 43.)

The Court need not decide whether or how the stipulation materially impacts Petitioner's argument, as it is clear that in Pinholster, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Id., 563 U.S. at 181.  Review under section 2254(d)(2) is explicitly limited to "the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Because Petitioner fails to show that this exhibit was part of the state record at the time this claim was decided, this Court cannot consider Exhibit A in deciding whether the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts.  Petitioner acknowledges this limitation, as he indicates in the reply brief that "based solely on the evidence that was before the state court, that the state court's adjudication of the claim was based on an unreasonable determination of the facts," and that "[o]n de novo review of the claim, this Court can thus consider the prosecutor's use of Jurado's plea of guilty to first degree murder."  (Reply at 39.)

For the reasons outlined in the discussion of this claim, because Petitioner fails to satisfy section 2254(d) on the record which was before the state court, the Court will not consider Exhibit A in adjudicating this claim.

Court's decision in <u>Johnson</u>. Given the timing of the dismissal of the special circumstance, immediately followed by a guilty plea to the remaining counts over the prosecutor's objection and with awareness of a potential appeal of that dismissal, the state court reasonably concluded that: "As in *Johnson*, there was 'none of the governmental overreaching that double jeopardy is supposed to prevent,' and imposing a double jeopardy bar 'would deny the State its right to one full and fair opportunity to convict those who have violated its laws.'" <u>Jurado</u>, 38 Cal. 4th at 97, citing <u>Johnson</u>, 467 U.S. at 501-02. This Court finds similarly, and concludes that as in <u>Johnson</u>, "[n]otwithstanding the trial court's acceptance of [Petitioner's] guilty pleas, [Petitioner] should not be entitled to use the Double Jeopardy Clause as a sword to prevent the State from completing its prosecution on the remaining charges." <u>Johnson</u>, 467 U.S. at 502. The Court cannot conclude that the California Supreme Court's adjudication was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Habeas relief is not available on Claim 7.

At oral arguments, Petitioner specified that he requests both evidentiary development and an evidentiary hearing on Claim 7. Specifically, Petitioner indicated that he requests discovery of District Attorney files relating to this matter and depositions of the trial prosecutors concerning why the District Attorney did not file an immediate writ, move for continuance, object to the plea or request that the plea be conditioned on the outcome of any writ proceedings, as well as whether or how the prosecution used the plea in any other manner, such as in other proceedings. However, because Petitioner fails to satisfy section 2254(d) on the basis of the state record, an evidentiary hearing is not available on Claim 7. <u>Sully</u>, 725 F.3d at 1075; <u>Totten</u>, 137 F.3d at 1176. Nor does this claim merit discovery. <u>See</u> <u>Kemp v. Ryan</u>, 638 F.3d 1245, 1260 (9th Cir. 2011) ("[B]ecause the district court was not authorized to hold an evidentiary hearing on Kemp's deliberate elicitation claim, obtaining discovery on that claim would have been futile.")

///

///

## 2.  **Claim 8**

Petitioner asserts that he "exercised his statutory rights to challenge the sufficiency of the evidence supporting the charged lying-in-wait special circumstance allegation, and to plead guilty after that special circumstance was dismissed, only to have the prosecution respond by seeking the death penalty when the special circumstance was reinstated." (SAP at 315.)  He argues that the prosecution's decision was in response to his exercise of rights, and "[b]ecause the prosecution failed to offer sufficient justification to dispel this appearance of vindictiveness, Petitioner's death sentence must be reversed." (Id.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> On July 6, 1992, after the Court of Appeal's decision reinstating the special circumstance allegation became final, the prosecutor announced that his office had decided to seek the death penalty against defendant. On August 20, 1992, defendant filed a motion to bar the prosecutor from seeking the death penalty on the ground that the decision to do so was vindictive. On September 4, 1992, the prosecutor filed written opposition to the motion, and on September 11, 1992, defendant withdrew his guilty pleas and entered pleas of not guilty. Also on September 11, 1992, the trial court denied the motion alleging vindictive prosecution. Defendant now claims the trial court erred in so ruling.

> "Absent proof of invidious or vindictive prosecution, as a general matter a defendant who has been duly convicted of a capital crime under a constitutional death penalty statute may not be heard to complain on appeal of the prosecutor's exercise of discretion in charging him with special circumstances and seeking the death penalty." (*People v. Lucas* (1995) 12 Cal.4th 415, 477, 48 Cal.Rptr.2d 525, 907 P.2d 373.) But the due process clauses of the federal and state Constitutions (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15) forbid the prosecution from taking certain actions against a criminal defendant, such as increasing the charges, in retaliation for the defendant's exercise of constitutional rights. (*United States v. Goodwin* (1982) 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74; *In re Bower* (1985) 38 Cal.3d 865, 880, fn. 7, 215 Cal.Rptr. 267, 700 P.2d 1269.) It is not a constitutional violation, however, for a prosecutor to offer benefits, in the form of reduced charges, in exchange for a defendant's guilty pleas, or to threaten to increase the charges if the defendant does not plead guilty. (*Bordenkircher v. Hayes* (1978) 434 U.S. 357, 365, 98 S.Ct. 663, 54 L.Ed.2d

63

604; see *People v. Collins* (2001) 26 Cal.4th 297, 309, fn. 4, 109 Cal.Rptr.2d 836, 27 P.3d 726.) In the pretrial setting, there is no presumption of vindictiveness when the prosecution increases the charges or, as here, the potential penalty. (*United States v. Goodwin*, *supra*, at pp. 381-382, 102 S.Ct. 2485; *People v. Michaels* (2002) 28 Cal.4th 486, 515, 122 Cal.Rptr.2d 285, 49 P.3d 1032.) Rather, the defendant must "prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something the law plainly allowed him to do." (*United States v. Goodwin*, *supra*, at p. 384, 102 S.Ct. 2485, fn. omitted; *People v. Michaels*, *supra*, at p. 515, 122 Cal.Rptr.2d 285, 49 P.3d 1032.)

The only evidence defendant submitted to the trial court to prove his claim of vindictive prosecution was a declaration by his trial attorney recounting certain events leading up to the prosecutor's announcement of the decision to seek the death penalty. On August 16, 1991, when defendant was arraigned on an information charging him with the murder of Teresa Holloway and alleging the special circumstance of lying in wait, the prosecutor, Deputy District Attorney Mark Pettine, announced that his office was not seeking the death penalty. On October 11, 1991, an amended information was filed adding the charge of conspiracy to commit murder. On November 15 through 19, 1991, Brian Johnsen testified at a conditional examination, describing how he and defendant had discussed a plan to kill Doug Mynatt and how defendant later admitted killing Teresa Holloway because "it had to be done." Two days later, on November 21, the trial court dismissed the special circumstance allegation and defendant pled guilty to the remaining charges.

The prosecution then challenged the dismissal of the special circumstance allegation by petitioning the Court of Appeal for a writ of mandate. In late March or early April of 1992, after the Court of Appeal had granted the petition, but before its decision had become final, Deputy District Attorney Pettine told defendant's trial attorney that if defendant withdrew his guilty pleas, Pettine would talk to the District Attorney about whether to seek the death penalty, but if defendant did not withdraw the guilty pleas it was likely that the death penalty would not be sought.[FN3] A few weeks later, however, Pettine advised defense counsel that he intended to discuss the death penalty with the district attorney whether or not defendant withdrew his guilty pleas, but he implied that the death penalty might not be sought if defendant admitted the special circumstance allegation. On July 6, 1992, at a hearing in superior court to discuss the status of the case, after defense counsel announced that this court had denied defendant's petition for review of the Court of Appeal's decision reinstating the special circumstance allegation,

Deputy District Attorney Pettine stated that he had again met with the district attorney, who had decided to seek the death penalty against defendant, and that he had immediately advised defense counsel of that decision.

> FN3. On April 27, 1992, the trial court held a hearing to discuss the status of the case. Defense counsel announced that defendant intended to petition this court for review of the Court of Appeal's decision reinstating the special circumstance allegation, and that regardless of the outcome of that effort defendant did not intend to withdraw his guilty pleas. Deputy District Attorney Pettine announced that he had discussed with the district attorney whether to seek the death penalty, and the district attorney said that no decision would be made until defendant decided whether he would withdraw his guilty pleas. Pettine said he would discuss the matter with the district attorney again in light of defendant's decision not to withdraw his guilty plea, but he explained that "all options are still open."

Like the trial court, we see in this sequence of events no evidence that the prosecution's decision to seek the death penalty against defendant was motivated by a desire to punish defendant for making the motion to dismiss the special circumstance allegation under section 995, for pleading guilty and attempting to assert a double jeopardy bar, for opposing the prosecution's writ petition in the Court of Appeal, or for petitioning this court to review the Court of Appeal's decision. Although the discussions between Deputy District Attorney Pettine and defense counsel suggest that the decision to seek the death penalty may have been influenced to some extent by defendant's decision to deny the special circumstance allegation, this was not an impermissible consideration. (*Bordenkircher v. Hayes*, *supra*, 434 U.S. at p. 365, 98 S.Ct. 663; *People v. Collins*, *supra*, 26 Cal.4th at p. 309, fn. 4, 109 Cal.Rptr.2d 836, 27 P.3d 726.)

Defendant argues, in substance, that the prosecution's decision to seek the death penalty against defendant must have been motivated by a desire to punish him for challenging the validity of the special circumstance allegation through his section 995 motion because nothing else of significance occurred between August 16, 1991, when the prosecutor said his office was not seeking the death penalty, and July 6, 1992, when the prosecutor said it was. We disagree. In September 1991, Brian Johnsen told prosecution investigators of defendant's involvement in a plan to kill Doug Mynatt; in November 1991, the prosecutor conditionally examined Brian Johnsen and assessed the credibility of his testimony; and, in early 1992, at Anna Humiston's trial for

the murder of Teresa Holloway, the prosecution had an opportunity to assess the strength of its case. These events could well have caused the prosecution to reassess its decision about the appropriate penalty in this case.

Defendant argues that Brian Johnsen's information could not have been significant because the prosecution did not decide to seek the death penalty until many months after receiving that information. We disagree. Because of its concerns for the safety of Brian Johnsen and Doug Mynatt, the prosecution decided to conditionally examine Johnsen immediately after disclosing the information obtained from him. Two days after that conditional examination ended, the trial court dismissed the special circumstance allegation. It was only months later that the special circumstance was reinstated, and the prosecution then immediately reassessed its decision and announced its intention to seek the death penalty. Thus, the actual window of time for the prosecution to act on Brian Johnsen's information was not many months, as defendant asserts, but only a few days. No inference of improper motive arises from the prosecution's failure to act during this brief period. Moreover, the decision to seek the death penalty ultimately did not rest on Johnsen's information alone, but also on the prosecution's opportunity to preview its case at the Humiston trial, including the testimony of Denise Shigemura.

Because defendant did not present evidence of a vindictive motive for the prosecution's decision to seek the death penalty, the trial court did not err in denying defendant's motion to bar the prosecution from seeking that penalty.

Jurado, 38 Cal. 4th at 97-100. This claim was later re-raised in the second state habeas petition and denied on procedural grounds, but for the reasons discussed above in section III.B., the Court will address this claim on the merits.

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). Yet, "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'"

Bordenkircher, 434 U.S. at 363 (internal citation omitted), quoting Chaffin v. Stynchcombe, 412 U.S. 17, 32-33 (1973).

A presumption of vindictiveness has been applied in certain situations, such as where a prosecutor sought greater punishment on retrial after a reversed conviction. See e.g. Pearce, 395 U.S. at 724-25; Blackledge v. Perry, 417 U.S. 21, 27 (1974). With respect to pretrial proceedings, the Supreme Court has declined to adopt this presumption. See Bordenkircher, 434 U.S. at 365-66; United States v. Goodwin, 457 U.S. 368, 382 (1982) ("A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. As we made clear in Bordenkircher, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.") (footnotes omitted). Even so, "a defendant in an appropriate case might prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." Id., 457 U.S. at 384. "'To establish a prima facie case of prosecutorial vindictiveness, a defendant must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such.'" United States v. Montoya, 45 F.3d 1286, 1299 (9th Cir. 1995), quoting United States v. Sinigaglio, 942 F.2d 581, 584 (9th Cir. 1991).

Petitioner contends that the prosecutor's decision to seek the death penalty in his case was vindictive and came in response to his motion to dismiss the special circumstance and his decision to plead guilty once it was dismissed. (SAP at 315.) Petitioner asserts that prior to trial, the defense made a prima facie case of vindictiveness which the prosecutor failed to rebut but the trial court still rejected, and argues that because he established this showing, the California Supreme Court's decision rejecting his claim was an unreasonable application of clearly established law under Bordenkircher and Goodwin. (Pet. Br. at 76-77.) Petitioner additionally argues that the California Supreme Court's decision was also based on an unreasonable determination of facts, in that the state court found that the prosecutor had only a few days to make a penalty decision with respect to

Johnsen's information, when the prosecutor in fact had that information for several months prior to the decision to seek the death penalty, as well as the state court's finding that the prosecutor's decision was based not only on Johnsen's information but also on information presented at Humiston's trial. (Id. at 77-78.)

With respect to this first argument, a review of the record does not support Petitioner's contention that the California Supreme Court's rejection of his vindictive prosecution motion was based on an unreasonable application of clearly established law. As Petitioner appears to concede, there is no "direct evidence of actual vindictiveness" in this case. See Montoya, 45 F.3d at 1299, quoting Sinigaglio, 942 F.2d at 584. Despite Petitioner's assertion otherwise, the Court also remains unpersuaded that Petitioner has established "facts that warrant an appearance of such." Id. The Court's review of the record does not support a conclusion that the defense made a showing of vindictiveness which went unrefuted.

The showing of vindictiveness that Petitioner relies upon is primarily the chronology of events surrounding the challenge to the special circumstance, plea proceedings, and eventual reinstatement of the special circumstance, as detailed in the defense's pretrial motion and accompanying declaration by defense counsel. (See CT 183-201.) However, this chronology, as the trial court reasonably found, does not sustain an appearance of prosecutorial vindictiveness. The record reflects that the prosecution decided to seek the death penalty against Petitioner after the reinstatement of the special circumstance in June 1992. While Petitioner is correct that the prosecution had the statement of Brian Johnsen, one of the primary witnesses against Petitioner, in September 1991, the record also reflects that Johnsen was not conditionally examined until November 1991. (PRT 381-82.) Only a few days after that proceeding, the trial court granted a defense motion to dismiss the sole special circumstance, removing the death penalty as an option unless and until that special circumstance was reinstated. (Id.) In the period between dismissal and reinstatement, the record also reflects that co-defendant Humiston was tried and convicted. (PRT 382-84.)

///

The trial court heard argument on this exact series of events and rejected the defense's argument, reasoning that: "I think there's no showing of actual or apparent vindictiveness on the part of the prosecuting agency in this case." (PRT 384.) The California Supreme Court agreed with the trial court's assessment of the issue, stating: "Like the trial court, we see in this sequence of events no evidence that the prosecution's decision to seek the death penalty against defendant was motivated by a desire to punish defendant for making the motion to dismiss the special circumstance allegation under section 995, for pleading guilty and attempting to assert a double jeopardy bar, for opposing the prosecution's writ petition in the Court of Appeal, or for petitioning this court to review the Court of Appeal's decision." Jurado, 38 Cal. 4th at 99. Clearly established law supports the reasonableness of this conclusion. See Goodwin, 457 U.S. at 382 n. 15 (rejecting presumption of prosecutorial vindictiveness where "the only evidence respondent is able to marshal in support of his allegation of vindictiveness is that the additional charge was brought at a point in time after his exercise of a protected legal right."); see also United States v. Gallegos-Curiel, 681 F.2d 1164, 1169 (9th Cir. 1982) ("When increased charges are filed in the routine course of prosecutorial review or as a result of continuing investigation, there is no realistic likelihood of prosecutorial abuse, and therefore no appearance of vindictive prosecution arises merely because the prosecutor's action was taken after a defense right was exercised.") (internal citation omitted.)

In the written motion to dismiss for vindictive prosecution, the defense also argued that the prosecutor "strongly inferred" that the prosecution would not seek the death penalty if Petitioner admitted the special circumstance, but stated that if he proceeded to trial, the prosecutor would "discuss the penalty to be sought with [the District Attorney]." (CT 188.) However, during arguments on the motion, defense counsel conceded that during the prosecution's appeal of the trial court's ruling, he and the prosecutor "had some contact about what would happen in the event that the court of appeals overruled [the trial] court," but that "there were no plea negotiations in terms of, well, if you abandon your appeal then we'll agree to do something, not seek the death penalty or whatever." (PRT 371.) In any

event, the California Supreme Court acknowledged and rejected this argument, reasoning in part that: "Although the discussions between Deputy District Attorney Pettine and defense counsel suggest that the decision to seek the death penalty may have been influenced to some extent by defendant's decision to deny the special circumstance allegation, this was not an impermissible consideration." Jurado, 38 Cal. 4th at 99. The state court reasoned that: "Because defendant did not present evidence of a vindictive motive for the prosecution's decision to seek the death penalty, the trial court did not err in denying defendant's motion to bar the prosecution from seeking that penalty." Id. at 100. The California Supreme Court's reasoning in this regard is consistent with clearly established authority. See Bordenkircher, 434 U.S. at 363 ("[I]n the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer."); see also Goodwin, 457 U.S. at 382-83 ("This Court in Bordenkircher made clear that the mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified.")

With respect to the second contention, Petitioner also fails to demonstrate that the California Supreme Court's decision was based on an unreasonable determination of the facts. Petitioner contests the reasonableness of two factual findings, first, the California Supreme Court's reasoning that the prosecution had a matter of days instead of months to make a penalty decision based on Johnsen's information, and second, the state court's determination that the prosecutor's decision was in part based on the Humiston trial. (SAP at 324-28; Pet. Br. at 77-78.) However, as discussed below, both contested matters find support in the state court record.

Petitioner asserts that that the state court holding that the prosecution had a few days to act on Brian Johnsen's information resulted from an unreasonable factual determination, arguing that "the prosecution had two months (not merely a few days) to act on Johnsen's information because the prosecution interviewed Johnsen on September 16, 1991, two months before his conditional examination, and during the interview Johnsen claimed that

70

Holloway was killed to prevent her from disclosing a purported plan to kill Mynatt. (CT 1:41-45; PRT 7:369-373.)" (Pet. Br. at 78.) In holding the trial court did not err in rejecting the defense motion to bar the prosecutor from seeking the death penalty due to vindictive prosecution, the California Supreme Court stated that "the actual window of time for the prosecution to act on Brian Johnsen's information was not many months, as defendant asserts, but only a few days. No inference of improper motive arises from the prosecution's failure to act during this brief period." Jurado, 38 Cal. 4th at 100.

A review of the decision on direct appeal reflects that the California Supreme Court explicitly acknowledged the timeline of the events in this case, including when the prosecution's interview with Johnsen and the later conditional examination took place, reciting that "[i]n September 1991, Brian Johnsen told prosecution investigators of defendant's involvement in a plan to kill Doug Mynatt," and that "in November 1991, the prosecutor conditionally examined Brian Johnsen and assessed the credibility of his testimony." Jurado, 38 Cal. 4th at 99-100. The California Supreme Court did not disregard or overlook the fact that the prosecution obtained Johnsen's information several months before the conditional examination, but clearly placed importance on the latter date in evaluating whether the prosecution's decision to seek the death penalty was vindictive, emphasizing that the conditional examination provided the prosecution with an opportunity to evaluate Johnsen as a witness and could have played a role in determining which penalty to seek. See id. at 100 ("These events [the September 1991 interview with Johnsen, November 1991 conditional examination, and early 1992 Humiston trial] could well have caused the prosecution to reassess its decision about the appropriate penalty in this case.")

This Court's own review of the record supports the reasonableness of the state court's factual finding. In the motion hearing before the trial court, the defense argued that "the case against Mr. Jurado since September of '91 really hasn't changed at all. Mr. Johnsen was interviewed at that time. They knew about him," and asserted that the conditional examination was not to evaluate him, but to preserve his testimony, arguing: "They knew about what he had to say long before he ultimately testified in this court. They

71

were in a position to make a determination before that." (PRT 381.) The prosecution agreed that they knew of Johnsen's information in September 1991, adding: "But determining whether or not his testimony would support a decision to seek the death penalty as opposed to going forward with a special circumstance only and life without possibility of parole, is an evaluation that I think takes time. And it is an evaluation that is an ongoing evaluation." (PRT 379.) The prosecution also stated: "I think that if the day that Brian Johnsen had walked into our office and sat down with [the DA investigator] and myself and gave this information to us, if five minutes after that conversation I called [defense counsel] and said, now this is a death penalty case, he would have said, take your time and evaluate this information, let's make sure this is a credible witness," and noted that: "The office of the District Attorney of San Diego County has never moved quickly in making these kind of decisions. Historically we've evaluated the information that we receive." (PRT 382.) The trial court indicated: "I think the office would be justifiably subject to criticism if you had made such a quick decision as you alluded to, yes." (Id.)

Petitioner also argues in the SAP that after receiving Johnsen's information, "the prosecution waited seven months – and after Petitioner exercised his statutory rights to challenge the sufficiency of the evidence supporting the special circumstance allegation, and to plead guilty in the face of the prosecutor's refusal to sign the plea form – before deciding they would reconsider their decision not to seek the death penalty, and almost 10 months before they actually announced that they were seeking to put Petitioner to death." (SAP at 325) (record citations omitted.) Even were the Court to calculate the time elapsed between the initial information from Johnsen and the decision to seek the death penalty, Petitioner's assertion that the prosecution "waited" for seven or ten months to make a decision on seeking the death penalty is without record support. The record reflects that while the prosecution had Johnsen's information in September 1991, the sole special circumstance charged in this case was dismissed in November 1991. The California Court of Appeal reinstated the special circumstance on March 24, 1992 and denied further review in June 1992; meanwhile, at a status conference in April 1992 shortly after the

reinstatement of the special circumstance, the prosecutor indicated that the district attorney's office might re-evaluate whether to seek the death penalty.  See Jurado, 4 Cal.App.4th at 1236; (see also CT 225-26.)  Because the lying in wait special circumstance was the sole special circumstance charged, Petitioner fails to explain how the prosecution could have decided to seek the death penalty between mid-November 1991 and late March 1992, when its dismissal was under challenge and no special circumstance was pending in Petitioner's case.  Under California law, a criminal defendant charged with murder in the first degree must also be charged with at least one special circumstance in order to be eligible for the death penalty.  See Cal. Penal Code § 190.2.

In any event, after reviewing the record in concert with the state court's findings, it is evident that the state court both acknowledged the proper timeline of events as well as articulated a rational and supportable reason for relying upon the date of the conditional examination instead of the date of Johnsen's interview in its analysis of the prosecutorial vindictiveness claim.  As such, the Court remains unpersuaded that the California Supreme Court's finding resulted from an unreasonable factual determination.

Petitioner also challenges the reasonableness of the state court's reference to Anna Humiston's trial, which took place in early 1992, as a potential factor in the prosecution's decision to seek the death penalty against Petitioner.  In upholding the trial court's decision to reject the defense claim of vindictive prosecution, the California Supreme Court reasoned in relevant part that "the decision to seek the death penalty ultimately did not rest on Johnsen's information alone, but also on the prosecution's opportunity to preview its case at the Humiston trial, including the testimony of Denise Shigemura."  Jurado, 38 Cal. 4th at 100.  Petitioner asserts that the state court determination was unreasonable, arguing that "the prosecution did not file an affidavit in opposition to the defense motion to dismiss for vindictive prosecution, and thus the prosecution did not present any admissible evidence that the decision to pursue the death penalty was based on the Humiston trial." (Pet. Br. at 78.)

///

A review of the pre-trial proceedings reflects that the prosecution cited the Humiston trial in both the written opposition filed in response to the defense's vindictive prosecution motion as well as offered it in argument at the motion hearing. (CT 237; PRT 382-83.) In opposing the defense motion to dismiss for vindictive prosecution, the prosecution noted that they originally sought a penalty of life without parole against Petitioner. (CT 235.) In addition to citing Johnsen's testimony at the November 1991 conditional examination, which included evidence that the murder of Holloway took place in the course of a plan to kill another individual, and the proceedings to appeal the dismissal of the special circumstance, the prosecution noted that: "Also during the pendency of the appeal, codefendant Humiston's trial occurred. Brian Johnson [sic] testified consistent with his prior testimony. Humiston was convicted of murder. This trial demonstrated to Mr. Pettine [the prosecutor] the strength of his case and how Brian Johnson's [sic] testimony would be received by a jury." (CT 237.)

The prosecution again cited both the Humiston trial and Johnsen's information in arguing this motion before the trial court, in relevant part as follows: "And in addition to the information, the thing that obviously concerns the office of the district attorney, that we didn't know originally, is this plan to kill Doug Mynatt. That makes this case far more serious than it was originally thought to be. But in addition to that information we've also the benefit of hearing the testimony at trial. And information came out in the course of that trial relating to the testimony of Denise Shigemura that showed the brutality of this case. That was not information that was even available in September of 1991." (PRT 382-83.) The prosecution stated: "Additionally, there was the testimony the Court may recall of a witness named Mark Schmidt, who provided the murder weapon to Mr. Jurado. None of that information was available at the time Mr. Johnsen first came forward in September 1991. As you recall, the testimony at the trial was after the weapon was provided to Mr. Jurado, he holds the weapon up to his throat, indicating what he plans to do. To me that was one of the most chilling pieces of evidence in the Humiston trial. That is evidence that we will present against Mr. Jurado." (PRT 383.) The prosecutor asserted that "the Schmidt

08cv1400

testimony, the Shigemura testimony and the whole evolution of the plot to kill Doug Mynatt has certainly projected this case in a different light." (PRT 383-84.)

This information was part of the state record, and as such, the California Supreme Court was entitled to consider it in rendering its decision on this claim. Petitioner fails to demonstrate that the lack of an affidavit is significant. This information was offered by a representative of the prosecution in proceedings before the trial court and is part of the state record. Petitioner provides no grounds for the Court to question, much less doubt, the veracity and reliability of the prosecution's assertion in open court that the testimony presented at Humiston's trial played a part in the prosecution's decision to seek the death penalty in Petitioner's case. Nor does Petitioner cite to any authority supporting his assertion that the lack of an affidavit from the prosecution on this matter somehow circumscribes the California Supreme Court's ability to consider it on review or renders such consideration unreasonable, despite the fact that the prosecution presented an argument, both in writing and at the motion hearing before the trial court, that the Humiston trial played a role in their decision to seek the death penalty. Petitioner fails to show that California Supreme Court's citation to the Humiston trial, given it was clearly part of the record before the state court, constituted an unreasonable determination of the facts.

The record before this Court supports a conclusion that the prosecution's decision to seek the death penalty was based on evidentiary concerns, including obtaining and testing the validity of a witness who would testify that Holloway was killed to prevent her from revealing the plot to kill Doug Mynatt, as well as other evidence presented at the trial of Petitioner's co-defendant Anna Humiston, and not on any desire to punish Petitioner for challenging the application of the special circumstance to his case.

///

///

///

///

///

Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. See Bordenkircher, 434 U.S. at 363-66; Goodwin, 457 U.S. at 380-82, 384. Petitioner also fails to demonstrate that the state court decision was based on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to habeas relief or an evidentiary hearing on Claim 8. Sully, 725 F.3d at 10175; Totten, 137 F.3d at 1176.

### 3. Claim 9

Petitioner contends that the trial court's failure to conduct individual, sequestered voir dire with respect to the death penalty qualification process violated his federal constitutional rights to due process, equal protection, an impartial jury, effective assistance of counsel and a reliable penalty determination. (SAP at 329.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80, 168 Cal.Rptr. 128, 616 P.2d 1301, this court decided that in capital prosecutions the death-qualification portion of each prospective juror's voir dire should be sequestered, meaning that it should be conducted out of the presence of other prospective jurors. This court did not hold that sequestered voir dire was constitutionally required; instead, we mandated this practice as a rule of procedure. (See *People v. Vieira* (2005) 35 Cal.4th 264, 286-287, 25 Cal.Rptr.3d 337, 106 P.3d 990; *People v. Cudjo* (1993) 6 Cal.4th 585, 628, 25 Cal.Rptr.2d 390, 863 P.2d 635.) In 1990, however, the voters abrogated this aspect of *Hovey* by enacting Proposition 115, which added section 223 to the Code of Civil Procedure. That statute provides, in part, that "where practicable" the trial court must conduct voir dire "in the presence of the other jurors in all criminal cases, including death penalty cases." (Code Civ. Proc., § 223.)
>
> The jury selection process in this case began with hardship screening, after which the remaining prospective jurors filled out a lengthy juror questionnaire. To comply with the statutory mandate that voir dire occur in the presence of other jurors "where practicable" (Code Civ. Proc., § 223), the trial court decided to conduct voir dire, including questioning about the death penalty, with small groups of 10 prospective jurors. Before the voir dire of the first small group, the defense requested individual voir dire of five prospective

jurors who, in the view of defense counsel, had "expressed very strong attitudes toward the death penalty" in their questionnaire responses. The trial court denied the request but stated that it would reconsider the matter based on the individual jurors' answers during voir dire. Thereafter, however, the court agreed to separate[FN4] or sequestered voir dire of prospective jurors whose questionnaire responses indicated strong opposition to the death penalty, and the court said that it would do the same if questionnaire responses indicated a bias in favor of the death penalty. The court followed this procedure during the remainder of the voir dire, providing sequestered death-qualification voir dire for any juror who had expressed particularly strong views about the death penalty, either for or against, in filling out the questionnaire, and inviting counsel to assist in identifying the prospective jurors for whom sequestered voir dire would be appropriate. After nearly 100 prospective jurors had been questioned on voir dire in this manner, and challenges for cause had been made and ruled upon, the jury selection process was completed by the exercise of peremptory challenges. The defense expressed satisfaction with the jurors selected, and they were sworn to try the case.

> FN4. In some instances, jurors who expressed strong death penalty views on the questionnaire responses were questioned with others who had expressed similar views but out of the presence of jurors who had not expressed such views.

Defendant contends that the trial court's failure to conduct sequestered death-qualification voir dire-that is, to question each prospective juror on subjects relating to the death penalty out of the presence of other prospective jurors-violated his rights under the federal Constitution to due process, equal protection, jury trial, effective assistance of counsel, and a reliable penalty verdict, and his right under California law to individual juror voir dire when group voir dire is not practical.

Insofar as defendant contends that the federal Constitution requires sequestered death-qualification voir dire of every prospective juror in a capital case, the claim has been frequently rejected by this court and is without merit. (*People v. Stitely* (2005) 35 Cal.4th 514, 536-537, 26 Cal.Rptr.3d 1, 108 P.3d 182; *People v. Vieira, supra,* 35 Cal.4th at pp. 286-287, 25 Cal.Rptr.3d 337, 106 P.3d 990; *People v. Box* (2000) 23 Cal.4th 1153, 1180, 99 Cal.Rptr.2d 69, 5 P.3d 130.)

Insofar as defendant contends that the trial court violated his rights under the federal Constitution and under California law by failing to exercise

its discretion to consider whether group voir dire was "practicable," the record in this case does not support his claim. Rather, the trial court clearly understood it had discretion to order individual voir dire, and it did so for those jurors whose questionnaire responses suggested strong and possibly disqualifying views regarding imposition of the death penalty. The trial court did not abuse its discretion under Code of Civil Procedure section 223, nor did it violate defendant's constitutional rights. (*People v. Box*, *supra*, 23 Cal.4th at pp. 1180-1181, 99 Cal.Rptr.2d 69, 5 P.3d 130.)

Jurado, 38 Cal. 4th at 100-02. This claim was later re-raised in the second state habeas petition and denied on procedural grounds, but for the reasons discussed above in section III.B., the Court will address this claim on the merits.

Petitioner first challenges the constitutionality of California's voir dire procedures, arguing that "[g]iven the substantial risks created by exposure to the death qualification process, any restriction on individual and sequestered voir dire on death-qualifying issues - including that imposed by Code of Civil Procedure section 223, which allows death qualification in the presence of other prospective jurors and abrogates the California Supreme Court's mandate that such voir dire be done individually and in sequestration . . . - cannot withstand constitutional principles of jury impartiality." (SAP at 330-31.)

Petitioner fails to cite clearly established federal law holding that individual, sequestered voir dire is constitutionally required in a capital trial proceeding. The Supreme Court has generally stated that "*[v]oir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" Morgan v. Illinois, 504 U.S. 719, 729 (1992), quoting Ristaine v. Ross, 424 U.S. 589, 594 (1976); see also Mu'Min v. Virginia, 500 U.S. 415, 427 (1991) ("[O]ur own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias.") "The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." Morgan, 504 U.S. at 729.

The California code provision at issue holds that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal

cases, including death penalty cases." Cal. Code Civ. Proc. § 223. As the California Supreme Court noted in its rejection of this claim on direct appeal, state courts have repeatedly rejected challenges to the constitutionality of this provision. See Jurado, 38 Cal. 4th at 101. Given the lack of clearly established federal law supporting his contention, the Court cannot conclude that the California Supreme Court's rejection of this claim was unreasonable.

Petitioner's related contentions, that the trial court abused its discretion in denying requests for individual sequestered voir dire and that the trial court's application of law concerning voir dire requires reversal of his sentence, fail to find support in either the state record or in clearly established federal law. The Supreme Court has held that "part of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." Morgan, 504 U.S. at 729. Petitioner has not shown that the voir dire in his case was somehow inadequate, as a review of the record reflects the trial court's considered approach in conducting voir dire was aimed at identifying individuals who held such strong views that rendered them unqualified to serve. Each prospective juror completed a lengthy written questionnaire which included numerous questions about their background, their views of and experience with the criminal justice system, and their views on capital punishment in particular. (See e.g. CT 5495-29.) The trial court conducted in-court questioning in small groups of ten individuals. (See e.g. RT 1005.) The groups of prospective jurors were apprised that they could ask to address certain topics or matters in private when needed. (See e.g. RT 1011, 1193, 1296-97.)

Neither does the record support a conclusion that the court's comments about the negative impact individual voir dire would have on the schedule reflect an improper exercise of discretion. While the record reflects the trial court noted individual voir dire would consume more time, this comment was in the context of what the law required. The trial court reasoned that state law no longer required individual questioning of all prospective jurors and that to separately question "anybody who seems to express a fairly strong support of the death penalty" would result in "going to be basically back to

individual <u>Hovey</u> voir dire, which is not required under the present law." (RT 1000.)  The trial court elected to conduct voir dire with small groups of prospective jurors, as "sort of a compromise I guess" but stated that "I intend to be and I will try to be sensitive to the questioning of each prospective juror, particularly on the - - on the death penalty issue." (RT 1005.)  The trial court also apprised counsel that if it appeared a juror was unwilling to open up, "I'll try to be sensitive to that and shut that down and suggest that maybe we ought to talk to that person privately and individually."  (RT 1005-06.)  The trial court further reassured the parties that: "I'm not ruling out entirely separate and individual voir dire, I just think for most people who are - - appear to be in the middle, and in the middle, by that I mean, not sufficiently out on one extreme or another, either always or never, but sort of in that broad middle range where they may . . . Most of these people I think are kind of in that midrange.  And so I think I'll just be sensitive." (RT 1006.)  The court also stated that: "[I]f I sense we've got somebody we're not going to get anything out of them at all unless we talk to them separately, I'll be sensitive to that." (<u>Id.</u>)  Additional comments by the trial court also undermine any argument that the rejection of individual voir dire was primarily motivated by the schedule, as the court informed counsel that: "I'm sensitive to the concerns you've raised, and - - and I say, if I think with respect to a particular individual juror that really is going to be necessary to talk to that person separately, why, we'll do so. Take whatever time is necessary."  (RT 1007.)

Petitioner also contends that the trial court abused its discretion and violated his constitutional rights "by the unequal manner in which it conducted individual death qualification voir dire," in that the trial court, on several occasions, conducted individual voir dire on jurors who had views against the death penalty, but did not individually voir dire those who were for the death penalty.  (SAP at 336-37.)  The record also belies this argument, as it reflects that defense counsel pointed out that the trial court had individually questioned several prospective jurors who expressed strong feelings against the death penalty, to which the trial court responded:  "Well, I'd do the same thing if I thought somebody was way over on the other end, too.  What I'm looking for is people I think are

on one extreme or the other." (RT 1659-60.) When defense counsel requested that some individuals with views on the other end of the spectrum be questioned individually, the trial court replied: "Point that out to me, and I would question them in the same way."[16] (RT 1660.) Defense counsel promptly identified prospective juror D.D., who had indicated views strongly favoring the death penalty and was scheduled for voir dire that same afternoon; the trial court conducted individual voir dire of D.D. on the death penalty matter. (RT 1660, 1668-1674.) Later during the voir dire process, another prospective juror who was already going to be individually questioned on a personal matter was at that same time asked about their strong feelings for the death penalty. (RT 1729-37.)

Nor is the Court persuaded that the small group voir dire caused prospective jurors' views to be influenced by the responses of others in the group. Instead, a review of the voir dire transcripts reflect that a number of prospective jurors voiced agreement or disagreement with the responses or views of other prospective jurors, pointing to others' responses in attempting to clarify and define their own positions. Indeed, Petitioner points to one example of such supposed influence, when the exchange in question was actually a question posed by defense counsel. (See SAP at 335, citing RT 1604-05.) There, in an attempt to define one prospective juror's feelings concerning the death penalty, defense counsel noted that: "The - - the two jurors that I've questioned already this morning have indicated that they - - if I'm interpreting them correctly, would lean toward the death penalty, given a choice between the death penalty and life without possibility of parole.

---

[16] In response to the trial court's remarks, Petitioner argues that: "That is, however, precisely what counsel did - to no avail," and cites to a number of prospective jurors who expressed strong views in favor of the death penalty and were not questioned individually. (SAP at 337-39.) The trial court's remarks took place on May 5, 1994. (RT 1660.) Petitioner points to several jurors who were questioned in the days prior to the trial court's statement. (Compare RT 1660 with SAP at 336-39, citing RT 1045, 1077-80, 1114-15, 1135, 1197, 1238, 1300-04.) Given the timing, these citations fail to support an argument that *after* the trial court's suggestion that counsel point out jurors to individually question, defense counsel made such requests "to no avail."

How would you fit yourself in on the spectrum?" (RT 1604.) That prospective juror responded that it would depend on the circumstances, and noted that "perhaps maybe mass murder" would be a case where the death penalty should always be imposed, and answered "no" to whether the killing of children should always warrant the death penalty. (RT 1605.) Another juror in the group, when asked, agreed with that juror's view concerning mass murder, while yet another said "I don't know" about always imposing the death penalty for the killing of children, and another stated "murder of a police officer" as a case that would warrant the death penalty. (Id.) Thus, even when specifically asked about comparing their views to those of others, the record reflects that the prospective jurors' responses were varied and reflected their individual views rather than simply repeating the responses of others in the group. Based on a review of the record, the Court is not persuaded that the small group voir dire was deficient in the manner alleged.

In sum, given the lack of Supreme Court authority supporting Petitioner's contention that the lack of individual voir dire violates the Constitution, and based on a review of the voir dire proceedings which fails to support his argument that the trial court abused its discretion in the manner it conducted voir dire in his case, Petitioner has not demonstrated that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 9.

### 4. __Claim 10__

Petitioner asserts that the "prosecutor used peremptory challenges to exclude from the jury two African-Americans, both women, and eight of twelve women in general." (SAP at 341-42.) Petitioner asserts that "the prosecutor's excuses for excluding these prospective jurors found little or no support in the record" and contends that "the trial court failed in its duty to seriously evaluate the credibility of the prosecutor's excuses and make a reasoned determination of whether purposeful discrimination existed." (Id. at 342.)

///

///

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> During jury selection, after the prosecution used its ninth peremptory challenge to excuse B.J., a Black woman, the defense made an objection under *People v. Wheeler* (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748. The trial court stated that it would hear argument on the objection at the next recess. The prosecution then used its eleventh peremptory challenge against N.M., another Black woman. After the prosecutor had exercised 12 peremptory challenges and the defense had exercised 13 peremptory challenges, both sides expressed satisfaction with the jury as constituted, and the jurors were sworn to try the case. Alternate jurors were then selected and sworn.

> During the next recess, the defense presented argument on the *Wheeler* objection. Defense counsel stated that the objection was under *Batson v. Kentucky* (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (*Batson*) as well as *Wheeler* and that "[t]he racial group we are talking about in this instance is African American, specifically African American women." The court asked whether the challenge was "based on the race of the two jurors who were excused." Defense counsel replied that it was based on "race and gender," that the prosecutor had excused two of the three African-American women who were on the jury panel, and that defense counsel believed this was sufficient to raise an inference of impermissible discrimination.

> In response, the prosecutor argued that the defense was improperly "interrelating classes" and that the presence of seven women on the jury showed there had been no discrimination against women. The prosecutor also noted that of the four African-Americans on the initial panel, he had challenged two, the defense had challenged one, and one was seated on the jury. Defense counsel responded that, as to gender, the prosecution had used eight of 12 peremptory challenges against women. The trial court stated that "out of an abundance of caution" it was giving the prosecution "the opportunity to offer whatever nongender-based or nonracially based rationale you care to offer for the challenges."

> The prosecutor said he challenged N.M. because she "indicated that she thought there was some problems with the district attorney's office handling high-profile cases" and because she "indicated that she had a brother that had been arrested and prosecuted for drugs." The prosecutor said he challenged B.J. because her "son was prosecuted by our office, and she was an alibi witness in that case" and because "she's probably one of the most hostile

83

jurors that I've ever questioned." The prosecutor added: "I think that she feels very, very upset with the prosecution of her son." Defense counsel declined the trial court's invitation to comment on these reasons, stating: "We would submit for the court's ruling on it." The trial court then ruled on this aspect of the challenge, stating: "I think the People-their explanation I think convinces me that the challenges to [B.J.] and [N.M.] were not racially motivated or based upon their race."

The trial court then "out of an abundance of caution" asked the prosecutor to provide reasons for its peremptory challenges against the other six women. The prosecutor asked for time to review his notes and papers, and the court agreed to take up the matter later. The prosecutor noted that the defense had used most of its peremptory challenges against men, possibly as many as 11 out of 13 challenges. The court replied, in substance, that it did not think that was relevant in ruling on the defense challenge: "I'm not sure two wrongs make a right...."

The next day, the prosecutor provided reasons for the remaining six peremptory challenges to women. The prosecutor said he challenged L.J. "because she indicated on five different places on the questionnaire that she was against the death penalty." He challenged J.O. because she "indicated on her questionnaire that she felt she was a wishy-washy person," that she "had difficult[y] making up her mind," that "pressure from other jurors might start her to doubt herself," and that "she thinks she is a bad judge of character." He challenged N.J. because she stated on her questionnaire that "the burden of deciding a person's life was really just too great a decision for her to make." He challenged F.C. because she stated on her questionnaire that she would "find it difficult" to vote for death and the prosecutor thought she had "a clear leaning against the death penalty." He challenged L.H. because "a fair reading of her questionnaire is that she hasn't made up her mind" about the death penalty, and because "a fair reading of her statements in court was that she really is much opposed to the death penalty." He challenged B.B. because she wrote on her questionnaire that "she had religious and philosophical views so that she would always vote against the death penalty" and because he thought she might have difficulty understanding spoken English. Finally, he challenged M.B. because she was 73 years old and appeared to be "basically overwhelmed" and because she had apologized for believing in the death penalty.

After hearing defense counsel's argument in response, the trial court overruled the defense objection, stating: "I'm satisfied that the district attorney has made an explanation for each of these challenges which

persuades me that they were not solely or sufficiently based on gender that they should be held to have violated [defendant's] constitutional rights."

Defendant contends that the trial court erred in overruling the *Batson/ Wheeler* objection because the prosecutor's reasons for the peremptory challenges "found little or no support in the record" and because the trial court "failed in its duty to seriously evaluate the credibility of the prosecutor's excuses and make a reasoned determination of whether purposeful discrimination existed." Defendant contends that this error violated his rights under the federal Constitution to a fair trial, to due process of law, and to equal protection of the law, and his rights under the state Constitution to trial by a jury drawn from a representative cross-section of the community.

The use of peremptory challenges to remove prospective jurors because of their race or gender violates both the federal and the California Constitutions. (*J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89; *Powers v. Ohio* (1991) 499 U.S. 400, 409, 111 S.Ct. 1364, 113 L.Ed.2d 411; *Batson*, *supra*, 476 U.S. at p. 89, 106 S.Ct. 1712; *People v. McDermott* (2002) 28 Cal.4th 946, 969, 123 Cal.Rptr.2d 654, 51 P.3d 874.) The United States Supreme Court has set out a three-step process to be followed when a party claims that an opponent has improperly discriminated in the exercise of peremptory challenges. First, the complaining party must make out a prima facie case of invidious discrimination. Second, the party exercising the challenge must state nondiscriminatory reasons for the challenge. Third, the trial court must decide whether the complaining party has proved purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129; *Purkett v. Elem* (1995) 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834; *People v. Silva* (2001) 25 Cal.4th 345, 384, 106 Cal.Rptr.2d 93, 21 P.3d 769.)

By asking the prosecutor to explain the peremptory challenges, the trial court here implicitly found that defendant had made a prima facie showing of impermissible discrimination in the exercise of peremptory challenges. (*People v. Cash* (2002) 28 Cal.4th 703, 723, 122 Cal.Rptr.2d 545, 50 P.3d 332.) Once the trial court ruled on the credibility of the prosecutor's stated reasons, the issue of whether the defense had made a prima showing became moot. (*Hernandez v. New York* (1991) 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395; *People v. Arias* (1996) 13 Cal.4th 92, 135, 51 Cal.Rptr.2d 770, 913 P.2d 980.)

When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great

deference to its ruling, reviewing it under the substantial evidence standard. (*People v. McDermott*, *supra*, 28 Cal.4th at p. 971, 123 Cal.Rptr.2d 654, 51 P.3d 874; *People v. Cash*, *supra*, 28 Cal.4th at p. 725, 122 Cal.Rptr.2d 545, 50 P.3d 332.)

We consider each of the eight challenged jurors, taking them in the order in which the prosecutor provided reasons for the peremptory challenges.

The prosecutor's stated reasons for challenging N.M. were that she "indicated that she thought there was some problems with the district attorney's office handling high-profile cases" and because she "indicated that she had a brother that had been arrested and prosecuted for drugs." These reasons are neutral as to race and gender, they are not inherently implausible, and substantial evidence supports the trial court's finding on the credibility of this explanation. In response to a question on the juror questionnaire asking whether she had "any specific feeling for or against ... prosecutors (district attorneys)," she marked "yes" and explained: "There seems to be many problems with high-profile cases." In response to another question, she indicated that a close relative or friend had been arrested, charged, and tried for a crime, and she explained: "Brother arrested for possession of drugs."

Defendant argues that the prosecutor's reasons for challenging N.M. are not credible because other jurors whom the prosecutor did not challenge, and who were ultimately seated on the jury, also had relatives who had been arrested for drug-related offenses. Even if we assume we must conduct a comparative juror analysis for the first time on appeal (see *Miller-El v. Dretke* (2005) 545 U.S. 231, fn. 2, 125 S.Ct. 2317, 2326, fn. 2, 162 L.Ed.2d 196; *People v. Schmeck* (2005) 37 Cal.4th 240, 270, 33 Cal.Rptr.3d 397, 118 P.3d 451; *People v. Gray*, *supra*, 37 Cal.4th at pp. 188-189, 33 Cal.Rptr.3d 451, 118 P.3d 496), defendant does not identify any seated juror who gave responses similar to N.M.'s on both of the topics mentioned by the prosecutor. Although some of the seated jurors had relatives who had been arrested for drug-related offenses, none of these jurors also expressed any feelings against prosecutors.

The prosecutor said he challenged B.J. because her "son was prosecuted by our office, and she was an alibi witness in that case" and because "she's probably one of the most hostile jurors that I've ever questioned." The prosecutor added: "I think that she feels very, very upset with the prosecution of her son." These reasons are neutral as to race and gender, they are not inherently implausible, and substantial evidence supports the trial court's finding on the credibility of this explanation. On voir dire, B.J. said that she

had been an alibi witness in her son's trial in San Diego County, that the case was dismissed after two trials resulted in hung juries, and that her experiences with the police in that case "were not very favorable," although she denied having negative feelings toward the prosecutor or the criminal justice system. When the prosecutor stated that B.J. was "probably one of the most hostile jurors" he had ever questioned, the trial court said, "I recall having that same impression when we were talking to her." Defense counsel did not dispute this characterization of B.J.'s demeanor on voir dire, instead merely submitting the matter.

The prosecutor's stated reason for challenging L.J. was that "she indicated on five different places on the questionnaire that she was against the death penalty." The record supports this statement, which provides a credible and gender-neutral ground for challenge. Skepticism about the death penalty is a permissible basis for a prosecutor's exercise of a peremptory challenge. (*People v. Panah* (2005) 35 Cal.4th 395, 441, 25 Cal.Rptr.3d 672, 107 P.3d 790; *People v. McDermott*, *supra*, 28 Cal.4th at pp. 970-971, 123 Cal.Rptr.2d 654, 51 P.3d 874.)

The prosecutor's stated reasons for challenging J.O. were that she "indicated on her questionnaire that she felt she was a wishy-washy person," that she "had difficult[y] making up her mind," that "pressure from other jurors might start her to doubt herself," and that "she thinks she is a bad judge of character." The record supports these reasons, which provide credible and gender-neutral grounds for challenge. A prosecutor could reasonably be concerned about a juror who said she was a bad judge of character because she would "believe any hard luck story."

The prosecutor's stated reason for challenging N.J. was her questionnaire response that "the burden of deciding a person's life was really just too great a decision for her to make." This is an accurate description of one of N.J.'s questionnaire responses, in which she marked the "no" response to a question asking whether she would like to serve as a juror on this case, adding this explanation: "The burden of decision for a person's life-either the death sentence or life imprisonment." This response provides a legitimate and credible reason for the challenge.

The prosecutor said he challenged F.C. because she stated on her questionnaire that she would "find it difficult" to vote for death and the prosecutor thought she had "a clear leaning against the death penalty." In response to a question asking for her "feelings about the death penalty," F.C. wrote on her questionnaire, "In a few cases it may be necessary, but in general

I would find it difficult to give this recommendation." These reservations about the death penalty provided a permissible basis for a prosecutor's exercise of a peremptory challenge. (*People v. Panah*, *supra*, 35 Cal.4th at p. 441, 25 Cal.Rptr.3d 672, 107 P.3d 790; *People v. McDermott*, *supra*, 28 Cal.4th at pp. 970-971, 123 Cal.Rptr.2d 654, 51 P.3d 874.)

The prosecutor said he challenged L.H. because "a fair reading of her questionnaire is that she hasn't made up her mind" about the death penalty, and because "a fair reading of her statements in court was that she really is much opposed to the death penalty." In response to the question asking for her "feelings about the death penalty," L.H. wrote this response: "Well, it seems that killing a person by the death penalty for killing someone else is confusing. What will sentencing someone to die do for our society? I'm not sure of this 'eye for an eye' sentence." In response to a question asking what purpose or purposes the death penalty serves, she wrote: "I'm not sure it does serve a valid purpose. Unfortunately, it seems to be disproportionately given to non-whites. Also, there's no going back once it's done-what if new evidence comes to light?" Her responses on voir dire also revealed skepticism about the death penalty. These reservations about the death penalty provided a legitimate, credible, gender-neutral basis for a prosecutor's exercise of a peremptory challenge.

He challenged B.B. because she wrote on her questionnaire that "she had religious and philosophical views so that she would always vote against the death penalty" and because he thought she might have difficulty understanding spoken English. The record supports these reasons. The questionnaire asked the prospective jurors whether they had "any moral, religious, or philosophical opposition to the death penalty so strong that [they] would be unable to impose the death penalty regardless of the facts." In response to this question, B.B. put a check mark next to "yes," with this explanation: "Thou shalt not kill, one of the 10 commandments of God." She also indicated that she had been born in the Philippines, thereby suggesting that English might not be her first language. These are permissible, neutral, and credible reasons for the peremptory challenge of B.B.

Finally, the prosecutor said he challenged M.B. because she was 73 years old and appeared to be "basically overwhelmed" and because she had apologized for believing in the death penalty. The record supports these reasons, which are credible and gender neutral. The questionnaire asked the prospective jurors to state their "feeling about the death penalty." M.B. wrote in response: "I am sorry to say but I am for the death penalty." She also indicated on the questionnaire that she would not like to serve as a juror on

this case. On voir dire, when the prosecutor asked her about this response, she said: "I have served on juries before and I also been on election boards, I think somebody else should do it. You know, my years living."

We are unpersuaded by defendant's argument that the trial court erred in deferring argument on defendant's *Batson/Wheeler* motion until the next recess, which occurred after the jury selection process had been completed and a jury had been sworn to try the case. Defense counsel did not object to this procedure at the time, and in fact indicated that the defense was satisfied with the jury that was sworn to try the case. Moreover, the swearing of the jury would not have made it impossible for the trial court to grant effective relief in the event the court granted the *Batson/ Wheeler* motion. Although jeopardy attached with the swearing of the jury, a *Batson/ Wheeler* motion may be deemed a motion for mistrial and thus a waiver of any double jeopardy defense. (See *People v. Batts* (2003) 30 Cal.4th 660, 679, 134 Cal.Rptr.2d 67, 68 P.3d 357 [a defendant's request for a mistrial waives any double jeopardy claim]; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 115, 2 Cal.Rptr.3d 186, 72 P.3d 1166 [*wheeler* motions often termed motions for mistrial].)

We conclude that substantial evidence supports the trial court's rulings rejecting defendant's *Batson/Wheeler* challenges on the basis of race and gender.

Jurado, 38 Cal. 4th at 102-08 (alterations in original). This claim was later re-raised in the second state habeas petition and denied on procedural grounds, but for the reasons discussed above in section III.B., the Court will address this claim on the merits.

In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court held that "the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause," and that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Id. at 89. The Supreme Court later also held similarly with respect to challenges based on the gender of a prospective juror, concluding that: "[T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man." J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 146 (1994); see also id. at 129 ("We hold that gender, like race, is an unconstitutional

proxy for juror competence and impartiality.")  The <u>Batson</u> Court outlined a three-step procedure to evaluate such claims, restated in <u>Johnson v. California</u>, 545 U.S. 162 (2005), as follows:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  476 U.S., at 93-94, 106 S.Ct. 1712 (citing *Washington v. Davis*, 426 U.S. 229, 239-242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)).  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  476 U.S., at 94, 106 S.Ct. 1712; see also *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."  *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) *(per curiam)*.

<u>Id.</u> at 168 (footnote omitted) (alteration in original).

The trial court did not specifically conclude that the defense had demonstrated a prima facie case with respect to either the race or gender challenge to the venire, but stated that: "Well, I think out of an abundance of caution, not to unnecessarily put the case at risk, I should at least afford the people the opportunity to offer whatever nongender-based or nonracially-based rationale you care to offer for the challenges to - - in the case of racial challenge on racial basis to Ms. [B.J.][17] and Ms. [N.M.]."  (RT 1967.)  With particular reference to the gender-based challenge, the trial court stated: "I don't feel real comfortable right now in saying, 'No, they haven't made a prima facie showing, so let's move on.'  I think they may have, so I'll give you an opportunity to rebut the prima facie showing. . ."  (RT 1970.)  As the California Supreme Court noted on direct appeal, and the parties here acknowledge, because in this case the trial court elicited and evaluated the prosecutor's reasons for the peremptory challenges, this first <u>Batson</u> step is "moot."  (<u>See</u> Ans. Mem. at

---

[17] The Court will refer to each member of the jury venire by their first and last initials only, following the practice of the California Supreme Court on direct appeal in this case.

237, SAP at 347); see also Jurado, 38 Cal. 4th at 104, citing Hernandez v. New York, 500 U.S. 352, 359 (1991) (plurality opinion) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima face case showing becomes moot.") As such, this Court's analysis will focus on the California Supreme Court's analysis of the third Batson step.

As previously argued on direct appeal, Petitioner contends that the record fails to support the prosecutor's stated reasons for the peremptory challenges. Specific to this Court's habeas review, Petitioner asserts that on direct appeal he "raised a meritorious claim that the prosecution's use of peremptory challenges to exclude Black and female jurors violated his federal constitutional rights, and that the state court's conclusion that there was no discrimination was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." (Pet. Br. at 82-83.) The Supreme Court recently outlined in detail the differing burdens with respect to Batson claims at the trial court level, during state court review, and on federal habeas corpus, as follows:

> The opponent of the strike bears the burden of persuasion regarding racial motivation. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*), and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is "entitled to 'great deference,'" *Felkner v. Jackson*, 562 U.S. 594, 598, 131 S.Ct. 1305, 179 L.Ed.2d 374 (2011) (*per curiam*) (quoting *Batson*, 476 U.S., at 98, n.21, 106 S.Ct. 1712.) On direct appeal, those findings may be reversed only if the trial judge is shown to have committed clear error. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). Under AEDPA, even more must be shown. A federal habeas court must accept a state-court finding unless it was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Collins*, *supra*, at 338-339, 126 S.Ct. 969 (quoting § 2254(e)(1)).

Davis v. Ayala, 576 U.S. ___, 135 S.Ct 2187, 2199-2200 (2015).

Petitioner acknowledges that "[t]he standard is doubly deferential; unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, the federal reviewing court cannot disturb it." (Pet. Br. at 83, citing Rice, 546 U.S. at 338-42 ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.") and Hernandez, 500 U.S. at 365 ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." (internal quotation marks and citation omitted)).) Pursuant to § 2254(d)(2), this Court must accept the California Supreme Court's conclusions unless they were based on an unreasonable determination of facts and must presume the state court's factual findings are correct unless Petitioner rebuts that presumption. In this case, as detailed below, because the California Supreme Court's findings are amply supported by the state record, Petitioner fails to rebut the presumption that the state court's findings are correct and does not demonstrate that the state court's conclusions were based on an unreasonable determination of the facts.

During voir dire proceedings, the defense raised a Batson challenge with respect to the prosecutor's exercise of peremptory challenges against nine[18] prospective jurors, asserting that those challenges were impermissibly based on race and/or gender. This includes prospective jurors N.M. and B.J., both Black females, who Petitioner claims were impermissibly excused on the basis of race and gender, and prospective jurors L.J., J.O., N.J., F.C., L.H., B.B., and M.B., each of whom Petitioner contends were impermissibly excluded based on their gender.

---

[18] In the opinion on direct appeal, the California Supreme Court incorrectly states that it would discuss the "eight challenged jurors" but in reviewing the opinion, the state court discusses the same nine jurors discussed in the instant Order. See Jurado, 38 Cal. 4th at 105-07.

The prosecutor cited several statements N.M. made in her juror questionnaire, specifically that "she indicated that she thought there was some problems with the district attorney's office handling high-profile cases," and that "she had a brother that had been arrested and prosecuted for drugs," as reasons for her excusal. (RT 1967.) In the briefing, Petitioner asserts that the record reflects the prosecutor admitted that he had yet not read her questionnaire at the time he issued the challenge and points out that the prosecutor failed to specifically question N.M. about either cited matter, arguing this both supports a conclusion that the reasons cited were not genuine and a pretext for discrimination, as well as proves that the state court's rejection of this claim was based on an unreasonable factual determination. (Pet. Br. at 85; Reply at 44.)

As an initial matter, the Court does not agree with Petitioner's contention that the prosecutor admitted he failed to read N.M.'s questionnaire prior to issuing the peremptory challenge, nor that it supports a conclusion that the prosecutor's stated reasons for the challenge were pretextual. During the Batson discussion, the prosecutor at one point stated: "I hadn't looked at her [N.M's] questionnaire when I issued the challenge this morning." (RT 1966.) Based on this statement, Petitioner alleges that: "It was only *after* Ms. M[] was challenged and the defense objected that the prosecutor reviewed her questionnaire." (SAP at 351, citing RT 1966.) After reviewing the trial transcript, it is evident that Petitioner takes this statement out of context, as the remark was clearly made concerning the prosecutor's indication that he did not realize the juror in question was Black and appeared limited to that subject. When the defense listed the prospective jurors included in the Batson challenge, the prosecutor explained that while he realized several other prospective jurors and one seated juror were Black, that "I didn't realize Ms. [M] was until counsel pointed that out," made the statement above; after pulling the questionnaire, he agreed it indicated she was Black. (RT 1966.) To this, the trial court responded that "from physical appearance, outward appearance, she's not as obviously African American or Black American as the others were," but stated that "I think it's - - I think she is in - - a member of that group, and I'm satisfied that's the case. And I think that at this point in the

process, that either was known or should have been known based on what she told us in writing and our talking with her during the selection process." (RT 1966-67.) The Court is not persuaded that the cited comment, when reviewed in light of the surrounding record rather than devoid of context, supports a conclusion that the prosecutor failed to conduct *any* review of N.M.'s written questionnaire prior to issuing the peremptory challenge. The record reflects the prosecutor made the cited comment in response to the defense's inclusion of N.M. in the <u>Batson</u> challenge as an explanation for his lack of realization that the prospective juror in question was Black. The Court is not persuaded it was a general statement intimating that he never, at any point, reviewed her questionnaire prior to issuing his peremptory challenge.

A review of the surrounding record further supports a conclusion that the prosecutor's statement was limited in its scope and was not, as Petitioner contends, an admission that the prosecutor failed to review the prospective juror's questionnaire prior to issuing the peremptory challenge. During a later portion of the <u>Batson</u> hearing, the prosecutor explained his procedure for reviewing the prospective jurors' questionnaires, stating that: "What we did by way of processing all these questionnaires is Mr. Bento [the prosecution's investigator] and I reviewed them and then met" in order to make their decisions on each potential juror. (RT 1968.) Indeed, as Petitioner acknowledged during oral arguments, a review of the voir dire record reflects that the prosecutor asked N.M. questions based on her responses in the questionnaire. (<u>See</u> <u>e.g.</u> RT 1539) ("Q: If on one end of the spectrum you have those folks that support the death penalty and the other end of the spectrum those folks that were opposed to the death penalty, *you indicate in the questionnaire* that you favored it or you thought it was appropriate in some cases I believe?") (emphasis added).

Based on the Court's review of the record, including the context surrounding the cited comment and the prosecutor's explanation of his procedure for evaluating the prospective jurors, specifically including the statement that his procedure included a review and discussion of the answers provided in the questionnaires as well as the prosecutor's

direct questioning of N.M. based on her responses in the questionnaire, the Court is not persuaded that the above statement supports Petitioner's assertion that the cited reasons for the peremptory challenge were pretextual.

The Court also remains unpersuaded that the prosecutor's failure to specifically question N.M. about her brother's arrest and the district attorney's office's handling of high-profile cases compel a conclusion that those reasons were not the genuine reasons for the peremptory challenge, nor that it serves to demonstrate that the state court's rejection of the claim involved an unreasonable determination of the facts. Petitioner is correct that the Supreme Court has indeed indicated that a prosecutor failing to question a prospective juror on a particular subject is a factor that may be considered in evaluating the genuineness of prosecutor's cited reason for the strike. See Miller-El v. Dretke, 545 U.S. 231, 246 (2005) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."), quoting Ex parte Travis, 776 So.2d 874, 881 (Ala. 2000). Yet, Supreme Court has also generally instructed that: "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." Miller-El v. Cockrell, 537 U.S. 322, 339 (2003).

Here, the California Supreme Court recited and assessed the prosecutor's stated reasons, concluding that: "These reasons are neutral as to race and gender, they are not inherently implausible, and substantial evidence supports the trial court's finding on the credibility of this explanation." Jurado, 38 Cal. 4th at 105. The Court agrees with this assessment. While a prosecutor's failure to question a prospective juror on a certain subject may "suggest" the existence of pretext, the Supreme Court has not held that such failure conclusively demonstrates that any such given reasons must be pretextual. See Miller-El, 545 U.S. at 246. Even if the circumstances surrounding the strike of N.M. raised a concern, the California Supreme Court's opinion reflects a keen awareness of Miller-El v. Dretke, as the state court cited to and applied that very decision in Petitioner's case when

conducting a comparative analysis between N.M. and other seated jurors. See Jurado, 38 Cal. 4th at 105. Thus, any potential for concern is dispelled by the state court's thorough treatment of the issue and specific application of clearly established law to Petitioner's claim. Even had the state court not specifically discussed the very case Petitioner relies upon, AEDPA's "highly deferential standard requires us to presume that 'state courts know and follow the law.'" Lewis v. Lewis, 321 F.3d 824, 829 (9th Cir. 2003), quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002). In this instance, the Court is not persuaded by Petitioner's assertion, based on a review of the trial record, the required deference, and the state court's diligent assessment of the matter.

After conducting the comparative juror analysis, the state supreme court reasoned that: "Even if we assume we must conduct a comparative juror analysis for the first time on appeal, defendant does not identify any seated juror who gave responses similar to N.M.'s on both of the topics mentioned by the prosecutor. Although some of the seated jurors had relatives who had been arrested for drug-related offenses, none of these jurors also expressed any feelings against prosecutors." Jurado, 38 Cal. 4th at 105 (internal citations omitted). Now on federal habeas review, Petitioner points out several seated jurors with relatives arrested for drug related offenses. (See SAP at 351 n.24.) However, as noted above, while several jurors were similar to N.M. on that matter, the California Supreme Court found that no seated juror was similar to N.M. on both of the cited subjects. Petitioner does not provide grounds to dispute the reasonableness of this finding.

Thus, given that the California Supreme Court was clearly aware of and applied Miller-El to Petitioner's claim, even if this Court were persuaded that the state court was somehow incorrect in its application of this clearly established law or in its factual determination, such error on its own would be insufficient to warrant relief unless the state court's decision was unreasonable under sections 2254(d)(1) or (d)(2). In light of the deference with which this Court must review the state court's decision, on this record the Court cannot reach that conclusion. For the reasons discussed above, Petitioner has not

08cv1400

shown that the California Supreme Court's conclusion that the record supported the trial court's decision concerning N.M. was unreasonable.

With respect to prospective juror B.J., Petitioner challenges the reasonableness of state court's finding that the juror was "hostile" and harbored feelings against the prosecution. During the <u>Batson</u> hearing, the prosecutor stated that "Ms. [J.]'s son was prosecuted by our office, and she was an alibi witness in that case. And I should also indicate that she's probably one of the most hostile jurors that I've ever questioned. I mean, she was so hostile that even defense counsel commented on it after we went into recess," to which the trial court responded, "I recall having that same impression when we were talking to her." (RT 1967.) Petitioner contends that the record does not support a conclusion that B.J. was hostile to the prosecution, pointing out that: "No description of B.J.'s conduct and demeanor appears in the record, and neither counsel nor the court made a record of any sensed hostilities after her voir dire." (Pet. Br. at 87.) During individual questioning of B.J. conducted prior to, and separately from, the later group voir dire, B.J. indicated that while "[t]he experience with the police were not very favorable," that she "didn't have much interaction" with the prosecutor's office and that "I assume the man was doing his job, and I don't have any feelings toward it at this point." (RT 1495.) Petitioner notes that the juror "explicitly stated that that she had no negative feelings about the criminal justice system as a result of her son's case and that her experience would not affect her ability as a juror." (Pet. Br. at 87, citing RT 1496-97.)

While this is correct, a review of the entirety of this cited exchange reveals that the prosecutor continued to question B.J. on whether she could be fair, stating that: "I sense that there's something else that - - maybe I'm just misreading what you're saying. Is there anything else in your background or past that would affect you in judging a case such as this? No?" to which she replied, "No." (RT 1496-97.) After B.J. left the courtroom, the trial court asked if either side wanted to discuss the prospective juror, and the prosecutor stated that: "I don't know if the defense is intending to challenge her. I know the line of questioning indicated they had a concern. We have a concern on other issues. We'd be

willing to stipulate to avoid additional questioning, if she were to come in with the group." (RT 1498.)  The defense declined.  (Id.)

During the <u>Batson</u> hearing, the prosecutor cited the earlier exchanges with B.J. in explaining his peremptory challenge, stating that: "In fact, I even think if we looked at the transcript, I asked her to expound on if there was a problem, and I never got a sufficient response."  (RT 1967.)  The prosecutor again voiced a belief that B.J. "feels very, very upset with the prosecution of her son" and "harbors ill feelings towards prosecutors and I think that was apparent in her conduct and demeanor in court."  (RT 1967-68.)  When the trial court asked if the defense had any comment, counsel declined and stated that they would submit it for the trial court's ruling.  (RT 1968.)  The trial court accepted the reasons, concluding that: "I think the People - - their explanation I think convinces me that the challenges to Ms. [J] and Ms. [M] were not racially motivated or based upon their race." (Id.)

Again, in addition to presuming the state court's findings correct unless that presumption is rebutted, a reviewing court must also defer to the trial judge's findings.  <u>See</u> 28 U.S.C. § 2254(d)(2)); <u>see also</u> <u>Hernandez</u>, 500 U.S. at 365 ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"), quoting <u>Wainwright v. Witt</u>, 469 U.S. 412, 428 (1985), citing <u>Patton v. Yount</u>, 467 U.S. 1025, 1038 (1984); <u>see</u> <u>also</u> <u>Miller-El</u>, 537 U.S. at 339 ("Deference is necessary because a reviewing court, which analyzes only the transcripts of *voir dire,* is not as well positioned as the trial court is to make credibility determinations.")

The Court's review of the record supports a conclusion that B.J. harbored negative feelings towards the prosecution.  While the prosecutor may not have explicitly called out the juror directly on this matter, it is apparent from the exchange between the prosecutor and B.J. that the prosecutor inquired repeatedly about his concerns that "something" in her background would prevent her from being a fair juror in the case.  The record also reflects that immediately after B.J. was excused from the courtroom, the prosecutor informed the

trial court that he had concerns and was willing to stipulate to her excusal. Moreover, during the <u>Batson</u> hearing, the trial court agreed with the prosecutor's characterization of B.J. as hostile. Therefore, regardless of the lack of an explicit verbal articulation of hostility from B.J., the record supports the California Supreme Court's factual findings.

Given the record support for both the trial court's decision and the state court's rejection of this claim, the Court is not persuaded that the California Supreme Court's acceptance of the citation to B.J.'s hostility and apparent adverse feelings towards the prosecution as appropriately neutral reasons for the peremptory challenge was unreasonable.

With respect to prospective juror L.J., the prosecutor stated that "she indicated on five different places on the questionnaire that she was against the death penalty. And that was one of our challenges for cause. And I believe she only survived that challenge for cause because of Mr. Warren's [defense counsel] hypothetical situations wherein she said she could fathom some extreme case of mass murder where it might be possible that she could do it. But basically she's very much opposed to the death penalty and indicated that five different places on her questionnaire." (RT 2004.) The California Supreme Court found the record supported the prosecutor's statement about L.J.'s feelings against the death penalty and reasoned that "[s]kepticism about the death penalty is a permissible basis for a prosecutor's exercise of a peremptory challenge." <u>Jurado</u>, 38 Cal. 4th at 106.

Petitioner asserts that "[c]ontrary to the state court's suggestion that L.J. could not return a death verdict under the appropriate circumstances, L.J. explicitly stated an ability to impose a death verdict in an appropriate case." (Pet. Br. at 89, citing RT 2004.) Petitioner asserts that the prosecutor did not question L.J. about this subject, undermining it as a valid basis for the challenge. (<u>Id.</u>, citing RT 1615-17, <u>Miller-El</u>, 545 U.S. at 246.)

But a review of the record reflects that the prosecutor *did* question L.J. about her views on the death penalty, and in fact, specifically inquired about the answers written in her questionnaire on that subject. (RT 1622-24.) The prosecutor noted that L.J. indicated she had "a conscientious objection" to the death penalty, to which L.J. responded "I wasn't

quite sure what it meant by conscientious objection. But it would just be difficult to make the decision for death. I guess I would probably lean towards life imprisonment without chance of parole. It would just be a difficult situation, difficult decision." (RT 1622-23.) L.J. stated that she "wouldn't always vote for that," but acknowledged "it's a leaning that I have." (RT 1623.) When asked if there was a situation where she might find the death penalty appropriate, she replied: "Well, like those other people were saying perhaps mass murder or something of that nature, that was, you know, horrendous enough that that would seem like it was appropriate." (Id.) After further questions, L.J. again stated that: "It would be difficult. It would be difficult to decide for the death penalty," and when asked if her views were the same as when she completed the questionnaire, L.J. stated: "I think so. I've just had time to really, you know, focus on what my views really are." (RT 1624.) In light of this record, it is evident that the prosecutor inquired extensively about L.J.'s views about capital punishment and ability to vote for the death penalty.

As for Petitioner's argument that the California Supreme Court erred in its "suggestion" that L.J. could not impose the death penalty, the Court finds no such suggestion in the state court's decision. The California Supreme Court simply recited the prosecutor's statement that L.J. indicated in several places on her questionnaire that she was against the death penalty and reasoned that "skepticism" about capital punishment was a legitimate basis for a peremptory challenge. Jurado, 38 Cal. 4th at 106. The Court finds no error in this regard. This claim does not concern a *cause* challenge pursuant to Witt/Witherspoon, but instead concerns the evaluation as to whether the prosecutor's *peremptory* challenge violated Batson. As the California Supreme Court reasonably found, a prospective juror's "skepticism" concerning capital punishment is a reasonable, gender-neutral ground for a peremptory challenge, and the record supported a finding that L.J. articulated skepticism, at a minimum, about capital punishment. Petitioner presents nothing to undermine the reasonableness of the state court's factual determination.

With respect to prospective juror J.O., the prosecutor noted that J.O. stated that she was a "wishy-washy person," and "had difficulty making up her mind," that her

questionnaire reflected "the emotional impact of this testimony - - of the case could sway her," and that "pressure from other jurors might start her to doubt herself," and that "she thinks she's a bad judge of character" and "can believe any hard-luck story." (RT 2004.) Similar to the contentions raised concerning L.J., Petitioner asserts that the reasons given are not credible "because the prosecutor failed to ask J.O. any questions about these subjects before challenging her." (Pet. Br. at 88.) Petitioner also contends that several of the reasons given by the prosecutor misstated J.O.'s answers or are contradicted by the record. For instance, Petitioner challenges the prosecutor's statement that J.O. could be swayed by the emotional aspects of the testimony or the case, asserting that "[t]his misstates J.O.'s statement, which was that she might be swayed by emotional testimony from Holloway's family about the impact of her death." (Id.) Petitioner also argues that the prosecutor's statement that J.O. indicated she might doubt herself due to pressure from other jurors lacks record support, because J.O. also indicated that she would not change her vote due to such pressure and that "since I don't like to be bullied I wouldn't back down unless someone could calmly explain the other view point and it made sense." (Id. at 88-89, quoting CT 5480, 5492.)

A review of the record, however, reveals that J.O. was questioned extensively on these matters during voir dire by defense counsel, and she articulated that she might be swayed or overwhelmed by prospective testimony from the victim's family. When counsel asked: "Do you feel you might be overwhelmed emotionally by that, making it difficult for you to assume your role as a juror?," J.O. replied, "Yes, I feel that really is a distinct possibility." (RT 1124-25.) Counsel asked "how much of a possibility is it," to which she replied "I feel that I will - - I will be swayed." (RT 1125.) When counsel further inquired about the potential impact of family testimony and whether it could impact her ability to be fair, J.O. replied: "Well, yeah, I - - that sounds horrible. I don't know. I - -I can't give you - - I'd like to think that yes, we could hopefully kind of maintain, but I just - - I don't know what these people are going to be like, what they could possibly say." (RT 1126.) It is clear this area was extensively probed, and that the prosecutor followed up on the

defense's inquiry by asking about J.O.'s statement that she thought the situation was "overwhelming." (RT 1160.) The prosecutor asked how J.O. felt about sitting in judgment on a capital case, and she stated "It's an incredible responsibility," but indicated that she could vote for death "if the evidence and facts warrant it." (RT 1160-61.) Consistent with the state court's findings, J.O. indicated a concern, both verbally and in writing, that she could be overwhelmed or swayed by emotional testimony from the victim's family members, and contrary to Petitioner's contention, defense counsel engaged in extensive questioning on this subject which was followed up by questions from the prosecutor on the overwhelming nature of the case. As such, based on a review of the record, the Court is not persuaded that the California Supreme Court's assessment, that the prosecutor's peremptory challenge against J.O. was supported by reasons in the record both credible and neutral to gender, was based on an unreasonable determination of the facts.

The prosecutor stated that prospective juror N.J. "does not want to be on this jury because she thought the burden of deciding a person's life was really just too great a decision for her to make," as she indicated in her questionnaire. (RT 2004.) The California Supreme Court concluded that the prosecutor accurately referenced N.J.'s questionnaire, specifically her response that she would not like to serve as a juror and citation to the "burden" of a life or death decision. Jurado, 38 Cal. 4th at 106. The state court found that "[t]his response provides a legitimate and credible reason for the challenge." Id.

After reviewing the Petitioner's merits brief and reply, it does not appear Petitioner has articulated a specific challenge to the reasonableness of the state supreme court's findings or conclusions concerning N.J. In the SAP, Petitioner generally argues that "[t]he record also provides reasons to suspect the good faith of the prosecutor's explanations for the other female prospective jurors he challenged," and asserts that "most people would feel the same" as N.J. about the burden of deciding between life in prison and the death penalty. (SAP at 365-66.) Petitioner points out that N.J. was "strongly for the death penalty" and was able to vote for it. (Id. at 366, citing RT 1198, 1250.)

///

1    Notwithstanding Petitioner's contention that many people feel making a life and
2    death decision would constitute a significant burden, that alone does not dispel or negate it
3    as a legitimate race-neutral reason for a peremptory challenge.  When the prosecutor
4    questioned N.J. during voir dire on this subject, her responses on this matter were consistent
5    with her questionnaire responses, as she stated that: "I've wrestled with this.  It's just - -
6    it's a difficult question, it's a difficult dilemma, because I very strongly believe in the death
7    penalty.  May not be necessarily in this case.  But again I guess I don't want to do the dirty
8    work, I don't want to bear the responsibility."  (RT 1249-50.)  Petitioner fails to
9    persuasively explain why there should be suspicion about the validity of the prosecutor's
10   stated reasons concerning N.J., particularly given that it appears reasonable for a prosecutor
11   to choose to strike a juror who repeatedly articulated a clear desire not to serve and an
12   aversion to making a penalty determination both verbally and in writing.  After reviewing
13   the record, the Court finds sufficient support for the California Supreme Court's factual
14   findings and conclusions with regard to N.J.

15        During the <u>Batson</u> hearing, the prosecutor stated that F.C. would be a good juror on
16   a non-capital case "but indicated on the questionnaire that she'd find it difficult to give this
17   recommendation, although she indicated there are some cases where she might."  (RT
18   2004-05.)  Petitioner points out that "[a]lthough candidly stating she would find it difficult
19   to return a death verdict, she had no conscientious, moral, religious, or philosophical
20   opposition to the death penalty, and explicitly stated that she would *not* automatically vote
21   for life without parole," and indicated that she could impose death in an appropriate case.
22   (Pet. Br. at 90, citing CT 3409-11, RT 1058-60.)  Based on this record, Petitioner asserts
23   that the California Supreme Court's finding that F.C. had "reservations" about the death
24   penalty was an unreasonable determination of the facts.  (<u>Id.</u>)

25        F.C. indicated during voir dire that "[i]t would have to be something very extreme
26   for me to want to have somebody put to death," and mentioned "severe" cases such as those
27   involving torture.  (RT 1058-59.)  This answer appears consistent with the responses
28   provided in her questionnaire, in which F.C. wrote about her feelings concerning the death

103

08cv1400

penalty, stating that: "In a few cases it may be necessary, but in general I would find it difficult to give this recommendation." (CT 3409.) To a question asking what purpose, if any, the death penalty served, F.C. wrote: "Little. A danger to society is removed forever – but I doubt that this will stop others from doing a similar crime." (CT 3410.) Given these responses, the record supports the factual finding that F.C. expressed "reservations" about the death penalty, as the state court concluded. While Petitioner correctly notes that F.C. could potentially vote for the death penalty and was not an automatic vote against it, that fact does not preclude a conclusion that the juror also harbored reservations about capital punishment. There is clear support in the record for a finding that F.C. found the penalty determination difficult and expressed concerns about her ability to impose capital punishment. In any event, whether F.C. could potentially impose the death penalty in any case is irrelevant to the outcome of this claim, as F.C. was not the subject of a successful challenge for cause based on her views. Instead, the prosecutor struck F.C. via peremptory challenge, and the prosecutor's references to F.C.'s hesitation about imposing the death penalty are both supported by the record and are gender neutral. Based on this review of the record, including F.C.'s written responses in the questionnaire as well as her verbal statements during voir dire questioning, the California Supreme Court acted reasonably in finding that "[t]hese reservations about the death penalty provided a permissible basis for a prosecutor's exercise of a peremptory challenge." Jurado, 38 Cal. 4th at 106.

At the Batson hearing, the prosecutor stated that he struck prospective juror L.H. because while she gave issues a lot of thought, she "wrote in the margins that she was unsure, hadn't made up her mind. And then when she was questioned by Mr. Warren [defense counsel] here in court and by myself, she indicated over and over again she could not do it. And she only survived a challenge for cause because Mr. Warren presented a hypothetical concerning some mass murder where she thought possibly under some circumstance she might." (RT 2005.) Similar to prospective juror F.C., the California Supreme Court concluded that L.H.'s written and verbal responses indicated a "skepticism" about the death penalty and that such "reservations" constituted appropriate gender-neutral

grounds for a challenge.  See Jurado, 38 Cal. 4th at 107.  Petitioner contends that "[t]he state court's conclusion that L.H. could never return a death verdict is belied by the record, which indicates that she could in fact consider the death penalty" and argues that L.H. survived a cause challenge because she could consider death as a potential penalty, rendering the state court's conclusion premised on an unreasonable factual determination. (Pet. Br. at 93, citing RT 1410-12, 2005.)

Contrary to Petitioner's assertion, the California Supreme Court did not articulate or conclude that L.H. "could never return a death verdict," but instead found that L.H. held "reservations" about the death penalty.  Jurado, 38 Cal. 4th at 107.  A review of the trial record affirms the reasonableness of the state court's factual findings.  Even defense counsel acknowledged that L.H. was not impartial on the issue of capital punishment. During the Batson hearing, defense counsel stated that: "[w]hat Mr. Pettine [the prosecutor] said about Miss [H.] is quite justified.  She was - - and he did take a challenges [sic] on her.  And I'm not going to sit here and argue that Miss [H.] was completely open-minded about death versus LWOP.  But I would just submit to the Court that there are several people sitting on the panel right now, and again who were on the overall panel, who were kept on the panel, not excused for cause, who had very, very strong leanings for the death penalty."  (RT 2010.)

Yet, as with F.C., the question is not whether L.H. was completely open-minded as to the death penalty, because she was not stricken from the jury for cause, but through the use of a peremptory challenge.  L.H.'s leanings against the death penalty are supported by the record and provide a gender neutral basis for the peremptory challenge.  As such, Petitioner fails to demonstrate that the state court's decision was based on an unreasonable determination of the facts.

The prosecutor stated that in reviewing B.B.'s questionnaire, it was initially unclear where she stood but later "she indicated she had religious and philosophical views so that she would always vote against the death penalty and cited one of the Ten Commandments as a basis for that."  (RT 2005.)  The prosecutor added that B.B. was born in the Philippines

and that he had a concern about a language problem given some of her responses, explaining: "And that was an additional concern I had in having a juror that may not understand English completely hearing the case of this magnitude." (RT 2006.)  The California Supreme Court cited these two stated reasons and concluded that: "These are permissible, neutral, and credible reasons for the peremptory challenge of B.B." Jurado, 38 Cal. 4th at 107.

Petitioner asserts that "[t]he state court's conclusion that a language problem provided a basis for the challenge is belied by the record," noting that "[a]lthough stating on voir dire that there were a few questions in the questionnaire that she did not understand, there is nothing in the record indicating this was due to a language problem." (Pet. Br. at 91.)  The state court simply indicated that the "record supports" the stated reasons for the challenge of B.B.  After reviewing the record, this finding appears reasonable.  B.B. acknowledged during voir dire that she did not understand some of the questions posed in the questionnaire, stating that: "There are a few questions that I put a question mark because I don't - - I don't want to answer it if I'm not really certain or sure about it." (RT 1615.) A review of the questionnaire reflects that several question were marked only with a "?" in the space provided for an answer, including questions asking "How would you judge the testimony of a victim's family about the impact of a death of a family member?" and "Please state your personal belief regarding each of these statements. a) The defendant is innocent until proven guilty beyond a reasonable doubt. b) If the prosecution goes to the trouble to bring someone to trial, the person is probably guilty of the charges." (CT 3341.) A review of B.B's questionnaire reflects that she failed to provide any response to several questions and answered other questions with "I don't know."  (See e.g. CT 3336-38.)  At the end of the questionnaire, B.B. added a signed postscript which read: "Some of the questions I hadn't answered are hard for me to understand so I leave [sic] it blank or ?-" (CT 3345.)

Petitioner points to the fact that B.B. lived in San Diego for fifteen years at the time of the trial, and that she had attended college and previously worked as a bank teller and

08cv1400

customer service clerk, but this does not preclude the state court from concluding there was record support for the prosecutor's stated reason of potential language difficulties. That Petitioner now offers facts that could support an opposite conclusion does not mean the California Supreme Court's factual finding concerning language difficulties was unsupported, much less that it was based on an unreasonable determination of the facts. Given the portions of voir dire and from the questionnaire referenced above, there is ample record support for the state court's conclusion.

The findings about B.B.'s views on capital punishment are also reasonable and supported by the record. As the prosecutor and the state supreme court each indicated, a review of B.B.'s questionnaire reflects that she answered yes to a question asking: "Do you have any moral, religious, or philosophical opposition to the death penalty so strong that you would be unable to impose the death penalty regardless of the facts?" and that she added in writing that: "Thou shalt not kill, one of the 10 commandments of god." (CT 3337.) A review of the record reflects that the trial court appeared to agree with the prosecutor's statements concerning B.B.'s views on the death penalty. When the prosecutor articulated his initial reasons for the challenge, the trial court responded that "looking at my own notes, as I read her questionnaire I had sort of figured she was a never-the-death-penalty person, although some of her answers did seem to be a little ambiguous or uncertain in that regard." (RT 2005-06.) At the <u>Batson</u> hearing, defense counsel argued that they interpreted B.B.'s reference to "Thou Shalt Not Kill" in the questionnaire as meaning a person should not kill, and not as a reference to death penalty, and noted that B.B. at another point in the questionnaire stated that the death penalty was appropriate in murder cases. (RT 2011.) To this, the trial court replied: "Well, I think there is an ambiguity or there is some uncertainty there about the meaning of her answers, yes. Those are - - the interpretations that both sides have put on her answers I think are reasonable. But I guess that sort of underscores the point that her answers reasonably gave some cause for concern, I think." (<u>Id.</u>) This conclusion is reasonable and well-supported by the record. While Petitioner now contends that any confusion about B.B.'s views about capital

punishment were cleared up during voir dire and that she could indeed impose the death penalty, as stated before, the question before this Court is not whether B.B.'s death penalty views would have sufficed to sustain a challenge for cause, but whether they provide reasonable, neutral grounds for the prosecutor's exercise of a peremptory challenge. The stated concerns about both B.B.'s language abilities and her views on capital punishment provide a reasonable and gender neutral basis for the peremptory challenge. As such, Petitioner fails to demonstrate that the state court's decision was based on an unreasonable determination of the facts.

In articulating the reasons for excluding the final contested prospective juror, the prosecutor stated that M.B. "was basically overwhelmed by this. And when she was asked on the questionnaire whether or not she believed in the death penalty, she was apologetic. She said she believed it in and apologized for believing in it. And I looked at that response and also her age, being 73 years old, and I thought this was just not the appropriate case for her." (RT 2006.) The California Supreme Court's opinion recited the prosecutor's stated reasons and concluded that: "The record supports these reasons, which are credible and gender neutral." Jurado, 38 Cal. 4th at 107.

Petitioner presently asserts that "[c]ontrary to the state court's suggestion that M.B.'s age was a factor in the prosecutor's decision to challenge her, the prosecutor never questioned her about how her age might affect her ability to impartially decide the case, thereby revealing the pre-textual nature of this reason." (Pet. Br. at 94, citing Miller-El, 545 U.S. at 246.) Petitioner also argues that M.B. could have been a fair juror and considered capital punishment, asserting that "[i]n light of the record, the prosecutor's vague explanation for the challenge- i.e., 'I thought this was just not the appropriate case for her' (RT 23:2006)-was so lacking in content as to amount to virtually no explanation, and thus failed to constitute the required 'clear and reasonably specific explanation of his legitimate reasons for exercising th(is) challenge().' *Batson*, 476 U.S. at 98, n. 20, internal quotations and citations omitted." (Pet. Br. at 94.)

///

While the prosecutor may not have specifically questioned M.B. on her age, a review of the record reflects that M.B. herself appeared to refer to it during questioning by defense counsel, as she reiterated the statement from her questionnaire that she did not want to serve, explaining that: "I have done - - I have served on juries before and I also been on election boards, I think somebody else should do it. You know, my years living." (RT 1026-27.) M.B. also indicated she had "a little bit" of a problem with her knees, but stated she did not think it would affect her ability as a juror. (RT 1027.) As noted above, while a prosecutor's failure to question a prospective juror on a certain subject may "suggest" the existence of pretext, the Supreme Court did not state that such failure conclusively demonstrates that any such reasons must be pretextual. See Miller-El, 545 U.S. at 246. Additionally, as previously noted, the California Supreme Court was clearly aware of Miller-El v. Dretke, which it applied to this claim. See Jurado, 38 Cal. 4th at 105.

The record also reflects that the prosecutor questioned M.B. about her ability to keep an open mind as to punishment and that he specifically inquired about her questionnaire response that she was "sorry to say" she was in favor of the death penalty. (RT 1056, 1070-72.) Despite the lack of specific questions on M.B.'s age, the prosecutor questioned her on another of his cited reasons for the peremptory challenge, her apology for believing in the death penalty, further undermining a suggestion of pretext.

Finally, the Court disagrees with Petitioner's characterization of the stated reasons for the peremptory challenge. As noted just above, Petitioner asserts that the prosecutor's statement that "'I thought this was just not the appropriate case for her' (RT 23:2006)-was so lacking in content as to amount to virtually no explanation." (Pet. Br. at 94.) Petitioner takes this statement out of context, as it was coupled with the prosecutor's citation to M.B.'s age and death penalty views, as follows:

> And then the final juror was [M.B.]. She was a juror that was 73 years old, and it was my view that she was basically overwhelmed by this. And when she was asked on the questionnaire whether or not she believed in the death penalty, she was apologetic. She said she believed in it and apologized for

believing in it. And I looked at that response and also her age, being 73 years old, and I thought this was just not the appropriate case for her.

(RT 2006.) Viewing the challenged statement in the context in which it was made, it is clear that the "appropriate case" remark was made in view of her age and death penalty views together, and it was not articulated as a stand-alone reason for the peremptory challenge.

Upon reviewing the record, M.B. indicated both verbally and in writing that she did not want to serve as a juror on the case, and that she verbally cited her "years living" as a reason. (RT 1026-27, CT 3123.) She noted in the written questionnaire that she had problems with her knees that could impair her ability to serve, although she stated during voir dire questioning that her knees would not impact her potential service. (CT 3094, RT 1027.) To the prosecutor's questions about her ability to set aside personal feelings and follow the rules or laws, M.B. indicated she had concerns, but also stated that she thought she "could play by the rules." (RT 1056.) The record also reveals that in response to the prosecutor's statements at the <u>Batson</u> hearing, the defense simply pointed out that several other prospective jurors were over age 70 and that despite saying she was "sorry" for favoring the death penalty and her inability to articulate a reason why, she favored it but could keep an open mind. (RT 2009-10.) Notably, the defense did not appear to offer any response to the prosecutor's statement that M.B. appeared overwhelmed nor a response to M.B.'s indication she did not want to serve as a juror on the case. Therefore, based on a review of the record, the Court finds that the stated grounds about M.B.'s age and views provide a reasonable and gender neutral basis for the peremptory challenge against her and Petitioner fails to demonstrate that the state court's decision was based on an unreasonable determination of the facts.

Finally, Petitioner alleges that the trial court's "conduct" and handling of the <u>Batson</u> motion itself was "suspect." (SAP at 348.) Petitioner notes that while trial counsel was timely in raising a <u>Batson</u> objection during the selection of the trial jury panel, the trial

court told counsel it would hear the motion during the next recess and continued jury selection. (Id., citing RT 1945-47.) Petitioner states that after the objection:

> The court then oversaw the selection and swearing of the twelve principle [sic] jurors (RT 1949; CT 1635), conducted selection of three alternate jurors and had the clerk swear these alternates (RT 1949-1952; CT 1635), excused the remaining jury panel (RT 1952-53; CT 1635), and gave preliminary remarks and admonitions to the jury. (RT 1953-1960; CT 1635-1636). This done, the court finally took a recess to hear Petitioner's *Batson-Wheeler* objection. (RT 1961.)

(Id.) Petitioner contends that "[a]bsent rare circumstances where it would reward a party's improper use of peremptory challenges, the remedy for a *Batson-Wheeler* violation is for the trial court to declare a mistrial, dismiss the jurors thus far selected and the remaining venire, and begin jury selection again from a new venire," but that in this case the trial court did not conduct the Batson hearing until after the jurors were sworn and jeopardy had attached. (Id. at 349, citations omitted.) He argues that "[t]he trial court's conduct in hearing Petitioner's objection ensured that the effect of granting that objection would be an acquittal barring retrial," and that: "This circumstance suggests that, from the start, the court had no intention of making a sincere determination of whether purposeful discrimination existed, and no intention of granting the objection if warranted. The ensuing hearing has the appearance of being nothing more than a pretense with court [sic] having already made up its mind." (Id. at 350.)

Here, Petitioner's two arguments appear intertwined. He first argues that the trial court erred in delaying the Batson hearing until after the jury was sworn and jeopardy attached, noting that had the trial court granted relief on the defense's Batson motion, double jeopardy would have barred a retrial. (Id. at 349.) Relatedly, Petitioner asserts that the trial court's decision to hold the Batson hearing after the jury was sworn demonstrates that the trial court had no intention to sincerely consider the Batson motion nor to grant relief if warranted, as a grant of relief at that point would have barred retrial. (Id. at 348-50.)

///

The California Supreme Court rejected Petitioner's claim of error in this regard, reasoning as follows:

> We are unpersuaded by defendant's argument that the trial court erred in deferring argument on defendant's *Batson/Wheeler* motion until the next recess, which occurred after the jury selection process had been completed and a jury had been sworn to try the case. Defense counsel did not object to this procedure at the time, and in fact indicated that the defense was satisfied with the jury that was sworn to try the case. Moreover, the swearing of the jury would not have made it impossible for the trial court to grant effective relief in the event the court granted the *Batson/ Wheeler* motion. Although jeopardy attached with the swearing of the jury, a *Batson/ Wheeler* motion may be deemed a motion for mistrial and thus a waiver of any double jeopardy defense. (See *People v. Batts* (2003) 30 Cal.4th 660, 679, 134 Cal.Rptr.2d 67, 68 P.3d 357 [a defendant's request for a mistrial waives any double jeopardy claim]; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 115, 2 Cal.Rptr.3d 186, 72 P.3d 1166 [*wheeler* motions often termed motions for mistrial].)

Jurado, 38 Cal. 4th at 107-08.

Petitioner fails to cite Supreme Court authority in support of his position, instead relying on a Ninth Circuit case and several state cases to buttress his argument. (See SAP at 368.) Petitioner cites to United States v. Sammaripa, 55 F.3d 433 (9th Cir. 1995), to assert that the trial court's handling of the Batson motion after the jury was sworn did not create a "manifest necessity" that would allow retrial had the motion been successful. However, that case is clearly distinguishable from the instant situation. In Sammaripa, unlike here, the *prosecution* moved for mistrial after the jury was sworn, due to alleged Batson error on the part of *defense counsel,* and a mistrial was declared over the objections of defense counsel. Id., 55 F.3d at 434. The Ninth Circuit specifically reasoned that "defense counsel's alleged Batson error, which by its very nature should be apparent *before* jeopardy attaches, cannot create a manifest necessity to declare a mistrial." Id. at 435.

In so ruling, the Ninth Circuit explicitly articulated a distinction between Batson motions made by the defense and those raised by the government, which the Court finds pertinent to the instant claim. The Ninth Circuit noted that in an earlier decision, it found a Batson objection raised by defense counsel after the jury was sworn to be timely and

valid. Id. at 435 n.1, citing United States v. Thompson, 827 F.2d 1254, 1257 (9th Cir. 1987). In Sammaripa, the Ninth Circuit explained that: "The significant difference between the two cases is that in Thompson, the *defendant* moved for a mistrial, and thus waived his right to be free from double jeopardy. In contrast, in the instant case, the *government* made the delayed objection. Here, the *government* moved for the mistrial over Sammaripa's objection. Sammaripa did not waive his right to be free from double jeopardy because he objected to the mistrial." Id. Thus, Petitioner's reliance on Sammaripa is not well-taken, as had the trial court ruled in favor of Petitioner's Batson motion, any mistrial would not have been over the objection of the defense, but instead would have been at the defendant's behest.

The Supreme Court has held that double jeopardy may be invoked after a defendant's successful mistrial motion under limited conditions, indicating that: "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Oregon v. Kennedy, 456 U.S. 667, 676 (1982); see also id. at 679 ("We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in an second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.") Petitioner has offered nothing to show that the prosecution "provoked" the Batson motion through the use of his peremptory challenges, and in any event, the motion was unsuccessful. The prosecution, when asked, provided thorough and persuasive gender and race neutral reasons for the challenges which the trial court found reasonable and supported by the record.

Petitioner's contention that the trial court's timing in handling the Batson motion suggested its lack of sincerity is similarly unpersuasive and is belied by the record. Even

113

as the trial court stated that it would require the prosecution to provide reasons for the peremptory challenges for the purposes of preserving the record, the record reflects the court repeatedly indicated that it was unsure that Petitioner had demonstrated a prima facie case of discrimination.  (See RT 2012- "I realize some case authority that - - by inviting the prosecution to make this record, I may be held by implication to have found that the defense had made a prima facie showing, and I'm not entirely satisfied myself that they have.")   The trial court also correctly recognized that the defense motion was "for a discharge of this jury and a summoning of a new panel of prospective jurors," and defense counsel agreed that was the aim of the request.  (Id.)

The record fails to support a suggestion that the Batson hearing was conducted under false pretense or that the denial of Petitioner's motion was a foregone conclusion.  As recounted above, the record reflects the trial court conducted a considered and thorough evaluation of the contested challenges.  With respect to the two challenges contested on the basis of race, the trial court implicitly found a prima facie case, required the prosecutor to detail the reasons for the challenges, evaluated those reasons in view of the questionnaires and voir dire, and articulated its decision on the record.  The trial court also provided for a detailed record concerning the challenges to several female jurors despite its own stated uncertainty over whether a prima facie case had actually been shown as to gender.  Again, the trial court inquired as to the prosecutor's reasons for the challenges, and evaluated those reasons and issued a ruling on the record.  Given the thorough and thoughtful way in which the trial court handled the Batson hearing, the Court is not persuaded that the timing of the hearing itself somehow compels a conclusion that the outcome was decided prior to the hearing or that court was somehow disingenuous in its handling of the Batson motion.

Accordingly, for the reasons discussed above, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of Batson, or that it was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 10.   At oral arguments, Petitioner requested discovery and an evidentiary hearing on this claim with respect to the challenge of

prospective juror N.M., including discovery of the prosecution files and notes concerning voir dire and depositions of the trial prosecutors. As Petitioner fails to satisfy section 2254(d) on the basis of the state record, an evidentiary hearing is not available on this claim. <u>Sully</u>, 725 F.3d at 1075; <u>Totten</u>, 137 F.3d at 1176. The request for discovery on Claim 10 is denied. <u>Kemp</u>, 638 F.3d at 1260.

## D.    Claims Alleging Error During Guilt Phase

### 1.    Claim 11

Petitioner alleges that "[t]he State was permitted to present Brian Johnsen's conditional examination testimony to the jury despite unequivocal state law prohibiting the use of such evidence in capital cases," and because without such evidence the State would neither have sought the death penalty against Petitioner nor could the jury have found Petitioner guilty beyond a reasonable doubt of either conspiracy or special circumstance murder, the admission of that evidence violated Petitioner's federal constitutional rights. (SAP at 368-69.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the trial court erred under state law in overruling his objection to admission at trial of the conditional examination testimony of Brian Johnsen, and that this error violated defendant's constitutional rights to due process, to counsel, to confrontation, and to fair and reliable determinations of guilt and penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

> 1. Factual background

> On November 1, 1991, the trial court granted the prosecutor's request under section 1054.7 for an in camera hearing out of the presence of defendant and his attorney to consider postponement or limitation of discovery. At the hearing, the prosecutor told the court that in September 1991, during an interview with a prosecution investigator, Brian Johnsen had said that defendant had killed Holloway to prevent her from revealing a plan to kill a man named Doug Mynatt, who was believed to have ties to the Hell's Angels and whose whereabouts was unknown. The prosecutor expressed concern that disclosure of this information to the defense through the discovery process

could endanger Mynatt's life or cause Mynatt to become a threat to the lives of Johnsen and Anna Humiston, who was not then in custody. The prosecutor also stated his intention to secure Johnsen's testimony by conditional examination. The trial court granted the prosecutor a one-week extension of the deadline for disclosure of the information obtained during the September interview of Johnsen.

At a hearing on November 8, 1991, the prosecutor gave the defense an investigator's report of the September interview of Brian Johnsen, and the prosecutor submitted a written motion for a conditional examination of Johnsen on the ground that his life was in jeopardy (§ 1336, subd. (b)). Defendant's attorney asked for more time to study the report and the motion, but the trial court granted the motion for conditional examination. The court observed, however, that under section 1341, if the magistrate was convinced, on the date set for the conditional examination, that Johnsen's life was not in jeopardy, then the conditional examination would not take place.

The conditional examination of Brian Johnsen, which was recorded on videotape, began on November 15, continued on November 18, and concluded on November 19, 1991. Thereafter, on July 6, 1992, the prosecutor announced that he was seeking the death penalty against defendant, in part because of the evidence disclosed at the conditional examination. On September 10, 1993, the defense filed a motion to exclude the conditional examination at trial, primarily on the ground that conditional examinations are not permitted in capital cases. After receiving opposition to the motion from the prosecution, and holding a hearing, the trial court denied the motion on October 29, 1993.

Defendant petitioned the Court of Appeal for a writ of mandate barring use of the conditional examination at trial. The Court of Appeal denied the petition in an unpublished opinion on December 2, 1993. This court granted defendant's petition for review of the Court of Appeal's decision and transferred the matter back to the Court of Appeal to reconsider in light of *People v. Municipal Court* (*Ahnemann*) (1974) 12 Cal.3d 658, 117 Cal.Rptr. 20, 527 P.2d 372 (stating that mandate is unavailable to resolve an issue as to the admissibility of evidence). After reconsideration, the Court of Appeal again denied the mandate petition, this time citing *Ahnemann*.

On March 22, 1994, defendant filed a motion asking the trial court to reconsider his motion to exclude the conditional examination on the ground that the controlling law had been clarified by the Court of Appeal's decision in *Dalton v. Superior Court* (1993) 19 Cal.App.4th 1506, 24 Cal.Rptr.2d 248 (holding that in a capital case the prosecution could not conditionally examine

a witness whose life was in jeopardy). The trial court agreed to reconsider its ruling, but after reconsideration it again denied the motion to exclude the conditional examination.

Defendant sought appellate review of this ruling by again petitioning the Court of Appeal for a writ of mandate. The Court of Appeal summarily denied the petition, and this court denied defendant's petition for review.

At trial, the parties stipulated to Brian Johnsen's unavailability as a witness. Over defendant's continuing objection, the videotape of the conditional examination was played for the jury. In his conditional examination testimony, Johnsen described how he and Teresa Holloway had become acquainted with defendant, Denise Shigemura, Anna Humiston, and Doug Mynatt, and how their relationships had developed. His testimony provided the only evidence of the telephone conversations in which the plan to kill Mynatt was discussed and concern was expressed that Holloway not be told about the plan for fear she would disclose it. His testimony also described a telephone conversation after Holloway's murder in which Johnsen asked defendant why he had killed Holloway and defendant had replied that it had to be done.

2. Conditional examinations in capital cases

Defendant contends that conditional examinations are not permitted in capital cases. He relies on section 1335, subdivision (a), which provides: "When a defendant has been charged with a public offense triable in any court, he or she in all cases, and *the people in cases other than those for which the punishment may be death,* may, if the defendant has been fully informed of his or her right to counsel as provided by law, have witnesses examined conditionally in his or her or their behalf, as prescribed in this chapter." (Italics added.) Defendant argues that this provision bars the prosecution from conditionally examining any of its witnesses in a capital case. In ruling the conditional examination admissible, however, the trial court relied on subdivision (b) of the same section, which at the time of defendant's trial provided: "When a defendant has been charged with a serious felony, the people may, if the defendant has been fully informed of his or her right to counsel as provided by law, have a witness examined conditionally as prescribed in this chapter if the people have evidence that the life of the witness is in jeopardy." (§ 1335, former subd. (b), as amended by Stats.1985, ch. 783, § 2, p. 2525.)[FN5]

FN5. The Legislature has since amended this subdivision to also

allow a defendant to take a conditional examination of a witness whose life is in danger. (Stats.2005, ch. 305, § 1.) It now reads: "When a defendant has been charged with a serious felony, the people or the defendant may, if the defendant has been fully informed of his or her right to counsel as provided by law, have witnesses examined conditionally as prescribed in this chapter, if there is evidence that the life of the witness is in jeopardy." (§ 1335, subd. (b).)

On first reading, subdivision (a) and former subdivision (b) of section 1335 appear inconsistent. Subdivision (a) appears to generally prohibit the prosecution from conditionally examining witnesses in cases "for which the punishment may be death," whereas former subdivision (b) appears to allow the prosecution to conditionally examine a witness whose life is in jeopardy in any case in which the defendant is charged with a serious felony.

To resolve this apparent inconsistency, we view the provisions in their statutory context as part of an overall statutory scheme for conditional examinations in criminal cases, seeking to harmonize the provisions in light of the apparent legislative purpose. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901, 135 Cal.Rptr.2d 30, 69 P.3d 951; *People v. Acosta* (2002) 29 Cal.4th 105, 112, 124 Cal.Rptr.2d 435, 52 P.3d 624; *People v. Murphy* (2001) 25 Cal.4th 136, 142, 105 Cal.Rptr.2d 387, 19 P.3d 1129.)

The statutory scheme for conditional examinations includes section 1336. At the time of defendant's trial, subdivision (a) of that section provided: "When a material witness for the defendant, or for the people, is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, the defendant or the people may apply for an order that the witness be examined conditionally." (Stats.1985, ch. 783, § 3, p. 2525.) Subdivision (b) of section 1336 provided: "When the people have evidence that the life of a prosecution witness is in jeopardy, the people may apply for an order that the witness be examined conditionally." (Stats.1985, ch. 783, § 3, p. 2525.)[FN6]

FN6. Since defendant's trial, the Legislature has amended section 1336 to include witnesses 65 years of age or older and dependent adults, and to authorize the defendant, as well as the prosecution, to take a conditional examination under subdivision (b). (Stats.2005, ch. 305, § 2.) Those subdivisions now read: "(a) When a material witness for the defendant, or for the people, is about to leave the state, or is so sick or infirm as to afford

118

reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older, or a dependent adult, the defendant or the people may apply for an order that the witness be examined conditionally. [¶] (b) When there is evidence that the life of a witness is in jeopardy, the defendant or the people may apply for an order that the witness be examined conditionally." (§ 1336, subds.(a)-(b).)

Reading sections 1335 and 1336 together, it appears that the Legislature may have intended to prohibit the prosecution in a capital case from taking a conditional examination of a witness for any of the reasons stated in subdivision (a) of section 1336-illness, dependency, age, or impending departure from the state-but to permit the prosecution in a capital case to conditionally examine a witness whose life is in jeopardy. This reading would resolve the apparent inconsistency between subdivision (a) and former subdivision (b) of section 1335 and harmonize those provisions with section 1336.

Arguing against this construction, defendant relies on *Dalton v. Superior Court*, *supra*, 19 Cal.App.4th 1506, 24 Cal.Rptr.2d 248. The Court of Appeal there expressed the view that allowing the prosecution to conditionally examine a witnesses in a death penalty case only when the witness's life was in jeopardy "would create a distinction in the use of preserved testimony which seemingly would have no justification" in that "the testimony of a witness who is to die before the death penalty trial because of natural causes could not be preserved, while that same witness's testimony could be preserved if the threat of nonattendance at trial were based upon possible kidnap or murder." (*Dalton*, *supra*, at p. 1512, 24 Cal.Rptr.2d 248.) We do not view this distinction as irrational, however. When a prosecution witness may die before trial from natural causes, the prosecution risks the loss of important evidence. This same interest is at stake when the witness's life is in jeopardy from criminal violence, but there is in addition the strong public interest in deterring criminal conduct in the form of an actual or attempted murder of the witness. Recognizing the presence of this additional interest, the Legislature could reasonably decide to authorize prosecutorial conditional examinations in capital cases when the witness's life is in jeopardy from criminal violence, to remove the incentive a capitally charged defendant or his or her allies might otherwise have to murder prosecution witnesses to prevent them from testifying.

This construction is also consistent with the history of conditional examinations in criminal cases in California. As enacted in 1879, the

119

08cv1400

California Constitution granted the Legislature power to authorize prosecutorial conditional examinations "in criminal cases, other than cases of homicide." (Cal. Const., former art. 1, § 13, repealed Nov. 5, 1974.) In 1905, the Legislature exercised this constitutionally granted authority by providing, in section 1335, for conditional examinations of prosecution witnesses in cases "other than homicide." (Stats.1905, ch. 540, § 1, p. 702.) In 1951, section 1335 was amended to permit conditional examinations of prosecution witnesses in cases other than "those for which the punishment may be death." (Stats.1951, ch. 96, § 1, p. 354.) In 1974, the state Constitution was amended to remove the prohibition on conditional examinations in capital cases. The relevant provision now reads: "The Legislature may provide for the deposition of a witness in the presence of the defendant and the defendant's counsel." (Cal. Const., art. 1, § 15, cl.4.) In 1985, the Legislature amended section 1335 to permit the prosecution to take a conditional examination when the defendant has been charged with a serious felony and there is evidence the witness's life is in jeopardy. (Stats.1985, ch. 783, § 2, p. 2525.) We infer that, after the 1974 constitutional amendment removed the blanket prohibition on conditional examinations by the prosecution in capital cases, the Legislature used its new authority in 1985 to authorize the prosecution to take conditional examinations in capital cases in the limited situation where the witness's life is threatened.

The 1985 amendment of sections 1335 and 1336 was included in Assembly Bill No.2059 (1985-1986 Reg. Sess.), which also added section 1350 to the Evidence Code. That provision establishes an exception to the hearsay rule for a statement by an unavailable declarant when, among other things, "[t]here is clear and convincing evidence that the declarant's unavailability was knowingly caused by, aided by, or solicited by the party against whom the statement is offered for the purpose of preventing the arrest or prosecution of the party and is the result of the death by homicide or the kidnapping of the declarant." (Evid.Code, § 1350, subd. (a)(1).) Like the "life in jeopardy" provision for conditional examinations (§ 1335, subd. (b)), the hearsay exception of Evidence Code section 1350 applies in criminal proceedings in which a serious felony is charged (*id.*, subd. (a)), and "serious felony" is defined to include felonies listed in subdivision (c) of section 1192.7. (Compare Evid.Code, § 1350, subd. (d), with Pen.Code, § 1335, subd. (c).) Those listed felonies include "any felony punishable by death ...." (§ 1192.7, subd. (c)(7).) Because they were packaged together, it is reasonable to infer that the adoption of the hearsay exception in Evidence Code section 1350 and the amendment of the conditional examination provisions of Penal Code sections 1335 and 1336 address a common problem and result from a common Legislative concern-criminal violence against prospective

prosecution witnesses to prevent their testimony. The risk that this will occur likely increases in proportion to the potential punishment for the charged offense, and thus it is greatest in capital cases. Absent language expressly barring application of these provisions to capital cases, therefore, it is reasonable to infer that the Legislature intended to permit the prosecution to conditionally examine witnesses in capital cases when there is evidence that their lives are in serious danger.

We conclude, therefore, that under subdivision (b) of section 1335, conditional examination of a prosecution witness is permitted in a capital case when the witness's life is in jeopardy.[FN7]

FN7. *Dalton v. Superior Court*, *supra*, 19 Cal.App.4th 1506, 24 Cal.Rptr.2d 248, is disapproved.

3. Required showing for conditional examination

Defendant argues, next, that the prosecution should not have been allowed to conditionally examine Brian Johnsen because there was no evidence that his life was in jeopardy.

Section 1335, subdivision (b), permits the prosecution to conditionally examine a witness "if there is *evidence* that the life of the witness is in jeopardy." (Italics added.) Section 1336, subdivision (b), similarly requires the prosecution to produce evidence to support a claim that a witness's life is jeopardy. Section 1337 provides that an application for conditional examination "shall be made upon affidavit stating" among other things "that the life of the witness is in jeopardy." Section 1338 requires that the application be made on "three days' notice to the opposite party," and section 1339 provides that "[i]f the court or judge is satisfied that the examination of the witness is necessary, an order must be made that the witness be examined conditionally, at a specified time and place, and before a magistrate designated therein."

Here, the prosecution's application to conditionally examine Brian Johnsen was supported by evidence in the form of a declaration of Deputy District Attorney Pettine stating, in relevant part: "I am informed that witness Brian Johnsen was directly involved with defendants Shigemura and Jurado in a plot to kill Doug Mynatt. According to Mr. Johnsen, the defendants, acting on their own and without the knowledge of Mr. Johnsen, killed victim Teresa Holloway so that she would not disclose the plan to murder Mr. Mynatt. Mr. Mynatt's current whereabouts is unknown. Mr. Johnsen, who was

08cv1400

in custody on the date of the Holloway murder, is currently out of custody. [¶] Declarant believes that once this information becomes known, witness Brian Johnsen's life will be jeopardized by Mr. Mynatt, the defendants, and/or their associates."

The trial court granted the application without allowing the defense the three days' notice specified in section 1338, but the court said that under section 1341 the conditional examination would not take place if, on the day set for the conditional examination, the defense was able to show to the magistrate's satisfaction that Johnsen's life was not in danger.[FN8] The conditional examination began a week later. Before it began, defendant offered no evidence that Johnsen's life was not in danger.

> FN8. In full, at the time of defendant's trial, section 1341 read: "If, at the time and place so designated, it is shown to the satisfaction of the magistrate that the witness is not about to leave the state, or is not sick or infirm, or that the life of the witness is not in jeopardy, or that the application was made to avoid the examination of the witness on the trial, the examination cannot take place." (Stats.1985, ch. 783, § 5, p. 2525.) Since defendant's trial, section 1341 has been amended to include witnesses 65 years of age or older and dependent adults. (Stats.2005, ch. 305, § 4.)

The prosecution satisfied the requirements of sections 1335, 1336, and 1337 by submitting a declaration stating that Johnsen's life was in danger from Doug Mynatt, defendant and his codefendants, and their associates. In granting the prosecutor's application for a conditional examination, the trial court did not abuse the broad discretion with which the statutory scheme vested it. In particular, it was not necessary, under the circumstances of this case, for the prosecution to present evidence that anyone had expressly threatened Johnsen or conspired to harm him. Because of the evidence that defendant, Shigemura, and Humiston had killed Holloway to prevent her from exposing a plot to kill Mynatt, the trial court-who both granted the application for conditional examination and served as magistrate in the taking of the examination-could justifiably conclude that defendant and the persons with whom he associated would be likely to use deadly force against anyone perceived as a threat, and that the substance of Johnsen's proposed testimony made him an actual or potential threat to defendant and his codefendants, and also to Mynatt.

///

08cv1400

Although defendant did not receive the three days' notice to which section 1338 entitled him, he was not prejudiced by the shortened notice because seven days elapsed before the conditional examination began during which, under section 1341, defendant could have presented evidence to contradict the prosecutor's declaration that Brian Johnsen's life was in danger. We conclude that defendant has failed to show that any prejudicial error occurred in the taking of Brian Johnsen's conditional examination.

4. Admission of conditional examination at trial

The prosecutor argued below, and the Attorney General argues in this court, that even if the prosecution is prohibited from taking conditional examinations in capital cases, that prohibition did not apply here because the prosecutor had not yet decided to seek the death penalty, and indeed had announced the death penalty would not be sought, when the trial court granted the prosecution's application for a conditional examination and when Brian Johnsen was conditionally examined. In response to this argument, defendant argues that even if it was proper to conditionally examine Johnsen because the prosecutor was not then seeking the death penalty, it was error to admit Johnsen's conditional examination in evidence at defendant's capital trial. Because we have concluded that the prosecution in a capital case may conditionally examine a witness whose life is in jeopardy, we need not address this issue.

Defendant also argues that admission of Brian Johnsen's conditional examination in evidence at trial denied him his rights under the federal Constitution to due process, confrontation of adverse witnesses, and reliable guilt and penalty determinations in a capital case. But Johnsen testified under oath at the conditional examination, and defendant had a full and fair opportunity to cross-examine him at that time. For purposes of due process, confrontation, and reliability, the situation is no different than if Johnsen or any other witness who testified at the preliminary hearing or at an earlier trial and then, because he had become unavailable, his prior testimony was admitted at trial. When a defendant has had an adequate opportunity for cross-examination and the witness is unavailable at trial, use of prior testimony does not violate the defendant's rights under the federal Constitution. (*People v. Wilson* (2005) 36 Cal.4th 309, 343, 30 Cal.Rptr.3d 513, 114 P.3d 758; see *Crawford v. Washington* (2004) 541 U.S. 36, 55-57, 124 S.Ct. 1354, 158 L.Ed.2d 177.)

Defendant asserts that he did not have an adequate opportunity to cross-examine Brian Johnsen at the conditional examination because his attorneys

later acquired additional information that would have been useful in cross-examining Johnsen. In particular, he calls our attention to the statements that Johnsen later made, after he had been charged with capital murder,[FN9] admitting that he was aware of and agreed with defendant's plan to kill Holloway. Again, however, the situation is no different than if Johnsen had testified at defendant's preliminary hearing or at a prior trial of defendant on the same charges. Absent wrongful failure to timely disclose by the prosecution, a defendant's subsequent discovery of material that might have proved useful in cross-examination is not grounds for excluding otherwise admissible prior testimony at trial. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 851, 64 Cal.Rptr.2d 400, 938 P.2d 2 [admission of prior testimony does not violate the right of confrontation "regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony."].)

> FN9. Brian D. Johnsen was sentenced to death on June 9, 1994, for crimes committed in Stanislaus County.

Jurado, 38 Cal. 4th at 108-16 (alterations in original). While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner alleges several errors in the admission of Johnsen's conditional examination at trial. He asserts that "the state court's erroneous application of state law rendered Mr. Jurado's trial fundamentally unfair, and thus denied Jurado due process under the federal Constitution," and contends that "Mr. Jurado had a state-created liberty interest under California law *not* to have a conditional examination conducted unless the life of the witness is in jeopardy, and thus a violation of that state-created liberty interest and subsequent introduction into evidence of the conditional examination testimony violated Jurado's right to due process." (Pet. Br. at 96) (emphasis in original.) Specifically, Petitioner alleges that "[t]here was no substantial evidence to support the trial court's ruling that Johnsen's life was in jeopardy, and thus the ruling permitting his conditional examination violated state law." (Id. at 100.) Finally, he asserts that the admission of the conditional examination testimony was prejudicial and violated his rights to a reliable guilt

and sentencing hearing, confrontation, right to present a complete defense, and a fundamentally fair trial.  (Id. at 96-97.)

Respondent maintains that the state court's rejection of the claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts.  (Resp. at 47.)  Respondent also argues that Petitioner's assertion that the California Supreme Court made an unreasonable factual determination in concluding the conditional exam was authorized under California law "is not a federal question cognizable in federal habeas."  (Id.)

In the reply brief, Petitioner addresses Respondent's assertion concerning his second argument, stating that "petitioner does *not* seek review of the California Supreme Court's interpretation of California Penal Code sections 1335 and 1336 (i.e., state law), nor its holding 'that under subdivision (b) of section 1335, conditional examination of a prosecution witness is permitted in a capital case when the witness's life is in jeopardy. *Jurado*, 38 Cal. 4th at 113,'" but that "[i]nstead, petitioner claims that the California Supreme Court made an unreasonable factual determination when concluding that the requisite showing for a conditional examination had been made-i.e., that Johnsen's life was in jeopardy," and that this contention "is entirely consistent with federal habeas review." (Reply at 46) (emphasis in original.)

While Petitioner clearly indicates in the Reply brief that he only alleges the state court's decision involved an unreasonable factual determination under section 2254(d)(2), a plain reading of the SAP and the Group Two merits brief clearly reflects that Petitioner also claims that state law error resulted in a denial of federal due process, which falls under section 2254(d)(1).  (See Pet. Br. at 96-97); (see also SAP at 368-69) ("The State was permitted to present Brian Johnsen's conditional examination testimony to the jury despite unequivocal state law prohibiting the use of such evidence in capital cases.")  As such, the Court will examine both arguments.

Federal habeas relief is not available based on alleged errors of state law unless that error violated a petitioner's federal constitutional rights.  See Estelle v. McGuire, 502 U.S.

62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); see also Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."); Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'"), quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986).

Here, the California Supreme Court analyzed the relevant sections of California law concerning conditional examinations, as well as discussed and considered the California Constitution, in holding that: "We conclude, therefore, that under subdivision (b) of section 1335, conditional examination of a prosecution witness is permitted in a capital case when the witness's life is in jeopardy."  Jurado, 38 Cal. 4th at 113.  Respondent correctly notes that this Court, reviewing a claim of state law error such as this one, is bound by the California Supreme Court's interpretation of California law.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.")  Although there is no error in the state court's finding that a conditional examination is permitted, Petitioner also alleges there is error in the application of that rule in his case.

However, Petitioner fails to demonstrate that the state court's decision was factually erroneous, much less that it involved an unreasonable factual determination.  Section 2254(d)(2) provides an avenue for federal habeas relief in the event that the state court's decision was based on an "unreasonable determination of the facts."  28 U.S.C. § 2254(d)(2).  "Factual determinations by state courts are presumed correct absent clear

and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." Miller-El, 537 U.S. at 340; see also Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004) ("[I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record."), abrogated on other grounds by Murray v. Schriro, 745 F.3d 984, 999-1000 (9th Cir. 2014).

As the California Supreme Court noted, at the time of Petitioner's trial, section 1335(b) provided for a conditional exam "if the people have evidence that the life of the witness is in jeopardy." Jurado, 38 Cal. 4th at 110. Petitioner contends that the California Supreme Court made an unreasonable factual determination when it concluded that the prosecutor properly demonstrated that a conditional examination was warranted. Petitioner asserts that "[t]here was no credible evidence that Johnsen's life was in jeopardy," and alleges that "the state presented only speculation and conjecture, and absolutely no evidence, that Johnsen's life was in jeopardy." (Pet. Br. at 99.) Petitioner contends that: "There was no known threat to Johnsen's life. The declaration of DDA Pettine did not explain-with competent evidence or otherwise- how Johnsen's life would be jeopardized when it was Johnsen who threatened Mynatt's life, *not* Mynatt who threatened Johnsen's life." (Id. at 102.)

The California Supreme Court found the prosecutor's proffer was sufficient and the trial court did not abuse its discretion in authorizing the conditional examination, reasoning as follows:

> In particular, it was not necessary, under the circumstances of this case,
> for the prosecution to present evidence that anyone had expressly threatened

127

Johnsen or conspired to harm him. Because of the evidence that defendant, Shigemura, and Humiston had killed Holloway to prevent her from exposing a plot to kill Mynatt, the trial court-who both granted the application for conditional examination and served as magistrate in the taking of the examination-could justifiably conclude that defendant and the persons with whom he associated would be likely to use deadly force against anyone perceived as a threat, and that the substance of Johnsen's proposed testimony made him an actual or potential threat to defendant and his codefendants, and also to Mynatt.

Jurado, 38 Cal. 4th at 114.

This evidence supported a conclusion that Johnsen's life was in jeopardy due to his proposed testimony. Johnsen indicated that Holloway had been killed to prevent her from revealing the plan to kill Doug Mynatt. As such, Johnsen, by testifying, put himself in a position similar to Holloway in the view of Petitioner and his co-defendants. Additionally, given that Johnsen participated in the plot against Mynatt, Johnsen could have expected retaliation from Mynatt or his associates. In advance of the conditional examination, the prosecutor submitted a declaration stating that "Mr. JOHNSEN, who was in custody on the date of the Holloway murder, is currently out of custody," that "Mr. Mynatt's current whereabouts is unknown," and that "[d]eclarant believes that once this information becomes known, witness BRIAN JOHNSEN's life will be jeopardized by Mr. Mynatt, the defendants, and/or their associates." (CT 69.) In light of the prosecutor's declaration, the Court cannot conclude that the state court's finding is unsupported by the record or that the decision involved an unreasonable determination of the facts. See Miller-El, 537 U.S. at 340; see also Taylor, 366 F.3d at 1000 ("[W]e must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.")

Nor does Petitioner demonstrate that the admission of Johnsen's testimony rendered his trial unfair or his guilt determination unreliable. Petitioner argues that Johnsen's testimony was critical to both the guilt verdict and the death judgment, asserting that "Johnsen was the only witness to testify regarding a plan to kill Mynatt, the underpinning

for the prosecution's theory of conspiracy, murder and the special circumstance of lying in wait to kill Holloway," and that "[i]n fact, without Johnsen's testimony, the state would not have sought the death penalty against Mr. Jurado." (Pet. Br. at 101.) The Court previously examined the importance of Johnsen's testimony in this respect in adjudicating Claim 1.I in the Group One Order (in which Petitioner alleged ineffective assistance of trial counsel in stipulating to Johnsen's unavailability as a witness) and finds the prior analysis applicable to the instant claim. As outlined in the Group One Order:

> While Johnsen was an important witness, the other evidence of premeditation, planning and lying in wait was strong. In the days prior to the May 1991 murder, Petitioner approached David and Jeff Colson on separate occasions and unsuccessfully tried to borrow Jeff's shotgun, telling David that he "needed to do somebody up" and informing Jeff that he "had a job to do." While at Schmidt's apartment on the evening of Holloway's murder, while Holloway was on the phone with Johnsen, Petitioner asked Schmidt for a chain to tie up Johnsen's bikes. When Schmidt provided Petitioner with wire, Petitioner placed it around his neck, clenched his fists and said "that will do." The medical examiner stated that marks on the victim's neck could have been from manual or ligature strangulation.
>
> Schmidt also testified that Petitioner had several extended interactions with both Shigemura and Humiston that evening. Petitioner also directed Schmidt to lie to Holloway about needing to leave the apartment to get her off the phone with Johnsen, after which Holloway left in the company of Humiston, Shigemura and Petitioner. Petitioner later told David Silva that Holloway sat in the front seat of Humiston's car that evening, while the medical examiner found it possible that many of the injuries to the victim's head and neck could have come from behind, and noted that the bite mark was found on the victim's back. When Shigemura later told Baldwin that she no longer needed what she had asked for, she stated in Petitioner's presence that: "We took care of our problem and dumped the body off at Balboa Park" while Petitioner remained silent.

(ECF No. 171 at 73.) Johnsen was admittedly an important witness. Yet, the record reflects that apart from Johnsen's testimony, the other evidence on the charged crimes and special circumstance was substantial. As such, Petitioner fails to demonstrate that the admission of Johnsen's conditional examination testimony rendered his trial fundamentally unfair or

his guilt determination unreliable so as to merit habeas relief.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, it has not yet made a clear ruling that admission of irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."); see also Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) ("Admission of evidence violates due process '[o]nly if there are *no* permissible inferences the jury may draw' from it.") (alteration in original), quoting Jammal, 926 F.2d 920.

With respect to his contention that admission of the conditional examination rendered his penalty determination unreliable, Petitioner generally asserts that "[a]t the penalty phase, the admission of non-statutory aggravating evidence violates a defendant's Eighth Amendment rights to a reliable sentencing determination."  (Pet. Br. 96-97.)  In the SAP, Petitioner asserts that he "was sentenced to die on the basis of Johnsen's conditional examination testimony," and that testimony "was the foundation upon which the State built its case for capital murder."  (SAP at 394.)  Given the significant evidence in aggravation wholly independent of Johnsen's testimony, including but not limited to the brutality of the murder itself and Petitioner's prior criminal activity, the Court finds no merit to this contention.  See Zant v. Stephens, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.")

Finally, Petitioner argues that the use of Johnsen's conditional examination testimony at trial violated Petitioner's constitutional right to confront and cross-examine witnesses against him and his right to present a complete defense.  (SAP at 390.)  The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. Am. VI.  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  Maryland v. Craig, 497 U.S. 836, 845 (1990).  "Testimonial

statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59 (2004).

In recounting the trial proceedings concerning Johnsen's examination, the California Supreme Court specifically noted that: "At trial, the parties stipulated to Johnsen's unavailability as a witness." Jurado, 38 Cal. 4th at 109. The state court rejected Petitioner's argument of constitutional error in this regard, finding that "Johnsen testified under oath at the conditional examination, and defendant had a full and fair opportunity to cross-examine him at that time," and reasoning that "[w]hen a defendant has had an adequate opportunity for cross-examination and the witness is unavailable at trial, use of prior testimony does not violate the defendant's rights under the federal Constitution." Jurado, 38 Cal. 4th at 115, citing Crawford, 541 U.S. at 55-57.

This Court's own review of the record confirms the accuracy of the California Supreme Court's factual findings, as the parties stipulated to Johnsen's unavailability as a witness, and the trial court accepted the stipulation and stated: "And for my purposes, then, or for all purposes here in this trial, we'll consider that the court has found pursuant to that stipulation that within the meaning of any applicable law as it relates to Mr. Johnsen that he is unavailable within the meaning of that law." (RT 1654.) At the conditional examination itself, Petitioner's counsel cross-examined Johnsen; Johnsen was also cross-examined by counsel for co-defendant Shigemura. (See PRT 148-216, 226-31.)

In the SAP, Petitioner nonetheless asserts that "Johnsen's conditional examination testimony did not fall within a firmly rooted hearsay exception and thus, did not possess the inherent reliability that renders established hearsay exceptions particularly worthy of belief under the Confrontation Clause." (SAP at 390.) A review of this argument reveals that Petitioner premises this argument on pre-Crawford case law, including Ohio v. Roberts, 448 U.S. 56 (1980), which Petitioner relies upon to assert that "an unavailable witness' out-of-court statements satisfy the demands of the Confrontation Clause only if they 'bear() adequate indicia of reliability,' and that "[r]eliability is inferred were the

evidence falls within a firmly rooted hearsay exception; otherwise, the evidence is admissible only upon 'a showing of particularized guarantees of trustworthiness.'" (SAP at 390, quoting Roberts, 448 U.S. at 66.) In Crawford, the Supreme Court specifically abrogated Roberts on this point, holding that: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Crawford, 541 U.S. at 68-69; see also id. at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.")

Indeed, as noted above, the California Supreme Court correctly recognized and applied Crawford, which was issued in 2004, in adjudicating this claim on direct appeal in 2006. See Jurado, 38 Cal. 4th at 115, citing Crawford, 541 U.S. at 55-57. Because Crawford was issued before Petitioner's conviction was final and therefore governs the Court's consideration of this claim under AEDPA,[19] Petitioner fails to state a claim of constitutional error in this regard, as it is clear both that Johnsen was unavailable as a

---

[19] In the Group Two Merits Brief with respect to Claim 12, Petitioner appears to acknowledge that Crawford sets forth the clearly established law with respect to the analysis of Confrontation Clause claims, stating: "Because Mr. Jurado's direct appeal was still pending when *Crawford* was announced, *Crawford* and its progeny provide the controlling law in this case. *Whorton v. Bockting*, 549 U.S. 406, 416 (2007)." (Pet. Br. at 105.)

witness and that the defense had an opportunity to cross-examine Johnsen during the conditional examination. See Crawford, 541 U.S. at 59.

Even were Petitioner somehow able to demonstrate that the California Supreme Court's rejection of the confrontation claim was unreasonable, habeas relief is unavailable because Petitioner fails to show that the admission of Johnsen's conditional examination had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) ("Confrontation Clause violations are subject to harmless error analysis, because 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'"), quoting Delaware v. Van Arsdall, 475 U.S. 673, 680-81 (1986).

As discussed previously and in greater detail elsewhere in this Order, apart from Johnsen's testimony, there was significant other evidence of planning and premeditation, including Petitioner's unsuccessful attempts to obtain a gun in the days prior to the murder, his successful attempt to obtain a chain on the night of the murder, and the evidence of subterfuge in getting the victim to accompany him, Shigemura and Humiston on the night of the murder. In light of the other evidence against Petitioner, the Court is not persuaded that the admission of Johnsen's conditional examination testimony had a "substantial and injurious effect or influence" in determining the jury's guilt or penalty phase verdicts. See Brecht, 507 U.S. at 637.

Nor does Petitioner demonstrate that the admission of Johnsen's testimony violated his right to present a complete defense "by denying him the opportunity to effectively cross-examine Johnsen." (SAP at 395.) "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986), quoting Trombetta, 467 U.S. at 485. Again, defense counsel cross-examined Johnsen at the conditional examination. When later offered the opportunity to impeach Johnsen's conditional examination testimony with the statements and letters to Holland,

the defense declined and in fact successfully sought to have those materials excluded from evidence.  (See CT 907-09; RT 1883-84.)  As such, the trial court did not prevent Petitioner from impeaching Johnsen's testimony, except by the defense's own request to exclude that evidence, and he fails to demonstrate that his ability to present a defense was impeded by the method of impeachment made available to him.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) ("Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."); see also Nevada v. Jackson, 569 U.S. 505, 509 (2013) (collecting cases and observing that "[o]nly rarely have we held that the right to present a complete defense was violated by the *exclusion of defense evidence* under a state rule of evidence.") (emphasis added).

Petitioner has not demonstrated that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts.  Because Petitioner has not satisfied the provisions of § 2254(d), he is not entitled to habeas relief or evidentiary development on Claim 11.  Sully, 725 F.3d at 1075; Totten, 137 F.3d at 1176.

**2.    Claim 12**

Petitioner contends that Shigemura's statements to Steven Baldwin, which were introduced at Petitioner's trial, were erroneously allowed into evidence as exceptions to the hearsay rule, and the admission of that evidence violated Petitioner's federal constitutional rights to a fair trial, due process, confrontation and a reliable guilt and penalty determination.  (SAP at 411.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the trial court erred in overruling defense hearsay objections to the testimony of Steven Baldwin relating out-of-court statements by Denise Shigemura. Baldwin testified that on the day after Holloway's murder, defendant and Shigemura came to his house with Mark Schmidt. As the four of them sat together in the living room, Shigemura said

to Baldwin: "I no longer need what it was I asked you for. We took care of the problem and we dumped the body at Balboa Park." Baldwin testified that he thought Shigemura was referring to a conversation a few days earlier during which she had asked him if he could get her a "gat" because she had a problem she needed to take care of. The trial court admitted this evidence under the adoptive admissions exception to the hearsay rule.

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid.Code, § 1221.) When a defendant remains silent after a statement alleging the defendant's participation in a crime, under circumstances that fairly afford the defendant an opportunity to hear, understand, and reply, the statement is admissible as an adoptive admission, unless the circumstances support an inference that the defendant was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution. (*People v. Riel* (2000) 22 Cal.4th 1153, 1189, 96 Cal.Rptr.2d 1, 998 P.2d 969; *People v. Mayfield* (1997) 14 Cal.4th 668, 741, 60 Cal.Rptr.2d 1, 928 P.2d 485.)

Denise Shigemura's out-of-court statement-"We took care of the problem and we dumped the body at Balboa Park"-was admissible as an adoptive admission by defendant. He must have heard and understood the statement because he was sitting on the same couch with Shigemura, the circumstances called for a denial or protest if the statement was inaccurate, nothing prevented him from making a response, and nothing supports an inference that he was relying on a constitutional right of silence. In this situation, the jury could properly view defendant's silence as adopting Shigemura's statement.

Defendant claims that admission of this evidence violated his right of confrontation under the Sixth Amendment to the federal Constitution. He did not, however, make a specific objection on constitutional grounds at trial. Assuming without deciding that the issue is preserved for appellate review (see *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6, 39 Cal.Rptr.2d 547, 891 P.2d 93; see also *People v. Partida* (2005) 37 Cal.4th 428, 35 Cal.Rptr.3d 644, 122 P.3d 765), the claim is without merit. The right of confrontation is not violated when the jury hears evidence, from a witness subject to cross-examination, relating a defendant's own out-of-court statements and adoptive admissions. (*People v. Roldan* (2005) 35 Cal.4th 646, 711, fn. 25, 27 Cal.Rptr.3d 360, 110 P.3d 289; *People v. Combs* (2004) 34 Cal.4th 821, 842-843, 22 Cal.Rptr.3d 61, 101 P.3d 1007.)

As defendant points out, he was not present a few days before when Shigemura asked Baldwin for a "gat" and said she needed it to take care of a problem, so this earlier statement was not admissible as an adoptive admission. The request for the gun, by itself, was not hearsay, however, because an out-of-court statement is hearsay only when it is "offered to prove the truth of the matter stated." (Evid.Code, § 1200.) Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated. (See *People v. Mayfield*, *supra*, 14 Cal.4th at p. 741, 60 Cal.Rptr.2d 1, 928 P.2d 485 [pleas for help "were not hearsay because they were not admitted for the truth of the matter stated"]; *People v. Bolden* (1996) 44 Cal.App.4th 707, 714-715, 52 Cal.Rptr.2d 485 [request that defendant "not come around the house anymore" was not hearsay because it was not offered for the truth of matter stated]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67, 132 Cal.Rptr. 848 ["words of direction or authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words"].) Thus, Shigemura's request for a gun was not hearsay.

Shigemura's earlier out-of-court statement to Baldwin was hearsay insofar as it asserted that Shigemura had a problem that she needed to take care of. The Attorney General argues that it was admissible under the coconspirator exception to the hearsay rule (Evid.Code, § 1223) because it was made to further a conspiracy between defendant, Shigemura, and Brian Johnsen to kill Doug Mynatt. There was no substantial evidence at trial, however, that these three individuals reached any agreement to kill Doug Mynatt until the evening of May 15, 1991, shortly before Holloway's murder, whereas Shigemura's statement to Baldwin occurred a day or two earlier. Accordingly, this statement was not admissible under the coconspirator exception to the hearsay rule, and the trial court erred in not excluding it.

Even if we assume this error violated defendant's right of confrontation under the federal Constitution, reversal is not required because defendant suffered no prejudice. Shigemura repeated the substance of the earlier hearsay statement (that she had a problem she needed to take care of) in defendant's presence ("We took care of the problem and we dumped the body at Balboa Park") and defendant by his conduct adopted that statement as his own. We conclude the error was harmless beyond a reasonable doubt.

Jurado, 38 Cal. 4th at 116-18 (alterations in original). While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

As discussed above, to establish a federal due process violation arising from a claim of state law error, such as the error asserted here through the admission of Shigemura's statements, that evidence must have "so fatally infected the proceedings as to render them fundamentally unfair." Jammal, 926 F.2d at 919; see also McGuire, 502 U.S. at 68-73. To warrant habeas relief, the Court must also conclude that the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

With respect to Shigemura's statement after the crime, which the trial court ruled was admissible as an adoptive admission, Petitioner acknowledges that "pure state law claims (even if incorrectly decided) are not reviewable on federal habeas," but nonetheless contends that "the state court's erroneous application of state law rendered Mr. Jurado's trial fundamentally unfair, and thus denied Jurado due process under the federal Constitution, which is an issue reviewable on federal habeas." (Reply at 47-48.) With respect to Shigemura's statement several days before the crime, which the trial court admitted under a co-conspirator exception to the hearsay rule, Petitioner contends that this too presents a federal claim because the California Supreme Court analyzed the contention by assuming that the error in admitting that statement rose to the level of a Confrontation Clause violation and conducted harmless error review under the federal standard. (Id. at 48, citing Jurado, 38 Cal. 4th at 118.)

The California Supreme Court held that "[w]hen a defendant remains silent after a statement alleging the defendant's participation in a crime, under circumstances that fairly afford the defendant an opportunity to hear, understand, and reply, the statement is admissible as an adoptive admission, unless the circumstances support an inference that the defendant was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution." Jurado, 38 Cal. 4th at 116. Again, this Court is bound by the California Supreme Court's interpretation of California law. See Richey, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") While there is no error in the state court's holding that an adoptive

admission constitutes a hearsay exception and can be admissible, Petitioner contends that the state court erred in applying the rule to his case.

The California Supreme Court affirmed the trial court's conclusion that Shigemura's post-crime statement "was admissible as an adoptive admission by defendant." Jurado, 38 Cal. 4th at 116-17. In finding Shigemura's statement that "We took care of the problem and dumped the body at Balboa Park" to be admissible, the California Supreme Court reasoned that Petitioner "must have heard and understood the statement because he was sitting on the same couch with Shigemura, the circumstances called for a denial or protest if the statement was inaccurate, nothing prevented him from making a response, and nothing supports an inference that he was relying on a constitutional right of silence." Id. at 117. To support his contention that Shigemura's post-crime statement was not admissible as his own adoptive admission, Petitioner suggests that the "we" in "We took care of the problem and dumped the body at Balboa Park," could have actually referred to Shigemura and Schmidt, rather than Shigemura and Petitioner, and as such, Petitioner would not have had a reason to respond to Shigemura's statement. (SAP at 414-15, Pet. Br. at 106-08.) To the extent Petitioner argues that this supports a conclusion that the California Supreme Court's decision involved an unreasonable determination of the facts, a review of the record supports the reasonableness of the state court's decision. While the record reflects that Schmidt accompanied Petitioner and Shigemura to Baldwin's home, Baldwin testified that Schmidt was "excited and nervous-acting" and stated: "You have to hear this, what they have to say, you have to hear this. Can we come in?" (RT 2451) (emphasis added.) Baldwin noted that during the conversation he was seated on one couch next to Schmidt, while Shigemura and Petitioner were seated on the other. (Id.) Petitioner also asserts that he "barely knew, and never confided in, Baldwin, and most likely knew him only as a methamphetamine user and a convicted felon," and "[t]here is no reason why Mr. Jurado would have responded to Shigemura's statement in Baldwin's presence." (Pet. Br. at 107-08.) A review of the trial transcript reflects that Baldwin knew and was acquainted with Petitioner and knew Shigemura through Mark Schmidt. (RT 2446.)

Baldwin stated that he knew Petitioner "maybe two months" prior to that conversation, had "met him on a few occasions," and agreed he did not know Petitioner or Shigemura very well. (RT 2455-56.) The record also reflects that Baldwin used methamphetamine on occasion during the time he was acquainted with Petitioner and Shigemura, and that he had been previously convicted of a felony. (RT 2456.) However, Petitioner fails to indicate and the record does not reflect whether Petitioner was aware of Baldwin's drug use and prior convictions during their acquaintance or if he subsequently learned that information. In any event, even assuming Petitioner's acquaintance with Baldwin was marginal, Shigemura's post-crime statement that they took care of a problem and dumped the body, made while sitting right next to Petitioner, clearly invited a denial, rebuttal or clarification if untrue or inaccurate, regardless of the quality of the audience.

Given the deference with which this Court must treat the state court's factual findings, and in light of the record support for the state court's findings in this instance, the Court is not persuaded that the California Supreme Court's decision was based on an unreasonable determination of the facts. See Rice, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"), quoting 28 U.S.C. § 2254(e)(1).

Petitioner also fails to show that the admission of Shigemura's statements violated his rights to due process, a fair trial, or to a reliable guilt determination. He argues that Shigemura's statements allowed corroboration of the conspiracy, which in turn provided a motive for the murder, as well as provided evidence of planning and premeditation with respect to the murder. However, the record reflects sufficient evidence apart from Shigemura's statements on these crimes, including but not limited to Schmidt's testimony about Petitioner's request for a chain, Petitioner's conversations with Shigemura and Humiston, Petitioner's request for Schmidt to lie to Holloway to get her to leave with the group, Petitioner's subsequent statements to David Silva and others about the crime, his subsequent behavior, and the physical evidence. Moreover, as noted above, even if the Court were to find federal error, the Supreme Court "has not yet made a clear ruling that

08cv1400

admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  Holley, 568 F.3d at 1101.

The Court also remains unpersuaded that the admission of Shigemura's statements violated his right to a reliable sentencing determination.  Petitioner simply asserts that "[a]t the penalty phase, the admission of non-statutory aggravating evidence- here the admission of Shigemura's out-of-court statements- violated Mr. Jurado's Eighth Amendment right to a reliable sentencing determination."  (Pet. Br. at 110.)  Petitioner alleges that "[t]he statements-suggesting a premeditated intent to kill arrived at a few days prior to the killing- was significant evidence in aggravation." (Reply at 50.)  However, as previously noted, in light of the substantial evidence in aggravation wholly independent of those statements, including but not limited to the brutality of the murder itself and Petitioner's prior criminal activity, this contention fails.  See Zant, 462 U.S. at 879 ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.")

In the briefing, Petitioner separately asserts that the admission of Shigemura's statements violated his constitutional rights under the Confrontation Clause.  (See e.g. Pet. Brief at 104-05, 110.)   With respect to Shigemura's post-crime statement made in Petitioner's presence, the California Supreme Court rejected Petitioner's Confrontation Clause argument, reasoning that: "The right of confrontation is not violated when the jury hears evidence, from a witness subject to cross-examination, relating a defendant's own out-of-court statements and adoptive admissions."  Jurado, 38 Cal. 4th at 117.  With respect to Shigemura's pre-crime statement, the California Supreme Court reasoned that:

> Even if we assume this error violated defendant's right of confrontation under the federal Constitution, reversal is not required because defendant suffered no prejudice. Shigemura repeated the substance of the earlier hearsay statement (that she had a problem she needed to take care of) in defendant's presence ("We took care of the problem and we dumped the body at Balboa Park") and defendant by his conduct adopted that statement as his own. We conclude the error was harmless beyond a reasonable doubt.

Id. at 118.

As an initial matter, the Court is not persuaded that either statement actually falls under the purview of the Confrontation Clause, as the Supreme Court emphasized that "only *testimonial* statements are excluded by the Confrontation Clause." <u>Giles v. California</u>, 554 U.S. 353, 376 (2008) (emphasis in original). Given the circumstances surrounding Shigemura's statements, both of which were utterances made during private conversation between acquaintances, Petitioner fails to demonstrate that either statement raises Confrontation Clause concerns.[20] <u>See Crawford</u>, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); <u>see also</u> <u>Ohio v. Clark</u>, 576 U.S. ___, 135 S.Ct. 2173, 2180 (2015) ("[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. 'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'"), quoting <u>Michigan v. Bryant</u>, 562 U.S. 344, 359 (2011).

First, the California Supreme Court reasonably concluded that Shigemura's post-crime statement did not violate the Confrontation Clause given Petitioner's adoption of that statement as his own, again, holding that: "The right of confrontation is not violated when the jury hears evidence, from a witness subject to cross-examination, relating a defendant's own out-of-court statements and adoptive admissions." <u>Jurado</u>, 38 Cal. 4th at 117. Petitioner fails to cite to any clearly established law holding that the introduction of a defendant's own adoptive admission implicates the Confrontation Clause. As Respondent correctly notes, several circuits have rejected such a proposition. (<u>See</u> Ans. Mem. at 267, citing <u>United States v. Kehoe</u>, 310 F.3d 579 (8th Cir. 2003); <u>Newman v. River</u>, 125 F.3d 315 (6th Cir. 1997); <u>United States v. Allen</u>, 10 F.3d 405 (7th Cir. 1993).) Even so, Petitioner accurately notes that the Ninth Circuit held, prior to <u>Crawford</u>, although "there

---

[20] At oral arguments, the Court asked counsel to address the Confrontation Clause aspect of this claim, and Petitioner appeared to acknowledge that the claim was primarily a due process and Eighth Amendment claim rather than a Confrontation Clause claim.

is some justification for viewing adoptive admissions as automatically satisfying the Confrontation Clause," that "adoptive admissions do not automatically satisfy the Confrontation Clause, at least where the third-party statements alleged to have been adopted have probative value independent of the fact that they may have been adopted by the defendant." United States v. Monks, 774 F.2d 945, 952 (9th Cir. 1985). But in this case, because Shigemura's statement that "we" had a problem that had been taken care of was only probative to the extent it was adopted by Petitioner due to his presence and silence became Petitioner's own statement, it does not present Confrontation Clause concerns. See Allen, 10 F.3d at 413 ("An 'adoptive admission' is a statement that the defendant has adopted as his own. Thus, the defendant himself is, in effect, the declarant. The 'witness' against the defendant is the defendant himself, not the actual declarant; there is no violation of the defendant's right to confront the declarant because the defendant only has the right to confront 'the witnesses against him.'"), quoting U.S. Const. Amend. VI. Had Shigemura instead made the same post-crime statement outside of Petitioner's presence and without specifically identifying who "we" was comprised of, it would not have independently implicated him in the crime. It is evident that the state court was persuaded that Petitioner's presence next to Shigemura, and his silence in the face of her statement that they took care of their problem and dumped the body in Balboa Park, allowed the statement to be admissible as an adoptive admission. See Jurado, 38 Cal. 4th at 117. As discussed above, Petitioner fails to show that this conclusion was incorrect, much less unreasonable. Because Petitioner fails to offer any clearly established federal law supporting his contention that allowing his adoptive admission into evidence violated the Confrontation Clause, the Court declines to conclude that the state court's rejection of that argument was objectively unreasonable.

With respect to Shigemura's earlier pre-crime statement, made outside Petitioner's presence several days before the crime, the California Supreme Court also chose to analyze any potential prejudice in its admission, under the assumption that the Confrontation Clause applied to that erroneously admitted statement. Petitioner is not entitled to federal

habeas relief unless he can show that the state court's determination that Petitioner was not prejudiced and that any error was harmless was itself objectively unreasonable. See Ayala, 135 S.Ct. at 2199 ("When a Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'"), quoting Fry, 551 U.S. at 119.

Petitioner first contends that the California Supreme Court's harmless error determination was unreasonable because it was premised not only on the incorrect assumption that the earlier statement was repeated in the later statement, but also that the later statement was properly admitted into evidence. (Reply at 48-49.) Petitioner again asserts that admission of the later post-crime statement actually violated his due process rights, and was not itself harmless. (Id. at 49.) Yet, as discussed earlier, Petitioner fails to show that the admission of Shigemura's post-crime statement made in the presence of, and adopted by, Petitioner, violated his federal constitutional rights.

Petitioner also asserts that the state court's harmlessness determination was unreasonable because the California Supreme Court was incorrect in concluding that Shigemura's later statement that they took care of the problem and dumped the body "repeated the substance" of Shigemura's pre-crime statement that she had a problem she needed to take care of. (Pet. Br. at 109.) Petitioner notes that "Shigemura's earlier hearsay statement was inadmissible, and thus the second statement was not merely a repeat of an admissible statement." (Id.) Petitioner also argues that Shigemura's earlier statement was one of "future intent" while the later statement was "recounting past events," and that only the earlier statement "was highly probative of the specific intent elements of conspiracy, first-degree murder, and the special circumstance of lying-in-wait." (Reply at 49.)

The Court is not persuaded that the noted differences between the two statements render the state court's decision unreasonable. The Court rejects Petitioner's contention that the California Supreme Court was incorrect in finding that the later statement "repeated the substance" of the earlier statement. In both conversations, one of which took place prior to the murder and the other a few days after, Shigemura spoke to the same individual,

Baldwin, about a "problem" she had and referenced taking care of that problem. The California Supreme Court also recognized that the earlier pre-crime statement was admitted in error, and analyzed the claim accordingly. See Jurado, 38 Cal. 4th at 117-18. The Court is required under AEDPA to apply a presumption of correctness to the state court's finding, which Petitioner has failed to rebut given the similarities between the two statements. See Rice, 546 U.S. at 338-39. Petitioner fails to demonstrate that the state court finding was unreasonable in light of the evidence in the state record. See Schriro, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold."), citing Williams, 529 U.S. at 410. It is true that Shigemura's earlier statement occurred prior to the murder and discussed an existing problem, while in the later statement she indicated that the problem had been taken care of. Yet, in addition to rejecting Petitioner's argument that this distinguishes the substance of the two statements, the Court also disagrees with Petitioner's contention that the earlier statement was alone probative of intent, given the clear similarities between the statements.

Even were Petitioner somehow able to demonstrate that the California Supreme Court's rejection of this claim was unreasonable, habeas relief is unavailable because any error from the admission of Shigemura's statements was harmless. The record reflects ample evidence of intent and planning apart from Shigemura's statements, including, but not limited to, Petitioner asking Schmidt for a cord on the evening of the murder, Petitioner conferring separately with Humiston and Shigemura, all three co-defendants urging Holloway to leave with them, and Petitioner asking Schmidt to lie to Holloway so she would leave with them. Meanwhile, as discussed in greater detail below in Claim 13, this coupled with the physical evidence clearly supported the jury's true findings on the lying in wait special circumstance, as the victim suffered numerous strangulation-type injuries to her neck and blunt force injuries to her head and back consistent with an attack from behind, and Petitioner told David Silva that he was in the back seat and Holloway was in the front seat that evening. Additionally, Holloway's body was found in a culvert several

miles from Schmidt's apartment, close in proximity to where Humiston's car was towed from the next morning, further supporting a conclusion that Holloway was not attacked immediately upon leaving Schmidt's apartment, but was instead first taken to a more remote location. In light of this evidence, Petitioner fails to show that the admission of Shigemura's statements had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 637; Nielsen, 371 F.3d at 581 ("Confrontation Clause violations are subject to harmless error analysis, because 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'"), quoting Van Arsdall, 475 U.S. at 680-81.

Petitioner has not demonstrated that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Because Petitioner fails to satisfy § 2254(d), he is not entitled to habeas relief or evidentiary development on Claim 12. Sully, 725 F.3d at 1075; Totten, 137 F.3d at 1176.

**3.    Claim 13**

Petitioner argues that the evidence at trial "did not establish beyond a reasonable doubt that a conspiracy existed between Petitioner, Shigemura, and Humiston to kill Teresa Holloway. Nor did the evidence legally support the conclusion that Petitioner killed Holloway while acting with premeditation and deliberation, and while lying-in-wait," and that the insufficiency of the evidence deprived him of his constitutional rights to due process, a fair trial, and a reliable guilt and penalty determination. (SAP at 424.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the evidence presented at the guilt phase was insufficient to establish the premeditation element of first degree murder, the lying-in-wait special circumstance, and the conspiracy conviction, and he asserts that basing a conviction or special circumstance finding on insufficient evidence violates his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution to due process of law, a fair trial, and reliable verdicts in a capital case.

"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128, 113 Cal.Rptr.2d 27, 33 P.3d 450; accord, *People v. Silva*, *supra*, 25 Cal.4th at p. 368, 106 Cal.Rptr.2d 93, 21 P.3d 769.)

A murder that is premeditated and deliberate is murder of the first degree. (§ 189.) "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'" (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 767, 60 Cal.Rptr.2d 1, 928 P.2d 485.) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely*, *supra*, 35 Cal.4th at p. 543, 26 Cal.Rptr.3d 1, 108 P.3d 182.) A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported-preexisting motive, planning activity, and manner of killing-but "[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation." (*Ibid.*; see also *People v. Combs*, *supra*, 34 Cal.4th at p. 850, 22 Cal.Rptr.3d 61, 101 P.3d 1007; *People v. Silva*, *supra*, 25 Cal.4th at p. 368, 106 Cal.Rptr.2d 93, 21 P.3d 769.)

The evidence of preexisting motive was ample. During the days before Holloway's murder, defendant had talked to Brian Johnsen and Denise Shigemura about whether they should kill Doug Mynatt, but they had decided not to tell Teresa Holloway about this because of concern that she would reveal it to the police. On the night of the murder, defendant told Johnsen that he had decided to proceed with the plan to kill Mynatt and that it could not wait until Johnsen was released from jail. Teresa Holloway then got on the phone and asked Johnsen whether there was a plan to kill Mynatt. From this evidence, a rational juror could infer that defendant had a motive to kill Holloway, to prevent her from revealing his planned killing of Mynatt.

The evidence of planning activity was ample as well. Shortly before the murder, defendant asked Mark Schmidt for a chain. When Schmidt offered defendant an 18-inch length of plastic weed-eater cord, defendant wrapped the cord around his own neck, with one end in each fist clenched at shoulder height, and said: "It will do." From these actions, a rational juror could infer that defendant had already decided to use the cord to strangle Holloway.

Defendant then asked Schmidt to tell Teresa Holloway to get off the phone because he (Schmidt) needed to leave the apartment. A rational juror could infer that defendant made this request so that Holloway would be forced to leave Schmidt's apartment and then could be lured into Anna Humiston's car, where the fatal attack would take place. In the car, defendant positioned himself directly behind Holloway. A rational juror could infer that defendant did so to facilitate his planned strangulation of Holloway.

Because this evidence of preexisting motive and planning activity was by itself sufficient to support the first degree murder conviction on a theory of premeditation and deliberation, we need not review the evidence concerning the manner of killing.

The lying-in-wait special circumstance requires proof of "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Morales* (1989) 48 Cal.3d 527, 557, 257 Cal.Rptr. 64, 770 P.2d 244; accord, *People v. Combs*, *supra*, 34 Cal.4th at p. 853, 22 Cal.Rptr.3d 61, 101 P.3d 1007; *People v. Michaels*, *supra*, 28 Cal.4th at p. 516, 122 Cal.Rptr.2d 285, 49 P.3d 1032.)

There is sufficient evidence that defendant concealed from Holloway his purpose to kill her. As explained earlier, there is substantial evidence from which a rational juror could infer that defendant had already formed this purpose when he obtained a cord from Mark Schmidt that could be used to strangle Holloway. He did not reveal that purpose to Holloway immediately by attacking her, but instead lured her into Humiston's car.

There is sufficient evidence of a substantial period of watching and waiting for an opportune time to act. The place where Teresa Holloway's body was found was two to three miles from Mark Schmidt's apartment. A rational juror could infer that defendant did not attack Holloway immediately after luring her into Humiston's car, but instead waited for a substantial period while the car was driven to a location where there was little risk that the attack would be observed by other motorists or by pedestrians.

Finally, there is substantial evidence that once the car reached a suitable location, defendant immediately launched a surprise attack on an unsuspecting victim from a position of advantage. Defendant ensured a position of advantage by occupying the back seat of Humiston's car, directly behind Teresa Holloway. From the blood evidence found in the car, the very

nature of the planned attack, and the lack of injury to defendant, Humiston, or Shigemura, a rational juror could infer that Holloway was taken by surprise, with little or no opportunity to escape or fight back.

In concluding that the evidence is sufficient to support the lying-in-wait special circumstance, we are guided by this court's decisions in *People v. Combs*, *supra*, 34 Cal.4th 821, 22 Cal.Rptr.3d 61, 101 P.3d 1007, and *People v. Morales*, *supra*, 48 Cal.3d 527, 257 Cal.Rptr. 64, 770 P.2d 244, which involved nearly identical facts. In *Combs* and *Morales*, as here, the defendant armed himself with a weapon suitable for use in strangulation, lured an unsuspecting victim into the front seat of an automobile, positioned himself directly behind the victim, waited until the car reached a suitable location, and then launched a surprise attack on the unsuspecting victim. (*People v. Combs*, *supra*, at p. 853, 22 Cal.Rptr.3d 61, 101 P.3d 1007; *People v. Morales*, supra, at p. 554, 257 Cal.Rptr. 64, 770 P.2d 244.) In *Morales*, as here, the defendant bludgeoned the victim to death after an initial attempt at strangulation was unsuccessful. (*People v. Morales*, *supra*, at p. 554, 257 Cal.Rptr. 64, 770 P.2d 244.)

We consider next defendant's challenge to the sufficiency of the evidence to support the conspiracy conviction.

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416, 84 Cal.Rptr.2d 665, 975 P.2d 1071; accord, *People v. Russo* (2001) 25 Cal.4th 1124, 1131, 108 Cal.Rptr.2d 436, 25 P.3d 641.) "Disagreement as to who the coconspirators were or who did an overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy." (*People v. Russo*, *supra*, at p. 1135, 108 Cal.Rptr.2d 436, 25 P.3d 641.)

Here, defendant's plan to attack and kill Teresa Holloway in Anna Humiston's car required the cooperation of Humiston and Denise Shigemura. There is ample evidence that one or both of them did agree or conspire to commit the murder. Shigemura shared defendant's motive to kill Holloway, because she also had been part of the plot to kill Doug Mynatt and, like defendant, would be put at risk if Holloway revealed that plot. Although there

148

is no direct evidence that defendant and Shigemura discussed in advance the killing of Holloway, there was evidence that they were alone together at Mark Schmidt's residence shortly before the killing, during which a discussion and agreement could have taken place. Shigemura's later conduct provided additional evidence that she agreed to the murder. She was driving Humiston's car at the time of the fatal attack, she did not separate herself from defendant or report the killing afterward, and with defendant's help she concocted a false story to explain why, on the night of Holloway's murder, she failed to return to the halfway house where she was then required to live. As for Humiston, there was evidence that defendant engaged in an intense conversation with her at Schmidt's residence, that she allowed Shigemura to drive her car, and that she did not report the murder afterward and continued to associate with defendant. From this evidence, a rational juror could conclude beyond a reasonable doubt that defendant and either Shigemura or Humiston (or both) had the specific intent to agree or conspire to murder Holloway, as well as the specific intent to commit the elements of murder.

The overt act requirement was also satisfied. The prosecution alleged five overt acts in support of the conspiracy charge. Two alleged overt acts occurred before Holloway's murder (defendant, Denise Shigemura, and Anna Humiston met with Teresa Holloway at Mark Schmidt's residence and defendant, Shigemura, Humiston, and Holloway left Schmidt's residence in Humiston's car); two alleged acts occurred after the murder (defendant, Shigemura, and Humiston placed Holloway's body in the culvert and walked to a nearby phone from which defendant called to request a ride); and one alleged act was the murder itself. The jury returned "not true" findings on the preoffense overt acts allegations, but it found each of the other overt act allegations to be true.

Commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement. (*People v. Padilla* (1995) 11 Cal.4th 891, 966, 47 Cal.Rptr.2d 426, 906 P.2d 388.) Because the jury found that defendant committed the murder itself in furtherance of the conspiracy, and because substantial evidence supports that finding, the overt act requirement is satisfied. Although defendant is correct that the overt act requirement may not be satisfied by conduct occurring after the target offense is complete (*People v. Zamora* (1976) 18 Cal.3d 538, 560, 134 Cal.Rptr. 784, 557 P.2d 75), defendant was not prejudiced by the jury's consideration of the invalid postoffense overt act allegations, and the valid finding of a single overt act is sufficient to support the conspiracy verdict. (*People v. Padilla*, *supra*, at pp. 965-966, 47 Cal.Rptr.2d 426, 906 P.2d 388.)

08cv1400

Defendant argues that the jury's "not true" findings on the preoffense overt act allegations conclusively demonstrate the jury's rejection of the prosecution's theory that defendant had agreed with Shigemura or Humiston (or both) to kill Holloway before Holloway was lured into Humiston's car, and that this inconsistency fatally undermines the conspiracy verdict. We disagree. An inconsistency between a "not true" finding on an overt act and a verdict or another finding is not a ground for overturning the inconsistent verdict or finding. (*People v. Hernandez* (2003) 30 Cal.4th 835, 862, 134 Cal.Rptr.2d 602, 69 P.3d 446; see *People v. Santamaria* (1994) 8 Cal.4th 903, 911, 35 Cal.Rptr.2d 624, 884 P.2d 81 [recognizing that an apparently inconsistent not true finding may be the result of mistake, compromise, or lenity].)

Jurado, 38 Cal. 4th at 118-22 (alteration in original). While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). To that end, in reviewing a claim that the evidence is insufficient to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). In other words, "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324. "The Jackson standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004), quoting Jackson, 443 U.S. at 324 n.16. Moreover, because this petition is governed by AEDPA, in order to merit habeas relief, Petitioner must also demonstrate that the state court's adjudication of his claim involved an objectively unreasonable application of Jackson. See Juan H. v. Allen, 408

F.3d 1262, 1274 (9th Cir. 2005) ("After AEDPA, we apply the standards of <u>Jackson</u> with an additional layer of deference."); <u>see also</u> <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (per curiam) ("We have made clear that <u>Jackson</u> claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.")

## A.    **First-Degree Murder**

With respect to the first-degree murder conviction, Petitioner asserts that the evidence presented failed to establish either premeditation or deliberation. In accordance with California Penal Code section 189, which states in part that: "All murder which is perpetrated . . . by any other kind of willful, deliberate, and premeditated killing, . . . is murder of the first degree," Petitioner's jury was instructed that:

> All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.
>
> The word "willful," as used in this instruction, means intentional.
>
> The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand.
>
> If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

(CT 1223.)

The California Supreme Court has "identified three categories of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation: (1) facts showing planning activity; (2) facts suggesting motive; and (3) facts about the manner of killing which suggest a preconceived design." <u>People v. Lucero</u>, 44 Cal. 3d 1006, 1018 (1988), citing <u>People v. Anderson</u>, 70 Cal. 2d 15, 26-27 (1968). "When the record discloses evidence in all three categories, the verdict generally will be sustained. Otherwise,

convictions for first degree murder typically have been upheld where there is 'either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.'" <u>People v. Proctor</u>, 4 Cal. 4th 499, 529 (1992), quoting <u>People v. Raley</u>, 2 Cal. 4th 870, 887 (1992) (internal quotations and citation omitted). In rejecting Petitioner's claim of insufficiency, the California Supreme Court noted that "ample" evidence existed of both motive and planning activity. With respect to motive, the California Supreme Court cited Brian Johnsen's testimony about discussions Petitioner had with Johnsen and Shigemura about killing Mynatt and their decision not to tell the victim for fear she would reveal the plan.

Petitioner argues that the evidence presented at trial failed to establish either premeditation or deliberation, and asserts that: "As discussed in Claim 11, *ante*, absent Brian Johnsen's deposition testimony, the evidence merely indicated that Petitioner, Shigemura, Humiston and Holloway arrived at and left Schmidt's home as friends, and that Holloway was subsequently killed in Humiston's car, possibly with a piece of plastic cord Petitioner had obtained from Schmidt to tie up Johnsen's motorcycle. There was no evidence presented as to what actually happened in the car, and the physical evidence was equivocal. Whether the killing was the result of calculated consideration or, as Silva testified Petitioner told him, an argument that got out of hand (RT 2397), was pure speculation." (SAP at 431.)

As an initial matter, for the reasons discussed in Claim 11, <u>supra</u>, the Court rejected Petitioner's claim of error arising from the admission of Brian Johnsen's conditional examination at trial. As such, it is appropriate for the Court to include that testimony when evaluating the sufficiency of the evidence against Petitioner. Johnsen's testimony provided substantial evidence of motive, as he testified about phone conversations he had with Shigemura and Petitioner concerning their plan to murder Doug Mynatt and their decision not to tell the victim out of concern that she would reveal those plans to the police. (CT 1006-20.) Johnsen also testified that, on the evening of the murder, Petitioner stated his intention to go ahead with the Mynatt murder prior to Johnsen's release from jail, and at

one point during the same phone call, Holloway got on the phone to speak with Johnsen and asked about the existence of a plan to murder Mynatt. (CT 1018-19.)

As this Court noted in rejecting Claim 1.I in the Group One Order, and again in the adjudication of Claim 11, there was substantial evidence of planning and premeditation apart from Johnsen's testimony, as follows:

> While at Schmidt's apartment on the evening of Holloway's murder, while Holloway was on the phone with Johnsen, Petitioner asked Schmidt for a chain to tie up Johnsen's bikes. When Schmidt provided Petitioner with wire, Petitioner placed it around his neck, clenched his fists and said "that will do." The medical examiner stated that marks on the victim's neck could have been from manual or ligature strangulation. [¶] Schmidt also testified that Petitioner had several extended interactions with both Shigemura and Humiston that evening. Petitioner also directed Schmidt to lie to Holloway about needing to leave the apartment to get her off the phone with Johnsen, after which Holloway left in the company of Humiston, Shigemura and Petitioner. Petitioner later told David Silva that Holloway sat in the front seat of Humiston's car that evening, while the medical examiner found it possible that many of the injuries to the victim's head and neck could have come from behind, and noted that the bite mark was found on the victim's back. When Shigemura later told Baldwin that she no longer needed what she had asked for, she stated in Petitioner's presence that: "We took care of our problem and dumped the body off at Balboa Park" while Petitioner remained silent.

(ECF No. 171 at 73.)

The California Supreme Court stated that it "need not review the evidence concerning the manner of killing," reasoning that "this evidence of preexisting motive and planning activity was by itself sufficient to support the first degree murder conviction on a theory of premeditation and deliberation." Jurado, 38 Cal. 4th at 119. In addition to the California Supreme Court's thorough recounting of the evidence of planning and motive, this Court's review of the record finds similarly "ample" evidence that the manner in which the victim was killed indeed reflects a "preconceived design." The evidence shows that the victim sustained numerous abrasions and lacerations to her face and head and a bite mark on her back, as well as marks on the sides of her neck and bruising on the muscles underneath, which the medical examiner testified was consistent with applying pressure to

153

the neck.  (RT 2131-33, 2157-58.)  The victim also suffered fractures to her voice box and hyoid bone, which, coupled with the neck marks and petechiae, provided evidence of strangulation, and the medical examiner testified that her death was caused by blunt force injuries and strangulation.  (RT 2159-60.)  The medical examiner stated that: "All the injuries appeared to be occurring at about the same time.  Whether - - they all might be going on concurrently.  Some blows may have occurred and then strangulation and then more blows.  So there's really no way to separate the injuries out temporally."  (RT 2161.) He agreed that the injuries could be consistent with attempted and unsuccessful strangulation followed by the infliction of blunt force injuries, as follows:

> Q:     Now, the injuries that you saw, is it consistent with a person being strangled for a period of time and then, when the strangulation doesn't work to kill the victim, that the victim is bludgeoned with a hard object such as a scissors jack?  Is that consistent?
>
> A:     That could result in injuries like we're seeing.

(RT 2161-62.)  The appearance of injuries consistent with strangulation, coupled with the testimony that Petitioner had earlier that evening procured a cord from Mark Schmidt, wrapped it near his neck and stated it "would do," evidence not only planning, but also support a conclusion that there was indeed a "preconceived design" to kill Holloway by strangulation, and that the tire jack was only used when that method of killing proved unsuccessful.  It is clear that "after viewing the evidence in the light most favorable to the prosecution," including the evidence in the record that demonstrated motive and planning, all of which supports a conclusion that the murder was deliberate and premeditated, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319.

As such, given this evidence, as well as the California Supreme Court's explicit citation to, and application of, the elements of the crime at issue, and the deferential standard of review under AEDPA, it is evident that the state supreme court's rejection of the contention that there was insufficient evidence of premeditation or deliberation was not

an objectively unreasonable application of <u>Jackson</u>, nor was it based on an unreasonable determination of the facts.  See <u>Chein</u>, 373 F.3d at 983, quoting <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Juan H.</u>, 408 F.3d at 1274; <u>Coleman</u>, 566 U.S. at 651.

## B.  Lying In Wait Special Circumstance

This argument bears significant similarities to the prior contention, in that Petitioner again asserts that "the State's case was dependent on Johnsen's testimony providing a motive for the killing, upon which the State asked the jurors to infer that Holloway was killed to prevent her from telling Mynatt of the plan to kill him.  Even with Johnsen's testimony, however, the inferences the State asked the jurors to draw from the evidence were far too speculative to establish that Petitioner calculated Holloway's murder, then committed that murder while lying in wait."  (SAP at 432.)  Petitioner alleges that "Johnsen's conditional examination testimony failed to establish a motive for the killing because, as noted above, there was no evidence indicating anyone was afraid Holloway was going to tell Mynatt about the plan," citing Johnsen's later testimony that when he heard of Holloway's death, he did not think it was connected to the plot to kill Mynatt.  (Id., citing PRT 180.)  He contends that "[t]he prosecutor's theory was based solely on conjecture and speculation that Petitioner intended to silence Holloway at the point in time when they drove away from Schmidt's home (see RT 2066-71, 2831-2838), rather than on the reasonable inferences that could actually be drawn from the evidence," and that "even with Brian Johnsen's deposition testimony, the evidence merely raised the *possibility* that the State's theory of the case was correct.  That possibility is not sufficient to support Petitioner's capital murder conviction."  (SAP at 432-33.)

Petitioner primarily focuses on contesting the weight and importance that should be granted to Johnsen's testimony, but largely fails to address the other evidence presented at trial.  That evidence, as discussed below, amply supports the lying in wait convictions. Starting with the elements, the California Supreme Court correctly noted that: "[t]he lying-in-wait special circumstance requires proof of 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of

155

watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.'" <u>Jurado</u>, 38 Cal. 4th at 119, quoting <u>People v. Morales</u>, 48 Cal. 3d 527, 557 (1989). Respondent, meanwhile, aptly points out that under California law, "the lying in wait special circumstance [']contains [the] more stringent requirements[']" than does the lying in wait theory of first degree murder, and thus "if 'the evidence supports the special circumstance, it necessarily supports the theory of first degree murder.'" (Ans. Mem. at 82 n. 15, quoting <u>People v. Hillhouse</u>, 27 Cal. 4th 469, 500 (2002).)

The Court's review of the record reflects that a rational juror could have found sufficient proof that Petitioner concealed his intentions from Holloway, given the evidence that Petitioner asked Mark Schmidt for a chain, and obtained a cord instead, on the evening of the murder, then wrapped the cord around his neck and stated "that will do," coupled with the fact that later that same evening Petitioner exhorted Schmidt to lie to Holloway to get her to leave the apartment with him, Humiston and Shigemura, which she did, stating she would be back later to finish her phone conversation with Johnsen. (RT 2291-96, 2320-22, 2325-26.)

A review of the record also provides sufficient evidence that Petitioner engaged in a "substantial period of watching and waiting for an opportune time to act," as the victim's body was discovered in a ditch or culvert off of Highway 163, several miles from Schmidt's apartment, and Humiston's car, which broke down that evening, was towed the next morning from the Quince Street Bridge, located over that same highway. (<u>See</u> RT 2079-83, 2086-89, 2244.) As the state court reasonably observed, the evidence supports a conclusion that the victim was not attacked until they reached this more secluded location. The evidence also shows that the victim's death was caused by not just strangulation but also by blunt force injuries, and that a scissors jack, which had likely been stored in the rear side panel of Humiston's vehicle and was not located in the vehicle when searched, was later found in the vicinity of the victim's body covered in red stains and with hair attached to it. (<u>See</u> RT 2161-62, 2496, 2497-2501.)

The record also contains substantial physical and testimonial evidence that the victim was subjected to a surprise attack from behind once the car reached its destination, as Petitioner himself acknowledged to David Silva that Holloway was in the front seat of the car and he was in the back seat behind her that evening. (RT 2396-99.) The seat belt on the front passenger side had red stains on it, as did the front passenger seat cover, the seat itself, and the rear floorboards. (RT 2489-95.) Humiston's father, meanwhile, testified that the front passenger seat of the car was broken, as it "wouldn't hold down at the front corners," that "[t]he whole seat would flop back" and that "[i]t would lie clear back against the front edge of the back seat." (RT 2475-77.)

Again, the medical examiner testified that the victim had marks on the sides of her neck and bruising on the muscles underneath, consistent with applying pressure to the neck. (RT 2131-33, 2157-58.) She also suffered fractures to her voice box and hyoid bone, which, coupled with the neck marks and petechiae the medical examiner noted, provided evidence of strangulation, and the examiner concluded that her death was caused by blunt force injuries and strangulation. (RT 2159-60.) Holloway had a bite mark on her back. (RT 2163.) While Petitioner also told Silva that it was an argument that got out of hand which led to Holloway's death, when viewing all of the evidence, as directed by the United States Supreme Court, "in the light most favorable to the prosecution," this Court concludes that given the substantial evidence that Petitioner first procured the cord, then lured Holloway from the apartment under false pretenses, that Holloway was attacked and found several miles from the apartment and that she was in the front seat of the car when attacked from behind, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

Accordingly, given the California Supreme Court's explicit discussion of the elements necessary to find true the lying in wait special circumstance and the evidence supporting those elements, as well as the deferential standard of review under AEDPA, the state supreme court's rejection of this contention was neither contrary to, nor an unreasonable application of, Jackson, nor was it based on an unreasonable determination

157

of the facts.  See Chein, 373 F.3d at 983, quoting Jackson, 443 U.S. at 324 n.16; Juan H., 408 F.3d at 1274; Coleman, 566 U.S. at 651.

## C. Conspiracy

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy."  People v. Morante, 20 Cal. 4th 403, 416 (1999), quoting Cal. Penal Code § 184 (entitled "Overt act; venue" and stating as follows: "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done.")

Petitioner contends that the evidence at trial was insufficient to establish the crime of conspiracy because of the five overt acts alleged,[21] the jury found "not true" the two overt acts alleged to have taken place prior to the murder, and only found true the overt act of the murder itself and two overt acts alleged to have taken place after the commission of the murder.  He argues that (1) the jury's rejection of the pre-offense overt acts demonstrate that the jury necessarily rejected the existence of an agreement to commit the murder, which was one of the elements required for conspiracy, and (2) that the overt acts found,

---

[21] The five overt acts, all alleged to have occurred "on or about May 15, 1991," were as follows: (1) Petitioner, Shigemura, and Humiston met with Holloway at Schmidt's apartment; (2) Petitioner, Shigemura, Humiston and Hollway left Schmidt's apartment in Humiston's vehicle; (3) After leaving Schmidt's apartment, Holloway was murdered by Petitioner, Shigemura and Humiston in the vehicle; (4) Humiston's vehicle broke down on the highway near the Quince Street exit, so Petitioner, Shigemura and Humiston left Holloway's body in a nearby ditch; and (5) After dumping the body, Petitioner, Shigemura and Humiston walked to a nearby phone where Petitioner called Silva to pick up all three individuals and give them a ride home.  (CT 1218.)

the murder itself and the two that took place after the murder, were insufficient to satisfy the overt act requirement, another required element of the crime.  (SAP at 425-30.)

Petitioner argues that "[t]he State's theory was that Petitioner, Shigemura and Humiston agreed to kill Holloway because they were afraid of Doug Mynatt and feared Holloway would tell Mynatt about the plan to kill him," citing the prosecutor's presentation of evidence that Holloway found out about the plan to kill Mynatt on the evening of her death, that Petitioner had separate private conversations with both Shigemura and Humiston at Schmidt's apartment, and that Petitioner procured a cord from Schmidt prior to luring Holloway from Schmidt's apartment under false pretenses, but "[c]onspicuously absent, however, is any evidence that Petitioner and Shigemura discussed Holloway and agreed to kill her while they were alone in Mark Schmidt's bedroom," and "[n]or was there any evidence that Petitioner and Humiston agreed to kill Holloway when they conversed after Petitioner came out of Schmidt's bedroom."  (Id. at 426-27.)  Petitioner also asserts "there was no indication in the evidence that anyone believed Holloway was going to tell Mynatt about the plan to kill him," citing Johnsen's testimony that they did not tell Holloway about the plan for fear she might tell the police.  (Id. at 427.)  He states that "[a]fter hearing this and the other evidence presented at trial, the jury expressly found that Petitioner, Shigemura, and Humiston did not meet with Holloway at Schmidt's home, and then leave with her in Humiston's vehicle, in order to further an agreed upon plan to kill Holloway," and asserts that "[t]hese findings indicate that the jurors did not believe the evidence was sufficient to show that Petitioner, Shigemura and Humiston had an agreement to kill Holloway at the point in time when they left Schmidt's residence in Humiston's vehicle."  (Id.)  Finally, Petitioner maintains that "[w]ithout sufficient evidence of a prior agreement, what is left to establish a conspiracy is the actual killing and subsequent events," but that "the actual killing cannot establish a conspiracy," nor can the conduct that took place after the crime.  (Id. at 427-28.)

Petitioner's first argument, that the jury's not true findings on the first two overt acts demonstrates that the jury found insufficient evidence that there was an agreement to kill

Holloway when they left the apartment, is unpersuasive. The "not true" finding did not necessarily mean, as Petitioner asserts, that the jury found Petitioner, Humiston, Shigemura and Holloway *did not actually meet* at Schmidt's apartment and later leave together that evening, but only that jury was not unanimously persuaded that the alleged acts *constituted overt acts*. See Jurado, 38 Cal. 4th at 124 ("Because undisputed evidence established that both of these acts occurred, the jury's 'not true' finding can be explained only by inferring that the jury was not satisfied beyond a reasonable doubt that these acts were done in furtherance of the conspiracy.")

Nor do the jury's not true findings on the two alleged overt acts occurring prior to the murder necessarily lead to a conclusion that the jurors rejected the existence of *any* agreement. Petitioner posits that because there was a lack of evidence conclusively showing what the alleged conspirators discussed that evening, there is no evidence that Petitioner, Humiston and Shigemura specifically discussed killing Holloway and thus no evidence of an agreement. While there is no direct evidence that the conversations that took place between Petitioner and Shigemura, and Petitioner and Humiston, that evening involved plans for Holloway's murder, such direct evidence is not required to prove the existence of a conspiracy. As the jury was instructed: "The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence, or by both direct and circumstantial evidence. *It is not necessary to show a meeting of the alleged conspirators or the making of an express or informal agreement.*" (CT 1210- CALJIC 6.12) (emphasis added.) At any rate, the jury found Petitioner guilty of the crime of conspiracy, which given the elements outlined by the jury instructions, means that the jurors found sufficient evidence of an agreement. (See CT 1208- "A conspiracy is an agreement entered into. . .")

Based on a review of the record, the evidence presented at trial also supports the existence of an agreement. On the evening of the murder, Petitioner had separate private conversations with Shigemura and Humiston, obtained a cord from Schmidt, made an

accompanying gesture and comment that the cord "would do," and directed Schmidt to lie to Holloway so she would leave the apartment with him, Shigemura and Humiston. Moreover, the day after the murder, Shigemura and Petitioner went to Baldwin's home, where in Petitioner's presence, Shigemura told Baldwin she no longer needed the weapon she previously requested, as the "problem" had been taken care of and the body dumped in Balboa Park. Holloway's body was found several days later in a ditch off the highway in that very area. See Jurado, 38 Cal. 4th at 86 (the driver who found the victim's body described coming upon it after experiencing engine trouble when "driving a van on Highway 163 through Balboa Park" and leaving the van to walk to a nearby call box.) There was also evidence that, days before the murder, the conspirators in the Mynatt murder plan discussed their intention to keep that information from Holloway for fear she would expose the plot, and evidence that she revealed her knowledge of the plan to murder Mynatt on the same night she was murdered.

The facts surrounding the murder itself also reflected circumstantial evidence of an agreement. As the California Supreme Court observed, "defendant's plan to attack and kill Teresa Holloway in Anna Humiston's car required the cooperation of Humiston and Denise Shigemura." Jurado, 38 Cal. 4th at 121. It was also reasonable for the state court to note that Shigemura, who was driving the car that evening and later enlisted others to help her create a fiction that she failed to make curfew at the halfway house due to a fight, had plotted with Petitioner and Johnsen to kill Doug Mynatt and similarly would want to silence Holloway. Humiston, meanwhile, was dating Petitioner, owned the car driven that evening and was present at the murder. Hair similar to Humiston's was additionally found in the victim's hands, supporting a conclusion that Humiston was, at a minimum, somehow physically involved in the violence that evening. As the California Supreme Court reasonably found: "From this evidence, a rational juror could conclude beyond a reasonable doubt that defendant and either Shigemura or Humiston (or both) had the specific intent to agree or conspire to murder Holloway, as well as the specific intent to commit the elements of murder." Id.

The basis for the jury's verdict on the first two overt acts is not known, but the California Supreme Court specifically denied Petitioner's claim that the not true findings "conclusively demonstrate the jury's rejection of the prosecution's theory" and that "this inconsistency fatally undermines the conspiracy verdict," reasoning that "[a]n inconsistency between a 'not true' finding on an overt act and a verdict or another finding is not a ground for overturning the inconsistent verdict or finding. (*People v. Hernandez* (2003) 30 Cal.4th 835, 862, 134 Cal.Rptr.2d 602, 69 P.3d 446; see *People v. Santamaria* (1994) 8 Cal.4th 903, 911, 35 Cal.Rptr.2d 624, 884 P.2d 81 [recognizing that an apparently inconsistent not true finding may be the result of mistake, compromise, or lenity].)" Jurado, 38 Cal. 4th at 122 (alterations in original). Petitioner fails to demonstrate that the California Supreme Court's conclusion was objectively unreasonable, particularly given the substantial evidence supporting the conspiracy conviction.

Petitioner's second argument, that the three overt acts the jury found true cannot support the conspiracy conviction, is also untenable. The California Supreme Court correctly concluded that the two overt acts which occurred after the murder could not satisfy the overt act requirement. See Jurado, 38 Cal. 4th at 122, citing People v. Zamora, 18 Cal. 3d 538, 560 (concluding that "acts committed by conspirators subsequent to the completion of the crime which is the primary object of the conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy.") However, the California Supreme Court correctly observed that "[c]ommission of the target offense in furtherance of the conspiracy satisfies the overt act requirement." Jurado, 38 Cal. 4th at 121, citing People v. Padilla, 11 Cal. 4th 891, 966 (1995) (concluding that jury's true finding on alleged overt act of "actual killing" of victim "clearly qualified as overt and was legally and factually sufficient."), overruled on other grounds by People v. Hill, 17 Cal. 4th 800 (1998). In this case, the jury found true the overt act alleging that "[o]n or about May 15, 1991, after leaving the Schmidt residence, TERESA HOLLOWAY is murdered by ROBERT JURADO JR., DENISE RENEE SHIGEMURA, and ANNA JEANETTE HUMISTON while inside ANNA JEANETTE HUMISTON'S vehicle." (CT 1254.) The jury was also

specifically instructed that: "The term 'overt act' means any step taken or act committed by one [or more] of the conspirators which goes beyond mere planning or agreement to commit a public offense and which step or act is done in furtherance of the accomplishment of the object of the conspiracy." (CT 1208) (alteration in original.) In light of the evidence, instructions, and case law supporting the validity of the target offense as an overt act, the California Supreme Court did not act unreasonably in concluding that "[b]ecause the jury found that defendant committed the murder itself in furtherance of the conspiracy, and because substantial evidence supports that finding, the overt act requirement is satisfied." Jurado, 38 Cal. 4th at 121-22.

Ultimately, Petitioner's contention that the evidence is insufficient to support the conspiracy conviction fails because when the Court views the evidence presented at trial, as it must, "in the light most favorable to the prosecution," it is clear that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. As discussed thoroughly above, this includes evidence that in the days and hours prior to the murder, Petitioner, Shigemura and Humiston intentionally entered an agreement to kill Teresa Holloway, shown by the numerous discussions between them, the separate plot to kill Mynatt and decision not to tell Holloway, coupled with the information that Holloway learned of the Mynatt plot prior to her death. There was also substantial evidence of intent to commit the murder itself, evidenced by Petitioner obtaining a cord from Schmidt on the evening of the murder and his accompanying comments, the lies to get Holloway to accompany them when leaving Schmidt's apartment, that the participants all left together, were present at the murder itself, and freely continued to associate with one another after the crime. There was also substantial evidence of an overt act, the murder itself. Given the record and the standard under which the Court must evaluate a claim of insufficiency, Petitioner fails to demonstrate that the evidence presented at trial is such that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324.

///

163

Thus, as with Petitioner's prior claims of insufficient evidence, in light of the California Supreme Court's clear and detailed decision discussing the evidence in support of each of the elements of conspiracy and the deferential standard of review under AEDPA, Petitioner fails to demonstrate that the state supreme court's rejection of this contention was contrary to, or an unreasonable application of, Jackson, or that it was based on an unreasonable determination of the facts. See Chein, 373 F.3d at 983, quoting Jackson, 443 U.S. at 324 n.16; Juan H., 408 F.3d at 1274; Coleman, 566 U.S. at 651. Petitioner does not merit habeas relief on Claim 13.

### 4.  **Claim 15**

Petitioner argues that the trial court failed to "clarify the jurors' confusion on an essential element of conspiracy" and gave an "erroneous instruction which omitted another essential element of this crime," in violation of Petitioner's constitutional rights to due process, proof beyond a reasonable doubt of each element of the charged offense, reliable fact-finding, and a fair and impartial jury trial. (SAP at 436.) In addition to asserting that "[t]aken alone, each of the above errors requires reversal of Petitioner's conspiracy conviction under the *Chapman* standard," Petitioner alleges that "[i]n conjunction, these errors require per se reversal of that conviction." (Id. at 445.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the trial court's instructions to the jury defining the charged offense of conspiracy omitted part of the specific intent element of that crime and that, during jury deliberations, the trial court erred in failing to dispel the jurors' confusion about the overt act element of conspiracy. He further contends that these errors denied him his rights under the federal Constitution to due process, to proof of each element beyond a reasonable doubt, to a fair and impartial jury trial, and to reliable factfinding in a capital case.

> The trial court instructed the jury with two modified versions-one spoken, one written-of CALJIC No. 6.10 defining the crime of conspiracy. As here relevant, the spoken version stated: "A conspiracy is an agreement entered into between two or more persons with the *specific intent to commit* a

crime, in this case alleged to be the crime of murder, the murder of Teresa Holloway, followed by an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement." (Italics added.) As here relevant, the written version stated: "A conspiracy is an agreement entered into between two or more persons with the *specific intent to agree to commit* the public offense of murder, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement." (Italics added.) The written version was given to the jury for its use during deliberations.

As this court has explained, the crime of conspiracy requires dual specific intents: a specific intent to agree to commit the target offense, and a specific intent to commit that offense. (*People v. Russo*, *supra*, 25 Cal.4th at p. 1131, 108 Cal.Rptr.2d 436, 25 P.3d 641; *People v. Swain* (1996) 12 Cal.4th 593, 600, 49 Cal.Rptr.2d 390, 909 P.2d 994.) We have cautioned trial courts not to modify CALJIC No. 6.10 to eliminate either of these specific intents. (*People v. Marks* (1988) 45 Cal.3d 1335, 1345, 248 Cal.Rptr. 874, 756 P.2d 260.)

Here, neither of the modified versions of the standard instruction expressly mentioned both of the required specific intents. The written instruction mentioned only the specific intent to agree, while the spoken instruction mentioned only the specific intent to commit the target offense of murder. As defendant points out, when the jury has received an instruction in both spoken and written forms, and the two versions vary, we assume the jury was guided by the written version. (*People v. Davis* (1995) 10 Cal.4th 463, 542, 41 Cal.Rptr.2d 826, 896 P.2d 119; *People v. Crittenden* (1994) 9 Cal.4th 83, 138, 36 Cal.Rptr.2d 474, 885 P.2d 887; *People v. McLain* (1988) 46 Cal.3d 97, 111, fn. 2, 249 Cal.Rptr. 630, 757 P.2d 569.)

Although the trial court erred in modifying CALJIC No. 6.10 to delete mention of the required specific intent to commit the target offense of murder, defendant suffered no prejudice. For a conspiracy to commit murder, intent to commit the target offense means an intent to kill. (*People v. Swain*, *supra*, 12 Cal.4th at p. 607, 49 Cal.Rptr.2d 390, 909 P.2d 994.) As defendant concedes, the jury's verdict that defendant was guilty of the first degree murder of Teresa Holloway necessarily included a finding that defendant himself had that intent. He argues, however, that the jury made no similar finding for either Denise Shigemura or Anna Humiston, the other alleged conspirators. But defendant does not identify any evidence in the record that could lead a rational juror to conclude that Shigemura and Humiston agreed to kill Holloway, with the specific intent to agree to do so, but without a specific

165

intent to actually kill her. Because we find in the record no evidence that could rationally lead to such a finding, we are satisfied that the instructional error was harmless beyond a reasonable doubt. (*Neder v. United States* (1999) 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35; *People v. Davis* (2005) 36 Cal.4th 510, 564, 31 Cal.Rptr.3d 96, 115 P.3d 417.)

During guilt phase deliberations, the jury sent a note to the trial judge. It read: "Is the jury merely deciding whether the overt acts alleged actually occurred, or are we also determining whether or not the acts do indeed meet the requirements of being overt acts as defined in CALJIC 6.10[?]" The trial court sent the jury this written response: "As [CALJIC No.] 6.10 states, in order to find Mr. Jurado guilty of conspiracy, you must unanimously find to be true at least one of the alleged Overt Acts, *as that term is defined in 6.10.*" (Italics added.)

Defendant maintains that this response did nothing to answer the jury's question, and that there is an unacceptable risk that the jury merely determined whether the conduct charged as overt acts occurred, without also determining whether any of the acts was committed in furtherance of the conspiracy. We disagree. The trial court's response expressly directed the jury's attention to the definition of an overt act in CALJIC No. 6.10, which stated that "'overt act' means any step taken or act committed by one or more of the conspirators ... *in furtherance of the accomplishment of the object of the conspiracy.*" (Italics added.) That the jury so understood the court's response is conclusively shown by the jury's findings on the overt acts. The jury found "not true" the overt act allegations that defendant, Denise Shigemura, and Anna Humiston met with Teresa Holloway at Mark Schmidt's residence and that they left Schmidt's residence with Holloway in Humiston's car. Because undisputed evidence established that both of these acts occurred, the jury's "not true" finding can be explained only by inferring that the jury was not satisfied beyond a reasonable doubt that these acts were done in furtherance of the conspiracy.

Jurado, 38 Cal. 4th at 122-24 (alterations in original). While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

A court evaluating a claim of instructional error must determine "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

process.'" <u>McGuire</u>, 502 U.S. at 72, quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." <u>McGuire</u>, 502 U.S. at 72, quoting <u>Cupp</u>, 414 U.S. at 147. Even if federal constitutional error occurred, habeas relief is only available if the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.

Petitioner first argues that the trial court erred in failing to clarify the jury's confusion with respect to the overt act element of conspiracy. The trial court instructed the jury that in order to find Petitioner guilty of conspiracy, "there must be proof of the commission of at least one of the overt acts alleged in the information." (RT 2787; <u>see also</u> CT 1208.) The trial court also instructed, pursuant to CALJIC 6.10, that:

> The term, quote "overt act," close quote, means any step taken or acts committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a crime and which step or act is done in furtherance of the accomplishment of the object of the conspiracy.

> To be an overt act, the step taken or the act committed need not in and of itself constitute the crime or even an attempt to commit the crime which is the ultimate object of the conspiracy, nor is it required that such step or act in and of itself be criminal or an unlawful act.

(RT 2787; CT 1208.) During deliberations, the jury sent a question to the trial court, asking: "Is the jury merely deciding whether the overt acts alleged actually occurred, or are we also determining whether or not the acts do indeed meet the requirement of being overt acts as defined in CALJIC 6.10," to which the trial court sent a written reply that stated: "As 6.10 states, in order to find Mr. Jurado guilty of conspiracy, you must unanimously find to be true at least one of the alleged overt acts, as that term is defined in 6.10." (CT 1164.)

Petitioner asserts that "the jury clearly was confused about whether they were determining solely if the alleged overt acts occurred, or if they were also determining whether the acts that they believed did occur were in fact 'overt acts' in furtherance of a

167

plan to kill Holloway," contends that "[t]he jury's verdict further reflects this confusion, and its findings regarding overt acts cannot be reconciled with a finding of conspiracy," and that the findings "strongly suggest that the jurors understood CALJIC 6.10, and the trial court's answer to their note, to mean their task was to decide only if the alleged acts occurred, and not whether these acts actually were in furtherance of an agreed upon plan to kill Holloway." (SAP at 439-40.)

As the California Supreme Court similarly found, a plain reading of the jury instruction refutes this contention, as CALJIC 6.10 defined an overt act, instructing that it "means any step taken or acts committed by one [or more] of the conspirators which goes beyond mere planning or agreement to commit a public offense and *which step or act is done in furtherance of the accomplishment of the object of the conspiracy*." (CT 1208) (emphasis added) (alteration in original.) The record further reflects that the jury reached a verdict shortly after receiving the trial court's response to their inquiry. (CT 1654.) A jury is presumed to understand and follow the trial court's instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 211 (1989).

In this claim, Petitioner repeats the assertion previously raised and rejected in Claim 13 that the jury's not true findings on the first two overt acts means the jurors did not accept the prosecution's theory that Petitioner, Shigemura and Humiston agreed to kill Holloway prior to the murder itself and argues that "a conclusion that the killing was the culmination of an agreement was, at best, speculative." (SAP at 440.) As discussed above, the jury's findings on the overt acts did not necessarily mean the jury rejected the existence of *any* agreement, only that the jury was not unanimously persuaded that those two particular events constituted overt acts in furtherance of the conspiracy. See Jurado, 38 Cal. 4th at 124 ("Because undisputed evidence established that both of these acts occurred, the jury's 'not true' finding can be explained only by inferring that the jury was not satisfied beyond a reasonable doubt that these acts were done in furtherance of the conspiracy.") Again, the jury found Petitioner guilty of the crime of conspiracy, which given the specific elements outlined in the jury instructions, means that the jurors were persuaded there was evidence

of an agreement. (See CT 1208- "A conspiracy is an agreement entered into. . .") Based on a review of the record, the Court finds no error in the trial court's instruction on the overt act requirement or in the trial court's response to the jury question, much less the existence of an error that would have "so infected" Petitioner's trial as to result in a denial of due process. McGuire, 502 U.S. at 72.

Petitioner next asserts that the trial court erred in omitting the "dual specific intent" requirement of conspiracy, and that the "erroneous instructions given to Petitioner's jurors completely removed from their deliberative process that element of conspiracy requiring that Shigemura and Humiston not only intended to agree with Petitioner to murder Holloway, but also intended to commit that murder." (SAP at 443-44.) The California Supreme Court acknowledged this error, noting that neither the spoken instructions, which mentioned the specific intent required to commit murder, nor the written instructions, which discussed the specific intent to agree, addressed both required intents. Jurado, 38 Cal. 4th at 123. Citing California law, the California Supreme Court "assume[d] the jury was guided by the written version." Id. Then, citing Neder v. United States, 527 U.S. 1 (1999),[22] the state court found the instructional error harmless. Id.

Petitioner simply argues that "given the state of the record, the People cannot show the trial court's failure to instruct on the omitted 'dual specific intent' element of conspiracy was harmless beyond a reasonable doubt, and this error requires reversal of the conspiracy verdict." (SAP at 445.) However, because the California Supreme Court acknowledged the error and conducted an analysis of any prejudicial impact, this Court must evaluate that determination, rather than engage, as Petitioner appears to advocate, in a de novo review of the claim. See Ayala, 135 S.Ct. at 2199 ("When a Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254

---

[22] Neder, in turn, cited both Chapman v. California, 386 U.S. 18 (1967) and Brecht, among other cases, in distinguishing between errors amenable to harmless error analysis as opposed to those constituting structural error. See Neder, 527 U.S. at 8-20.

unless *the harmlessness determination itself* was unreasonable.'"), quoting <u>Fry</u>, 551 U.S. at 119; <u>see</u> <u>also</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18-19 (2003) (per curiam).

The California Supreme Court reasonably concluded that "the jury's verdict that defendant was guilty of the first degree murder of Teresa Holloway necessarily included a finding that defendant himself had that intent." <u>Jurado</u>, 38 Cal 4th at 123. Rejecting Petitioner's contention that the jury failed to make similar findings of intent with respect to his co-conspirators, the state court reasoned that: "But defendant does not identify any evidence in the record that could lead a rational juror to conclude that Shigemura and Humiston agreed to kill Holloway, with the specific intent to agree to do so, but without a specific intent to actually kill her. Because we find in the record no evidence that could rationally lead to such a finding, we are satisfied that the instructional error was harmless beyond a reasonable doubt." <u>Id.</u>

Even were the Court to engage in its own harmless error analysis, the record reflects substantial evidence supporting a conclusion that the co-conspirators had not only the specific intent to enter an agreement, but also the specific intent to kill Holloway. For instance, as discussed in greater detail throughout Claim 13, there was evidence that Shigemura, who was driving the car that evening, had planned Mynatt's murder with Petitioner and Johnsen and shared the motive to prevent Holloway from informing others of those plans. Humiston, meanwhile, owned the car driven that evening, was at a minimum present at the murder, and hair similar to hers was found in the victim's hands after her death, indicating potentially more extensive involvement in the crime. The day after the murder, rather than ending their association with Petitioner, both Shigemura and Humiston returned to the scene to have Humiston's car towed. That same day, Shigemura enlisted Petitioner and another individual to beat her up in an attempt to create an alternate reason for missing curfew the prior evening.

Yet, this Court is not simply conducting its own harmless error analysis, but under AEDPA must first decide whether the California Supreme Court's harmless error determination was unreasonable. <u>Ayala</u>, 135 S.Ct. at 2199. Given the evidence in the

record supporting the jury's findings, and the lack of any demonstrable support for Petitioner's position, the Court cannot conclude that the state court's harmless error analysis was erroneous, much less objectively unreasonable.

Based on the lack of error arising from the trial court's answer to the jury inquiry about the overt act element, the Court also rejects Petitioner's contention that the "combined effect" of the two alleged instructional errors on the conspiracy charge warrant reversal of that conviction. Petitioner argues that this case is comparable to a California Supreme Court case in which the state court found a trial court's failure to instruct on four of five elements of robbery was not amenable to harmless error analysis, but instead required reversal. (SAP at 446, citing People v. Cummings, 4 Cal. 4th 1233 (1993).) He argues that: "As described above, there are essentially three elements of the crime of conspiracy: (1) an agreement between two or more persons with the specific intent to agree to commit a crime, (2) with the further specific intent to commit the elements of that crime, (3) followed by an overt act in furtherance of accomplishing the object of the agreement," and asserts that "[t]he trial court's failure to clarify the jury's confusion on the overt act requirement of conspiracy, and its failure to instruct on that portion of CALJIC 6.10 requiring a further specific intent to commit the elements of the targeted crime, effectively removed two of these three elements from the jury's consideration." (Id. at 446) (citations omitted.)

Again, the Court found no error in the trial court's response to the jury question on the overt act requirement, as the provided instructions clearly and accurately directed the jury to the written instruction, which provided that an overt act was a "step or act [] done in furtherance of the accomplishment of the object of the conspiracy." (CT 1208.) Because Petitioner has only identified one error, which the California Supreme Court was not unreasonable in finding harmless,[23] his claim of "combined error" with respect to the

---

[23] While Petitioner's claim of "combined error" in the conspiracy jury instructions fails, Petitioner has also raised multiple claims of cumulative error, notably in Claim 19,

conspiracy instructions necessarily fails. For the reasons discussed above, habeas relief is unavailable on Claim 15.

### 5. **Claim 16**

Petitioner asserts that the trial court erred in instructing the jury that it was required to unanimously acquit Petitioner of first degree murder before the trial court could accept a verdict as to second degree murder. (SAP at 447.) He argues that "[a]n instruction that the jury cannot convict on the lesser charge unless it first unanimously votes to acquit on the greater charge prevents a capital case jury from making use of lesser included offense instructions in the way contemplated by *Beck* [v. Alabama, 447 U.S. 625 (1980)], and subjects jurors to the same pressure to ignore the reasonable doubt standard that they would face if no lesser included offense instruction were given at all." (Id. at 449.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends the trial court erred when it instructed the jury, in the language of CALJIC No. 8.75, that it would not accept a verdict that defendant was guilty of second degree murder unless the jury also unanimously returned a verdict that he was not guilty of first degree murder. Defendant maintains that this "acquittal first" instruction violated his federal constitutional rights to due process and to a fair and reliable jury consideration of lesser included offenses in a capital case.

> As defendant concedes, this court has repeatedly rejected the same contention. (E.g., *People v. Nakahara* (2003) 30 Cal.4th 705, 715, 134 Cal.Rptr.2d 223, 68 P.3d 1190.) As we stated in *Nakahara*, "[w]e see no reason for reconsidering these decisions." (*Ibid.*)

Jurado, 38 Cal. 4th at 125 (alteration in original). While Petitioner also later raised this

_____

47 and 48. As such, the instructional error discussed in the instant claim will be necessarily included in the Court's analysis of Petitioner's claims of cumulative error. See Parle, 505 F.3d at 927 ("The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."), citing Chambers, 410 U.S. at 290 n.3.

claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Again, to merit relief, Petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," after considering the challenged instruction "in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147. Even if such error occurred, habeas relief is only available if it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

In this case, the trial court instructed the jurors pursuant to CALJIC 8.75, which provided the following direction for their consideration of the murder charges:

> If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime of first degree murder as charged in Count Two and you unanimously so find, you may convict him of any lesser crime provided you are satisfied beyond a reasonable doubt that he is guilty of such crime.

> You will be provided with guilty and not guilty verdict forms as to Count Two for the crime of murder in the first degree and lesser crimes thereto. Murder in the second degree is a lesser crime to that of murder in the first degree.

> Thus, you are to determine whether the defendant is guilty or not guilty of murder in the first degree or of any lesser crime thereto. In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it productive to consider and reach tentative conclusions on all charged and lesser crimes before reaching any final verdicts. You should consider the lesser offenses before reaching a verdict upon the greater.

> Before you return any final or formal verdicts, you must be guided by the following:

> 1. If you unanimously find a defendant guilty of first degree murder, as to Count Two, your foreperson should sign and date the corresponding guilty verdict forms. All other verdict forms as to Count Two should be left unsigned.

2.  If you are unable to reach a unanimous verdict as to the charge in Count Two of first degree murder, do not sign any verdict forms as to that count and report your disagreement to the court.

3.  The court cannot accept a verdict of guilty of second degree murder as to Count Two unless the jury also unanimously finds and returns a signed verdict of not guilty as to murder of the first degree in the same count.

4. If you find a defendant not guilty of murder in the first degree as to Count Two but cannot reach a unanimous agreement as to murder of the second degree, your foreperson should sign and date the not guilty of murder in the first degree form, and should report your disagreement to the court.  Do not sign any other verdict forms.

5.  If you unanimously find a defendant not guilty of first degree murder, but guilty of second degree murder, your foreperson should sign and date the corresponding verdict forms.

(CT 1228-29.)

In <u>Beck</u>, the Supreme Court held that a capital jury must be instructed on a lesser-included charge supported by the evidence, stating that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense- but leaves some doubt with respect to an element that would justify conviction of a capital offense- the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." <u>Id.</u>, 447 U.S. at 637.

Here, the jury was clearly instructed on the lesser included option of second degree murder.  Petitioner's contention that the instruction at issue prevented or precluded the jury from properly considering the lesser included offense is not supported by the record. Petitioner argues that "[u]nder 'unanimous acquittal' instructions such as those given in this case, a jury that is deadlocked on the charged offense can render a verdict on a lesser crime only if they report their deadlock to the judge, and the judge then declares a mistrial as to the charged offense and directs the jury to deliberate on the lesser offense."  (SAP at 449.)  But Petitioner's jury was not provided with any such "acquittal first" instructions,

and was instead specifically instructed that they could evaluate and discuss the two charges in the order they chose:

> You must determine whether Mr. Jurado is guilty of the crime of murder in the first degree or a lesser crime, murder in the second degree. Now, in doing so, you have the discretion to choose the order in which you consider those two crimes and consider the evidence relating to each of those crimes. We have seen that the crimes share certain common elements, and the common elements are that murder in either degree is the unlawful killing of one human being by another with malice aforethought. For murder in the first degree, there has to be those additional elements or ingredients of either premeditation and deliberation or its equivalent, lying in wait.

> So those are the common elements and those are the distinctions. And I think you should talk about both crimes, the essential required elements of both crimes, where the distinctions lie, what is required additionally to find murder in the first degree as opposed to murder in the second degree.

> So I think it may well be productive to talk about murder in both degrees, understand the essential elements of each crime, what distinguishes one from the other, what additional ingredients are required for first degree as opposed to second degree. Consider all the evidence in that regard and - - it may be helpful, productive to reach some tentative conclusions at least as to first degree and second degree, see where you think the - - the - - there has been proof and where there hasn't been proof in that regard.

> But when it comes time to reach any final or formal verdicts, you have to consider the two crimes in the greater-lesser relationship that I've talked about; that is, you must first in a final or formal way when it comes time to see if you can reach a final or formal verdict, you must first consider murder in the first degree and then murder in the second degree, because murder in the first degree is considered the greater, murder in the second degree the lesser.

(RT 2797-98.)

For this reason, Petitioner's reliance on the Ninth Circuit's decision in <u>United States v. Jackson</u>, 726 F.2d 1466 (9th Cir. 1984), and the Second Circuit's decision in <u>United States v. Tsanas</u>, 572 F.2d 340 (2nd Cir. 1978), is misplaced. In both of those cases, the jurors were instructed that they could not even *consider* lesser charges before reaching a verdict on the greater offense, and the respective circuit courts held that such instructions

175

violated due process.    See Jackson, 926 F.2d at 1469-70; Tsanas, 572 F.2d at 344. Meanwhile, as the record clearly reflects, the trial court did not preclude Petitioner's jury from considering the lesser crime of second degree murder, as the jurors were instructed that they could "choose the order" in which they considered the two crimes.    The trial court even explicitly suggested that the jury "talk about murder in both degrees" and reach "tentative conclusions at least to first degree and second degree" before attempting to reach a final verdict.    Accordingly, there is no support for a conclusion that the instruction at issue "so infected" Petitioner's trial as to result in a due process violation.    Even were Petitioner able to establish a constitutional violation, which he has not, he fails to show that any such error had a "substantial and injurious effect or influence in determining the jury's verdict."    Brecht, 507 U.S. at 637.

Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts.    Habeas relief is not warranted on Claim 16.

### 6.    Claim 17

Petitioner contends that the trial court's instructions on consciousness of guilt "were impermissibly argumentative, they permitted the jury to make irrational inferences from the evidence, and the trial court should have modified all of these instructions, as Petitioner requested, to clarify that consciousness of guilt evidence was not probative of Petitioner's state of mind, and therefore could not be used in determining the degree of his guilt." (SAP at 452.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the trial court's instructions to the jury on consciousness of guilt were impermissibly argumentative, permitted the jury to draw irrational inferences, were potentially misleading, and were unsupported by the evidence.

The trial court instructed the jury that it could infer consciousness of guilt from efforts to suppress evidence (CALJIC No. 2.06), from flight after a crime (CALJIC No. 2.52), and from the telling of a falsehood (CALJIC No. 2.03). The trial court declined defense requests to modify the instructions to state that they were inapplicable to fix the degree of a crime.

We have repeatedly rejected contentions that these standard jury instructions on consciousness of guilt were impermissibly argumentative or permitted the jury to draw irrational inferences about a defendant's mental state during the commission of the charged offenses. (E.g., *People v. Benavides* (2005) 35 Cal.4th 69, 100, 24 Cal.Rptr.3d 507, 105 P.3d 1099; *People v. Nakahara*, *supra*, 30 Cal.4th at p. 713, 134 Cal.Rptr.2d 223, 68 P.3d 1190; *People v. Kipp* (1998) 18 Cal.4th 349, 375, 75 Cal.Rptr.2d 716, 956 P.2d 1169.) We see no reason to reconsider these decisions. Because the instructions as given correctly stated the law and did not invite the jury to draw irrational inferences about defendant's mental state, the trial court did not abuse its discretion in declining the defense requests to modify them.

Whenever the prosecution relies on evidence of flight as tending to show a defendant's guilt, the trial court must instruct the jury substantially in this language: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (§ 1127c.) In this context, flight "requires neither the physical act of running nor the reaching of a faraway haven" but it does require "a purpose to avoid being observed or arrested." (*People v. Crandell* (1988) 46 Cal.3d 833, 869, 251 Cal.Rptr. 227, 760 P.2d 423; accord, *People v. Bradford* (1997) 14 Cal.4th 1005, 1055, 60 Cal.Rptr.2d 225, 929 P.2d 544.) "*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so." (*People v. Turner* (1990) 50 Cal.3d 668, 695, 268 Cal.Rptr. 706, 789 P.2d 887; accord, *People v. Bradford*, *supra*, at p. 1055, 60 Cal.Rptr.2d 225, 929 P.2d 544.)

Here, the circumstances of defendant's departure from the scene of Teresa Holloway's murder were sufficient to support an inference that his purpose was to avoid being observed or arrested, and thus an inference of consciousness of guilt for her death. Although there was a call box around 20 yards from the culvert in which Holloway's body had been placed, defendant

did not use the call box to summon aid after Anna Humiston's car broke down. Instead, defendant, Humiston, and Denise Shigemura walked a half-mile to a 7-Eleven Store, along the way hiding in a tree the scissors jack that had been used to kill Holloway, before calling a friend for assistance. Defendant's failure to use the call box, and the secreting of the murder weapon, support an inference that in leaving the crime scene defendant acted with a purpose to avoid observation and arrest. The flight instruction was properly given.

Jurado, 38 Cal. 4th at 125-26 (alteration in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Again, the Court must decide if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," by considering the alleged error "in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147. Habeas relief is only available if any such error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

Petitioner argues that three jury instructions, CALJIC 2.03, 2.06 and 2.52, were argumentative and improperly allowed the jury to draw irrational inferences regarding his degree of guilt. CALJIC 2.03 directed the jurors that: "If you find that before this trial (the) defendant made a willfully false or deliberately misleading statement concerning the crime(s) for which (he) is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." (CT 1233.) CALJIC 2.06 instructed that: "If you find that a defendant attempted to suppress evidence against (himself) in any manner, such as (by concealing evidence), such attempt may or may not be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration." (CT 1234.) CALJIC 2.52 instructed that: "The flight of a person immediately after the

commission of a crime, is not sufficient in itself to establish (his) guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of whether he is guilty or not guilty. Whether or not the evidence proves flight, and if so, whether that flight shows a consciousness of guilt, and the significance to be attached to such a circumstance, are matters solely for your determinat [sic]." (CT 1239.)

The California Supreme Court cited prior California decisional law while stating: "We have repeatedly rejected contentions that these standard jury instructions on consciousness of guilt were impermissibly argumentative or permitted the jury to draw irrational inferences about a defendant's mental state during the commission of the charged offenses," and concluded that "[b]ecause the instructions as given correctly stated the law and did not invite the jury to draw irrational inferences about defendant's mental state, the trial court did not abuse its discretion in declining the defense requests to modify them." Jurado, 38 Cal. 4th at 125-26.

This decision was not unreasonable. Reviewing the instructions as a whole, the Court remains unpersuaded that the jury misunderstood or misapplied these three challenged instructions in a way that "so infected" Petitioner's trial as to result in a due process violation. The instructions were clear and stated the law correctly, instructed that Petitioner's conduct, including falsehoods, concealment of evidence, or flight, *if* the jurors found it, were "not sufficient" on their own to prove guilt, and directed the jurors that it was their province to decide what weight or significance "if any" to give those matters. Additionally, as Respondent points out, the Ninth Circuit has previously rejected challenges to the constitutionality of CALJIC 2.03 and 2.52. See Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002) (rejecting challenge to CALJIC 2.52 and noting that the instruction "clarified that flight alone is insufficient to establish guilt."); Turner v. Marshall, 63 F.3d 807, 820 (9th Cir. 1995) ("So long as the instruction does not state that inconsistent statements constitute evidence of guilt, but merely states that the jury may consider them as indicating a consciousness of guilt, the instruction would not violate constitutional rights. Because CALJIC 2.03 fits this requirement, we find no constitutional

179

error.") (internal citation omitted), overruled on other grounds by <u>Tolbert v. Page</u>, 182 F.3d 677, 685 (9th Cir. 1999).  As all three challenged instructions "merely state[]" that the jurors *may* consider the statements presented or conduct alleged, *if proved*, as circumstances tending to show a consciousness of guilt, the Court is not persuaded that the trial court's decision to give these instructions was erroneous, much less that their inclusion in the jury charge amounted to error of a constitutional dimension.

Even were Petitioner able to demonstrate that the trial court erred in providing the above instructions to the jury, Petitioner fails to show that the instructions had a "substantial and injurious effect or influence" on the outcome of his trial proceedings. <u>Brecht</u>, 507 U.S. at 637.  Again, the jury was repeatedly instructed that none of the alleged conduct was sufficient on its own to establish guilt and was specifically charged with determining what, if any, "weight and significance" to give to this evidence in deciding whether it showed a consciousness of guilt on the part of Petitioner.  Moreover, as discussed throughout this Order, the jury was presented with strong affirmative evidence of the premeditation and planning of Holloway's murder, including, but not limited to, Petitioner obtaining a cord from Schmidt prior to leaving that apartment, wrapping it around his neck and stating "that will do," and directing Schmidt to lie to the victim to get her to leave the apartment with him, Shigemura, and Humiston in Humiston's car, where Holloway was murdered shortly thereafter.  Petitioner himself later told an acquaintance that Holloway sat in the front seat of Humiston's car that evening, while the medical examiner found it possible that many of the injuries to the victim's head and neck could have come from behind, noted a bite mark on the victim's back, and testified that marks on the neck could have come from manual or ligature strangulation.  The jury also heard testimony that the day after the murder Shigemura told Baldwin that she no longer needed the weapon she had asked him for days earlier, and she stated in Petitioner's presence and in the face of Petitioner's silence, that: "We took care of our problem and dumped the body off at Balboa Park," which is where Holloway's body was found.  In light of the strength

of this evidence, any potential error arising from the consciousness of guilt instructions would clearly be harmless.

Petitioner also separately contends that there was insufficient evidence of flight to warrant instructing the jury with CALJIC 2.52, arguing that: "Petitioner had no choice but to leave the crime scene as Humiston's car had broken down on the side of the freeway and thus, Petitioner would have left the scene and made a phone call regardless of the crime." (SAP at 460.) He asserts that in giving this instruction in the absence of factual support, the trial court acted contrary to admonitions from the California Supreme Court "'not to confuse a mere departure from the scene of the crime with a deliberate flight from the area in which the suspect is normally to be found.[']" (SAP at 461, quoting People v. Green, 27 Cal. 3d 1, 37 (1980).)

But, as the California Supreme Court reasonably and accurately pointed out, the evidence at trial was clearly sufficient to show that Petitioner undertook actions calculated to minimize attention paid to him or to the area surrounding the crime scene, and was not "merely" departing from the area, in that: "Although there was a call box around 20 yards from the culvert in which Holloway's body had been placed, defendant did not use the call box to summon aid after Anna Humiston's car broke down. Instead, defendant, Humiston, and Denise Shigemura walked a half-mile to a 7-Eleven Store, along the way hiding in a tree the scissors jack that had been used to kill Holloway, before calling a friend for assistance. Defendant's failure to use the call box, and the secreting of the murder weapon, support an inference that in leaving the crime scene defendant acted with a purpose to avoid observation and arrest." Jurado, 38 Cal. 4th at 126. Petitioner misled his friends and minimized the severity of that evening's events, as when friends inquired what had happened and observed the blood on his socks and shoes, Petitioner simply stated that he had gotten into a "fight." The evidence shows that Petitioner waited until the next day, after disposing of the bloody items of clothing in a dumpster near his apartment, to call for a tow truck for Humiston's car. This also supports a conclusion that the trial court did not, as Petitioner asserts, confuse a "mere departure" with flight, and that the flight instruction

was properly given in this case. Given the evidence supporting this instruction, Petitioner fails to show that the trial court's decision "so infected" his trial as to deprive him of his constitutional rights to due process or a fair trial, much less that the state supreme court's rejection of this claim was objectively unreasonable under AEDPA. Claim 17 is without merit, and accordingly, does not warrant habeas relief.

### 7. Claim 18

Petitioner argues that "[a] number of the jury instructions given during the guilt phase misled the jury regarding the reasonable doubt standard, and impermissibly lightened the prosecution's burden of proof," in violation of Petitioner's rights to due process, a fair trial, unanimous jury verdict, and to reliable and individualized guilt and penalty determinations. (SAP at 463.) He contends that while California jury instruction ["CALJIC"] 2.90, which instructs the jury on the presumption of innocence, reasonable doubt, and burden of proof, "standing alone," has been upheld as constitutional, "in combination with the other instructions and the prosecutor's argument, it was reasonably likely to have led the jury to convict Petitioner on proof that did not meet the 'beyond a reasonable doubt' standard." (Id. at 464.) Specifically, Petitioner asserts that elements of California jury instructions 1.00, 2.01, 2.02, 2.21.2, 2.22, 8.20, 8.83 and 8.83.1, likely "undermined" or "replaced" the reasonable doubt burden of proof standard and allowed the jury to convict him under a lesser standard. (Id. at 463-68.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that certain of the trial court's instructions to the jury misled the jury regarding the reasonable doubt standard of proof and impermissibly lightened the prosecution's burden of proof. He maintains that these instructions violated his federal constitutional rights to due process, a fair trial, a unanimous jury verdict, and reliable guilt and penalty determinations.
>
> We have previously rejected each of the claims that defendant makes, and we decline to reconsider these decisions. Contrary to defendant's arguments, CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1, which direct the jury to

accept reasonable inferences and to reject unreasonable ones, do not permit the jury to base a determination of guilt on something less than proof beyond a reasonable doubt. (*People v. Harris* (2005) 37 Cal.4th 310, 351, 33 Cal.Rptr.3d 509, 118 P.3d 545; see also *People v. Crew* (2003) 31 Cal.4th 822, 847, 3 Cal.Rptr.3d 733, 74 P.3d 820; *People v. Nakahara*, *supra*, 30 Cal.4th at pp. 713-714, 134 Cal.Rptr.2d 223, 68 P.3d 1190.) CALJIC No. 1.00, which directs the jury not to "infer or assume" that defendant "was more likely to be guilty than not guilty" merely because he had been arrested, charged, or brought to trial, does not undercut the burden of proof. (*People v. Crew*, *supra*, at pp. 847-848, 3 Cal.Rptr.3d 733, 74 P.3d 820; *People v. Nakahara*, *supra*, at p. 714, 134 Cal.Rptr.2d 223, 68 P.3d 1190.) CALJIC No. 2.21.2, the standard instruction on willfully false testimony, does not lighten the prosecution's burden of proof. (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 751, 11 Cal.Rptr.3d 236, 86 P.3d 302; *People v. Nakahara*, *supra*, at p. 714, 134 Cal.Rptr.2d 223, 68 P.3d 1190; *People v. Maury* (2003) 30 Cal.4th 342, 428-429, 133 Cal.Rptr.2d 561, 68 P.3d 1.) CALJIC No. 2.22, the standard instruction on weighing conflicting testimony, does not undermine the standard of proof beyond a reasonable doubt. (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 751, 11 Cal.Rptr.3d 236, 86 P.3d 302; *People v. Nakahara*, *supra*, at p. 714, 134 Cal.Rptr.2d 223, 68 P.3d 1190; *People v. Maury*, *supra*, at p. 429, 133 Cal.Rptr.2d 561, 68 P.3d 1.) Finally, CALJIC No. 8.20, defining premeditation and deliberation, does not suggest that a defendant must absolutely preclude the possibility of premeditation rather than merely raising a reasonable doubt. (*People v. Nakahara*, *supra*, at p. 715, 134 Cal.Rptr.2d 223, 68 P.3d 1190.)

Jurado, 38 Cal. 4th at 126-27. Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner acknowledges that the jury was given CALJIC 2.90, which provided instruction on the presumption of innocence, reasonable doubt and the burden of proof, and states in part that: "A defendant in a criminal action is presumed to be innocent until the contrary is proven, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. The presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] In this case, the presumption places upon the People the burden of proving beyond a reasonable doubt that

Mr. Jurado is guilty of conspiracy to commit murder and/or guilty of first degree murder with the special circumstance of 'lying in wait.'" (CT 1199.)

Yet, Petitioner contends that the other jury instructions listed above undermined or otherwise obviated the reasonable doubt standard. For one, Petitioner asserts that CALJIC 2.01, 2.02, 8.83 and 8.83.1 "informed the jury, in essentially identical terms, that if one interpretation of the evidence, 'appears to you to be reasonable and the other interpretation appears to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable," which "was contrary to the requirement that Petitioner may be convicted only if guilt is proved beyond a reasonable doubt." (SAP at 464.) He argues that "the instructions operated as an impermissible mandatory conclusive presumption of guilt upon a finding that an interpretation of the evidence that pointed to guilt 'appears to be reasonable.'" (Id. at 465.) He asserts that CALJIC 1.00 also undermined the burden of proof, as while the jury was properly instructed that Petitioner's arrest, charges, trial were not evidence of guilt, the mention of "innocent" in juxtaposition with guilt was problematic, contending that "the issue to be decided at a criminal trial is not one of guilt or 'innocence,'" but rather whether the state could prove its case beyond a reasonable doubt, and that "[t]his error encouraged jurors to find Petitioner guilty because it had not been proven that he was 'innocent.'" (Id. at 465-66.) With respect to CALJIC 2.21.2, which advised that jurors could reject testimony of a witness who was willfully false in part, he argues that the instruction "allowed the jury to assess prosecution witnesses by seeking only a *probability* of truth in their testimony." (Id. at 466.) Petitioner asserts that CALJIC 2.22, which instructed jurors to weigh evidence not by counting witnesses but by evaluating "the convincing force of the evidence," actually "replaced" the standard of proof and directed jurors "to determine which side has presented evidence that is comparatively more convincing than that presented by the other side." (Id.) He further argues that the use of the word "precluding" in defining premeditation and deliberation in CALJIC 8.20, "could be interpreted as requiring the defendant to absolutely preclude the possibility of premeditation- as opposed to raising a reasonable doubt," and that: "No reasonable juror

184

could have understood-in the face of so many instructions permitting conviction upon a lesser showing- that they were required to find Petitioner not guilty unless each element of the charged offenses was proven by the State beyond a reasonable doubt." (Id. at 467-68.)

As stated previously, this Court must decide "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," after considering it "in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147. Petitioner's contentions parse the language contained within a number of the contested instructions to point out and highlight phrases or passages that could potentially on their own, or in combination with phrases or passages plucked from other instructions, be interpreted as lowering the burden of proof. This treatment of the jury instructions clearly contravenes Supreme Court authority, which directs a reviewing court to consider the "instructions as a whole," and not in "'artificial isolation.'" McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147. The jury in Petitioner's case was properly directed to consider the instructions as a whole, as follows: "Again I think you understand as I pointed out at the outset, that the instructions are to be considered as a whole as they relate one to the other to make up an entire body of applicable law. You're not to single out any particular rule or instruction, place any greater or lesser emphasis thereon." (RT 2764.) The written set of instructions included that same admonition, as follows: "Do not single out any particular sentence or any individual point or instruction and ignore the others. Consider the instructions as a whole and each in light of all the others." (CT 1177.) That Petitioner has selected phrases or passages from these instructions that could, devoid of context, suggest a different burden of proof, fails to persuade the Court of the complained of error, given the Supreme Court's clearly established authority directing that the instructions must be considered "as a whole."

After reviewing the full complement of jury instructions, the Court is not persuaded that the challenged instructions "misled the jury regarding the reasonable doubt standard, and impermissibly lightened the prosecution's burden of proof," as Petitioner contends. (SAP at 463.) The record clearly reflects that the jurors were repeatedly instructed on the

burden of proof. For instance, Petitioner complains that the language in CALJIC 2.01 concerning reasonable and unreasonable interpretations of the evidence were "contrary to" the reasonable doubt burden of proof, yet that very instruction also contained explicit references to the very reasonable doubt standard it supposedly undermined, as the instruction directed that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessary rests must be proved beyond a reasonable doubt." (CT 1184.) The jury was also repeatedly instructed with the proper burden of proof and reasonable doubt standards during instructions on the degrees of murder, special circumstances, and other allegations. (See e.g. CT 1226- CALJIC 8.71 instructed that: "If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree."; CT 1228- CALJIC 8.75 instructed in part that: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime of first degree murder as charged in Count Two and you unanimously so find, you may convict him of any lesser crime provided you are satisfied beyond a reasonable doubt that he is guilty of such crime."; CT 1240- CALJIC 17.16, instruction on the allegation of personal use of a dangerous/deadly weapon, stated in part that: "The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true."; CT 1241- CALJIC 8.80, the introductory special circumstances instruction, stated that: "The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true."; CT 1244- CALJIC 8.83, an instruction on the sufficiency of circumstantial evidence of a special circumstance, instructed in part that: "Further, each fact which is essential to complete a set of circumstances necessary to establish the truth of a special

circumstance must be proved beyond a reasonable doubt. [¶] In other words, before an inference essential to establish a special circumstance may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.")

Even were there any potential for confusion in the passages Petitioner highlights in the challenged instructions, the jury was repeatedly and properly instructed that the prosecution bore the burden of proof and that each of the elements of the charged crimes, special circumstances, and other allegations must be proven beyond a reasonable doubt in order to establish guilt. Considering the jury instructions as a whole, as the Supreme Court has specifically directed, Petitioner fails to show that the instructions at issue here were erroneous, much less that they "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147. Nor has Petitioner shown that the asserted error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Habeas relief is unavailable on Claim 18.

**E.** **Claims Alleging Error During Penalty Phase Proceedings**

**1.** **Claim 29**

Petitioner argues that the trial court erred in excluding Petitioner's videotaped confession as hearsay, arguing that "Petitioner's non-assertive conduct, as seen in the videotape, was not hearsay. Moreover, even assuming it was hearsay, the videotape was still admissible in the penalty phase of this capital trial under the United States Supreme Court's holdings in *Green v. Georgia*, 442 U.S. 95 (1979) and *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)." (SAP at 515.) Petitioner contends that this error prevented the jurors from hearing all available mitigation evidence and deprived him of rebuttal evidence to counter the State's evidence in favor of the death penalty. (Id. at 516.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the trial court erred in excluding a videotape of his interrogation by police detectives on May 18, 1991, shortly after his arrest for the murder of Terry Holloway. He further contends that this error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.
>
> As part of its case in mitigation, the defense proposed to have the jury watch a videotape that was made, without defendant's knowledge, while he was being interrogated by police detectives about the murder of Terry Holloway. During the interrogation, defendant at first denied any involvement in the murder, but eventually he admitted killing Holloway, and he insisted that he had done it entirely on his own and that neither Denise Shigemura nor Anna Humiston was present. He said he killed Holloway because he was in danger and his family was in danger. He expressed fear that Brian Johnsen had friends in prison who would kill him or his mother or other family members in retaliation for killing Holloway. He also expressed concern that he would be perceived in prison as a snitch and killed for that reason, or that he would have to spend his entire life in prison. During this part of the interrogation, defendant displayed considerable emotion, sobbing and at one point grasping an interrogating officer's hand. The defense argued that the evidence of defendant's emotional responses was admissible to show his remorse for the killing.
>
> The prosecution objected that the videotape was inadmissible under the hearsay rule (Evid. Code, § 1200), because defendant's emotional displays were assertive conduct, and also under Evidence Code section 352, because the evidence's probative value was substantially outweighed by the risk of undue prejudice and jury confusion. After viewing the videotape, the trial court sustained the hearsay objection and excluded the evidence. The court agreed with the prosecution that defendant's emotional displays were a form of hearsay and not within any exception to the hearsay rule. The court also rejected the defense argument that defendant's constitutional right to present mitigating evidence in a capital case overrode the hearsay rule in this instance. The court noted there was no compelling need for the evidence, because defendant could testify to any remorse he might have felt, and that the evidence was not particularly trustworthy as evidence of remorse because on the videotape defendant never articulated any feelings of sorrow or regret for killing Teresa Holloway, or any sympathy for Holloway or her family, although he did indicate concern for his own safety and well-being, and also

concern for his mother and for Anna Humiston. Thus, in the court's view, it was by no means clear that defendant's emotional display was in any way caused by remorse, and it seemed more likely that it was caused entirely by concern for his own predicament.

The defense raised the issue again after both sides had rested at the penalty phase and the prosecutor had given his closing argument to the jury. Defense counsel requested permission to reopen the evidence to play the videotape for the jury to rebut the prosecutor's assertion, in argument to the jury, that defendant "lacked a conscience." Defense counsel pointed out that during the videotaped interview defendant said, in response to a question asking whether he had received any injuries in his struggle with Teresa Holloway, "The only injury I got is from my, just from my conscience." The trial court denied the request to reopen.

The defense raised the issue a final time after the jury had returned the penalty verdict of death. In a motion for a new trial, the defense argued that the trial court had erred in excluding the videotape. To demonstrate prejudice, the defense submitted declarations by three trial jurors stating that evidence that defendant lacked remorse for killing Teresa Holloway was an important factor in aggravation, and that evidence that defendant had an emotional reaction to the murder and talked about his conscience would have counterbalanced that evidence. The trial court denied the motion for a new trial.

Defendant is correct that, *by themselves,* defendant's emotional displays were nonassertive conduct, and thus not within the hearsay rule. For purposes of the hearsay rule, conduct is assertive if the actor at the time intended the conduct to convey a particular meaning to another person. (Evid. Code, § 225 [defining statement to include "nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression"].) For example, a nod of the head in response to a question calling for a yes-or-no answer, or a gesture pointing to a particular person when asked to identify a perpetrator, are examples of assertive conduct. Here, nothing in the videotape suggests that defendant's emotional responses were voluntary or that he intended them to convey any particular meaning to the interrogating officers.

But the defense sought to introduce more than just evidence of the emotional displays themselves. To explain the significance of the emotional displays, and particularly defendant's statement that as a result of the murder he had received an "injury from [his] conscience," the defense sought to introduce the statements defendant made during the videotaped interview. As

189

defendant must concede, those statements, including assertions and descriptions of his own feelings and other mental states, were hearsay. They were not admissible under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250) if they were made under circumstances indicating a lack of trustworthiness (*id.*, § 1252). As the trial court correctly determined, the circumstance that defendant made his statements during a postarrest police interrogation, when he had a compelling motive to minimize his culpability for the murder and to play on the sympathies of his interrogators, indicated a lack of trustworthiness. In past decisions, we have upheld the exclusion of self-serving postcrime statements made under similar circumstances. (*People v. Livaditis* (1992) 2 Cal.4th 759, 779-780, 9 Cal.Rptr.2d 72, 831 P.2d 297; *People v. Edwards* (1991) 54 Cal.3d 787, 820, 1 Cal.Rptr.2d 696, 819 P.2d 436; *People v. Whitt* (1990) 51 Cal.3d 620, 642-643, 274 Cal.Rptr. 252, 798 P.2d 849.)

We have also rejected the argument that exclusion of this sort of hearsay evidence violates a capital defendant's right to a fair trial and a reliable penalty determination under the federal Constitution. As we have explained, a capital defendant has no federal constitutional right to the admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination. (*People v. Stanley*, *supra*, 10 Cal.4th at pp. 838-840, 42 Cal.Rptr.2d 543, 897 P.2d 481; *People v. Livaditis*, *supra*, 2 Cal.4th at p. 780, 9 Cal.Rptr.2d 72, 831 P.2d 297; *People v. Edwards*, *supra*, 54 Cal.3d at pp. 820-821, 1 Cal.Rptr.2d 696, 819 P.2d 436; *People v. Whitt*, *supra*, 51 Cal.3d at p. 644, 274 Cal.Rptr. 252, 798 P.2d 849.)

In excluding the entire videotape of defendant's postarrest interrogation, the trial court did not err under state law, nor did it violate defendant's rights under the federal Constitution. The defense never offered to redact the videotape to show only the nonassertive conduct, and, even if it had done so, any error in excluding the admissible portions of the videotape was harmless.

Jurado, 38 Cal. 4th at 128-30 (alterations in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

///

Petitioner asserts that the California Supreme Court correctly found that his emotional responses during the interrogation were not within the scope of the hearsay rule, but erred in concluding the evidence was unreliable and untrustworthy, and thus properly excluded, because the statements and responses were made during an interrogation just after his arrest. (Pet. Br. at 119, citing <u>Jurado</u>, 38 Cal. 4th at 130.) Petitioner contends that "[t]he state court's opinion fails to analyze the material fact that the police had *secretly* recorded the interview, and thus since Mr. Jurado was in fact unaware that he was being videotaped the circumstance of the videotaped interrogation presents significant indicia of reliability." (<u>Id.</u> at 119-20) (italics in original.)

This first assertion, that the California Supreme Court "implicitly- and correctly-found the videotaped interrogation was admissible" under an exception to the hearsay rule warrants clarification and correction. Petitioner, citing the direct appeal opinion, maintains that "[t]he California Supreme Court agreed with the defense that 'defendant's emotional displays were *nonassertive conduct, and thus not within the hearsay rule.* . . . . Here, (unlike conduct that is assertive in nature,) nothing in the videotape suggests that defendant's emotional responses were voluntary or that he intended them to convey any particular meaning to the interrogating officers.[']* Jurado*, 38 Cal. 4th at 129, italics added." (<u>Id.</u> at 118.) However, a review of the California Supreme Court's opinion shows that Petitioner's reference to, and quotation from, the state court's opinion is incomplete. The state supreme court found that while, "*by themselves,* defendant's emotional displays were nonassertive conduct, and thus not within the hearsay rule," the defense was at the same time attempting to introduce the statements Petitioner made to provide context for and explain the significance of his emotional responses, and that "those statements, including assertions and descriptions of his own feelings and other mental states, were hearsay." <u>Jurado</u>, 38 Cal. 4th at 129 (emphasis in original.)

///

///

///

As the Court previously discussed in the Group One Order with respect to Claim 1.R,[24] while Petitioner contends that his behavior during the interrogation did not constitute hearsay and provided reliable evidence of remorse, both the trial court and the California Supreme Court rejected that argument, as follows:

> When the defense attempted to introduce the video into evidence, the trial court ruled that the tape constituted inadmissible hearsay and questioned the reliability of the statements, as follows: "So I think that for this evidence to have any relevance it really has to have a hearsay purpose, that is, to communicate his mental or emotional state, either through express words or conduct which is a substitute for words. () So I think there is the inherent danger and mischief in hearsay. I think the circumstances under which the statement was made raise serious, serious questions about the reliability of the trustworthiness of the statements." (RT 3133.) The trial court acknowledged that the decision was "a close call," yet reasoned that: "But I just think any way you cut it, it's a - - its either hearsay or so close to hearsay that the hearsay analysis is relevant, really, and applicable." (RT 3135.) The California Supreme Court agreed that the statements were hearsay. See Jurado, 38 Cal. 4th at 129-30.

(ECF No. 171 at 120.) In the Group One Order, the Court also noted the difficulty in attempting to introduce only the non-hearsay aspects of the interrogation:

> Had counsel redacted or muted the video in an attempt to show only the nonassertive conduct, the lack of context would have deprived the evidence of relevance. The trial court recognized this difficulty when it elaborated on the reasons for excluding the videotape, concluding that it was impossible to divorce the emotional displays from the surrounding circumstances:
>
> > Again I think here, for this to really have any meaning or relevance in this case, the emotional response and display of emotion requires some explanation or interpretation for it to have relevance. It - - its relevance is not in my view just some general display of emotion or - - or - - or the crime here. (¶) I mean it's

---

[24] In Claim 1.R, which the Court rejected in the Group One Order, Petitioner asserted that trial counsel should have sought to introduce Petitioner's videotaped confession without sound, which would have addressed the hearsay issue and allowed the jury to view his emotional responses and remorse, and that the failure to do so constituted ineffective assistance of counsel. (ECF No. 171 at 119-23.)

not a contention that he's a - - completely emotionless, that he can never cry or never display emotion, it's whether he has displayed any emotion concerning the crime here and the victim. And particularly that's - - I think on all theories advanced that's the relevancy. Certainly that's the relevancy if it's intended to rebut the testimony of the prosecution witness, but I think also under the expanded "k" factor relevance and the sub "a" relevance it's only relevant if it's emotion concerning the crime and the victim and what he did here. And that demands cross-examination in my view, that demands being tested on the anvil of truth, cross-examination.

(Id. at 121, quoting RT 3256-57.) As the Court previously noted in the Group One Order, (see id. at 122), Petitioner fails to persuasively explain how his non-verbal conduct during the interrogation, including any emotional responses, could be effectively separated from his statements in order to satisfy the hearsay exception while still offering relevant evidence of remorse. Moreover, as the California Supreme Court observed, the trial court was not persuaded that remorse was the impetus for Petitioner's emotional behavior at the interrogation, as follows:

> The court noted there was no compelling need for the evidence, because defendant could testify to any remorse he might have felt, and that the evidence was not particularly trustworthy as evidence of remorse because on the videotape defendant never articulated any feelings of sorrow or regret for killing Teresa Holloway, or any sympathy for Holloway or her family, although he did indicate concern for his own safety and well-being, and also concern for his mother and for Anna Humiston. Thus, in the court's view, it was by no means clear that defendant's emotional display was in any way caused by remorse, and it seemed more likely that it was caused entirely by concern for his own predicament.

Jurado, 38 Cal. 4th at 128-29. This passage also undercuts Petitioner's second argument, that the California Supreme Court's decision involved an unreasonable factual determination concerning the reliability and trustworthiness of the videotape based on the circumstances surrounding the interrogation. As noted above, Petitioner also argues that "[t]he state court's opinion fails to analyze the material fact that the police had *secretly*

recorded the interview, and thus since Mr. Jurado was in fact unaware that he was being videotaped the circumstance of the videotaped interrogation presents significant indicia of reliability." (Pet. Br. at 119-20.) He contends that "[t]he court's factual finding- i.e., that the statement was untrustworthy because it was made during a postarrest police interrogation-also was erroneous in that it ignored the trial court's own statements showing strong indicia of trustworthiness." (Id. at 120.)

The Supreme Court has held that in certain circumstances, the exclusion of hearsay evidence may rise to the level of a due process violation, such as when "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial . . . and substantial reasons existed to assume its reliability." Green v. Georgia, 442 U.S. 95, 97 (1979), citing Chambers, 410 U.S. at 302 ("[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice.") Yet, the Ninth Circuit has since clarified that decisions such as Green and Chambers "do not stand for the proposition that a defendant must be allowed to put on any evidence he chooses." LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir. 1998); see also Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[W]e have never questioned the power of the States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability- even if the defendant would prefer to see the evidence admitted.")

Petitioner fails to show that the evidence in question satisfies Green, as the Court is not persuaded that the tape was both relevant to the jury's penalty phase determination and reliable. Petitioner cites portions of the motion hearing in trial court in support of his argument that the trial court found the tape trustworthy. However, upon review, the citations in question are from the trial court's questioning of the parties' arguments, and are not the actual "findings" of the trial court. For instance, Petitioner cites to a portion of the record where the trial court generally stated that "[t]he presence of remorse is relevant" to assert that the trial court found the tape itself "clearly" relevant, when the record reflects the trial court immediately added that relevance alone was insufficient, as "you have to prove it by admissible evidence." (Pet. Br. at 120, citing RT 3138.) The trial court's

ultimate conclusion was that the tape constituted inadmissible hearsay, reasoning that: "I think for this evidence to have any relevance, it really has to have a hearsay purpose, that is, to communicate his mental or emotional state, either through express words or conduct which is a substitute for words," and that: "I think the circumstances under which the statement was made raise serious, serious questions about the reliability of the trustworthiness of the statements." (RT 3133.) The California Supreme Court similarly concluded that Petitioner's statements were not reliable, reasoning that: "As the trial court correctly determined, the circumstance that defendant made his statements during a postarrest police interrogation, when he had a compelling motive to minimize his culpability for the murder and to play on the sympathies of his interrogators, indicated a lack of trustworthiness. In past decisions, we have upheld the exclusion of self-serving postcrime statements made under similar circumstances." Jurado, 38 Cal. 4th at 130.

Petitioner argues that the California Supreme Court's decision was unreasonable because Petitioner did not minimize his involvement, but instead, as the trial court noted, admitted to strangling and bludgeoning the victim. (Reply at 56-58, citing RT 3117.) However, this admission about his physical actions does not preclude a conclusion that Petitioner at the same time sought to minimize his moral culpability during that interview. A review of the interrogation transcript reveals that Petitioner first denied and then admitted committing the murder, but he also rationalized his behavior and lied about the circumstances of the crime. Petitioner claimed at one point that "all I know is I'm in danger, my family's in danger," stating that he had been kidnapped earlier and the victim had something to do with it. (CT 1387-89.) When asked by the interrogating officer if "this is because you got threats to your family," Petitioner replied that: "It's the only reason man. I could never do this to nobody." (CT 1393.) The evidence at trial showed that the murder was committed because the victim discovered Petitioner's plan to kill another individual, Doug Mynatt, and was planned and carried out to prevent her from informing Mynatt of that plot rather than out of fear for his family's safety or due to threats to him or his family.

Petitioner also argues that his lack of knowledge that the statement was recorded by the police increases its reliability, but offers no clearly established authority in support of this contention. He simply asserts that "[s]tatements made by individuals accused of committing crimes are routinely introduced into evidence in California trial courts- and in trial courts around the county- on the basis that the statements made during postarrest police interrogations are made under circumstances indicating trustworthiness," and cites Arizona v. Fulminante, 499 U.S. 279, 296 (1991) and Colorado v. Connelly, 479 U.S. 157, 182 (1982) (dis. opn. Brennan, J.), as well as several California Supreme Court cases. (Pet. Br. at 120.) However, while both Fulminante and Connelly constitute clearly established authority binding on this Court, a review of those decisions reveals that neither supports Petitioner's argument or compels the result he urges. Instead, in both decisions, the Supreme Court expressed concern about the reliability of confessions, particularly given the potential import and power of such evidence, and emphasized that a reviewing court must take careful pains to examine the trustworthiness of such statements. Fulminante involved a question as to whether the admission of a coerced confession was harmless error, while Connelly involved a voluntariness question about a confession; in neither case did the Supreme Court state that that a police interrogation was inherently reliable, much less support Petitioner's argument that an unknowingly recorded interrogation resulting in a confession is reliable simply because the suspect was unaware of the recording. See Fulminante, 499 U.S. at 296 ("A confession is like no other evidence. . . . In the case of a coerced confession . . ., the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless."); Connelly, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.") Both cases are also easily distinguished from Petitioner's assertion that his post-arrest statement to police should have been considered reliable. While the Connelly decision, like Petitioner's case, involved a confession to the police, the

Supreme Court acknowledged that the issue in that case was the voluntariness of that confession given the defendant's mental state and coercive police actions, factors not asserted in Petitioner's case.  See Connelly, 479 U.S. at 165-67.  Meanwhile, neither of the two confessions at issue in Fulminante was the result of post-arrest police interrogation.  See Fulminante, 499 U.S. at 283-84.

Additionally, as Petitioner acknowledges, his citation of Connelly is to the dissenting opinion.  (See Pet. Br. at 120.)  Even in that dissent, Justice Brennan acknowledged that: "Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process," stated that "[b]ecause the admission of a confession so strongly tips the balance against the defendant in the adversarial process, we must be especially careful about a confession's reliability," and like the Fulminante Court, articulated the need for caution in admitting such evidence.  Id. at 182-83.  For the reasons discussed, the Court finds no support in either decision for Petitioner's contention that a post-arrest police statement is inherently reliable, much less that it is somehow more reliable because Petitioner was unaware it was recorded.

Regardless of whether the interrogation was recorded with or without Petitioner's knowledge, the fact remains that it took place just after Petitioner's arrest and that situation weighed against finding the statements reliable.[25]  This Court is limited to reviewing the

---

[25] At oral arguments, Petitioner cited Lilly v. Virginia, 527 U.S. 116 (1999), in which the Supreme Court noted that the "against penal interest" hearsay exception "is founded on the broad assumption 'that a person is unlikely to fabricate a statement against his own interest at the time it is made.'"  Lilly, 527 U.S. at 126-27, quoting Chambers, 410 U.S. at 299.  While the Supreme Court acknowledged in Lilly that "[s]tatements in the first category-voluntary admissions of the declarant-are routinely offered into evidence against the maker of the statement and carry a distinguished heritage confirming their admissibility when so used," see id. at 127, any attempt by Petitioner to leverage this as support for an argument that expressions of remorse made in such a statement are similarly reliable is unpersuasive.  Whether or not the prosecutor contemplated attempting to introduce Petitioner's statement at the guilt phase, as Petitioner contended at oral arguments, the fact

08cv1400

reasonableness of the state court's determination, not rendering a decision on the merits of the matter in the first instance. Thus, in light of the trial court's explicit and reasonable finding that Petitioner's police interrogation took place under circumstances that undermined the reliability of the statements he sought to admit, Petitioner fails to demonstrate that the California Supreme Court's decision to affirm the trial court's conclusions on similar grounds was unreasonable.

Petitioner also asserts that, contrary to the California Supreme Court's conclusion, the tape was relevant to show his humanity, remorse and acceptance of responsibility. As the trial court and the California Supreme Court each found, the tape did not offer compelling evidence of remorse for his actions, as any concern or emotion Petitioner displayed appeared related to what would happen to him and his own loved ones, such as his family and Anna Humiston, rather than any regret or concern for the victim or her family. After viewing the tape, the trial court stated: "I did note that nowhere does he expressly articulate any emotion, if you will, or concern or remorse about the victim or her family." (RT 3251.) The trial court recounted that Petitioner expressed concerns about being labeled a snitch, expressed fear and concern for his family and Humiston, and indicated that he did not want to go to jail, "[b]ut never, I say, did he articulate or express in words any mention of the victim herself or the victim's family." (RT 3251-52.) After reviewing the tape, the trial court reaffirmed its earlier ruling excluding the tape as hearsay and stated: "[U]nder Green versus Georgia there must be some compelling need for the evidence, reason for the evidence - - and some significant, substantial evidence of inherent trustworthiness or reliability. And I don't think there's either in this case." (RT 3255.) The trial court stated that:

> Again I think here, for this to really have any meaning or relevance in this case, the emotional response and display of emotion requires some explanation or interpretation for it to have relevance. It - - its relevance is not

remains that Petitioner fails to demonstrate the evidence at issue was reliable or trustworthy for the purpose of mitigation.

in my view just some general display of emotion or - - or - - or some emotional response, it has to be related to the victim or - - or - - or the crime here. [¶] I mean it's not a contention that he's a - - completely emotionless, that he can never cry or never display emotion, it's whether he has displayed any emotion concerning the crime here and the victim. And particularly that's - - I think on all theories advanced that's the relevancy. Certainly that's the relevancy if it's intended to rebut the testimony of the prosecution witness, but think also under the expanded "k" factor relevance and the sub "a" relevance it's only relevant if it's emotion concerning the crime and the victim and what he did here. And that demands cross-examination in my view, that demands being tested on the anvil of truth, cross-examination.

(RT 3256-57.) The California Supreme Court affirmed this decision, similarly concluding that "a capital defendant has no federal constitutional right to the admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination." Jurado, 38 Cal. 4th at 130.

This Court's own review of the interrogation transcript affirms the reasonableness of that decision. While at one point Petitioner mentions an injury to his "conscience" from the crime and expresses emotions by crying, at no point does Petitioner articulate any feelings of regret or remorse over his actions or their impact on the victim or her family. Indeed, almost immediately after mentioning an "injury" from his "conscience," the officer leaves the room and Petitioner says to himself: "Lord help me get out early. I don't want to waste my life in prison." (CT 1398.) As such, the Court's review of the record does not support Petitioner's assertion that the California Supreme Court acted unreasonably in upholding the exclusion of the tape.

Finally, Petitioner separately argues that the "[t]he due process violation amounts to clear error under Eddings [v. Oklahoma, 455 U.S. 104 (1982)] and Skipper [v. South Carolina, 476 U.S. 1 (1986)] because petitioner proffered the videotaped confession as relevant evidence in mitigation for a sentence of less than death." (Reply at 62.) Petitioner argues the tape was relevant evidence in mitigation, as it showed that he took and accepted responsibility for the murder as well as demonstrated remorse. (Id. at 62-63.)

"'[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Eddings, 455 U.S. at 110, quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis in original). In Skipper, the Supreme Court reaffirmed those earlier decisions and added that "[e]qually clear is the corollary rule that the sentence may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" Skipper, 476 U.S. at 4, quoting Eddings, 455 U.S. at 114.

The Court remains unpersuaded that the tape constituted relevant evidence in mitigation either with respect to Petitioner's acceptance of responsibility or demonstration of remorse. Petitioner sought during his interrogation to characterize the murder as being committed out of fear or due to threats, when the available evidence shows Holloway was instead murdered to conceal Petitioner's plan to commit another murder, and that while Petitioner may have demonstrated concern for his own future and well-being, and that of his family and of Humiston, as well as dismay about how his actions would affect him and his own loved ones, he did not articulate any such concern about Holloway or her family. As such, the Court finds an absence of error under Eddings or Skipper.

Because Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, habeas relief is not available on Claim 29. At oral arguments, Petitioner requested discovery and an evidentiary hearing[26] on this claim, including discovery of notes or

_____

[26] At oral arguments, Petitioner also requested discovery and an evidentiary hearing on Claim 1.R, a related ineffective assistance of counsel claim previously denied in the Group One Order. (See ECF No. 171 at 119-23.) In that prior Order, the Court also denied Petitioner's request for an evidentiary hearing and discovery on a number of claims, including Claim 1.R (see id. at 123, 150-51), and Petitioner fails to provide grounds for reconsideration of those decisions.

documents concerning the use of the videotaped interrogation in other cases, such as Humiston's or Shigemura's. As Petitioner fails to satisfy section 2254(d) on the basis of the state record, an evidentiary hearing is not warranted on Claim 29. <u>Sully</u>, 725 F.3d at 1075; <u>Totten</u>, 137 F.3d at 1176. Petitioner's request for discovery is also denied. <u>Kemp</u>, 638 F.3d at 1260.

## 2. <u>Claim 30</u>

Petitioner alleges that while the trial court excluded evidence of Teresa Holloway's pregnancy and the death of her fetus at the guilt phase, the trial court erred in admitting that same evidence during the penalty phase, arguing that "[t]he evidence presented at Petitioner's penalty phase trial established that Petitioner did not believe Teresa Holloway was pregnant at the time of her death" and that it was thus "irrelevant to the jurors' reasoned moral response to Petitioner's crime." (SAP at 558.) Alternately, he argues that "even *assuming* that evidence of Holloway's pregnancy was relevant to the jury's individualized determination of whether Petitioner should die, this evidence was so inflammatory and created such a substantial danger of undue prejudice that any probative value the evidence may have had clearly was outweighed by its harmful effects." (<u>Id.</u>) (emphasis in original.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Before defendant's trial began, the trial court denied his motion to exclude from the penalty phase any evidence that Teresa Holloway was pregnant when defendant murdered her. Defendant contends that the ruling was error because the evidence was irrelevant and unduly prejudicial. He further contends that admission of the evidence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> The trial court did not err in admitting evidence of the murder victim's pregnancy at the penalty phase as a circumstance of the offense. The Eighth Amendment to the federal Constitution permits the prosecution, in a capital case, to present evidence about the murder victim and the specific harm that the defendant caused as relevant to the jury's penalty decision. (*Payne v. Tennessee* (1991) 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720; *People v. Harris*, *supra*, 37 Cal.4th at p. 351, 33 Cal.Rptr.3d 509, 118 P.3d 545.) In California, the prosecution may introduce evidence of the specific harm

caused by a defendant's crime at the penalty phase in aggravation as a circumstance of the crime (§ 190.3, factor (a)). (*People v. Panah*, *supra*, 35 Cal.4th at p. 494, 25 Cal.Rptr.3d 672, 107 P.3d 790; *People v. Fierro* (1991) 1 Cal.4th 173, 235, 3 Cal.Rptr.2d 426, 821 P.2d 1302.)

Defendant argues that evidence of the pregnancy was irrelevant because, although the prosecution presented evidence that Terry Holloway told him she was pregnant, there was also uncontradicted evidence that he did not believe it. This court has concluded, however, that facts concerning the victim that are admissible at the penalty phase of a capital trial as circumstances of the crime are not limited to those known to or reasonably foreseeable by the defendant at the time of the murder. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183, 13 Cal.Rptr.3d 34, 89 P.3d 353; accord, *People v. Roldan*, *supra*, 35 Cal.4th at p. 732, 27 Cal.Rptr.3d 360, 110 P.3d 289.)

We also reject defendant's argument that the trial court abused its discretion by not excluding the pregnancy evidence as unduly prejudicial. We have explained the parameters of the trial court's discretion in these situations in this way: "'On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.'" (*People v. Edwards*, *supra*, 54 Cal.3d at p. 836, 1 Cal.Rptr.2d 696, 819 P.2d 436, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864, 180 Cal.Rptr. 640, 640 P.2d 776; accord, *People v. Panah*, *supra*, 35 Cal.4th at pp. 494-495, 25 Cal.Rptr.3d 672, 107 P.3d 790; see also *People v. Pollock*, *supra*, 32 Cal.4th at 1180, 13 Cal.Rptr.3d 34, 89 P.3d 353 [evidence admissible if it "is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case"].) That in murdering Teresa Holloway defendant also terminated the life of a healthy 17-week-old fetus she was carrying was part of the harm caused by defendant's crime and thus was a legitimate, though emotional, consideration for the jury in making its penalty decision. We note also that defendant does not challenge the *manner* in which the evidence was presented, and we conclude it was not presented in an unnecessarily inflammatory way. Therefore, we reject defendant's claim that the trial court abused its discretion in admitting evidence of the victim's pregnancy.

Jurado, 38 Cal. 4th at 130-31 (alteration in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see

Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Again, a claim of state law error arising from the erroneous admission of evidence may merit federal habeas relief only if "the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair." Jammal, 926 F.2d at 919; see also McGuire, 502 U.S. at 68-73. As discussed in greater detail with respect to Claim 31 below, an allegation of error arising from the admission of victim impact evidence is amenable to this type of analysis. See Gretzler v. Stewart, 112 F.3d 992, 1009 (9th Cir. 1997) ("Evidence about a victim's characteristics and the impact of a murder on the victim's family is relevant and admissible at a death penalty sentencing proceeding. Admission of such evidence will only be deemed unconstitutional if it is so unduly prejudicial that it renders the sentence fundamentally unfair."), citing Payne v. Tennessee, 501 U.S. 808, 825, 827 (1991).

Specifically, Petitioner asserts that the California Supreme Court's rejection of his claim was unreasonable under section 2254(d)(1) because the state court erred in limiting itself to deciding whether the trial court abused its discretion in admitting the pregnancy evidence rather than explicitly examining whether the admission of that evidence violated due process. (Pet. Br. at 124-26.) Petitioner contends that unforeseeable characteristics of the victim are irrelevant to a penalty determination, and that "the state court failed to appropriately consider that unforeseeable victim characteristics are irrelevant to a defendant's personal responsibility and moral guilt, and thus when considered as a factor at sentencing will lead to sentences out of proportion to the defendant's blameworthiness." (Id. at 126, citing Enmund v. Florida, 458 U.S. 782, 801 (1982).)

This argument fails to find support in clearly established law. In Enmund, the Supreme Court held that: "For purposes of imposing the death penalty, . . .[a defendant's] punishment must be tailored to his personal responsibility and moral guilt." Enmund, 458 U.S. at 801. In 1987, the Supreme Court relied on Enmund to hold that the Eighth Amendment prohibited the consideration of a victim impact statement during capital

sentencing proceedings.  See Booth v. Maryland, 482 U.S. 496, 502, 507, 509 and n.10 (1987), overruled by Payne, 501 U.S. 808.  However, as discussed in greater detail with respect to Claim 31, the Supreme Court has since reversed Booth and provided for the admission and consideration of victim impact evidence in capital sentencing.  See Payne, 501 U.S. at 825 ("We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.")

Moreover, as Respondent correctly points out, the victim's pregnancy was not an "unforeseeable" characteristic.  As outlined in greater detailed below, testimony showed that Holloway told Petitioner she was pregnant in a conversation a short time prior to her death and that the victim was in fact several months pregnant at the time of her death.  While the trial record also reflects that Petitioner expressed his disbelief that Holloway was pregnant, regardless of that belief or lack thereof, it is clear that Petitioner was at the very least aware that she claimed to be pregnant.  Thus, Holloway's pregnancy could not have been an "unforeseeable" victim characteristic, and the Court is unpersuaded that Petitioner's stated disbelief that Holloway was pregnant somehow "lessened the probative value of the evidence."  (Pet. Br. at 126.)

The California Supreme Court's analysis of this matter was not unreasonable, as the trial court correctly found that the pregnancy evidence was both relevant and admissible under Cal. Penal Code § 190.3(a), as part of the circumstances of the crime, regardless of whether Petitioner believed that she was pregnant or not.  Jurado, 38 Cal. 4th at 130-31 ("In California, the prosecution may introduce evidence of the specific harm caused by a defendant's crime at the penalty phase in aggravation as a circumstance of the crime (§ 190.3, factor (a)). . . . This court has concluded, however, that facts concerning the victim that are admissible at the penalty phase of a capital trial as circumstances of the crime are not limited to those known to or reasonably foreseeable by the defendant at the time of the murder.")  This Court is bound by the state court's interpretation of California law.  See

Richey, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") In any event, the state court's decision is also consistent with federal law concerning the admissibility of victim impact evidence. See Payne, 501 U.S. at 808 ("Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.") In light of this authority, Petitioner fails to demonstrate that the California Supreme Court's affirmance of the trial court's decision to allow the pregnancy evidence as relevant to the penalty decision involved an unreasonable application of clearly established federal law.

Petitioner's second argument[27] is that the California Supreme Court's decision was unreasonable because, even assuming the pregnancy evidence was relevant, the state court did not adjudicate the issue of prejudice correctly under either prong of section 2254(d). (Pet. Br. at 126-27; Reply at 67-68.) With respect to section 2254(d)(2), Petitioner asserts that: "The state court's holding was an unreasonable factual determination because the state court did not correctly consider the prejudicial effect and influence on the jury of this testimony," and relies on Ninth Circuit authority to argue that "[section] 2254(d)(2) [is]

_____

[27] In the merits brief, Petitioner also briefly argues that the California Supreme Court did not address prejudice at all, asserting that "the California Supreme Court held the evidence of the pregnancy was admissible, and thus it did not adjudicate the issue of prejudice," and that as a result, this Court must examine prejudice de novo. (Pet. Br. at 127.) However, a plain reading of the California Supreme Court's direct appeal opinion reflects that the state court addressed prejudice, finding: "We also reject defendant's argument that the trial court abused its discretion by not excluding the pregnancy evidence as unduly prejudicial," and that: "We note also that defendant does not challenge the *manner* in which the evidence was presented, and we conclude it was not presented in an unnecessarily inflammatory way." Jurado, 38 Cal. 4th at 131 (emphasis in original). Because the record refutes Petitioner's contention that the California Supreme Court failed to address prejudice, the Court is not persuaded that de novo review of that issue is warranted.

satisfied where state court factual findings 'were not supported by substantial evidence in the state court record.'" (Pet. Br. at 127, quoting <u>Hibbler v. Benedetti</u>, 693 F.3d 1140, 1146 (9th Cir. 2012).) Additionally, Petitioner contends with respect to section 2254(d)(1) that "[i]n failing to engage in the correct due process analysis, identified above, the state court also failed to appropriately consider that the pregnancy would serve no other purpose other than to encourage jurors to decide in favor of death rather than life on the basis of their emotions rather than their reason." (<u>Id.</u> at 126, citing <u>Gregg v. Georgia</u>, 428 U.S. 153, 189 (1976) (plurality opinion.).)

As an initial matter pertinent to both of these arguments challenging the reasonableness of the California Supreme Court's prejudice determination, this Court must reiterate that a state court's alleged *errors* in undertaking a legal or factual analysis is distinct from a conclusion that the state court's decision was *unreasonable*. Federal habeas relief is not available unless the state court's application of federal law or determination of the facts is shown to have been unreasonable. <u>See</u> <u>Schriro</u>, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold."), citing <u>Williams</u>, 529 U.S. at 410; <u>see also</u> <u>id.</u> ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.")

Regardless, in this case it is apparent that the California Supreme Court correctly and reasonably applied controlling law. The state court firmly rejected Petitioner's argument that pregnancy evidence should have been excluded as "unduly prejudicial," acknowledging that "irrelevant information or inflammatory rhetoric" was not allowable, but reasoning in this case: "That in murdering Teresa Holloway defendant also terminated the life of a healthy 17-week-old fetus she was carrying was part of the harm caused by defendant's crime and thus was a legitimate, though emotional, consideration for the jury in making its penalty decision." <u>Jurado</u>, 38 Cal. 4th at 131.

Petitioner argues that the state court's conclusion was unreasonable "because evidence of the pregnancy would necessarily create a highly negative visceral reaction in

a reasonable juror, such that the evidence was unduly prejudicial in view of the circumstances that petitioner thought that Holloway was *not* pregnant."  (Reply at 67.) Again, the Court is not persuaded that Petitioner's lack of belief concerning Holloway's pregnancy diminishes the probative value of that evidence, nor that Petitioner's belief or lack thereof about the victim's pregnancy materially impacts the prejudice determination, much less amplifies any potential prejudice.  The evidence showed both that the victim told Petitioner she was pregnant and that she was actually pregnant at the time of her murder, and the jury was also presented with evidence that Petitioner did not believe the victim was pregnant.  The state court's determination that the pregnancy evidence, regardless of Petitioner's knowledge or belief in its truth, was admissible under state law is binding in this forum.  See Richey, 546 U.S. at 76.  The state court's analysis of the issue was reasonable, acknowledging the emotional power of such evidence but ultimately deciding that the trial court correctly concluded the evidence was not overly prejudicial, and thus admissible.  Petitioner's assertion that the jury would have had a "visceral" and emotional reaction to this evidence which impacted their penalty determination is not supported by the record.  As detailed below, the evidence was presented in a brief and unemotional manner and was not so "unduly prejudicial that it render[ed] the sentence fundamentally unfair." Gretzler, 112 F.3d at 1009.

Petitioner's challenge to the reasonableness of the state court's factual determination is similarly untenable.  The California Supreme Court concluded that: "We note also that defendant does not challenge the *manner* in which the evidence was presented, and we conclude it was not presented in an unnecessarily inflammatory way." Jurado, 38 Cal. 4th at 131.  As recounted in the direct appeal opinion, the pregnancy was presented as part of the prosecution's penalty phase case in aggravation as follows: "In May 1991, during the autopsy of Teresa Holloway's body, she was found to have been pregnant. The fetus, which was around 17 weeks old, was too young and too small to have survived outside the womb, but it showed no evidence of traumatic injury or other condition that would have precluded its survival to full term and birth had Holloway not died. Some weeks before her death,

Holloway had told defendant that she was pregnant, but defendant did not believe her. Holloway said she was planning to get a pregnancy test and that when she got the test result she would show it to defendant to prove she was pregnant." Id. at 90.

A review of the penalty phase transcript affirms that the California Supreme Court's account of the evidence was accurate and reasonable. At the penalty phase, medical examiner Mark Super testified that: "Besides the injuries, the decedent was pregnant," and that "[d]uring the autopsy, the uterus was - - the uterus contained a male fetus, approximately 15 or 16 weeks of age." (RT 3290.) Super stated that the fetus itself was not injured, had not suffered trauma, and when asked for a conclusion, stated: "That the death of the fetus was due to the death of the mother." (RT 3291.) Pediatric pathologist Henry Krous then testified, stating that he had been called to consult on the autopsy concerning the age of the fetus and as to whether the fetus would have survived to term had pregnancy continued. (RT 3293-96.) Krous opined that the fetus was at about 17 weeks of gestation. (RT 3297.) Krous stated that he did not see any effects of drug use on the fetus and that he saw nothing that would prevent the fetus from surviving to term. (RT 3301.) He acknowledged on cross-examination that the continued drug use of the mother could have resulted in injury to the fetus. (RT 3303.)

Larissa Slusher stated that she knew Terry Holloway was pregnant prior to her death, as she took Holloway to get a pregnancy test, which came back positive. (RT 3305.) Slusher testified that a "short time" prior to her death, and prior to the pregnancy test, Slusher took part in a conversation with Holloway about her pregnancy, and testified that others, including Petitioner, also took part in the conversation. (RT 3305-06.) Slusher testified that Petitioner did not believe Holloway was pregnant, to which Holloway said she was getting a test and would show him the paper. (RT 3306.) Slusher acknowledged that she left during part of conversation and was not present for its entirety, and stated that Denise Shigemura and Mark Schmidt were also present during the conversation. (RT 3307-08.) Slusher estimated that she took Holloway for a pregnancy test probably about a week after that conversation. (RT 3309.) Slusher also acknowledged that part of the

conversation included Holloway indicating she would get an abortion, as well as Petitioner voicing disbelief that Holloway was pregnant and indicating that she said it "for attention." (RT 3310.) Slusher stated: "I honestly didn't catch the whole thing, but the whole discussion and argument was the fact if she was even pregnant in the first place. So that's the reason why I was supposed to take her to get the proof, so she could show him." (Id.)

Thus, upon review, Petitioner's argument is not persuasive, given that "substantial evidence" in the state record supports the California Supreme Court's factual findings concerning the presentation of the victim's pregnancy. See Hibbler, 693 F.3d at 1146 ("[A] petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record.")

A review of this record also supports the reasonableness of the California Supreme Court's conclusion that the evidence introduced with respect to victim's pregnancy was not inflammatory or overly prejudicial. The testimony was brief and largely clinical, as the medical examiner testified a primarily about the age and viability of fetus, and a pediatric pathologist affirmed its viability. Larissa Slusher briefly recounted a conversation, for which Petitioner was present, where Holloway mentioned her pregnancy, Petitioner expressed disbelief, and Holloway stated an intention to take a pregnancy test to prove it to Petitioner. In light of the evidence presented at trial, the state court reasonably concluded that the evidence as introduced was not prejudicial.

Because Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, habeas relief is unavailable on Claim 30. Greztler, 112 F.3d at 1009, citing Payne, 501 U.S. at 825, 827. Because Petitioner has not satisfied §2254, an evidentiary hearing is not warranted on this claim. Sully, 725 F.3d at 1075; Totten, 137 F.3d at 1176.

///

///

///

### 3.    **Claim 31**

Petitioner asserts that the trial court's decision to allow the admission of victim impact evidence during the penalty phase under California Penal Code section 190.3(a) "renders California's sentencing statute unconstitutionally vague and overbroad," and that "retroactive application in Petitioner's case of the change in law allowing this type of evidence violated established principles of ex post facto and due process, and undercut the reliability of Petitioner's death sentence." (SAP at 566.) Petitioner also contends that "[t]hree of the witnesses that the State presented in seeking Petitioner's death gave detailed and extremely emotional testimony describing the grief suffered by Teresa Holloway's relatives," namely the victim's former mother-in-law Carol Holloway Cheatem, and the victim's parents James and Joan Cucinotta, and asserts that "this evidence was so voluminous and inflammatory that it rendered Petitioner's penalty trial unfair and unreliable, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution." (Id. at 565-66.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that admission of detailed and emotional testimony about the impact of Teresa Holloway's murder on members of her family rendered his penalty trial unfair and unreliable, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He further contends that section 190.3, factor (a), which permits introduction of victim impact evidence as a circumstance of the crime, is unconstitutionally vague, and that retroactive application of case law allowing use of this evidence violates federal constitutional principles of ex post facto and due process.

> We have rejected claims that section 190.3, factor (a), is unconstitutionally vague insofar as it permits introduction of victim impact evidence as a circumstance of the crime (*People v. Wilson*, *supra*, 36 Cal.4th at p. 358, 30 Cal.Rptr.3d 513, 114 P.3d 758; *People v. Boyette* (2002) 29 Cal.4th 381, 445, fn. 12, 127 Cal.Rptr.2d 544, 58 P.3d 391), and that use of victim impact evidence in trials for capital crimes committed before the United States Supreme Court's decision in *Payne v. Tennessee*, *supra*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, violates federal constitutional

principles of ex post facto and due process (*People v. Brown* (2004) 33 Cal.4th 382, 394-395, 15 Cal.Rptr.3d 624, 93 P.3d 244). Defendant does not persuade us to reconsider these decisions.

Nor are we persuaded that the trial court erred in failing to exclude victim impact testimony that defendant claims was overly emotional or irrelevant. Three witnesses testified to the impact of Teresa Holloway's murder on members of her family. Carol Holloway, Teresa Holloway's mother-in-law, testified primarily about the impact of the murder on Teresa's young daughter, but also about its impact on herself. James and Joan Cucinotta, Teresa's parents, testified mainly about the impact of the murders on themselves, but also about its impact on their other two children and on their grandchild. The testimony of these three witnesses was relatively brief, comprising just 25 pages in the reporter's transcript. During their testimony, the defense made no objections to any questions put to the witnesses, nor did the defense move to strike any of the answers. During a break in proceedings immediately after the testimony of Carol Holloway, however, the defense moved for a mistrial or in the alternative to preclude any further victim impact testimony. Defense counsel pointed out that as the jury was leaving the courtroom for the break, four of the jurors were "very visibly crying." The trial court denied the motions, although it agreed with defense counsel that at least two of the jurors had been in tears, and the trial court added that defendant had been "crying and sobbing" as well. Later, out of the jury's presence, the trial court observed for the record that during the testimony of Teresa Holloway's parents it had been watching the four jurors that defense counsel had previously identified as crying and that it did not notice "nearly as much emotional response on their part, frankly."

As examples of testimony that was irrelevant, defendant cites, among other things, Joan Cucinotta's testimony that her mother died of cancer shortly after Teresa Holloway's death and that her husband lost his job two weeks after Holloway's death. By failing to make timely objections during the witnesses' testimony, defendant forfeited the claim that any of the victim impact evidence was irrelevant. (*People v. Wilson*, *supra*, 36 Cal.4th at p. 357, 30 Cal.Rptr.3d 513, 114 P.3d 758.) In any event, we are satisfied that all of that testimony was relevant. For example, Joan Cucinotta explained that because she did not want to upset her mother during her final illness, she had pretended that Holloway was still alive, which was "very difficult." And James Cucinotta explained that he lost his job "pretty much because of this [meaning Holloway's death]." Thus, all of this testimony was relevant to explain the direct impact of the murder on Holloway's family members.

Defendant provides examples of testimony he considers overly emotional. In the testimony of Teresa Holloway's mother, Joan Cucinotta, defendant cites, among other things, her statements that "there is nothing worse to me than the death of a child," that she lunged at and wanted to hit the detective who told her Holloway was dead, that she visits Holloway's grave every week and at first she would "cry, sobbing, cry and cry, throw [her]self on the grave," and that Holloway's daughter, when she visits the grave, "says a prayer and kisses her [mother's] picture." In the testimony of Holloway's father, James Cucinotta, defendant cites, among other things, his statements that he and his wife visit Holloway's grave every week, that they "couldn't take a look at her [Holloway] for the last time because of the condition that she was in ... [a]nd of course she'd laid out in the road for a couple days," that while he was making the funeral arrangements for Holloway he "had to stuff everything" (meaning suppress his emotions) and "because of that stuffing, [he] started to do a lot of inappropriate things," his "drinking got out of hand," and he "had to finally go to a treatment center and get that taken care of," that as a result of Holloway's death his son, who was 34 years old, was "not the same anymore" and was "in a recovery home here in San Diego," and that during the first year after Holloway's death he and his wife "didn't even have a holiday in the house," they "didn't have a turkey for Thanksgiving ... didn't have a Christmas tree for Christmas."

This testimony was not dissimilar from, or significantly more emotion-laden than, other victim impact testimony that has been held admissible. For example, in *Payne v. Tennessee*, *supra*, 501 U.S. 808, 111 S.Ct. 2597, the defendant was convicted of murdering a 28-year-old woman and her two-year-old daughter. At the trial, when asked how the woman's three-year-old son had been affected by the murders of his mother and sister, the boy's grandmother replied: "'He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie.'" (*Id.* at pp. 814-815, 111 S.Ct. 2597.) In *People v. Harris*, supra, 37 Cal.4th 310, 33 Cal.Rptr.3d 509, 118 P.3d 545, the murder victim's mother "described how she learned of the murder, and of the emotional and financial costs involved in planning and attending the funeral." (*Id.* at p. 328, 33 Cal.Rptr.3d 509, 118 P.3d 545; see also *id.* at pp. 351-352, 33 Cal.Rptr.3d 509, 118 P.3d 545 [holding this evidence properly admitted].) In *People v. Panah*, *supra*, 35 Cal.4th 395, 25 Cal.Rptr.3d 672, 107 P.3d 790, the murder victim's father testified that before the victim's death, her 16-year-old brother "was the family athlete, and was a '4.0 student,' but, following her death, his grades deteriorated, 'he is drinking a lot and doing drugs,' and would not talk about

his sister but 'kept it all inside himself,' and refused to go to counseling." (*Id.* at p. 495, 25 Cal.Rptr.3d 672, 107 P.3d 790.) We concluded that this testimony was "neither irrelevant nor prejudicial but, in context, depicted the 'residual and lasting impact' he 'continued to experience' as a result of [the victim's] murder." (*Ibid.*) In *People v. Boyette*, *supra*, 29 Cal.4th 381, 127 Cal.Rptr.2d 544, 58 P.3d 391, a murder victim's father "testified and related how close he was with the victim, how her eight-year-old son had said he wanted to die so he could be with his mother, how her six-year-old son had nightmares and would telephone wanting to know where his mother was, and how [the victim] had been in a drug rehabilitation program and had turned her life around." (*Id.* at p. 440, 127 Cal.Rptr.2d 544, 58 P.3d 391; see also *id.* at p. 444, 127 Cal.Rptr.2d 544, 58 P.3d 391 [holding the evidence was properly admitted].) As in these cases, we conclude that the victim impact evidence here "did not surpass constitutional limits." (*Id.* at p. 444, 127 Cal.Rptr.2d 544, 58 P.3d 391.)

The record does not support defendant's suggestion that after hearing the victim impact testimony the jurors were so overwhelmed by emotion that they were unable to make a rational determination of penalty. Of particular significance, the jury deliberated on penalty for five days before reaching its verdict. The length of their deliberations rather strongly implies that, rather than rushing to judgment under the influence of unbridled passion, the jurors arrived at their death verdict only after a full and careful review of the relevant evidence and of the legitimate arguments for and against the death penalty.

Jurado, 38 Cal. 4th at 131-34 (alterations in original).  Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

The Supreme Court has held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne, 501 U.S. at 827; see also Gretzler, 112 F.3d at 1009 ("Evidence about a victim's characteristics and the impact of a murder on the victim's family is relevant and admissible at a death penalty sentencing

proceeding. Admission of such evidence will only be deemed unconstitutional if it is so unduly prejudicial that it renders the sentence fundamentally unfair."), citing Payne, 501 U.S. at 825, 827.

First, with respect to Petitioner's assertion that the admission of victim impact evidence under Payne violated ex post facto and due process principles, the Court finds reasonable the California Supreme Court's rejection of that argument. In general, "'any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.'" Collins v. Youngblood, 497 U.S. 37, 42 (1990), quoting Beazell v. Ohio, 269 U.S. 167, 169-70 (1925); see also Bouie v. City of Columbia, 378 U.S. 347, 353 (1964) ("An ex post facto law has been defined by this Court as one that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action, or that aggravates a crime, or makes it greater than it was, when committed.") (internal quotations omitted).

However, in Gentry v. Sinclair, the Ninth Circuit rejected an ex post facto challenge to the application of Payne. The Ninth Circuit acknowledged that "[t]he admission of victim impact statements potentially implicates Calder's [Calder v. Bull, 3 U.S. 386, 290 (1798)] fourth category: 'Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender,'" but the circuit court clarified that "an ex post facto problem does not arise for a law that 'does nothing more than admit evidence of a particular kind in a criminal case . . . which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed.'" Gentry, 705 F.3d at 908-09, quoting Thompson v. Missouri, 171 U.S. 380, 387 (1898).

That is precisely the situation presented in the instant case. While Payne provides for the admission of victim impact testimony, it does not alter the burden of proof required for finding in favor a death sentence. Both before and after Payne, a California capital jury

was and still is required to determine whether the evidence presented in aggravation so outweighs the evidence in mitigation that they are persuaded death is the appropriate sentence in the individual case before them.  See id. at 909-10 ("We agree with the Eighth and Tenth Circuits that the admission of a victim impact statement under Payne does not violate the Ex Post Facto Clause. . . While the admission of the victim impact statement may have adversely affected [the petitioner's] presentation at the penalty phase, the State's evidentiary burden remained the same.")   In view of this clear authority rejecting Petitioner's precise contention, the Court is not persuaded that the California Supreme Court's resolution of this issue was unreasonable.

Petitioner similarly fails to demonstrate that California Supreme Court was unreasonable in declining to conclude that the admission of victim impact evidence rendered section 190.3 overbroad and vague in violation of the federal Constitution. California law provides for the admission of victim-impact evidence as part of the "circumstances of the crime" outlined in section 190.3(a).  See e.g. People v. Robinson, 37 Cal. 4th 592, 650 (2005) ("[V]ictim-impact evidence may be introduced at penalty-phase proceedings under the federal Constitution . . . we also have found such evidence (and related 'victim character' evidence) admissible as a 'circumstance of the crime' under section 190.3, factor (a).") (internal citation to Payne omitted) (collecting cases). Moreover, as Respondent correctly notes (see Ans. Mem. at 349), while not specifically addressing the admission of victim-impact evidence, the Supreme Court has previously rejected a vagueness challenge to section 190.3(a).  See Tuilaepa v. California, 512 U.S. 967, 976 (1994) ("Petitioners' challenge to factor (a) is at some odds with settled principles, for our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. . . . [T]his California factor instructs the jury to consider a relevant subject matter and does so in understandable terms.   The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.")  Petitioner

fails to offer any clearly established law demonstrating that the introduction of victim impact evidence renders the California statute constitutionally infirm and has not shown that the state court's rejection of this argument was unreasonable.

Finally, Petitioner contends that the victim impact evidence introduced in his case was inflammatory, prejudicial and violated his right to due process.[28]  In <u>Payne</u>, the Supreme Court indicated that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  <u>Payne</u>, 501 U.S. at 825, citing <u>Darden</u>, 477 U.S. at 179-83.  As noted above, such error may warrant habeas relief only if "the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair."  <u>Jammal</u>, 926 F.2d at 919; <u>see also McGuire</u>, 502 U.S. at 68-73.

The California Supreme Court found that the victim impact evidence presented at Petitioner's trial "was not dissimilar from, or significantly more emotion-laden than, other victim impact testimony that has been held admissible."  <u>Jurado</u>, 38 Cal. 4th at 133.  The state court specifically compared the testimony presented in Petitioner's case with that admitted in other cases and concluded that, like in those cases, the evidence presented during the penalty phase proceedings "did not surpass constitutional limits."  <u>Id.</u> at 134. The California Supreme Court also rejected Petitioner's assertion that the evidence was so prejudicial that it prevented the jurors from properly fulfilling their role of rationally deciding the appropriate penalty, reasoning as follows:

---

[28] At one point in the SAP, Petitioner appears to argue that if the victim impact evidence had *any* impact on the jury's decision, that impact was itself prejudicial.  (<u>See</u> SAP at 584-85 - "There is more than a reasonable possibility that the victim impact evidence in this case contributed to the jury's death verdict, and this evidence must therefore be deemed to have prejudiced Petitioner.")  As discussed above, this is not the appropriate standard for evaluating this claim.  Instead, as outlined in <u>Payne</u>, relief may be warranted under due process principles only if the evidence in question is "*so unduly prejudicial* that it renders the trial fundamentally unfair."  <u>Payne</u>, 501 U.S. at 825 (emphasis added).

The record does not support defendant's suggestion that after hearing the victim impact testimony the jurors were so overwhelmed by emotion that they were unable to make a rational determination of penalty. Of particular significance, the jury deliberated on penalty for five days before reaching its verdict. The length of their deliberations rather strongly implies that, rather than rushing to judgment under the influence of unbridled passion, the jurors arrived at their death verdict only after a full and careful review of the relevant evidence and of the legitimate arguments for and against the death penalty.

Id.

Upon review, the state supreme court evaluated Petitioner's claim under the clearly established law under Payne, discussed the evidence presented at Petitioner's trial at length, specifically compared the testimony presented in his case to that presented in cases raising a similar claim, and carefully evaluated whether there was a likelihood that the evidence had a prejudicial impact. While Petitioner asserts in the SAP that the evidence was prejudicial because it was overly emotional and several jurors became visibly upset by the testimony, the California Supreme Court acknowledged and considered the emotional impact of the testimony. In its decision, the state supreme court specifically mentioned the trial court comments, noting that several jurors had a visible response to the testimony of the victim's former mother-in-law, but at the same time recognizing that the trial court also later remarked that he did not see any repeat of that type of response to the victim impact testimony by the victim's parents. Petitioner fails to demonstrate that this decision was unreasonable, particularly given the lengthy and well-reasoned discussion of the claim, which persuasively pointed to the length of time of jury deliberations as supporting a conclusion that the jury based its decision on an objective view of evidence, rather than subjectively making a penalty decision based on emotion.

In the SAP, Petitioner also asserts the trial prosecutor relied heavily on victim impact evidence and argued to the jury that this evidence, by itself, outweighed mitigation, "[t]hey [the jurors] heard that the victim impact evidence presented in this case was the only aggravating evidence they needed to look at because this evidence 'substantially outweigh(ed) any and all factors in mitigation.'" (SAP at 584.) A review of the record

does not support this argument. Instead, the record reflects that the cited portion of the prosecutor's closing argument was made during the prosecutor's discussion of the whole of section 190.3, factor (a), which provided that the jury could consider the "circumstances of the crime." In arguing the sentencing factors, the - prosecutor started with factor (a) and stated that the crime was "a hands-on execution" of an individual that was four feet ten inches tall, weighed 107 pounds and was four months pregnant. (RT 3583.) The prosecutor went on to state that: "But probably the most aggravating fact in this entire case, and I would submit to you that this fact substantially outweighs any and all factors in mitigation, and that's the fact that Mr. Jurado killed Terry Holloway so that he could kill again. That's one of the most aggravating factors about this murder. This was not an isolated random act of violence. This was a cold a calculated plan to snuff out the life of a human being so that he could kill again." (RT 3583-84.) Only after asserting that killing the victim in order to kill again was "probably the most aggravating fact in this entire case" did the prosecutor then address the victim impact evidence, stating that in addition to the crime itself, this evidence could also be considered under factor (a), as the "circumstances of the crime includes different things. It includes victim-impact testimony, for example." (RT 3584.) After briefly discussing the victim impact testimony, the prosecutor then summed up the argument on factor (a) by stating: "I'd submit to you that you can take a look at that one factor in aggravation, and that outweighs, substantially outweighs any and all factors in mitigation." (RT 3585.) The prosecutor then moved on to discuss factor (b). (Id.) Thus, it is clear from a review of the record that the prosecutor was not asserting that the *victim impact evidence on its own* outweighed the evidence in mitigation, but instead, that all of the evidence under factor (a), the circumstances of the crime, primarily Petitioner's planning and commission of a vicious and callous murder so that the existing murder plot was not revealed and he could kill again, when coupled with the victim impact evidence, together comprised significant evidence in aggravation.

Ultimately, Petitioner fails to show that the victim impact evidence was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." Payne, 501 U.S. at 825.

Again, apart from the victim impact evidence which was introduced as part of the circumstances of the crime, the murder was particularly brutal, as the pregnant victim was less than five feet tall, weighed just over 100 pounds, and was subjected to a surprise attack by several taller and larger individuals.  She died from a combination of strangulation and numerous blunt force injuries to her head and body, including fractures to her jaw, eye sockets, nose, voice box and skull.  In addition to the fact that she was murdered to prevent her from exposing a plot to murder another individual, there was significant other evidence in aggravation, including a prior conviction and prior criminal activity in which Petitioner was involved and armed during a jail altercation, was involved in a jailhouse assault, and an assault against his mother.[29]

In sum, because Petitioner fails to demonstrate that the state court decision was contrary to, or an unreasonable application of, Payne, or that it was based on an unreasonable determination of the facts, habeas relief is not warranted on Claim 31.

### 4.  Claim 32

Petitioner asserts that the jury's consideration of the Baldwin jail assault during the penalty phase violated his federal Constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments because: (1) the prosecution's lack of diligence in discovering and providing timely notice of the introduction of this evidence in aggravation led to the destruction of evidence necessary to counter the evidence in aggravation; (2) the jury's consideration of the assault was irrelevant to any statutory aggravating factor because the

---

[29] For this same reason, any potential error arising from the testimony of Mr. Cuccinotta, the victim's father, that he was "angry" at those involved in the trial proceedings, including the defendant, and his statement that "I can't forgive.  I can't forget," (RT 3388), was also harmless in light of the strong evidence in aggravation.  See Bosse v. Oklahoma, 580 U.S. ____, 137 S.Ct. 1, 2 (2016) (per curiam) (courts "remain[] bound by Booth's prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence unless this Court reconsiders that ban.")

conduct at issue did not constitute a crime; and (3) the introduction of the evidence violated the state statute of limitations. (SAP at 585-608.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the trial erred in overruling his objections to admission of evidence of his assault on Steven Baldwin, and that this error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

> On April 14, 1994, the prosecution notified defendant that it intended to introduce in aggravation evidence of defendant's assault on Steven Baldwin, which had occurred in July 1991, soon after defendant's arrest. The defense moved to exclude evidence of the incident on the ground that the notice was untimely. After a hearing, the trial court denied the motion without prejudice to its renewal if the trial reached the penalty phase.

> Defendant renewed the motion to exclude after the jury returned its guilt verdicts and made its special circumstance finding. In support of the motion, defendant informed the court that jail documents listing the inmates who were housed in the module where the assault occurred and the employees who worked in that module had been destroyed on or before July 1993, although a report relating to the incident had been preserved. The trial court denied the renewed motion to exclude, rejecting defendant's argument that, in light of the document destruction, use of the incident in aggravation would violate his constitutional right to due process of law. Defendant contends the trial court erred in denying the motions to exclude.

> "Section 190.3, factor (b) provides for the admission, during the penalty phase of a capital trial, of evidence of any criminal activity by the defendant involving the use or attempted use of force or violence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1070, 99 Cal.Rptr.2d 1, 5 P.3d 68.) Section 190.3, factor (b), imposes no time limitation on the introduction of unadjudicated violent crimes; rather, it permits the jury to consider a capital defendant's criminally violent conduct occurring at any time during the defendant's life. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1174, 74 Cal.Rptr.2d 121, 954 P.2d 384; *People v. Williams (*1997) 16 Cal.4th 153, 233, 66 Cal.Rptr.2d 123, 940 P.2d 710.) Thus, evidence of violent criminal activity is admissible even though prosecution of the crime would be time-barred (*People v. Williams*, *supra*, at p. 233, 66 Cal.Rptr.2d 123, 940 P.2d 710), the right to a speedy trial is not implicated (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1161, 36

Cal.Rptr.2d 235, 885 P.2d 1), and the defense of laches is not available (*People v. Koontz* (2002) 27 Cal.4th 1041, 1087-1088, 119 Cal.Rptr.2d 859, 46 P.3d 335). As we have explained, the remoteness in time of a prior incident "goes to its weight, not to its admissibility." (*People v. Catlin* (2001) 26 Cal.4th 81, 172, 109 Cal.Rptr.2d 31, 26 P.3d 357.) Defendant asks us to reconsider these decisions, but he does not persuade us to do so.

Here, as defendant concedes, defendant's assault on Steven Baldwin was not remote in time; indeed, it occurred *after* the charged capital offense, the murder of Teresa Holloway. Defendant nonetheless contends that the trial court should have excluded evidence of the incident because the prosecutor's lack of diligence in discovering the incident and in providing notice of his intention to offer evidence of the incident in aggravation resulted in the destruction of relevant jail records, thereby compromising defendant's ability to defend against the charge.

The prosecutor told the trial court that he first learned of the incident in December 1993 during an interview of Steven Baldwin while preparing the case for trial. Although defendant argues that the prosecutor *could have* discovered the incident earlier, he cites no authority for the proposition that a prosecutor in a death penalty case has an obligation to promptly and diligently search for all available aggravating evidence, or that, if such a duty exists, exclusion of evidence is an appropriate and lawful sanction for its violation. Thus, defendant fails to persuade us that he suffered any legally cognizable harm as a result of the prosecution's failure to discover the incident at an earlier time.

The prosecution is required to notify a capital defendant of its intended penalty phase evidence "within a reasonable period of time as determined by the court, prior to trial." (§ 190.3.) Notice provided before jury selection begins is generally considered timely, and the purpose of the notice provision is satisfied if the defendant has a reasonable chance to defend against the charge. (*People v. Stitely*, *supra*, 35 Cal.4th at p. 562, 26 Cal.Rptr.3d 1, 108 P.3d 182.) Here, the prosecutor gave notice to defendant of his intention to introduce evidence of the Baldwin assault 11 days before jury selection began. Defendant then received, or had already received, a report that described the incident and included the names of two inmates, in addition to Baldwin and defendant, who had been present in the module and were questioned about the incident. The trial court did not abuse its discretion in concluding that defendant received timely and adequate notice.

Defendant also argues that the incident was inadmissible because it did

not constitute a crime by defendant. Evidence of other criminal activity introduced in the penalty phase under section 190.3, factor (b), must demonstrate "the commission of an actual crime, specifically, the violation of a penal statute." (*People v. Phillips* (1985) 41 Cal.3d 29, 72, 222 Cal.Rptr. 127, 711 P.2d 423; see also *People v. Kipp*, *supra*, 26 Cal.4th 1100, 1133, 113 Cal.Rptr.2d 27, 33 P.3d 450; *People v. Boyd* (1985) 38 Cal.3d 762, 772, 215 Cal.Rptr. 1, 700 P.2d 782.) The prosecution did not argue that defendant personally assaulted Baldwin, but instead that he aided and abetted an assault on Baldwin by loudly referring to Baldwin as a "snitch," knowing that snitches are commonly the targets of assault in jail. "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561, 199 Cal.Rptr. 60, 674 P.2d 1318.) On the evidence presented, the jury could reasonably conclude that defendant, acting with the intent to have Baldwin assaulted, and with knowledge that other inmates would likely do so if told that Baldwin was a snitch, encouraged or instigated the assault by openly announcing to the other inmates that Baldwin was a snitch. Defendant's remark to Baldwin after the assault ("You can't be in this cell") supports an inference that defendant orchestrated the assault to achieve his own purposes, intimidation of Baldwin and his removal from the module. Therefore, we reject defendant's argument that the evidence was insufficient to show that defendant violated a penal statute.

Jurado, 38 Cal. 4th at 134-36 (alteration in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

California Penal Code § 190.3(b) provides for the consideration of penalty phase evidence concerning: "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or implied threat to use force or violence." That same statute also provides that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to

trial." Cal. Penal Code § 190.3. Yet, as the California Supreme Court accurately and reasonably observed, the defense was provided notice of this aggravating evidence 11 days prior to jury selection in this case, that "[n]otice provided before jury selection begins is generally considered timely, and the purpose of the notice provision is satisfied if the defendant has a reasonable chance to defend against the charge," and the defense had also been previously provided with a report which included the names of several inmates present during the altercation, aside from Petitioner and Baldwin. Jurado, 38 Cal. 4th at 136. The record further reflects that the report concerning the July 1991 Baldwin assault had been provided to the defense when the prosecutor learned about it in December 1993, and that while notice of the prosecution's intent to introduce the incident as aggravation was provided prior to jury selection in mid-April 1994, the penalty phase jury proceedings did not actually commence until June 1994, nearly six weeks later. (See RT 3063, 3085; CT 1664.)

Similar to the argument advanced on direct appeal, while Petitioner "argues that the prosecutor *could have* discovered the incident earlier, he cites no authority for the proposition that a prosecutor in a death penalty case has an obligation to promptly and diligently search for all available aggravating evidence, or that, if such a duty exists, exclusion of evidence is an appropriate and lawful sanction for its violation." Jurado, 38 Cal. 4th at 135-36; (compare Lodgment No. 72 at 300-07 with SAP at 594-601.) Petitioner's attempt to draw parallels between this issue and Supreme Court cases such as Brady v. Maryland or Lankford v. Idaho, 500 U.S. 110 (1991), are unpersuasive. Under Brady and subsequent case law, the prosecution is required to learn of, and provide the defense with, all available and material *exculpatory* evidence. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.") However, as Respondent aptly points out, the evidence at issue in this case, the report of the Baldwin assault, was not "exculpatory." Nor was the San Diego Sheriff's Department acting as an investigatory agency on the murder case, rather, they were

working in a correctional capacity, housing defendant in the county jail while he was awaiting trial. Petitioner's citation to <u>Lankford</u> is similarly unavailing, as in that case the Supreme Court articulated a general rule that "adequate notice" was required to allow the adversarial system to function effectively, finding a violation of due process where "[p]etitioner's lack of adequate notice that the judge was contemplating the imposition of the death sentence created an impermissible risk that the adversary process may have malfunctioned in this case." <u>Lankford</u>, 500 U.S. at 127. This situation is again clearly distinguishable, as first, the defense in this case was clearly aware that the prosecution was pursuing a death sentence, and second, as discussed above, the defense was provided with a report about the assault six months prior to the penalty proceedings and was given notice of the prosecutor's intent to use it in aggravation eleven days before the commencement of trial proceedings and approximately six weeks before the penalty phase actually began. Thus, based on a review of the record and the lack of clearly established authority supporting Petitioner's argument, it is clear the trial court did not abuse its discretion in admitting this evidence and the California Supreme Court did not act unreasonably in rejecting Petitioner's attempts to exclude the evidence due to a lack of notice.

Petitioner also alleges that the Baldwin assault was inadmissible as evidence in aggravation because the conduct at issue did not constitute a crime, which was required for admission under section 190.3(b). As the California Supreme Court correctly noted, "[e]vidence of other criminal activity introduced in the penalty phase under section 190.3, factor (b), must demonstrate 'the commission of an actual crime, specifically, the violation of a penal statute.'" <u>Jurado</u>, 38 Cal. 4th at 136, quoting <u>People v. Phillips</u>, 41 Cal. 3d 29, 72 (1985). The California Supreme Court reasoned that the jury could have concluded that Petitioner had aided and abetted an assault on Baldwin, as follows:

> On the evidence presented, the jury could reasonably conclude that defendant, acting with the intent to have Baldwin assaulted, and with knowledge that other inmates would likely do so if told that Baldwin was a snitch, encouraged or instigated the assault by openly announcing to the other inmates that Baldwin was a snitch. Defendant's remark to Baldwin after the

assault ("You can't be in this cell") supports an inference that defendant orchestrated the assault to achieve his own purposes, intimidation of Baldwin and his removal from the module. Therefore, we reject defendant's argument that the evidence was insufficient to show that defendant violated a penal statute.

<u>Jurado</u>, 38 Cal. 4th at 136.

Petitioner maintains that "even if 'snitches' are disliked and sometimes subjected to physical or verbal abuse, Petitioner's statement, made to another inmate standing next to him, did not constitute a statutory crime," and asserts that there was a lack of evidence that the inmate or inmates who committed the assault were near Petitioner at the time of his comments or that they even heard his comments. (SAP at 602-03) (citations to reporter's transcript omitted.)

At the penalty phase proceedings, Baldwin testified that: "I was booked in county jail for a violation of probation and was processed to be put in the same tank as the defendant. In walking by the tank, Jurado saw me and identified me by saying, 'I know that dude. He's the reason I'm in here. He told the cops I killed that bitch.'" (RT 3315.) Baldwin indicated that the comments were made in the presence of "several" other inmates. (<u>Id.</u>) After he was placed in the cell, Baldwin testified he went to look for Petitioner to talk to him, stating: "And I was walking down the hall and someone struck me from behind. And it turned into a multiple - - multiple fight, and I don't really know exactly what happened. I was hit several times. And then it stopped for a moment." (<u>Id.</u>) Baldwin testified that he did not know how many inmates attacked him, but that it may have been "two or three," and that he was hit "mostly from behind." (RT 3315-16.) When asked if he saw Petitioner again while the assault was taking place, Baldwin testified that: "At the moment that the fight stopped for a second, he stepped out of one of the side cells, and everything just came to a standstill for a moment, and he said, 'You can't be in this cell. You got to roll up out of this cell.'" (RT 3316.) Baldwin stated that shortly after that, he "was unconscious," and that: "Next thing I knew, I was on a gurney being carried down the hallway." (<u>Id.</u>)

On cross-examination, Baldwin stated that: "I told the deputy that I had a problem with this inmate. And he said, 'Well, you'll just have to work it out,' and he put me in the tank anyway." (RT 3318.) Baldwin acknowledged that during a prior interview with deputies, and prior interviews with prosecutors and defense counsel, he did not mention Petitioner using the term "bitch." (RT 3319-20.) Baldwin testified that Petitioner was not one of the inmates who hit him. (RT 3322.) Baldwin stated he did not know the inmate who hit him and that the only individual he knew in the group was Petitioner. (RT 3323.) Baldwin explained that the reason he wanted to talk to Petitioner upon entering the cell, after Petitioner had called him a snitch, was to explain to Petitioner that he had not initiated the conversations with police about the murder. (RT 3323-24.)

Prior to Baldwin's testimony, a San Diego Sheriff's detective from the fugitive and jail investigations unit testified that snitch was a "slang term for an informant," that is, "someone who is normally either testifying against someone or providing us information about activity going on in the jails." (RT 3312.) He noted that some snitches are placed into protective custody "to protect them from any physical harm, is usually the problem, but even verbal abuse. Any number of things. An inmate that's labeled a snitch is normally not liked by most inmates in there." (RT 3312-13.) The detective stated it was common knowledge that inmates do not like snitches. (RT 3313.)

This review of the record does not support Petitioner's argument, as Baldwin plainly testified that they were in the presence of "several" other inmates when Petitioner identified Baldwin as having told police of Petitioner's involvement in the murder, and that Baldwin was assaulted by one or more inmates almost immediately after being placed in the cell. The jury also heard testimony that snitches are not looked upon favorably by other inmates, and efforts are often made to protect those individuals from harm by other inmates, including placing those inmates in protective custody.

///

///

///

Based on this record, the Court agrees with the California Supreme Court's conclusion that the evidence presented at trial could have led the jury to reasonably conclude that Petitioner's conduct constituted a crime,[30] that is, Petitioner made comments about Baldwin informing on him to the police in the presence of other inmates, intending to incite violence against Baldwin. The state supreme court's rejection of this argument was not unreasonable.

With respect to Petitioner's third and final argument, that the admission of this incident violated the state statute of limitations and denied Petitioner his rights to due process and to a speedy trial, clearly established authority again fails to support his position. Petitioner argues that "[t]he cases upon which the California Supreme Court relied in developing the proposition that 'the penalty phase of trial (is not) the equivalent of a criminal prosecution for the purposes of due process and speedy trial analysis' (*People v. Stanley*, *supra*, 10 Cal.4th at pp. 822-823, citing *People v. Jennings*, 46 Cal.3d 963, 982 (1988), *People v. Balderas*, 41 Cal.3d 144, 205, fn. 32 (1985)) have not involved situations where, as here, the prosecution's failure to act with diligence in discovering and noticing alleged other criminal activity is directly responsible for the permanent loss of evidence necessary to the capital defendant's defense to the alleged crime," and asserts that "Petitioner's situation clearly lends itself to the due process analysis applicable to a speedy trial claim." (SAP at 604-05.)

Petitioner's argument is premised on a patchwork of authority expressing general principles, such as that a capital jury's consideration of prior criminal activity can have a

---

[30] Petitioner's related argument, that the trial court erred in not instructing the jury on the elements of aiding and abetting liability and assault, was raised as Claim 33 in the SAP, and was considered and rejected by the Court in the Group One Order, on the grounds that neither clearly established federal law, nor California law, requires such instruction. (See ECF No. 171 at 35-37); see also People v. Lewis, 25 Cal. 4th 610, 668 (2001) ("Instruction to the jury on the elements of unadjudicated crimes are not required by logic or by the constitutional guarantees of due process, fundamental fairness, right to a fair trial, equal protection, or reliability of penalty.")

"'dramatic'" or "'decisive'" impact on the penalty determination and that "[s]tatutes of limitation are 'designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.'" (Id. at 605-06, quoting Zant, 462 U.S. at 903, Johnson v. Mississippi, 486 U.S. 578, 586 (1988), and United States v. Marion, 404 U.S. 307, 323 (1971).)

Yet, the Supreme Court has also held that: "Sentencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." Nichols v. United States, 511 U.S. 738, 747 (1994). Petitioner fails to cite to any clearly established authority supporting his position that the prosecution should be precluded from introducing evidence of prior criminal activity that would not be subject to prosecution on its own. California's capital statute expressly allows for the introduction and consideration of prior criminal activity in the penalty phase. See Cal. Penal Code § 190.3(b). As the California Supreme Court accurately pointed out in its rejection of this claim, "[s]ection 190.3, factor (b), imposes no time limitation on the introduction of unadjudicated violent crimes; rather, it permits the jury to consider a capital defendant's criminally violent conduct occurring at any time during the defendant's life." Jurado, 38 Cal. 4th at 135. Moreover, the Supreme Court has upheld the constitutionality of California's capital statute, including specifically rejecting a challenge to factor (b). See Tuilaepa, 512 U.S. at 975-80.

The Supreme Court has also recently rejected the contention that the speedy trial right applies to sentencing proceedings, holding that "[t]he Sixth Amendment speedy trial right, however, does not extend beyond conviction, which terminates the presumption of innocence." Betterman v. Montana, 578 U.S. ___, 136 S.Ct. 1609, 1618 (2016). In so deciding, the Supreme Court stated that: "We reserve the question whether the Speedy Trial Clause applies to bifurcated proceedings in which, at the sentencing stage, facts that could increase the prescribed sentencing range are determined (e.g., capital cases in which eligibility for the death penalty hinges on aggravating factor findings)." Id. at 1613 n. 2.

In light of the Supreme Court's decision in <u>Betterman</u>, specifically reserving this matter, it is apparent that the California Supreme Court's rejection of Petitioner's speedy trial argument could not have been contrary to, or an unreasonable application of, clearly established federal law.

In <u>Betterman</u>, the Supreme Court also noted that "[a]fter conviction, a defendant's due process right to liberty, while diminished, is still present," that "he retains an interest in a sentencing proceeding that is fundamentally fair," but because the petitioner had not raised a due process argument, "we express no opinion on how he might fare under that more pliable standard." <u>Id.</u> at 1617-18. Thus, with respect to the due process argument, even if Petitioner were able to demonstrate error of a constitutional dimension, Petitioner fails to show that the admission of this evidence rendered his penalty phase proceedings fundamentally unfair. As discussed in greater detail elsewhere in this order, there was significant and powerful evidence in aggravation, primarily concerning the brutality and reasons for the murder itself. The evidence showed that the victim was killed to prevent her from revealing another murder plot, was lured to an area by three acquaintances, attacked from behind and brutally beaten and strangled, and apart from that, evidence of other prior criminal activity aside from Petitioner's involvement in this assault. In light of this evidence, Petitioner fails to show that any potential error arising from the admission of the Baldwin assault had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.

Accordingly, the California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Claim 32.

///

///

///

///

## 5.     Claim 35

Petitioner asserts that "the trial court allowed the prosecutor to improperly argue lack of remorse as an aggravating circumstance supporting a death sentence, which in turn allowed the jurors to erroneously conclude that they could attach aggravating weight to this nonstatutory factor."  (SAP at 617.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant claims the death judgment must be reversed because the prosecutor improperly urged the jury to consider defendant's lack of remorse after the crime as an aggravating circumstance.
>
> During his argument to the jury at the conclusion of the penalty phase, the prosecutor began to read the testimony of Christie Medlin about statements defendant had made to her during telephone calls after the murder of Teresa Holloway. Defense counsel interrupted and asked to approach the bench, where he argued that defendant's postoffense statements were "inappropriate evidence in aggravation to show lack of remorse," and that the court should not permit the prosecutor to make an argument urging the jury to view defendant's postoffense lack of remorse as aggravating. The court overruled the objection, noting that defendant's postoffense statements could properly be used in aggravation insofar as they constituted circumstantial evidence of his state of mind during the crime. The prosecutor then quoted defendant's postoffense statements that "the bitch is gone" and that he did not care if he had to spend the rest of his life paying for it. The prosecutor argued that this showed "the state of mind of [defendant] at or about the time this crime occurred as to his idea of punishment."
>
> The prosecutor then discussed evidence showing that defendant knew that killing Teresa Holloway was wrong. The prosecutor mentioned that there were seven factors in aggravation and mitigation that the jury would be asked to consider, and that the jury was not merely to count the factors on each side but was to weight them to determine their "convincing force." As factors in aggravation, the prosecutor mentioned and discussed the circumstances of the crime, including the victim impact testimony, the presence or absence of criminal activity involving force or violence, and the presence or absence of prior felony convictions. The prosecutor mentioned and discussed whether the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; whether at the time of the offense

defendant had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, and whether that capacity was impaired by intoxication; defendant's age at the time of the crime; and "the last factor," which was "any other circumstances which extenuate the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence of less than death."

In connection with this last factor, the prosecutor discussed the evidence that the defense had presented during its case in mitigation. During this discussion, the prosecutor made this argument, which defendant now challenges: "I listened as the defense witnesses testified yesterday for any evidence or testimony pertaining to the victim. And there was. There was. The defendant's grandmother testified, bless her heart, that she not only prays for [defendant] but she prays for the victim and the victim's family. What a nice thing. What a human thing. What a nice person from a nice family. [¶] When she testified to that I kind of thought back in the evidence that was presented in the guilt phase and the penalty phase, about the defendant and his view of the victim. After the murder of Terry Holloway, she had only been in the drainage ditch a matter of minutes, what was [defendant] doing at Christie Medlin's house? He was playing darts. What was he doing the next day with Denise Shigemura while the victim still lay cold in the drainage ditch? He was having pizza and beer. [¶] And after he got arrested and he talked to Christie Medlin on the telephone, how did he feel about the victim at that time, right around the time of the crime? 'On, on, the bitch is gone.' [¶] And when he identified Steve Baldwin as a snitch in the county jail, what were his words? 'That's the guy who told the cops I killed the bitch.' [¶] What's his grandmother doing during this time? She's praying for the victim. [¶] Do you see what I mean? He's not like them. He doesn't share in their goodness, he doesn't share in their compassion, he doesn't share in their humanity. [¶] I think those statements that he made in the presence of Baldwin and in the presence or on the telephone to Christie Medlin tell you who the real Robert Jurado is. All right out there, very clear and open for you to understand and evaluate."

Although a prosecutor in a capital case may not argue that a defendant's postcrime lack of remorse is an aggravating factor, a prosecutor may, as the prosecutor did here, argue that lack of remorse is relevant to the evaluation of mitigating factors. (*People v. Pollock*, *supra*, 32 Cal.4th at p. 1186, 13 Cal.Rptr.3d 34, 89 P.3d 353; *People v. Mendoza* (2000) 24 Cal.4th 130, 187, 99 Cal.Rptr.2d 485, 6 P.3d 150.) The prosecutor here never suggested that lack of remorse was an aggravating factor, and he did not refer to lack of

remorse during the portion of his argument devoted to the discussion of aggravating factors. Instead, the challenged argument occurred during the course of the prosecutor's review of the defense case in mitigation and the potential mitigating factors. A reasonable juror likely would have understood the prosecutor's argument to be that defendant's failure to demonstrate any concern for the woman he had killed meant "that remorse was not available as a mitigating factor and also that defendant was not entitled to the jury's sympathy." (*People v. Pollock*, *supra*, at p. 1186, 13 Cal.Rptr.3d 34, 89 P.3d 353.)

*Jurado*, 38 Cal. 4th at 140-41 (alterations in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner contends that the prosecutor's argument urged the jurors to improperly consider his actions and comments in aggravation, because section 190.3(a) allows the jury to consider the circumstances of the crime in aggravation, but neither Petitioner's post-crime behavior nor statements should be considered under that factor. (SAP at 617-18.) Petitioner alleges that the prosecutor's argument was not, as the state court concluded, directed at negating any mitigating evidence of remorse. (Id. at 619.)

Petitioner relies on a California Supreme Court case, People v. Gonzalez, 51 Cal. 3d 1179 (1990), which approved the admission of evidence of a defendant's lack of remorse "at the immediate scene of the crime" but instructed that "postcrime evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating." (SAP at 617-18, quoting from Gonzalez, 51 Cal. 3d at 1232.) Yet, Gonzalez also states that "[i]t is proper for the prosecution to stress that remorse is not available as a sentencing factor," and found no basis for relief where "[f]or the most part, the prosecutor's argument focused on *overt* evidence of defendant's defiance, not his mere failure to confess guilt or express remorse." Gonzalez, 51 Cal. 3d at 1232. Moreover, as the Court has previously noted, state law error is not grounds for federal habeas relief. See McGuire, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.")

As noted previously, this type of claim may merit relief only if "the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair." Jammal, 926 F.2d at 919; see also McGuire, 502 U.S. at 68-73. In the Group One claims, Petitioner raised a claim of ineffective assistance of counsel (Claim 1.T) for failing to present evidence of remorse and, relevant to the instant claim, for failing to object to the prosecutor's comments and argument on Petitioner's lack of remorse and lack of conscience. (See ECF No. 171 at 126-30.) In adjudicating that claim, the Court rejected Petitioner's argument that the remarks at issue amounted to misconduct, as follows:

> An argument that counsel was ineffective for failing to object to the prosecutor's argument on lack of remorse is similarly without merit. Petitioner argues that the prosecutor committed misconduct in arguing that Petitioner had a lack of remorse and conscience because the prosecutor was aware that Petitioner had expressed remorse in the probation report and in the confession and was privy to Denise Shigemura's statements about Petitioner's remorse. As discussed earlier, the probation report and confession contained unreliable hearsay statements, and Denise Shigemura's proposed testimony was ambiguous, as it was unclear whether Petitioner's upset after the crime was attributable to remorse or to Petitioner's fear of the consequences to himself and his own loved ones. Meanwhile, it is clear from a review of the record that the prosecutor's argument was based on the evidence presented at trial, such as Petitioner's statement to Christine Medlin that "the bitch is gone," and to Steven Baldwin in prison that: "I killed the bitch," and did not constitute misconduct. "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996); see also Menendez v. Terhune, 422 F.3d 1012, 1037 (9th Cir. 2005) ("The prosecutor may argue reasonable inferences from the evidence presented . . . .")

(Id. at 128-29.) The prosecutor's argument was reasonable, as it was based on the testimony and evidence introduced at trial, and was relevant to the evaluation of Petitioner's case on an individualized basis, as the federal Constitution requires. See Zant,

462 U.S. at 879 ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.") The prosecutor's argument, that Petitioner's crime and the circumstances surrounding it warranted the death penalty, were reasonably admitted, and did not "so fatally infect[]" his penalty phase proceedings as to result in a constitutional violation.

Even if Petitioner were somehow able to demonstrate that this argument amounted to constitutional error, Petitioner cannot establish that the comments had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Petitioner asserts that the jurors considered his alleged lack of remorse in aggravation, citing three juror declarations submitted during post-trial proceedings. (See SAP at 621, citing CT 1484-89.) But, as the Court previously discussed in greater detail in the Order on the Group One Claims, these type of post-verdict statements may not be considered by the Court. (See ECF No. 171 at 30-31.) Federal Rules of Evidence Rule 606(b) states: "During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The Court may not receive a juror's affidavit or evidence of a juror's statement on these matters." Fed. R. Evid. 606(b).[31]

In the declarations, three of the jurors who sat on Petitioner's case acknowledge discussing and considering Petitioner's remorse, or lack thereof, during deliberations. (CT 1484-89.) But again, "a juror may not testify about any statement made or incident that occurred during the jury's deliberations." Fed. R. Evid. 606(b); see also Raley v. Ylst, 470 F.3d 792, 803 (9th Cir. 2006) (rejecting claim of juror misconduct stemming from the

---

[31] The Federal Rules of Evidence notes three exceptions to this rule and allows juror testimony in a case where the jury was: presented with "extraneous prejudicial information," subject to "an outside influence," or where "a mistake was made in entering the verdict." See Fed. R. Evid. 606(b). There is no allegation nor showing that any of the exceptions are applicable to the instant claim.

jury's discussion of matters they were instructed not to consider, reasoning that such evidence was not "extrinsic" to the evidence presented at trial, and holding that "[w]e may not inquire into a jury's deliberations concerning the evidence at trial."), citing Belmontes v. Brown, 414 F.3d 1094, 1124 (9th Cir. 2005), reversed on other grounds by Ayers v. Belmontes, 549 U.S. 7 (2006); see also Warger v. Shauers, 574 U.S. ___, 135 S.Ct. 521, 527 (2014) ("As enacted, Rule 606(b) prohibited the use of *any* evidence of juror deliberations, subject only to the express exceptions for extraneous information and outside influences.")  Accordingly, the Court is precluded from considering the juror declarations for this purpose.

Given Petitioner's failure to demonstrate that the trial court erred in allowing the prosecutor's argument, much less that the decision amounted to error of a constitutional dimension such that it impacted the fairness of the penalty phase proceedings, the Court is unable to conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, nor that it was based on an unreasonable determination of the facts.  Habeas relief is not warranted on Claim 35.

### 6.    Claim 36

Petitioner argues that the jury improperly considered evidence that he possessed a weapon in jail as aggravation because: (1) the evidence presented failed to identify the weapon Petitioner allegedly possessed and the jury was therefore deprived of the opportunity to decide whether the conduct alleged constituted criminal activity; (2) the trial court erred in directing the jury to presume that possession of a weapon in jail involved an actual or implied use of force or violence or a threat of force or violence; and (3) the crime of possession of a deadly weapon in jail is an unconstitutionally overbroad aggravating circumstance.  (SAP at 621-31.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> In regard to the prosecution's evidence at the penalty phase that defendant illegally possessed a weapon in the county jail, defendant claims,

08cv1400

first, that the evidence was insufficient to establish that the weapon he possessed was a deadly weapon within the meaning of section 4574; second, that the trial court misinstructed the jury regarding the elements of a section 4574 violation; and, third, that the trial court should not have permitted the jury at the penalty phase to consider the section 4574 violation as an aggravating circumstance because the offense does not necessarily involve an actual or implied threat of violence.

Section 4574 makes it a felony for a county jail inmate to possess a "deadly weapon." Within the meaning of this penal statute, an object is a deadly weapon if it has a reasonable potential of inflicting great bodily injury or death. (*People v. Pollock*, *supra*, 32 Cal.4th at p. 1178, 13 Cal.Rptr.3d 34, 89 P.3d 353; see *People v. Hughes* (2002) 27 Cal.4th 287, 383, 116 Cal.Rptr.2d 401, 39 P.3d 432.)

Arguing that here the prosecution's evidence was insufficient to establish that the weapon he possessed had a reasonable potential of inflicting great bodily injury or death, defendant asserts that the evidence did not show which of several weapons he possessed and that some of the weapons, such as soap bars in socks, were incapable of inflicting great bodily injury. We disagree with defendant's characterization of the evidence.

Mark Thiede testified, on direct examination, that on September 5, 1993, he was working as a deputy sheriff at the county jail in San Diego when he saw groups of Black and Hispanic inmates facing off against each other in one of the tanks. Several Hispanic inmates had steel poles or posts that they were slamming against the steel bunks and using to make stabbing motions to keep the Black inmates in another part of the room. He later wrote a report identifying four inmates "who possessed weapons." Defendant was one of the four. Asked to describe "with a little more particularity what type of weapons ... these inmates were possessing," Thiede replied: "The weapons that was used in the riot, they're bars about between 12 and 18 inches long, quarter inch in diameter. There was also socks. They take a sock and they put two, one or two bars of soap in the socks to make it weighted. You can use that as a clubbing instrument. Thin pieces about a half inch wide, five or six inches long with tape on the end that you can sharpen down to a point. Those are I believe the weapons *that were found.*" (Italics added.)

Defendant argues that from this testimony the jury could not determine which weapon, of the several that Deputy Thiede described, he had possessed during the riot, and thus the jury could not determine whether the weapon satisfied the section 4574 definition of a deadly weapon. The more likely

interpretation of this testimony, we think, is that defendant was one of four inmates that Thiede saw wielding the steel poles or posts and that the other weapons were merely found during a later search of the tank. Moreover, any confusion or uncertainty in this regard was dispelled by cross-examination. Defense counsel asked: "You never saw Mr. Jurado, or the person that you identified as Mr. Jurado, *that is, the person in the tank that you said had the pipe,* you never saw that individual strike anybody, did you?" (Italics added.) Thiede replied, "No, I didn't." Thus, the evidence before the jury sufficiently established that defendant possessed one of the steel objects 12 to 18 inches in length-variously described as poles, posts, bars, and pipes-that the inmates were slamming against bunks and using to make stabbing motions. As defendant does not dispute, an object of this sort is capable of inflicting great bodily injury or death, and thus it is a deadly weapon within the meaning of section 4574.

We next consider defendant's claim that the trial court misinstructed the jury regarding the elements of a section 4574 violation. Specifically, the trial court instructed the jury that in reaching the penalty verdict it could consider evidence that defendant had engaged in criminal activity that involved the express or implied use of force or violence or the threat of force or violence. The court then stated: "And indeed, evidence has been introduced during this phase of the trial for the purpose of showing and proving that [defendant] committed the following criminal activity: ... possession of a weapon in the county jail." Defendant contends that this instruction was inaccurate or at least misleading because it referred merely to "a weapon" rather than "a deadly weapon."

As defendant recognizes, we considered a similar claim in *People v. Hughes, supra,* 27 Cal.4th 287, 116 Cal.Rptr.2d 401, 39 P.3d 432. There, the prosecution introduced evidence at the penalty phase of a capital trial that the defendant while in a county jail had possessed "a four-inch, slightly bent but straightened, hard, sharp object with a loop at the end." (*Id.* at p. 381, 116 Cal.Rptr.2d 401, 39 P.3d 432.) The trial court instructed the jury that "'evidence has been introduced for the purpose of showing that the defendant has committed the following criminal act: possession of a sharpened instrument while confined in the county jail....'" (*Id.* at p. 382, 116 Cal.Rptr.2d 401, 39 P.3d 432.) We concluded that the trial court had erred in instructing in these terms because possessing a sharpened instrument while confined in the county jail "was, at the time, and without more (that is, a showing that the object was a deadly weapon), not a crime." (*Id.* at p. 383, 116 Cal.Rptr.2d 401, 39 P.3d 432.) The trial court's instruction "should have used the words 'deadly weapon' rather than 'sharpened instrument,'" an error we characterized as

"minor." (*Id.* at p. 384, 116 Cal.Rptr.2d 401, 39 P.3d 432.)

We also concluded, beyond a reasonable doubt, that the defendant was not prejudiced by the error. We observed that the object the defendant had possessed qualified as deadly weapon under section 4754. (*People v. Hughes*, supra, 27 Cal.4th at p. 383, 116 Cal.Rptr.2d 401, 39 P.3d 432.) We reasoned: "To find prejudice, we would need to hypothesize two things, which tend to be self-canceling: (i) that the jury would consider the shank, although a sharpened instrument, not to be a deadly weapon, and (ii) that despite such a finding, the jury nonetheless considered the evidence to be so important that it affected the penalty determination. [¶] It is quite unlikely that the jury would find the object to be a sharpened instrument but not a deadly weapon. But if the jury made that improbable finding, thus minimizing the seriousness of the evidence, it is also quite unlikely that it would then consider the evidence to be so important as to control, or even have a significant impact upon, the penalty determination." (*Id.* at p. 384, 116 Cal.Rptr.2d 401, 39 P.3d 432; see also *People v. Pollock*, supra, 32 Cal.4th at p. 1179, 13 Cal.Rptr.3d 34, 89 P.3d 353.)

Similarly here, we conclude that defendant was not prejudiced by the trial court's description of the alleged criminal conduct as defendant's possession of a "weapon" rather than a "deadly weapon." It is quite unlikely that the jury would view the object that defendant possessed-a steel rod or bar 12 to 18 inches in length-as a weapon but not a deadly weapon. It is also quite unlikely that if the jury made such an improbable finding, it would then nonetheless treat the incident as sufficiently aggravating to have affected the penalty verdict. The combination of these improbabilities persuades us beyond a reasonable doubt that the instructional error was harmless.

Defendant also argues that the instruction was erroneous insofar as it required the jury to treat defendant's possession of a deadly weapon in county jail as aggravating without making its own determination that the conduct involved actual or threatened force or violence. Defendant argues that the instruction precluded the jury from considering any possible innocent explanation for his weapon possession. We have previously rejected this argument (*People v. Gray*, supra, 37 Cal.4th at p. 235, 33 Cal.Rptr.3d 451, 118 P.3d 496; *People v. Monterroso* (2004) 34 Cal.4th 743, 793, 22 Cal.Rptr.3d 1, 101 P.3d 956), and defendant does not persuade us to reconsider these decisions.

Finally, we reject defendant's argument that the trial court should not have permitted the jury at the penalty phase to consider the section 4574

violation as an aggravating circumstance because the offense does not necessarily involve illegal violence. This court has consistently concluded, to the contrary, that a prisoner's possession of a weapon is conduct that necessarily involves an actual or implied threat to use force or violence. (E.g., *People v. Hines* (1997) 15 Cal.4th 997, 1057, 64 Cal.Rptr.2d 594, 938 P.2d 388; People v. Ramirez (1990) 50 Cal.3d 1158, 1186-1187, 270 Cal.Rptr. 286, 791 P.2d 965; *People v. Harris* (1981) 28 Cal.3d 935, 962-963, 171 Cal.Rptr. 679, 623 P.2d 240.) "The trier of fact is free to consider any 'innocent explanation' for defendant's possession of the item, but such inferences do not render the evidence inadmissible per se." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589, 15 Cal.Rptr.2d 382, 842 P.2d 1142.)

Jurado, 38 Cal. 4th at 137-40 (alterations in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Again, a claim of state law error may only merit habeas relief if the error "so fatally infected the proceedings as to render them fundamentally unfair." Jammal, 926 F.2d at 919; see also McGuire, 502 U.S. at 68-73. The Court must also conclude that the asserted error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

A California capital jury may consider penalty phase evidence that includes: "[t]he presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence." Cal. Penal Code § 190.3(b). Meanwhile, California Penal Code § 4574(a) states in relevant part that "any person who, while lawfully confined in a jail or county road camp possesses therein any firearm, deadly weapon, explosive, tear gas or tear gas weapon, is guilty of a felony." California decisional law provides that: "Within the meaning of this penal statute [section 4574], an object is a deadly weapon if it has a reasonable potential of inflicting great bodily injury or death." People v. Pollock, 32 Cal. 4th 1153, 1178 (2004).

///

Petitioner first asserts the evidence presented at trial failed to specify or properly identify the type of weapon Petitioner possessed or whether that weapon satisfied section 4574. Deputies Hernandez and Thiede testified about the jail altercation. Hernandez stated that upon being alerted to the disturbance, that: "So we went over, responded to that module and turned the corner of the catwalk where we heard yelling and screaming, and we came up to it. We just seen a bunch of inmates fighting, throwing things back and forth at each other. And I noticed some blood on a couple of inmates. We knew there was a good fight going on." (RT 3327-28.) Hernandez estimated that there were about 30 to 40 inmates in the module, that some in the area were not involved, and that the dispute took place along racial lines, in that: "There was group of Black inmates on one side and a group of Hispanic inmates on the other side." (RT 3328-29.) After separating the groups, Hernandez stated that they searched the module and found a variety of weapon, including metal bars, broken mop pieces, razors, grates from windows and wooden gates, socks with soap bars inside, and pens. (RT 3331-33.) Hernandez acknowledged that he could not pinpoint Petitioner's location during the altercation. (RT 3334.)

Deputy Thiede, who also responded to the fight along with Hernandez, testified that after arriving he told Hernandez to close the gates between the groups of inmates. (RT 3343-44.) Thiede stated that from his view of the altercation: "And there's several inmates - - what I could see right in front of me there was several inmates, Hispanic inmates with steel - - steel poles, steal [sic] posts. And they were, geez, they were taking them and slamming them against steel bunks, they were also using it as a - - stabbing motions to keep all the other Black inmates in this other - - in the other part of the dorm, in the other room." (RT 3344.) Thiede recounted that: "After the gate was shut and inmates scattered away, I made - - I made a note to myself, that I later wrote in my report, who these inmates were." (Id.) Thiede explained that he tried to recall the identities of those four inmates because possession of a weapon was a crime and stated that: "I was able to identify four - - four inmates." (RT 3344-45.) To the prosecutor's question: "Was Mr. Jurado one of the inmates who possessed a weapon?" Thiede replied: "Yes, he was." (RT 3345.) Thiede,

like Hernandez, described the weapons found in the search of the module, and similarly stated that they found weapons that included bars 12-18 inches in length, socks with soap in them, and clubbing instruments. (RT 3345-46.)

Petitioner contends that "while there was testimony that Petitioner possessed a weapon (RT 3345), neither deputy identified this particular weapon," and asserts that "[a]bsent identification of the specific object Petitioner allegedly possessed, neither the jurors, nor the court, could be satisfied beyond a reasonable doubt that Petitioner possessed a 'deadly weapon' as prohibited by section 4574." (SAP at 626-27.) The California Supreme Court rejected Petitioner's assertion that Thiede's testimony would not have allowed the jury to determine what type of weapon Petitioner possessed during the altercation, reasoning that: "The more likely interpretation of this testimony, we think, is that defendant was one of four inmates that Thiede saw wielding the steel poles or posts and that the other weapons were merely found during a later search of the tank. Moreover, any confusion or uncertainty in this regard was dispelled by cross-examination." Jurado, 38 Cal. 4th at 138. This Court agrees with the California Supreme Court that an examination of the trial record clearly shows that defense counsel's questions reflected that he too, understood that Deputy Thiede testified Petitioner possessed a pipe, not one of the other weapons, during the altercation. On cross-examination, defense counsel specifically asked Thiede: "You never saw Mr. Jurado, or the person that you identified as Mr. Jurado, *that is, the person in the tank that you said had the pipe,* you never saw that individual strike anybody, did you?" (RT 3349) (emphasis added.) With respect to the pipe, the state court found that "an object of this sort is capable of inflicting great bodily injury or death, and thus it is a deadly weapon within the meaning of section 4574." Jurado, 38 Cal. 4th at 138. Based on the testimony that described the metal pipes or bars as made of steel and about twelve to eighteen inches in length (see RT 3331-33, 3345-46), this conclusion was clearly reasonable.

Petitioner next alleges that the trial court's instruction, which "essentially defined the alleged criminal activity as one that involved the express or implied use of force or

violence or the threat of force or violence," also violated his rights, as "[o]nce the jury found the underlying fact that Petitioner possessed a weapon to be true, they were to presume that this conduct constituted an actual or threatened use of force or violence, and apply the aggravating fact against Petitioner." (SAP at 628-29.) Petitioner argues that due to the trial court's instructional error, the jury was precluded from considering an "innocent explanation" for his possession of a weapon in jail. (Id. at 629-30.) The facts of the case fail to support any such likelihood, as the evidence showed that Petitioner brandished a twelve to eighteen inch long pipe or bar during a prison altercation. Petitioner fails to explain, and the Court fails to discern, any possible "innocent explanation" for this weapon possession that does not involve the use of, or threat to use, force or violence. As such, even were the Court to assume, without deciding, that the trial court's instruction was erroneous, Petitioner fails to show that the error had a "substantial and injurious effect or influence in determining the jury's verdict" in his case. Brecht, 507 U.S. at 637.

Finally, Petitioner notes that "[s]ection 4574 proscribes *possession*, not use, of a deadly weapon by a jail inmate" and points out that "[b]ecause of the potential or capability for causing great bodily injury or death determines an objects [sic] classification as a deadly weapon, virtually any item possessed in jail could be considered as a deadly weapon." (SAP at 630) (internal citation omitted.) Petitioner asserts that "[s]uch possession standing alone, however, does not necessarily imply a threat of violence pursuant to section 190.3, factor (b)," and argues that "[e]vidence that a defendant possessed a 'potentially' deadly weapon in jail in violation of section 4574 therefore amounts to an overbroad and invalid aggravating factor." (Id. at 630-31.) Petitioner supports his contention with only the general argument that this aggravating factor has such a broad reach that it fails to "meaningfully assist" the jury in its penalty determination and allows for "'randomness'" or for the "'jury to be influenced by a speculative or improper consideration.'" (SAP at 630-31, quoting Zant, 462 U.S. at 878 and People v. Bacigalupo, 6 Cal. 4th 457, 477 (1993).) The Court sees no potential for the identified error in his case, as again, the evidence presented during his penalty phase proceedings showed that Petitioner possessed

and wielded a twelve to eighteen inch long pipe or bar, clearly a deadly weapon, during a prison altercation, clearly imputing the threat of force or violence.[32]  Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts.  Claim 36 does not merit habeas relief.

**7.  Claim 37**

Petitioner asserts that the trial court erred in admitting two incidents between Petitioner and his mother as evidence in aggravation, and contends that the admission of that evidence violated his rights to due process, a fair penalty trial and reliability in the sentencing determination under the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 632.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant argues that the trial court should have exercised its discretion to exclude, as inflammatory and lacking in probative value, the evidence that on one occasion he pushed and spit on his mother, and on another occasion he approached with raised arm as if to strike her and threatened to kill her and shoot up the house. He further argues that admission of this evidence violated his statutory and due process right that the penalty evidence admitted against him be limited to evidence relevant to a factor listed under section 190.3, and his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments to due process, a fair penalty trial, and reliability in the determination of capital punishment.
>
> We reject the argument that defendant's conduct toward his mother was not admissible under section 190.3, factor (b), as criminal activity that involved the use or attempted use of force or violence or the express or implied

---

[32] The California Supreme Court also rejected Petitioner's contention that he was prejudiced by the trial court's error in referring to Petitioner's possession of a "weapon" rather than a "deadly weapon" during jury instructions on the elements of section 4574. See Jurado, 38 Cal. 4th at 138-39.  While Petitioner does not specifically re-raise that contention in the SAP, the Court is in accord with the state supreme court's conclusion that any error in this regard was harmless.  See id. at 139.

threat to use force or violence. Defendant does not argue that his conduct did not violate a penal statute, nor does he argue that it did not involve the use or attempted use of force or violence or the express or implied threat to use force or violence. Instead, he argues that the evidence was "not the kind of evidence that justified sentencing [him] to execution," because it is "unfortunately not that uncommon for a teenager or a nineteen-year-old to have such confrontations with his parents." But the admissibility of section 190.3, factor (b), evidence does not depend on how common or uncommon the criminal conduct is, or whether viewed in isolation it would be sufficient to justify a death sentence. The evidence met all statutory requirements for admission under section 190.3, factor (b).

We reject also defendant's argument that the trial court should have exercised its discretion under Evidence Code section 352 to exclude the evidence on the ground that its probative value was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. As we have explained, Evidence Code section 352 does not give the trial court discretion to exclude all evidence of a criminal incident that is admissible under section 190.3, factor (b). (*People v. Cunningham* (2001) 25 Cal.4th 926, 1017, 108 Cal.Rptr.2d 291, 25 P.3d 519; *People v. Anderson* (2001) 25 Cal.4th 543, 586, 106 Cal.Rptr.2d 575, 22 P.3d 347; *People v. Sanders* (1995) 11 Cal.4th 475, 542-543, 46 Cal.Rptr.2d 751, 905 P.2d 420.)

Nor are we persuaded by defendant's constitutional arguments, which are based on the unrealistic perspective of viewing this evidence in isolation from all the other evidence offered in aggravation and mitigation at the penalty phase, including the circumstances of the capital offense. In the context of the entire penalty determination process, we find nothing improper or unfair about allowing the jury to consider each occasion during defendant's life when he violated a penal statute by conduct that involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

Jurado, 38 Cal. 4th at 142-43 (alteration in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

California Penal Code § 190.3(b) provides for penalty phase consideration of "[t]he presence or absence of other criminal activity by the defendant which involved the use or

attempted use of force or violence or which involved the express or implied threat to use force or violence." Petitioner argues that the incidents between him and his mother do not fit the parameters of section 190.3(b), because "[t]here is a vast and insurmountable difference between violent criminal conduct that justifies putting a defendant to death, and a teenager's only two instances (see RT 3354, 3356, 3362-63) of aggressive conduct towards his parent involving verbal threats, a 'slight push' and spitting." (SAP at 634.)

Both the trial court and the California Supreme Court undertook a detailed analysis of whether these incidents met the statutory requirements of section 190.3(b). The prosecutor sought to introduce evidence of several incidents between Petitioner and his mother, one which "involve[d] pushing of her person and spitting on her," and the other "where Mr. Jurado advanced toward her with his hand in a raised position and got to within a couple feet from her before a couple of his friends jumped on him and subdued him and dragged him outside." (RT 3019.) The prosecutor also mentioned Petitioner destroying items at his mother's home, putting his hands through walls and grabbing a phone from his sister. (Id.) With respect to the pushing and spitting incident, the trial court inquired "Well, think [sic] that's a classic battery, isn't it, technically?" to which defense counsel conceded that "It's technically a battery. I just - - there's something which strikes me as almost surreal about using a technical battery to try to kill somebody," and the trial court stated: "That may be a great argument to the jury." (RT 3022.) The trial court found the second incident admissible under section 190.3(b), and to defense counsel's point that it was unclear whether Petitioner actually was going to assault his mother, the trial court reasoned that "Well, again, I think that goes to the weight. That goes - - that's an argument to be made to the jury, I think. I mean, I take your point and the jury may agree that there was no - - I mean assault is a general intent crime, but that he didn't even really intend to actually strike her, actually commit a battery on her. But that again I think is - - I think there's some substantial evidence from which the jurors could find that he did unless otherwise restrained, and so I think there are two incidents there that I think technically qualify." (RT 3023.) After further argument about whether the second incident, or the

other incidents, qualified for admission under section 190.3(b), the trial court limited its ruling to only the first two incidents, stating: "I think there's some substantial evidence of those two incidents sufficient to allow the people to present her testimony on those two incidents, but I think we're going to - - I will be cautious, and I don't like to make my own objection, but I assume there are going to be some defense objections, and I'll be cautious and sensitive to limit her testimony to just those two incidents." (RT 3029.)

The California Supreme Court conducted a similar analysis, and also concluded that the evidence met standards for admissibility under section 190.3(b), rejecting Petitioner's argument that "common" incidents, such as disputes between a teenager and his mother, were somehow unfair to admit into evidence. The state court noted that "the admissibility of section 190.3, factor (b), evidence does not depend on how common or uncommon the criminal conduct is, or whether *viewed in isolation* it would be sufficient to justify a death sentence. The evidence met all statutory requirements for admission under section 190.3, factor (b)." Jurado, 38 Cal. 4th at 142 (emphasis in original). The state court's reasoning that the incidents in question met the standards necessary for admission is sound, as in both incidents there was "criminal activity" by Petitioner that involved "force or violence" or the "implied threat to use force or violence." Cal. Penal Code § 190.3(b).

Petitioner argues generally that "Mrs. Jurado's testimony about her two incidents with her son was not the kind of evidence that justified sentencing Petitioner to execution, and certainly was not the type of evidence that allowed the jurors to differentiate between those found guilty of murder who deserve death, and those who do not." (SAP at 634.) Petitioner notes that during the sentencing proceedings, the trial court characterized evidence of the two incidents as having "trivialized the process a little bit" and "was stretching it a bit" and, while acknowledging that the jury may have decided differently, stated that he did not consider them persuasive in determining Petitioner's sentence. (RT 3733.) Yet, as the California Supreme Court correctly and reasonably noted, evidence introduced in the penalty phase is not to be viewed in isolation, as the jury was instructed to weigh and consider everything together in determining penalty. (See e.g. CT 1437-38 -

246

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. . . In weighing the various circumstances you determine under the evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.")  Petitioner's assertion that these incidents, if considered on their own, do not justify a death sentence, is misplaced and unpersuasive.  The issue is whether the trial court erred in admitting the incidents into evidence, and whether that admission, if in error, violated his federal constitutional rights.  See e.g. Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) ("A habeas petitioner who challenges a state court's admission into evidence of prior acts of misconduct is not entitled to habeas relief unless the state court's admission of this evidence violated the petitioner's federal due process right to a fair trial under the Constitution."); see also McGuire, 502 U.S. at 68-73.  This Court is in accord with the reasoning of the California Supreme Court, which rejected Petitioner's argument, stating: "Nor are we persuaded by defendant's constitutional arguments, which are based on the unrealistic perspective of viewing this evidence in isolation from all the other evidence offered in aggravation and mitigation at the penalty phase, including the circumstances of the capital offense. In the context of the entire penalty determination process, we find nothing improper or unfair about allowing the jury to consider each occasion during defendant's life when he violated a penal statute by conduct that involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Jurado, 38 Cal. 4th at 142-43.

    In addition to Petitioner's failure to demonstrate that this evidence was admitted in error, he fails to show that the admission of the evidence rendered his penalty proceedings "fundamentally unfair."  See Jammal, 926 F.2d at 919 ("[Petitioner] claims that he was denied his right to the fundamentally fair trial guaranteed by the due process clause.  We therefore consider whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair.")  As trial court noted, it did not

consider the evidence persuasive in determining the appropriate penalty. While the trial court acknowledged it was unknown what, if any, importance the jury placed on this evidence, it is clear that there was significant and weighty evidence in aggravation independent from these two incidents. As discussed in detail previously, the murder itself was particularly brutal, as the pregnant victim was less than five feet tall, weighed just over 100 pounds, and was subjected to a surprise attack by several taller and larger individuals. She died from strangulation and a myriad of blunt force injuries to her head and body. The evidence showed she was murdered to prevent her from revealing a plot to murder another individual. Wholly aside and apart from Petitioner's incidents with his mother, there was substantial evidence of other prior criminal activity, including his involvement in a jailhouse assault and being armed with a weapon during a jail altercation. Even were Petitioner able to establish a constitutional violation, which he has not, he fails to show any alleged error in admitting the evidence of these two incidents between him and his mother had an impact on the outcome of the penalty proceedings, much less a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

Accordingly, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 37.

### 8. Claim 38

Petitioner asserts that the lying-in-wait special circumstance, set forth in California Penal Code § 190.2(a)(15), "violates the Eighth Amendment by failing to narrow the class of persons eligible for the death penalty." (SAP at 637.) Petitioner also contends that the special circumstance fails to properly differentiate between capital and non-capital cases. (Id., citing Godfrey v. Georgia, 446 U.S. 420, 427 (1980) ("A capital sentencing scheme must, in short, provide a '"meaningful basis for distinguishing the few cases in which (the penalty) is imposed from the many cases in which it is not."'"), quoting Gregg, 428 U.S. at 188, and Furman v. Georgia, 408 U.S. 238, 313 (1972) (White, J., concurring).)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant contends that the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)), as interpreted by this court, violates the Eighth Amendment to the federal Constitution by failing to appropriately narrow the class of persons eligible for the death penalty. "We have repeatedly rejected this contention, and defendant fails to convince us the matter warrants our reconsideration." (*People v. Nakahara*, *supra*, 30 Cal.4th at p. 721, 134 Cal.Rptr.2d 223, 68 P.3d 1190; see also *People v. Vieira*, *supra*, 35 Cal.4th at p. 303, 25 Cal.Rptr.3d 337, 106 P.3d 990; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148-1149, 124 Cal.Rptr.2d 373, 52 P.3d 572.)

Jurado, 38 Cal. 4th at 127.

Petitioner asserts that "[t]he lying-in-wait special circumstance applies to almost all premeditated killings," and thus "fails to narrow the class of death-eligible defendants as required by the Eighth Amendment" and "creates a substantial and unconstitutional risk of arbitrariness in the imposition of the death penalty." (Pet. Br. at 129, citing People v. Morales, 48 Cal.3d, 527, 575 (1989) (Mosk, J., dissenting), Maynard v. Cartwright, 486 U.S. 356 (1988), Gregg, 428 U.S. at 205-06.) Petitioner notes that "[t]he overly broad structure of this special circumstance has come under increasing attack," and relies on concurring and dissenting opinions from California Supreme Court and Ninth Circuit decisions. (See id. at 131-32, citing People v. Ceja, 4 Cal. 4th 1134, 1146 (1993) (Kennard, J., concurring); People v. Jones, 17 Cal. 4th 279, 321 (1998) (Mosk, J., dissenting); Morales v. Woodford, 388 F.3d 1159, 1180-81 (9th Cir. 2003) (McKeown, J., concurring and dissenting in part).)

Petitioner fails to provide any clearly established federal law supporting his contention that California's lying in wait special circumstance violates constitutional guarantees. The Supreme Court cases Petitioner relies upon simply affirm general principles that a state's capital sentencing system must provide guidance to a sentencer and a "way to distinguish this case, in which the death penalty is imposed, from the many cases in which it is not." Maynard, 486 U.S. at 363, quoting Godfrey, 446 U.S. at 433; see also

<u>Gregg</u>, 428 U.S. at 206 (upholding capital sentencing system in which "jury's discretion is channeled" through guidelines, sentencing factors, and appellate review, stating that "[l]eft unguided, juries imposed the death sentence in a way that could only be called freakish.") Meanwhile, in <u>Morales</u>, the Ninth Circuit explicitly rejected the argument that California's lying in wait special circumstance fails to narrow those eligible for the death penalty:

> The lying-in-wait circumstance is not overly broad such that it "appl[ies] to every defendant convicted of murder." Such over breadth would render it inadequate under <u>Tuilaepa</u>. Evidently, California regards ambush as an especially immoral way of murdering someone. The lying-in-wait special circumstance codifies that moral sentiment. Our dissenting colleague is quite right that the California Supreme Court has interpreted it liberally, to embrace not just traditional ambush, but murder accomplished by surprising the victim. Where we differ is that the dissent thinks almost all first-degree murders satisfy the California lying-in-wait requirements as so interpreted, and we do not. The three elements of lying in wait, in California law, are "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." The combination of these elements embraces some first-degree murders, but not all.

<u>Morales</u>, 388 F.3d at 1175 (alteration in original) (footnote omitted.)

Given the lack of Supreme Court authority compelling the result Petitioner advocates and Ninth Circuit authority rejecting this very argument, Petitioner fails to demonstrate that the California Supreme Court's denial of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. <u>See</u> <u>Van Patten</u>, 552 U.S. at 126 ("Because our cases give no clear answer to the question presented, let alone one in [Petitioner's] favor, 'it cannot be said that the state court unreasonabl(y) appli(ed) clearly established law.'"), quoting <u>Musladin</u>, 549 U.S. at 77; <u>Morales</u>, 388 F.3d at 1175. Petitioner does not merit habeas relief or an evidentiary hearing on Claim 38. <u>See</u> <u>Sully</u>, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief."); <u>see</u> <u>also</u> <u>Totten</u>, 137 F.3d at 1176.

///

### 9. **Claims 39 and 40**

In Claim 39, Petitioner argues that while the jury was instructed that the reasonable doubt standard applied to their evaluation of Petitioner's prior convictions and prior criminal activity, "[t]he jury was not, however, instructed to apply the reasonable doubt standard to the other aggravating circumstances - the 'circumstances of the crime' and age," and "[n]or were the jurors instructed that the reasonable doubt standard governed their ultimate determination of the appropriate penalty in this case, and that they could impose a sentence of death only if they were persuaded beyond a reasonable doubt that the aggravating circumstances were so substantial in comparison with the mitigating circumstances that the death penalty was justified." (SAP at 644.) In Claim 40, Petitioner contends that the trial court erred in failing to instruct the jury that they were required to unanimously agree on the aggravating circumstances, and instead instructed the jurors that they were not required to unanimously agree on the aggravating circumstances, violating Petitioner's rights to due process, equal protection[33] and a reliable determination of penalty under the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 649-50, citing RT 3560, 3562.)

On direct appeal, the California Supreme Court rejected Claim 39 on the merits, reasoning as follows:

> Defendant claims that his death sentence must be reversed because the trial court did not instruct the jurors to return a death verdict only if they were persuaded beyond a reasonable doubt that the aggravating circumstances were so substantial in comparison with the mitigating circumstances that the death penalty was justified. As defendant acknowledges, this court has held that "neither the federal nor the state Constitution requires the jury to agree unanimously as to aggravating factors, or to find beyond a reasonable doubt that aggravating factors exist, that they outweigh mitigating factors, or that

---

[33] In Claim 44, Petitioner asserts that the California sentencing scheme as a whole violates equal protection by denying capital prisoners procedural safeguards that are provided to non-capital prisoners. (See SAP at 662-66.) The Court will address Petitioner's equal protection arguments raised in its adjudication of Claim 44.

death is the appropriate sentence." (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1255, 69 Cal.Rptr.2d 784, 947 P.2d 1321.) Defendant urges us to reconsider this holding in light of the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, *Ring v. Arizona*, *supra*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, and *Blakely v. Washington* (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. We have already done so, and we have concluded that these decisions do not require us to alter our previous conclusion on this point. (*People v. Cornwell* (2005) 37 Cal.4th 50, 103-104, 33 Cal.Rptr.3d 1, 117 P.3d 622; *People v. Morrison* (2004) 34 Cal.4th 698, 730-731, 21 Cal.Rptr.3d 682, 101 P.3d 568.)

<u>Jurado</u>, 38 Cal. 4th at 143. The California Supreme Court also rejected Claim 40 on the merits, reasoning as follows:

Defendant contends that the trial court erred in not instructing the jury that unanimity was required before a particular circumstance could be considered aggravating. As defendant acknowledges, this court has consistently rejected this argument (e.g., *People v. Gray*, *supra*, 37 Cal.4th at p. 236, 33 Cal.Rptr.3d 451, 118 P.3d 496; *People v. Morrison*, *supra*, 34 Cal.4th at pp. 730-731, 21 Cal.Rptr.3d 682, 101 P.3d 568), and he fails to persuade us to reconsider these holdings.

<u>Jurado</u>, 38 Cal. 4th at 143. Petitioner also later raised these claims in the second state habeas petition and the state court imposed procedural bars (<u>see</u> Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address both claims on the merits.

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Id.</u> at 490. "<u>Ring</u> altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment," by holding that "'a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty.'" <u>Schriro v. Summerlin</u>, 542 U.S. 348, 353 (2004), quoting <u>Ring</u>, 536 U.S. at 609 (alteration in original).

08cv1400

With respect to Claim 39, Petitioner asserts that California's capital statute is similar to the Arizona statute at issue in <u>Ring</u>, as it only allows for imposition of the death penalty if the jury makes additional findings in the penalty phase, and thus "[u]nder the principles expressed in *Ring* and *Apprendi*, the additional factual findings required for a death sentence in California must be proved beyond a reasonable doubt." (SAP at 649.) Petitioner also cites <u>Apprendi</u> and <u>Ring</u> in support of Claim 40, arguing that "[b]ased on the rationales in *Apprendi* and *Ring*, jury unanimity as to each aggravating circumstance is required as well." (<u>Id.</u> at 650.)

"A defendant in California is eligible for the death penalty when the jury finds him guilty of first-degree murder and finds one of the § 190.2 special circumstances true." <u>Tuilaepa</u>, 512 U.S. at 975, citing <u>California v. Ramos</u>, 463 U.S. 992, 1008 (1983); <u>see</u> <u>also</u> Cal. Penal Code § 190.2(a) ("The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: . . . (15) The defendant intentionally killed the victim by means of lying in wait.") At the end of the guilt phase proceedings in this case, Petitioner's jury found him guilty of first-degree murder and found the charged lying in wait special circumstance to be true beyond a reasonable doubt. (<u>See</u> <u>e.g.</u> CT 1199 (jury instruction on reasonable doubt and burden of proof); CT 1220-29 (jury instructions on murder); CT 1241-45 (jury instructions on special circumstance); CT 1256-57 (jury verdict on murder and special circumstance).)

The Court remains unpersuaded that the California capital sentencing system is contrary to <u>Apprendi</u>, as after the guilt phase verdict in a capital case such as Petitioner's, a death sentence is within the "prescribed statutory maximum." <u>Apprendi</u>, 530 U.S. at 490. Nor does Petitioner demonstrate that <u>Ring</u> assists his argument, as that case concerned an Arizona system in which a judge, not a jury, rendered the findings necessary to sentence an individual to death. <u>See</u> <u>Ring</u>, 536 U.S. at 609 ("We overrule <u>Walton</u> [<u>v. Arizona</u>, 497 U.S. 639 (1990)] to the extent that it allows a sentencing judge, sitting without a jury, to

find an aggravating circumstance necessary for imposition of the death penalty. Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury."), quoting Apprendi, 503 U.S. at 494, n. 19 (internal citations omitted). Again, in California, the jury makes both the eligibility determination at the guilt phase as well as renders the penalty decision.

The Supreme Court has upheld the constitutionality of California's capital sentencing statute despite the absence of unanimity and reasonable doubt standards advocated by Petitioner. See Tuilaepa, 512 U.S. at 979 ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment."), quoting Ramos, 463 U.S. at 1008; see also Tuilaepa, 512 U.S. at 979 ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.") As such, Petitioner fails to show that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Claims 39 or 40.

### 10.  Claim 41

Petitioner asserts that "[t]he trial court instructed the jury on seven statutory factors to consider in deciding whether Petitioner should live or die, and directed the jurors to determine which of these circumstances they believed to be aggravating," and argues that "there is a 'reasonable likelihood' (*Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Boyde v. California*, 494 U.S. 370, 380) that the jurors understood the court's charge as allowing them to attach aggravating labels to statutory factors that militated in favor of a lesser sentence." (SAP at 653.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

///

Contrary to defendant's contention, "[t]he trial court was not constitutionally required to inform the jury that certain sentencing factors were relevant only in mitigation, and the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." (*People v. Morrison*, *supra*, 34 Cal.4th at p. 730, 21 Cal.Rptr.3d 682, 101 P.3d 568; accord, *People v. Gray*, *supra*, 37 Cal.4th at p. 237, 33 Cal.Rptr.3d 451, 118 P.3d 496.)

Defendant argues, however, that certain instructions given in this case created an unacceptable risk that the jurors would treat as aggravating a circumstance that could only be mitigating. First, the trial court modified the standard jury instruction on penalty factors, CALJIC No. 8.85. After listing the seven factors that the parties had agreed were relevant to penalty determination in this case, the instruction stated: "The circumstances in the above list which you determine to be aggravating are the only ones which the law permits you to consider." The instruction also stated, however, that "[t]he absence of a statutory mitigating circumstances does not constitute an aggravating circumstance."

Second, during penalty deliberations, the jury sent the trial court a note with this question: "Can we consider the conspiracy to kill Doug Mynatt a 'circumstance of the crime,' as this term is used in CALJIC [No.] 8.85. (a)?" The trial court replied: "Yes, it can be considered as a 'circumstance of the crime' under CALJIC [No.] 8.85(a), as either a circumstance in aggravation or mitigation." Defendant suggests that this reply would cause the jury to conclude that it could consider any of the statutory factors as either aggravating or mitigating. We disagree. On the same day, the jurors also sent the trial court a note asking whether section 190.3, factor (k), as described in CALJIC No. 8.85 ("Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial") could be either mitigating or aggravating. The trial court replied that this factor was "mitigating only." Thus, no reasonable juror could have been misled into believing that any factor could be either aggravating or mitigating.

Jurado, 38 Cal. 4th at 143-44 (alterations in original). Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (see

08cv1400

Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner challenges the constitutionality of the trial court's penalty phase instructions on aggravating and mitigating circumstances, first alleging that the trial court erred in failing to define which factors were aggravating and which could only be mitigating and second, alleging that given the absence of specific direction, it is likely that the jurors construed one or more of the factors that could only be mitigating as aggravating instead. This argument fails to find support in clearly established law. Indeed, the United States Supreme Court rejected a similar challenge to California's capital sentencing statute as a whole:

> Petitioners also suggest that the § 190.3 sentencing factors are flawed because they do not instruct the sentencer how to weigh any of the facts it finds in deciding upon the ultimate sentence. In this regard, petitioners claim that a single list of factors is unconstitutional because it does not guide the jury in evaluating and weighing the evidence and allows the prosecution (as well as the defense) to make wide-ranging arguments about whether the defendant deserves the death penalty. This argument, too, is foreclosed by our cases. A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.

Tuilaepa, 512 U.S. at 978-79; see also Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995) ("The death penalty statute's failure to label aggravating and mitigating factors is constitutional."), citing Harris v. Pulley, 692 F.2d 1189, 1994 (9th Cir. 1982), reversed on other grounds by Pulley v. Harris, 465 U.S. 37, 53-54 (1984).

Petitioner also fails to demonstrate any likelihood that the jurors in his case misunderstood or misapplied the penalty phase instructions. Petitioner's jury was instructed with seven of the eleven sentencing factors provided for in California Penal Code section 190.3. Factors (a), (b), (c), and (i) could be considered in aggravation, while factors (d), (h), and (k) could only be considered in mitigation. Citing academic studies and reports suggesting that juries have difficulty in accurately comprehending capital sentencing instructions and pointing to several questions Petitioner's jury submitted to the trial court,

Petitioner contends that his penalty phase jury was likely confused and may have erroneously considered sentencing factors that could only be considered in mitigation as aggravating. (SAP at 654-56.) Petitioner also asserts that the trial court's modification of CALJIC 8.85 allowed the jurors to consider mitigating factors as aggravating, as it directed the jurors that: "The circumstances in the above list which you determine to be aggravating circumstances are the only one which the law permits you to consider. You are not allowed to consider any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case." (CT 1431.)

A review of the record does not support Petitioner's claim that the jury may have construed mitigating factors as aggravating. During deliberations, Petitioner's jury sent several questions to the judge inquiring about the proper application of the sentencing factors. The jury submitted a question to the trial court asking: "Can we consider the conspiracy to kill Doug Mynatt a 'circumstance of the crime,' as this term is used in CALJIC 8.85(a)?," to which the trial court responded, "Yes, It can be considered as a 'circumstance of the crime' under Caljic 8.85(a), as either a circumstance in aggravation or Mitigation." (CT 1415.) Citing this question and response, Petitioner contends that "[t]here is no reason why the jurors would not have understood the court's answer that this could be considered as a circumstance of the crime and could be 'either a circumstance in aggravation or (m)itigation' as allowing them to likewise attach aggravating labels to those statutory factors that are mitigating only, especially when those mitigating factors were defined as 'whether or not' they existed." (SAP at 656.) But this assertion is not borne out by the record because the jurors also asked the trial court: "May we use Factor #g (other)[34]

---

[34] Factor (k), which allows a jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. . . ." was labeled factor (g) in the instructions given in this case because

257

as either a mitigating or aggravating circumstance? (CALJIC 8.85(g).[)]," to which the trial court answered, "Factor g is mitigating only." (CT 1414.)

While Petitioner asserts that the questions themselves reflect the jury's confusion and that the trial court's responses left open the possibility that the jury might have considered mitigating factors as aggravating, the Court finds no record support for this argument, particularly in light of the fact that the jurors were explicitly directed that section 190.3(k) was "mitigating only" and were also instructed that "[t]he absence of a statutory mitigating circumstance does not constitute an aggravating circumstance." (CT 1431.) A jury is presumed to understand and follow the trial court's instructions. See Weeks, 528 U.S. at 234; Richardson, 481 U.S. at 211. On this record, the state court was not unreasonable in concluding that "no reasonable juror could have been misled into believing that any factor could be either aggravating or mitigating." Jurado, 38 Cal. 4th at 144.

It is clear from the trial court's specific responses to the jury questions that while certain factors could be considered in aggravation or mitigation, other sentencing factors could only be considered in mitigation. Based on a review of the record, including the juror questions, trial court's responses, and the instructions to the jurors as a whole, the Court remains unpersuaded that a likelihood exists that the jurors considered mitigating factors in aggravation, much less that these instructions "so infected" the penalty phase proceedings that the resulting death sentence "violates due process." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.

Accordingly, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts. Habeas relief is unavailable on Claim 41.

///

---

the trial court renumbered the section 190.3 sentencing factors after deleting several inapplicable factors from the instructions. (RT 3677; CT 1430-31.)

## 11.   <u>Claim 42</u>

Petitioner asserts that "California's death penalty scheme fails to require that the jury make a written statement of findings and reasons for the death verdict," which violates his rights to due process, equal protection,[35] and meaningful appellate review of his sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.  (SAP at 658.)

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant claims that California's death penalty law is unconstitutional because it does not require the jury to make a written statement of findings and reasons for its death verdict. This court has consistently rejected this claim (e.g., *People v. Gray*, *supra*, 37 Cal.4th at p. 236, 33 Cal.Rptr.3d 451, 118 P.3d 496; *People v. Cornwell*, *supra*, 37 Cal.4th at p. 105, 33 Cal.Rptr.3d 1, 117 P.3d 622; *People v. Morrison*, *supra*, 34 Cal.4th at pp. 730-731, 21 Cal.Rptr.3d 682, 101 P.3d 568), and defendant does not persuade us to reconsider these decisions.

<u>Jurado</u>, 38 Cal. 4th at 144.  Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (<u>see</u> Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner fails to cite any clearly established law supporting his contention that written findings are constitutionally required in a capital penalty decision.  The Ninth Circuit rejected a similar challenge to California's 1977 death penalty statute, predecessor to the 1978 version under which Petitioner was sentenced, reasoning that the capital statute "need not require written jury findings in order to be constitutional." <u>Williams</u>, 52 F.3d at 1484-85, citing <u>Harris</u>, 692 F.2d at 1995-96, <u>reversed on other grounds by</u> <u>Harris</u>, 465 U.S. at 53-54.

---

[35] In Claim 44, Petitioner asserts that the California sentencing scheme as a whole violates equal protection by denying capital prisoners procedural safeguards that are provided to non-capital prisoners, including failing to require a statement of reasons on the record for a capital sentencing decision.  (<u>See</u> SAP at 662-66.)  As previously noted, the Court will address Petitioner's equal protection arguments in its adjudication of Claim 44.

Given the lack of Supreme Court authority on this matter, Petitioner cannot show that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law. See Van Patten, 552 U.S. at 126 ("Because our cases give no clear answer to the question presented, let alone one in [Petitioner's] favor, 'it cannot be said that the state court unreasonabl(y) appli(ed) clearly established law.'"), quoting Musladin, 549 U.S. at 77. Nor has Petitioner shown that the decision was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 42.

### 12. Claim 44

Petitioner asserts that "California's death penalty scheme provides significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with non-capital crimes. This differential treatment violates the constitutional guarantee of equal protection of the laws." (SAP at 663.) Petitioner also alleges that appellate counsel was ineffective in failing to raise this issue on direct appeal. (Id. at 665.)

Petitioner raised this claim as Claim XXXV in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.)

Specifically, Petitioner points out that: (1) "[a]n enhancing allegation in a California non-capital case is a finding that must, by law, be unanimous," and that "[n]o such unanimity is required before a juror can find that a particular fact is so aggravating and militates in favor of death;" (2) a judge in a non-capital case must state on the record reasons for selecting a lower or upper term and there is no such requirement in a capital case; (3) "[i]n a non-capital case, furthermore: 'Circumstances in aggravation and mitigation shall be established by a preponderance of the evidence.' Cal. Rules of Court, rule 4.42(b). There is no standard of proof in the penalty phase of a capital case;" and (4) "[i]n non-capital cases, defendants are entitled to disparate-sentence review," while "[t]hose sentenced to death are not." (SAP at 664-65.)

///

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985), quoting Plyler v. Doe, 457 U.S. 202, 216 (1982). Petitioner fails to cite clearly established federal law supporting his position. Meanwhile, the Ninth Circuit has previously rejected the proposition that a capital and non-capital defendant are "similarly situated" and articulated that "[t]he relevant comparison for equal protection purposes is between two defendants, both of whom are sentenced to death." Massie v. Hennessey, 875 F.2d 1386, 1389 (9th Cir. 1989). In light of this authority, the Court remains unpersuaded that the cited differences between capital and non-capital cases violate equal protection guarantees. Moreover, because Petitioner fails to demonstrate that the claim is meritorious, appellate counsel cannot be faulted for failing to raise this claim on direct appeal. See Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.")

In sum, habeas relief is not warranted on Claim 44 because Petitioner fails to demonstrate that the state court decision is either contrary to, or involves an unreasonable application of, clearly established federal law, or that the decision was based on an unreasonable determination of the facts.

### 13.  Claim 46

Petitioner contends that his "confinement is unlawful in that his convictions and sentence were illegally and unconstitutionally obtained in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it was based on inaccurate, unreliable evidence, ambiguous instructions, misleading argument and is disproportionate to Petitioner's culpability." (SAP at 673.)

Petitioner raised this claim as Claim XXXIX in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.) Petitioner also later raised this claim in the second state

habeas petition and the state court imposed procedural bars (see Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner asserts that: "The death sentence imposed on Petitioner is unconstitutional because it was not based on an individualized determination of his death-worthiness and was based on inaccurate, incomplete, and unreliable evidence. The jury's determination that Petitioner was deserving of the death penalty was based on incomplete, inaccurate and unreliable evidence as the result of the failure of defense counsel to investigate, develop and present critical mitigating evidence or challenge the aggravating evidence, ambiguous instructions, and prosecutorial misconduct." (SAP at 674.) Specifically, Petitioner asserts that the death sentence imposed in his case "was and is disproportionate to his moral culpability," pointing out that he was 20 years old at the time of the crime and youth is an "extremely weighty mitigator," that a defendant's immaturity, particularly his "mental and emotional development," is also a factor to consider in sentencing, that "reasonably competent counsel would have presented evidence that Petitioner's impairments and disabilities, including the severe and chronic substance abuse he had suffered, severely affected Petitioner's development" and "would have presented lay witness testimony and other evidence of Petitioner's immaturity." (Id. at 675-76.)

Upon reviewing the contentions that comprise this claim, it is clear that Petitioner has simply restated alleged constitutional violations which were raised in other claims and either rejected in the Group One Order or elsewhere in this Order. For instance, Petitioner argues that trial counsel failed to investigate and present sufficient evidence in mitigation concerning his age, immaturity, impairments and disabilities, and substance abuse. In Claim 1.Y, which was addressed and rejected in the Group One Order, Petitioner alleged in part that trial counsel "conceded that Petitioner's age of 20 years might not be a mitigating factor in favor of a life sentence." (See ECF. No. 171 at 135-38.) In Claim 1.Z, also addressed and rejected in the Group One Order, Petitioner alleged that "trial counsel failed to investigate, develop, and present to the jury, available evidence of Petitioner's extreme immaturity, which placed his psychological and emotional age at a level well

below his chronological age and below the chronological age of a 16-year-old, and counsel unreasonably and prejudicially failed to argue to the jury that Petitioner's psychological and emotional age compelled a verdict of life in prison." (See id. at 138-44.) In Claims 1.M, 1.N and 1.O, also addressed and rejected in the Group One Order, Petitioner alleged that trial counsel was ineffective in "failing to investigate and present evidence of exposure to toxins, chemicals, and pesticides and the resulting behavioral and physical consequences that arose from such exposure," that trial counsel failed to "investigate, discover and present adequately available and substantially mitigating evidence," and that counsel "failed to conduct a timely or adequate investigation of the potential penalty phase evidence and issues, did not develop or present a coherent penalty phase strategy, and were unable and failed to make informed and rational decisions regarding potentially meritorious defenses and tactics." (See id. at 86-107.) In Claims 1.C, 1.D., 1.E, 1.F, 1.G, and 1.H, also addressed and rejected in the Group One Order, Petitioner alleged that trial counsel was ineffective for failing to present evidence at trial of Petitioner's substance abuse and intoxication on the day of and at the time of the crimes, including alcohol, LSD, methamphetamine and marijuana, and his history of substance abuse, particularly his long-standing use of alcohol, marijuana, cocaine, LSD and methamphetamine. (See id. at 54-68.) Finally, to the extent this claim can be construed as alleging cumulative error, Petitioner raised several separate cumulative error claims in the SAP, which are adjudicated elsewhere in this Order. (See Claims 19, 47, 48, infra.)

Because the Court has rejected each of the contentions comprising this claim, either in the Group One Order or elsewhere in the instant Order, Petitioner fails to demonstrate that the California Supreme Court's rejection of Claim 46 was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Habeas relief is not warranted.

///

///

///

## F.     Systemic Claims; Atkins

### 1.     Claim 20

Petitioner asserts that his conviction and death sentence violate the federal Constitution "because California's method of execution constitutes cruel and unusual punishment and was adopted by means which violate fundamental principles of procedural and substantive due process." (SAP at 470.)

Petitioner raised this claim as Claim XXVII in the first state habeas petition and the California Supreme Court denied that claim "as premature, without prejudice to renewal after an execution date is set." (Lodgment No. 79.)  He again raised the claim as Claim 20 in the second state habeas petition, and the California Supreme Court again denied the claim, stating that "Claim 20 is denied as premature, without prejudice to renewal after an execution date is set. (*People v. Boyer* (2006) 38 Cal.4th 412, 485.)"  (Lodgment No. 91.)

Both parties previously addressed this claim in briefs filed in connection with the Group One claims.  In the Response to Opening Brief Related to Procedural Defenses, Respondent asserts that "Claim 20 in the current Petition should be dismissed because it is unripe at this time." (ECF No. 146 at 17-18 n.9.)  In the Reply to Response to Opening Brief Related to Procedural Defenses, Petitioner cites Respondent's argument and states, "Petitioner agrees.  Claim 20 should be dismissed without prejudice as premature." (ECF No. 162 at 27.)

The Court agrees with the parties that Claim 20 is not ripe for review.  See Payton v. Cullen, 658 F.3d 890, 893 (9th Cir. 2011) ("No new protocol was in place when the district court ruled" on a lethal injection challenge and "the claim was unripe, and it should have been dismissed.")  Other judges in this district have denied habeas challenges to California's lethal injection procedures without prejudice as premature.  See e.g. Roybal v. Davis, No. 99cv2152 JM (KSC), 148 F.Supp.3d 958, 1106-07 (S.D. Cal. December 2, 2015); Michaels v. Chappell, No. 04cv0122 JAH (JLB), 2014 WL 7047544, at *118-19 (S.D. Cal. December 18, 2014).   The Court is in agreement with those decisions.  Accordingly, Claim 20 is denied without prejudice as premature.

## 2. **Claim 21**

Petitioner contends that "[t]he California statutory scheme under which Petitioner was convicted and sentenced to death, as set forth in California Penal Code §§ 189 et. seq., violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, in that the California statute fails to adequately narrow the class of persons eligible for the death penalty." (SAP at 477.)

Petitioner raised this claim as Claim XXIX in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.)

"Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S. at 189 (plurality opinion). "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Lowenfield v. Phelps, 484 U.S. 231, 244 (1988), quoting Zant, 462 U.S. at 877.

Petitioner notes that "[i]n California during the 5-year period 1988-92 (a period including the year of the capital offense charged against Petitioner), approximately 9.6% of convicted first degree murderers were sentenced to death," and while the special circumstances set forth in Cal. Penal Code section 190.2 narrows the class of murderers eligible for the death penalty, "[t]here are however, so many special circumstances, so broadly construed, that the special circumstances accomplish very little narrowing." (SAP at 480-81.) Citing a declaration and study conducted by Professor Steven F. Shatz, Petitioner asserts that "[u]nder the death penalty scheme in effect in 1991, the year of the capital offense charged against Petitioner, 87% of first degree murderers were statutorily death eligible," and argues that such a scheme does not genuinely narrow. (Id. at 481.) Petitioner also alleges that "since only 11.0% of those statutorily death-eligible are

sentenced to death, California's death penalty scheme permits an even greater risk of arbitrariness than the schemes considered in Furman [sic], and, like those schemes, is unconstitutional." (Id.)

Petitioner fails to cite any Supreme Court authority supporting his contention that the California capital statute violates the federal Constitution in this manner. Moreover, the Ninth Circuit has repeatedly rejected this contention, as follows:

> With regard to this claim, we reject Karis' argument that the scheme does not adequately narrow the class of persons eligible for the death penalty. The California statute satisfies the narrowing requirement set forth in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. See id. at 972, 103 S.Ct. 2733. The selection requirement is also satisfied by an individualized determination on the basis of the character of the individual and the circumstances of the crime. *See id.* California has identified a subclass of defendants deserving of death and by doing so, it has "narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Arave v. Creech*, 507 U.S. 463, 476, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

Karis v. Calderon, 283 F.3d 1117, 1141 n. 11 (9th Cir. 2002); see also Mayfield v. Woodford, 270 F.3d 915, 924 (9th Cir. 2001) (en banc) ("A reasonable jurist could not debate, therefore, that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional.")

As such, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law. Nor has Petitioner shown that the decision was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 21.

### 3. **Claim 22**

Petitioner alleges that his "conviction, judgment and sentence of death violate the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because defects in the state's statutory scheme introduces arbitrary and capricious elements into the decision-making process." (SAP at 482.) Specifically, Petitioner contends that "[u]nder

08cv1400

California law, by virtue of the failure of the state's death penalty scheme to narrow the class of death eligible murders (see Claim 21, re: Professor Shatz, Ex. 22, *supra*), the prosecutor in a special circumstances case has the unbridled discretion to determine whether a penalty trial will be held to determine whether the death penalty should be imposed," and that the exercise of this power deprived Petitioner of his constitutional rights. (Id.)

Petitioner raised this claim as Claim XXX in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.)

In support of his contention, Petitioner references several Supreme Court decisions, as follows: "*Eddings v. Oklahoma*, 455 U.S. 104, 112 (1981) ("Capital punishment (must) be imposed ... with reasonable consistency, or not at all."); *Zant v. Stephens*, 462 U.S. 862, 885 (1983) (seeking the death penalty on the basis of 'factors that are constitutionally impermissible ... such as ... race" violates the Fifth, Eighth, and Fourteenth Amendments); *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) ('arbitrary and wanton' jury discretion condemned); *Furman v. Georgia*, 408 U.S. 238 (1972) (principled decision-making in charging, prosecuting, and deciding whether to submit a case to a penalty phase jury mandated by the Fifth, Eighth, and Fourteenth Amendments.[)]" (SAP at 483.) He also argues that "[t]he statistical information developed by Professor Shatz, and described in Claim 21, *supra*, demonstrates that the charging and trial practices of the San Diego County District Attorney's office have resulted in the arbitrary imposition of many death sentences, including Petitioner's." (SAP at 483.)

None of the cited Supreme Court cases holds that prosecutorial discretion in capital charging decisions violates constitutional guarantees. The Supreme Court has instead rejected this argument in several cases. See e.g. Gregg, 428 U.S. at 199-200; Jurek v. Texas, 428 U.S. 262, 274 (1976); Proffitt v. Florida, 428 U.S. 242, 254 (1976). The California Supreme Court has, in turn, applied Gregg, Jurek, and Proffitt on numerous occasions to reject this same argument. See e.g. People v. Williams, 16 Cal. 4th 153, 278

08cv1400

(1997), quoting <u>People v. Keenan</u>, 46 Cal. 3d 478, 505 (1988) ("[P]rosecutorial discretion to select those eligible cases in which the death penalty would actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment."), citing <u>Jurek</u>, 428 U.S. at 274, <u>Proffitt</u>, 428 U.S. at 254, <u>Gregg</u>, 428 U.S. at 199-200.

In light of authority rejecting this contention, it is evident that the California Supreme Court's rejection of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Nor has Petitioner demonstrated that the decision was based on an unreasonable determination of the facts. Habeas relief is unavailable on Claim 22.

### 4. Claim 23

Petitioner argues that the absence of proportionality review in the 1978 death penalty statute, under which he was sentenced, is unconstitutional, and specifically asserts that "[g]iven the tremendous reach of the special circumstances that make one eligible for death as set out in section 190.2- a significantly higher percentage of murderers than those eligible for death under the 1977 statute considered in *Pulley v. Harris*- and the absence of any other procedural safeguards to ensure a reliable and proportionate sentence, the California Supreme Court's categorical refusal to engage in inter-case proportionality review now violates the Eighth Amendment." (SAP at 488.)

Petitioner raised this claim as Claim XXXI in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.)

Petitioner argues that "[t]wenty-nine of the thirty-eight states that have reinstated capital punishment require comparative, or 'inter-case,' appellate sentence review," and specifically points to Supreme Court decisions upholding the capital sentencing statutes in Georgia and Florida, respectively, in which the Supreme Court noted that those states had adopted proportionality review. (SAP at 487, quoting <u>Gregg</u>, 428 U.S. at 198 and <u>Proffitt</u>, 428 U.S. at 259.)

In <u>Harris</u>, however, the Supreme Court clearly rejected the contention that prior decisions of the Court, specifically referencing <u>Proffitt</u> and <u>Gregg</u>,[36] mandated proportionality review in capital sentencing, reasoning that "[p]roportionality review was considered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required." <u>Id.</u>, 465 U.S. at 50. The Supreme Court upheld California's 1977 death penalty statute, which did not provide for such review. <u>See id.</u> at 51 ("Assuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977 California statute is not of that sort.")

The Ninth Circuit has since found "no merit" to a similar claim raised with respect to the 1978 statute under which Petitioner was sentenced, reasoning that "[petitioner's] due process argument is foreclosed by the Supreme Court's holding in <u>Pulley v. Harris</u>, 465 U.S. 43-46, 104 S.Ct 871, 79 L.Ed.2d 29 (1984), that neither the Eighth Amendment nor due process requires comparative proportionality review in imposing the death penalty." <u>Allen v. Woodford</u>, 395 F.3d 979, 1018 (9th Cir. 2005).

In light of the above authority, it is evident that the California Supreme Court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. <u>Harris</u>, 465 U.S. at 50-51; <u>Allen</u>, 395 F.3d at 1018. Nor has Petitioner demonstrated that the decision was based on an unreasonable determination of the facts. Habeas relief is not available on Claim 23.

///

///

_____

[36] Indeed, the Court specifically noted: "[t]hat <u>Gregg</u> and <u>Proffitt</u> did not establish a constitutional requirement of proportionality review is made clearer by <u>Jurek v. Texas</u>, 428 U.S. 262, 96 S.Ct 2950, 49 L.Ed.2d 929 (1976), decided the same day. In <u>Jurek</u> we upheld a death sentence even though neither the statute, as in Georgia, nor state case-law, as in Florida, provided for comparative proportionality review." <u>Harris</u>, 465 U.S. at 48.

### 5. <u>Claim 24</u>

Petitioner contends that his death sentence and incarceration "were obtained in violation of the Eighth and Fourteenth Amendments to the United States Constitution because the death penalty is imposed arbitrarily and capriciously depending on the county in which the case is prosecuted." (SAP at 489.)

Petitioner raised this claim as Claim XXXII in the first state habeas petition, and the California Supreme Court denied it on the merits without a statement of reasoning. (Lodgment No. 79.) While Petitioner also later raised this claim in the second state habeas petition and the state court imposed procedural bars (<u>see</u> Lodgment No. 91), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

As the noted earlier in the discussion of Claim 22, the United States Supreme Court has rejected this argument. <u>See</u> e.g. <u>Jurek</u>, 428 U.S. at 274; <u>Proffitt</u>, 428 U.S. at 254; <u>Gregg</u>, 428 U.S. at 199-200. Petitioner acknowledges the holdings in <u>Jurek</u>, <u>Proffitt</u>, and <u>Gregg</u>, but argues that "[n]onetheless, on December 12, 2000, the Supreme Court of the United States recognized that when fundamental rights are at stake, uniformity among the counties within a state, in the application of processes that deprive a person of a fundamental right, are essential. *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 530-32 (2000). When a statewide scheme is in effect, there must be sufficient assurance 'that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.' *Id.* at p. 532. This principle must apply to the right to life as well as the right to vote." (SAP at 490.)

Petitioner's reliance is misplaced. <u>Bush v. Gore</u> was a narrow holding that specifically dealt with legal challenges arising from a presidential election, in which the Supreme Court explicitly stated that "*our consideration is limited to the present circumstances*, for the problem of equal protection in *election processes* generally presents many complexities." 531 U.S. at 109 (emphasis added). Petitioner's assertion that the case is applicable to capital charging and sentencing is undermined by the very language of the decision itself.

///

Accordingly, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Claim 24.

### 6. Claims 25 and 26

In Claim 25, Petitioner asserts that his "conviction and sentence of death violate the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the American Declaration of the Rights and Duties of Man (American Declaration), and the International Convention Against All Forms of Racial Discrimination," as well as the Fifth, Sixth, Eighth and Fourteenth Amendments and Article VI of the United States Constitution. (SAP at 491-92.) In Claim 26, Petitioner contends that his "confinement is unlawful in that his conviction and sentence were illegally and unconstitutionally obtained in violation of his rights under Article II, clause 2, and Article VI, clause 2 of the United States Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, their state constitutional analogs, and international law, covenants, treaties and norms because Petitioner's sentence of death was imposed without regard to international treaties and laws to which the United States is a signatory, and which obligate the United States to comply with human rights principles," again referencing the agreements noted above, and additionally argues that he has been "denied his right under customary international law to appeal and habeas corpus review by an independent, impartial tribunal." (Id. at 495-96.)

Petitioner raised Claim 25 as Claim XXXIII in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.) Petitioner raised both claims in second state habeas petition as Claims 25 and 26, respectively, and the California Supreme Court denied the claims "on the merits for failure to state a prima facie case for relief." (Lodgment No. 91.)

"[W]hile treaties may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys

an intention that it be self-executing and is ratified on these terms." Medellin v. Texas, 552 U.S. 491, 505 (2008) (internal quotation omitted); see also Cornejo v. County of San Diego, 504 F.3d 853, 856 (9th Cir. 2007) ("For any treaty to be susceptible to judicial enforcement it must both confer individual rights and be self-executing.")

Petitioner fails to demonstrate that the international agreements he relies upon are self-executing or otherwise enforceable on federal review. Available case law appears to preclude such a conclusion. See e.g. Sosa v. Alvarez-Machain, 542 U.S. 692, 734 (2004) ("[T]he [Universal] Declaration [of Human Rights] does not of its own force impose obligations as a matter of international law."); Id. at 735 ("[A]lthough the [International] Covenant [on Civil and Political Rights] does bind the United States as a matter of international law, the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts."); Garza v. Lappin, 253 F.3d 918, 923 (7th Cir. 2001) ("[T]he American Declaration of the Rights and Duties of Man . . . is merely an aspirational document that, in itself, creates no directly enforceable rights.")

Petitioner's assertion that his conviction and sentence are in violation of the federal Constitution because they were "imposed without regard to international treaties and laws" and because he was denied his rights under "customary international law," similarly lacks support, as Petitioner fails to cite to any Supreme Court authority that compels the result he seeks. The Ninth Circuit has disallowed individual attempts to invoke international law for such a purpose, reasoning that "customary international law is not a source of judicially enforceable private rights in the absence of a statute conferring jurisdiction over such claims." Serra v. Lappin, 600 F.3d 1191, 1197 (9th Cir. 2010). Petitioner fails to cite to any such statute.

Given the lack of clearly established law supporting a conclusion that California's capital sentencing system violates international law or treaties that are enforceable on habeas corpus review, the Court is unable to conclude that the California Supreme Court's rejection of these claims was either contrary to, or an unreasonable application of, clearly

established federal law.  Nor has Petitioner shown that the state court decision was based on an unreasonable determination of the facts.  Habeas relief is not warranted on Claims 25 and 26.

### 7. Claim 27

Petitioner argues that his conviction and sentence violate the Fifth, Sixth, Eighth and Fourteenth Amendments "because the extraordinary delay in the appellate process violates the state and federal constitutions," and argues that "[s]uch delay also violates international covenants prohibiting cruel, inhuman or degrading punishment."[37]  (SAP at 501.)

Petitioner raised this claim as Claim XXXVII in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning.  (Lodgment No. 79.)  This claim was later re-raised in the second state habeas petition and was denied "on the merits for failure to state a prima facie case for relief."  (Lodgment No. 91.)

Petitioner relies on Barker v. Wingo, 407 U.S. 514 (1972), to argue that delay in appointing appellate counsel and adjudicating his direct appeal "has severely prejudiced Petitioner's ability to discover and present exculpatory evidence in his habeas corpus proceedings."  (SAP at 503.)  This reliance is misplaced, however, as the Ninth Circuit clearly rejected the application of Barker to an appellate context, as follows:

> We cannot grant relief on this claim because no "clearly established Federal law, as determined by the Supreme Court of the United States" recognizes a due process right to a speedy appeal.  28 U.S.C. § 2254(d)(1). Hayes relies on Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), but that case established only the contours of the right to a speedy trial, not an appeal. . . . "[W]hen a Supreme Court decision does not 'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context," 28 U.S.C. § 2254(d)(1) requires that we deny relief. Moses v. Payne, 555 F.3d 742 (9th Cir. 2009) (quoting Wright v. Van

---

[37] To the extent Petitioner again asserts violations of international law, those arguments are addressed in the Court's adjudication of Claims 25 and 26, elsewhere in the instant Order.

<u>Patten</u>, 552 U.S. 120, 125, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008)) (second, third, and fourth alteration in original). No Supreme Court decision "squarely addresses" the right to a speedy appeal, nor does the right to a speedy trial "clearly extend" to the appellate context. The interest in a prompt initial adjudication of a defendant's rights, which underlies the right to a speedy trial, is plainly not the same as the interest in having a trial court conviction reviewed quickly on appeal.

<u>Hayes v. Ayers</u>, 632 F.3d 500, 523 (9th Cir. 2011) (alterations in original).

"The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." <u>Allen</u>, 435 F.3d at 958. The Supreme Court has instead declined to address this matter. <u>See</u> <u>e.g.</u> <u>Lackey v. Texas</u>, 514 U.S. 1045 (1995) (mem.) (Stevens, J., discussing denial of certiorari and observing that the claim has not been addressed, noting "the Court's denial of certiorari does not constitute a ruling on the merits"); <u>see</u> also <u>Valle v. Florida</u>, 564 U.S. 1067 (2011) (mem.); <u>Thompson v. McNeil</u>, 556 U.S. 1114 (2009) (mem.); <u>Smith v. Arizona</u>, 552 U.S. 985 (2007) (mem.). The Ninth Circuit has also rejected a similar claim pursuant to <u>Teague</u>. <u>See</u> <u>Smith v. Mahoney</u>, 611 F.3d 978, 998-99 (9th Cir. 2010) (rejecting a claim that a prisoner's "four sentences in combination with his twenty-five years on death row satisfy any need for retribution and deterrence and that any penalty beyond such punishment violates the Eighth Amendment," reasoning that "a state court considering [Petitioner's] Eighth Amendment claim at the time his conviction became final would not have felt compelled by existing precedent to conclude that the rule sought was required by the Constitution.")

Nonetheless, Petitioner argues that: "Over a century ago, the United States Supreme Court recognized that stating that 'when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it.'" (SAP at 504, quoting <u>In re Medley</u>, 134 U.S. 160, 172 (1890).) Petitioner contends that: "In *Medley*, the period of uncertainty was just four weeks. As recognized by Justice Stevens, *Medley's* description should apply with even greater force in a case such as this, involving a delay that has lasted over thirteen years." (SAP at 504, citing <u>Lackey</u>, 514 U.S.

1045.)  However, in view of the Supreme Court's clear decision to refrain from addressing this issue, Petitioner fails to demonstrate an entitlement to habeas relief.  <u>Van Patten</u>, 552 U.S. at 126 ("Because our cases give no clear answer to the question presented, let alone one in [Petitioner's] favor, 'it cannot be said that the state court unreasonabl(y) appli(ed) clearly established law.'"), quoting <u>Musladin</u>, 549 U.S. at 77.

Because Petitioner fails to provide clearly established federal law which supports his claim, and fails to demonstrate that the state supreme court's rejection of this claim on appeal was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, habeas relief is not warranted on Claim 27.

**8.** **<u>Claim 28</u>**

Petitioner argues that "[t]he imposition of the death penalty on offenders so mentally impaired that they are unable to understand, modulate, and/or control their behavior offends a longstanding collective judgment of the American people as expressed in their laws and sentencing practices, is grossly disproportionate to such offenders' moral culpability, serves no permissible penological goal, and carries an enhanced risk of error," and asserts that because he suffers from such mental impairments, his conviction and sentence are in violation of the federal Constitution.  (SAP at 510-11.)  Petitioner cites <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002) and <u>Thompson v. Oklahoma</u>, 487 U.S. 815 (1998), in support of this claim.  (<u>Id.</u> at 510.)

Petitioner raised this claim as Claim XXXVIII in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning.  (Lodgment No. 79.)  Petitioner later raised this claim in the second state habeas petition and the state court imposed a procedural bar (<u>see</u> Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner fails to offer any clearly established law in support of his argument and instead argues that "[v]irtually every major mental health association in the United States has published a policy statement advocating either an outright ban on executing all

08cv1400

mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented," citing numerous organizations that have expressed a position to this effect. (SAP at 512.) Petitioner fails to persuasively explain how positions expressed by mental health or medical organizations establish a cognizable claim for federal habeas corpus relief on this matter.

Petitioner's reliance on Atkins and Thompson is also unpersuasive, as both decisions are distinguishable from his situation. In Thompson, the Supreme Court held that "the Eighth and Fourteenth Amendments prohibit the execution of a person who was under 16 years of age at the time of his or her offense." Id., 487 U.S. at 838. Petitioner was born on June 11, 1970, and was twenty years old at the time of the May 15, 1991 murder of Teresa Holloway. (CT 129.) As such, Thompson is clearly inapplicable to this case. Petitioner's reliance on Atkins is similarly untenable. In Atkins, the Supreme Court held that "[t]he Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability." Hall v. Florida, 572 U.S. ___, 134 S.Ct. 1986, 1990 (2014), citing Atkins, 536 U.S. at 321. Yet, Petitioner fails to assert, much less offer any evidence to substantiate a contention that he is intellectually disabled.

To state a claim of intellectual disability in California[38] post-conviction proceedings, a prisoner must submit a habeas petition which includes an expert declaration stating that the petitioner is intellectually disabled. See In re Hawthorne, 35 Cal. 4th 40, 47 (2005), quoting Cal. Penal Code § 1376. Specifically, "the expert's declaration must set forth a

---

[38] California's definition of intellectual disability appears consistent with the definition outlined by the Supreme Court in Atkins. Compare Cal. Penal Code § 1376(a) ("As used in this section, 'intellectual disability' means the condition of significantly subaverage intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age.") with Hall, 134 S.Ct. at 1994 ("As the Court noted in Atkins, the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and the onset of these deficits during the developmental period."), citing Atkins, 536 U.S. at 308 n. 3.

factual basis for finding the petitioner has significantly subaverage intellectual functioning and deficiencies in adaptive behavior in the categories enumerated above. The evidence must also establish that the intellectual and behavioral deficits manifested prior to the age of 18." Id. at 48. In the instant case, Petitioner does not appear to contend that he is intellectually disabled, nor was his state petition accompanied by the required declaration. As such, Petitioner has not shown that Atkins is applicable to his situation.

Petitioner instead argues that "[a]t the time of the crime, Petitioner suffered from myriad, serious mental impairments, which individually and in combination affected his abilities to make reasoned judgments, to rationally and effectively modulate his impulses and behaviors, to understand the consequences of his actions, to exercise volitional control of his behavior, and to meaningfully comprehend and follow the capital trial proceedings and assist in his own defense." (SAP at 511.) He asserts that "volitionally incapacitated individuals" such as himself should be exempt from execution, as they are less culpable for their behavior, their prosecution results in a higher risk of unjustified executions due to their reduced ability to assist counsel, testify, or express remorse, and asserts a death sentence for such offenders would serve neither retribution nor deterrence. (Id. at 511-13.) He contends that "[t]he weight of national consensus dictates that Petitioner's death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment, and must be vacated." (Id. at 514.) But, the fact remains that Petitioner fails to offer any clearly established federal authority compelling that result.

In the absence of any clearly established law barring the execution of such "volitionally incapacitated" individuals that do not meet the definition of intellectually disabled, the Court is unable to conclude that the California Supreme Court's rejection of these claims was either contrary to, or an unreasonable application of, clearly established federal law. Nor has Petitioner shown that the state court decision was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 28.

///

///

## G.    Cumulative Error Claims

### 1.    Claim 19

Petitioner contends that his "guilt trial was tainted by numerous errors" outlined in other claims in the SAP and that "[i]n addition to considering these errors individually, the Court must consider their cumulative impact." (SAP at 468.)

As discussed above in section III.A.2., Ninth Circuit authority refutes Respondent's assertion of a <u>Teague</u> bar.  <u>See</u> <u>Parle</u>, 505 F.3d at 928, n.8.  Thus, the Court must conclude that Petitioner's claims of cumulative error are not barred from habeas review.

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant argues that even if no single error requires reversal of the guilt verdicts, the cumulative effect of the errors at the guilt phase must be deemed sufficiently prejudicial to warrant reversal of the guilt verdicts. Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the guilt verdicts.

<u>Jurado</u>, 38 Cal. 4th at 127.  Petitioner later raised this claim in the second state habeas petition and the state court imposed procedural bars (<u>see</u> Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." <u>Parle</u>, 505 F.3d at 927, citing <u>Chambers</u>, 410 U.S. at 290 n.3; <u>see</u> also <u>Killian v. Poole</u>, 282 F.3d 1204, 1211 (9th Cir. 2002) ("[E]ven if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'"), quoting <u>United States v. de Cruz</u>, 82 F.3d 856, 868 (9th Cir. 1996).

Petitioner refers to the admission of Johnsen's testimony and Shigemura's statements and generally asserts that "the numerous errors in his case had a negative synergistic effect that resulted in 'a criminal defense far less persuasive than it might

278

(otherwise) have been.'"  (Pet. Br. at 113, quoting Parle, 505 F.3d at 927 (unattributed internal quotation marks omitted).)  Petitioner specifically states that "[t]hese errors include the state's use of Johnsen's conditional examination and the state's use of Shigemura's out-of-court statements to Baldwin."  (Reply at 52.)

As discussed in Claim 11, the Court found no constitutional error in the admission of Brian Johnsen's conditional examination testimony at trial.  As recounted in Claim 12, while there was an acknowledged error in admitting Shigemura's earlier, pre-crime statement to Baldwin, the error was harmless because the earlier statement was similar in substance to the later, post-crime statement which was made in Petitioner's presence and properly admitted into evidence as an adoptive admission.  As recognized by the state court and discussed in Claim 15, there was also an acknowledged error in the given conspiracy instruction with respect to the dual specific intent, but that error too, was harmless.  After examining these asserted errors cumulatively, Petitioner fails to show that his constitutional rights were violated and the Court is not persuaded that this claim of cumulative error is meritorious.

Thus, based on a review of the record, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established law, or that it was based on an unreasonable determination of the facts.  Habeas relief is unavailable on Claim 19 and an evidentiary hearing is not warranted.  Sully, 725 F.3d at 1075; Totten, 137 F.3d at 1176.

**2.    Claim 47**

Petitioner contends that his "death judgment must be evaluated in light of cumulative effect of the multiple errors occurring at both the guilt and penalty phases of his trial," specifying that this claim concerns the "cumulative effect of the errors raised on direct appeal," and asserts that "even if the Court were to hold that not one of the errors discussed above was, by itself, prejudicial, the cumulative effect of these errors sufficiently undermines confidence in the integrity of the penalty proceedings in this case."  (SAP at 677; see also Pet. Br. at 132-34.)

279

As discussed above in section III.A.2., in light of Ninth Circuit authority refuting Respondent's assertion of a <u>Teague</u> bar, Petitioner's claims of cumulative error are not barred from habeas review.  <u>See</u> <u>Parle</u>, 505 F.3d at 928, n.8.

On direct appeal, the California Supreme Court rejected this claim on the merits, reasoning as follows:

> Defendant claims that the judgment must be reversed because of the cumulative effect of errors at both the guilt and penalty phases of his trial. Defendant has demonstrated few errors at either phase of the trial, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.

<u>Jurado</u>, 38 Cal. 4th at 144-45.  Petitioner later raised this claim in the second state habeas petition and the state court imposed procedural bars (<u>see</u> Lodgment No. 91), but for the reasons discussed above in section III.B., the Court will address the claim on the merits.

In addition to the errors identified and alleged in Claim 19 above (the acknowledged error concerning the jury instruction on conspiracy and the admission of Shigemura's pre-crime statement to Baldwin, as well as the alleged error in admitting Johnsen's conditional examination testimony into evidence at trial), Petitioner incorporates all allegations of error raised on direct appeal concerning both the guilt and penalty phases of his trial.  (<u>See</u> SAP at 677) ("Petitioner's death judgment must be evaluated in light of the cumulative effect of the multiple errors occurring at both the guilt and penalty phases of his trial, as set forth in Claims 7 through 13, inclusive, 14 through 19, inclusive, 29, 30, 31, 32, and 35 through 42, inclusive, herein, which were raised on direct appeal in state court.")  In particular, Petitioner asserts that "[t]he significant errors identified herein, including those set forth in the guilt-phase cumulative error claim (Claim 19), when combined with the penalty-phase errors-including exclusion of Mr. Jurado's mitigating evidence of the videotaped interrogation (Claim 29) and the inclusion of the Holloway pregnancy evidence (Claim 30)- cumulatively produced a trial setting that was fundamentally unfair, requiring reversal of the death judgment for a denial of due process."  (Pet. Br. at 133.)

Respondent maintains that "the California Supreme Court found that Jurado has demonstrated few errors, and that each error or possible error was harmless when considered separately," and argues that any cumulative effect does not warrant relief. (Resp. at 59.) Respondent also notes that "as to the penalty phase, the California Supreme Court only found err [sic] in the fact that the trial court mis-instructed the jury on the elements of a violation under Penal Code section 4574 regarding Jurado's possession of a deadly weapon in jail, but found that error to be harmless beyond a reasonable doubt," and that "because there was only one error, and there were not multiple errors to consider together, there can be no cumulative error." (Id. at 60.)

In assessing this claim, the Court shall consider the errors discussed above with respect to Claim 19 together with any penalty phase errors raised on direct appeal. First, the errors alleged by Petitioner in Claims 29 and 30 are not amenable to inclusion in the cumulative error analysis because, as discussed above, Petitioner demonstrates no error in either the exclusion of Petitioner's videotaped interrogation or the admission of evidence concerning the victim's pregnancy. (See Claims 29, 30, supra.) As discussed in greater detail above, in light of the questions about the videotape's reliability and whether it actually amounted to evidence of remorse, the trial court did not err in excluding the interrogation from evidence. Meanwhile, the fact that the victim was pregnant was not unforeseeable, was clearly relevant to the penalty determination and was admissible as victim impact evidence and as a circumstance of the crime; the trial court did not err in admitting the evidence. Thus, neither allegation warrants inclusion in the cumulative error determination.

However, Respondent correctly notes that the California Supreme Court acknowledged and addressed one penalty phase error on direct appeal, concerning the trial court's error in instructing the jury on Petitioner's possession of a weapon, rather than a deadly weapon, in jail, which was addressed and rejected by this Court in the instant order. (See Claim 36, supra.) A jail deputy testified that Petitioner was one of several inmates in possession of a twelve to eighteen inch steel pipe or post during an altercation. But

regardless of the instructional error, the evidence showed that Petitioner was seen in possession of the weapon and that the weapon in question had a reasonable potential to cause death or great bodily injury sufficient to qualify as a deadly weapon. As such, Petitioner was not prejudiced by that error. Considering this penalty phase error along with the two guilt phase errors, the Court remains unpersuaded that Petitioner has shown a constitutional violation. The cumulative impact of these errors does not undermine confidence in the verdict or sentence.

Petitioner fails to show the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established law, or that it was based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief or an evidentiary hearing on Claim 47. Sully, 725 F.3d at 1075; Totten, 137 F.3d at 1176.

### 3. **Claim 48**

Petitioner alleges that "[t]he conviction and sentence of death were imposed in violation of Petitioner's rights as guaranteed by Fifth, Sixth, Eighth and Fourteenth Amendments because the trial was so tainted by the ineffective assistance of his appointed counsel, errors by the trial court, and acts of misconduct by the prosecution that Petitioner's right to fundamental fairness at his trial was violated," and that "[e]ach of the errors asserted in this petition, individually and cumulatively, including, inter alia, of ineffective assistance of counsel, trial court error and misconduct, and prosecutorial misconduct, had a substantial and injurious effect and/or influence in determining the jury's sentencing verdict and rendered the guilt and penalty phase of Petitioner's trial unfair and the sentencing and trial process unreliable." (SAP at 678-79.) Petitioner argues that "[t]he instant claim incorporates all direct appeal and state habeas claims, and thus includes the claims of ineffective assistance of counsel addressed in the *Opening Brief on the Merits (Group 1 Claims)*." (Pet. Br. at 136) (italics in original.)

As discussed above in section III.A.2., in light of Ninth Circuit authority refuting Respondent's assertion of a Teague bar, Petitioner's claims of cumulative error are not barred from habeas review. See Parle, 505 F.3d at 928, n.8.

Petitioner raised this claim as Claim XL in the first state habeas petition, and the California Supreme Court denied that claim on the merits without a statement of reasoning. (Lodgment No. 79.) Petitioner again raised this argument as Claim 48 in the second state habeas petition, and the California Supreme Court denied the claim "on the merits for failure to state a prima facie case for relief." (Lodgment No. 91.) While the state court also barred this claim as untimely (see id.), for the reasons discussed above in section III.B., the Court will address the claim on the merits.

Petitioner reiterates many of the allegations of ineffective assistance of counsel addressed in the Group One Order, including that counsel was prejudicially deficient in failing to investigate and present evidence of Petitioner's drug use and intoxication at the time of the crimes and history of substance abuse despite promising such evidence to the jury, in conceding that Petitioner was guilty of second degree murder, and in failing to present evidence of Petitioner's history of drug use or fear of Mynatt at the penalty phase. (Pet. Br. at 137-38, referencing Claims 1.B-1.H and 1.M-1.O and citing Claims 1.J, 1.T, 1.Y and 1.Z.) Petitioner also reiterates a number of claims of misconduct addressed elsewhere in the instant Order, including the destruction of Petitioner's blood and urine samples, inconsistencies in the prosecution's presentation of evidence at Petitioner's trial in comparison with the trials of Humiston and Johnsen, allegations that the prosecution presented the false testimony of Schmidt and Johnsen, and alleged prosecutorial vindictiveness in seeking the death penalty in Petitioner's case. (Id. at 138, citing Claims 2-4 and 8.) Petitioner also reiterates the errors alleged in Claims 19 and 47, including the trial court's admission of Johnsen's conditional examination testimony, the admission of Shigemura's statements to Baldwin, the exclusion of the videotaped interrogation, and the admission of Holloway's pregnancy into evidence at the penalty phase. (Id. at 138-39, citing Claims 11-12 and 29-30.)

As discussed throughout the Group One Order, Petitioner's claims of ineffective assistance were largely speculative assertions premised on academic sources and were presented without evidentiary support, such as declarations, affidavits or other substantive

evidence. (See e.g. ECF No. 171 at 67, 101, 105-106, 137, 140-42.) For instance, Petitioner alleged that counsel was ineffective for failing to present mitigating evidence of his mental difficulties due to exposure to pesticides and other chemicals, but supported that contention with reference to academic sources and anecdotal accounts concerning the potential for exposure to such substances- i.e., that he and his sibling played in fields that were later found to be contaminated and that his family members worked as field laborers. (See id. at 90-93, citing e.g. Exs. 7, 8, 10, 12, 15 to SAP.) However, Petitioner failed to present any testing results or declarations from experts supporting a contention that he was actually impacted by such exposure and instead merely relied on speculation to support the claim. (See id. at 100-01.) Petitioner's claims that counsel was ineffective for failing to present evidence of his extreme immaturity and long term drug use suffered from similar evidentiary shortcomings. (See id. at 139-40, 142-43.) In any event, in the Group One Order, the Court also considered Petitioner's claims of ineffective assistance in the cumulative, and found no prejudice. (See id. at 140-44.)

With respect to the remaining claims Petitioner cites, the Court has considered these contentions elsewhere in the instant Order and rejected his allegations of error in each instance. (See Claims 2-4, 8.) For instance, the record shows that Petitioner's blood and urine sample were not destroyed until well after his trial, that they had been already subjected to testing for multiple substances (although not LSD) by both the defense and prosecution and played a part in the trial; Petitioner offered only speculation that additional testing would have showed the presence of LSD, much less that the evidence would have assisted in his defense. (See Claim 2, supra.) The Court also rejected Petitioner's claim that the prosecution offered inconsistent theories in trying Humiston and Johnsen, as Johnsen was not tried by the same prosecuting agency as Petitioner, and the prosecution's presentation was similar in both Humiston and Petitioner's trial. (See Claim 3, supra.) The Court similarly rejected Petitioner's claim that the prosecution presented false testimony, as it was the defense that succeeded in excluding Johnsen's letters that reflected inconsistent statements, and suspicion that Johnsen knew more than he said during his

conditional examination testimony was not the same as presenting false testimony; meanwhile, the Court found Schmidt testified consistently with his statements with respect to Petitioner's involvement in the crime and the addition of details did not sustain a claim that his testimony was false. (See Claim 4, supra.) The Court also found no evidence that the prosecution's decision to seek the death penalty was vindictive, as the record supported a conclusion that the decision was based on the evidence offered in Johnsen's conditional examination and the presentation of evidence at Humiston's trial rather than as any sort of punishment for Petitioner's decision to plead guilty after the special circumstance was dismissed. (See Claim 8, supra.)

Even considering Petitioner's allegations of error cumulatively, including the errors alleged in Claims 19 and 47 as well as those alleged in this claim, Petitioner fails to offer a persuasive showing that these errors resulted in a "fundamentally unfair" guilt or penalty phase trial proceeding in violation of his constitutional right to due process. See Parle, 505 F.3d at 928 ("[T]he combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.")

Thus, based on a review of the record, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established law, or that it was based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief or an evidentiary hearing on Claim 48. Sully, 725 F.3d at 1075; Totten, 137 F.3d at 1176.

## VI. CERTIFICATE OF APPEALABILITY

In a habeas case, a certificate of appealability ["COA"] may be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" Shoemaker v. Taylor, 730 F.3d 778, 790 (9th Cir. 2013), quoting Slack v. McDaniel, 529 U.S. 473, 484

(2000); see also Miller-El, 537 U.S. at 338 ("Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.") Meanwhile, the Ninth Circuit has repeatedly characterized the standard required for granting a COA as "relatively low" or "modest." See e.g. Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002), Silva v. Woodford, 279 F.3d 825, 832 (9th Cir. 2002), quoting Lambright v. Stewart, 220 F.3d 1022, 1024 (9th Cir. 2000).

In the November 19, 2015 Order on the Group One Claims (Claims 1, 5-6, 14, 33-34, 43 and 45 in the Second Amended Petition), the Court indicated that: "In the final order, the Court will **GRANT** a COA on Claim 1 (limited to subparts 1.J, 1.M-1.O, 1.U, 1.Y) and Claim 33." (ECF No. 171 at 153.) At oral arguments on the instant matter, Petitioner indicated that he is requesting a COA on a number of claims and decisions by the Court, including several claims and motions adjudicated in the Group One Order as well as claims and motions presently at issue. Subsequent to oral arguments and pursuant to the Court's request, Petitioner filed a Supplemental Brief outlining the claims and matters on which he requests a COA and Respondent filed a Response to that brief. (See ECF Nos. 205, 206.) In that brief, Petitioner requests a COA on the claims the Court previously identified in the Group One Order as suitable for a COA, and additionally lists Claims 7, 10, and 29 from the instant set of claims and Claims 1.R, 1.S., and 1.Y[39] from the Group One claims. (ECF No. 205 at 4-5.) Petitioner also requests a COA on several Orders issued by the Court, including the Court's Order denying Petitioner's motion for investigation, discovery and an evidentiary hearing on procedural default and Order denying Petitioner's motion for evidentiary development and an evidentiary hearing on Claims 1.A-1.K, 1.M-1.W, 1.Y-1.AA, 5 and 6. (ECF No. 205 at 6.) Petitioner also states that "[i]f the Court denies

---

[39] In the Group One Order, the Court indicated it will grant a COA on Claim 1.Y (see ECF No. 171 at 153), and Petitioner appears to acknowledge this ruling in the supplemental brief. (See ECF No. 205 at 4.) As such, this request appears moot.

Petitioner's request for evidentiary development of Claims 7, 10 and 29, as requested during oral argument on May 22, 2018, Petitioner requests a COA on the Order denying such relief." (Id.)  Respondent maintains that "[t]his Court should reject Jurado's request for a COA because he has failed to demonstrate that reasonable jurists would find this Court's denials of the claims and orders debatable and wrong." (ECF No. 206 at 4.)

With respect to Petitioner's request for a COA on the Court's orders denying the above motions, Petitioner cites Ayestas v. Davis, 584 U.S. ___, 138 S.Ct. 1080 (2018), in which the United States Supreme Court recently considered whether it had jurisdiction in a case where "petitioner appealed an order of the District Court that denied both his request for funding under 18 U.S.C. § 3599 and his underlying habeas claims," and "[t]he Court of Appeals denied a COA as to the merits of his request for habeas relief but held that a COA was not required insofar as petitioner challenged the District Court's denial of funding under § 3599." Id. at 1088 n.1.  The Supreme Court "assume[d] for the sake of argument that the Court of Appeals could not entertain petitioner's § 3599 claim without the issuance of a COA." Id.

Upon review, the Court finds Claims 7, 11-12, 29-30 and 37 appropriate for a COA, but remains unpersuaded that Claims 1.R or 1.S are suitable for a COA.  In light of Ayestas, and in an abundance of caution, the Court finds it appropriate to issue a COA on the Order denying Petitioner's motion for investigation, discovery and an evidentiary hearing on procedural default as it relates to Claims 1.J, 1.M-1.O, 1.U, 1.Y and 33.  The Court also finds it appropriate to issue a COA on the Order denying Petitioner's motion for evidentiary development, discovery and/or an evidentiary hearing on Claims 1.J, 1.M-1.O, 1.U, 1.Y, 7, 11-12, and 29-30.

## VII. CONCLUSION

For the reasons discussed above, the Court **DENIES** Petitioner's motion for evidentiary development, discovery, and/or evidentiary hearing on Claims 2-4, 7-8, 10-12, 19, 29-30, 38 and 47-48 and **DENIES** habeas relief on Claims 2-4, 7-13, 15-32, 35-42, 44, and 46-48 in the Second Amended Petition.  In the final order, the Court will **GRANT** a

COA on Claims 7, 11-12, 29-30, and 37. The Court will also **GRANT** a COA on the Order denying Petitioner's motion for investigation, discovery and an evidentiary hearing on procedural default as it relates to Claims 1.J, 1.M-1.O, 1.U, 1.Y and 33, and on the Order denying Petitioner's motion for evidentiary development, discovery and/or an evidentiary hearing on Claims 1.J, 1.M-1.O, 1.U, 1.Y, 7, 11-12, and 29-30.

 **IT IS SO ORDERED.**

Dated:  September 17, 2018

Hon. Janis L. Sammartino
United States District Judge

08cv1400